ACCEPTED
13-15-00024-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/6/2015 3:52:31 PM
CECILE FOY GSANGER
CLERK

IN THE THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/6/2015 3:52:31 PM
CECILE FOY GSANGER
Clerk

NO. 13-15-00024-CV

MARIA ZAMARRIPA, AS GUARDIAN OF THE ESTATES OF R.F.R. AND R.J.R., MINORS, AND OLGA FLORES, AS ADMINISTRATOR OF THE ESTATE OF YOLANDA IRIS FLORES,
Appellants

v.

BAY AREA HEALTH CARE GROUP, LTD. D/B/A CORPUS CHRISTI MEDICAL CENTER, HIDALGO COUNTY EMS, AND HIDALGO COUNTY EMERGENCY MEDICAL SERVICE FOUNDATION,
Appellees.

**APPELLANTS MARIA ZAMARRIPA AS GUARDIAN OF R.F.R. AND R.J.R., MINORS, AND OLGA FLORES, AS ADMINISTRATOR OF THE ESTATE OF YOLANDA FLORES REPLY TO BRIEF OF APPELLEE BAY AREA HEALTH CARE GROUP, LTD. D/B/A CORPUS CHRISTI MEDICAL CENTER**

WEST, WEBB, ALLBRITTON & GENTRY, P.C.
Gaines West
State Bar No. 21197500
Email: gaines.west@westwebblaw.com
Jennifer D. Jasper
State Bar No.: 24027026
E-mail: jennifer.jasper@westwebblaw.com
Donald Delgado
State Bar No. 24065139
E-mail: donald.delgado@westwebblaw.com
1515 Emerald Plaza
College Station, Texas 77845
979.694.7000 ~ Telephone
979.694.8000 ~ Facsimile

COUNSEL FOR APPELLANTS

i

# TABLE OF CONTENTS

Table of Contents .............................................................................. ii

Table of Authorities ........................................................................ iii

**Reply Point One:** Nurse Spears is qualified to opine on the applicable
standard of care and CCMC's breach....................................................1

   A. CCMC has conceded that 74.402(b)(1) does not apply ................................1

   B. CCMC waived any challenge under section 74.402(b)(2) and (b)(3)...........1

**Reply Point Two:** Appellants' expert reports sufficiently connect CCMC's
breach of the standard of care and Yolanda's injuries and death...............6

   A. Nurse Spears adequately stated the standard of care and breach ..................6

   B. Nurse Spears's reports do not impose a duty on CCMC that violates
Texas Law ..........................................................................................9

**Reply Point Three:** Dr. Harlass's report constitutes a good faith effort to
comply with section 74.351 ...............................................................9

   A. Dr. Harlass's report offers a causation opinion against CCMC that
is not conclusory ................................................................................10

   B. Dr. Harlass is qualified to render causation opinion against CCMC ..........12

**Reply Point Four:** Alternatively, Appellants are entitled to amend reports .........14


Prayer..............................................................................................15

Certificate of Compliance.....................................................................16

Certificate of Service...........................................................................17

# TABLE OF AUTHORITIES

<u>CASES</u>

*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,*................................................14
    46 S.W.3d 873 (Tex. 2001)

*Bowie Mem'l Hosp. v. Wright,*..........................................................................8
    79 S.W.3d 48 (Tex. 2002)

*Sus Spohn Health Sys. Corp. v. Castro,*..............................................................15
    No. 13-13-00302-CV, 2013 WL 6576041
    (Tex. App.—Corpus Christi Dec. 12, 2013, no pet.)

*Cornejo v. Hilgers,* ......................................................................... 10, 12
    446 S.W.3d 113 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)

*Costello v. Christus Santa Rosa Health Care Corp.,* ..............................................11
    141 S.W.3d 245 (Tex. App.—San Antonio 2004, no pet.)

*Fortner v. Hosp. of the Sw., LLP,* ....................................................................12
    399 S.W.3d 373 (Tex. App.—Dallas 2013, no pet.)

*Gen. Chem. Corp. v. De La Lastra,* ....................................................................2
    852 S.W.2d 916 (Tex. 1993)

*Group v. Vicento,* .......................................................................................3
    164 S.W.3d 724 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)

*Hillery v. Kyle,* ........................................................................................13
    371 S.W.3d 482 (Tex. App.—Houston [1st Dist.] 2012, no pet.)

*Jelinek v. Casas,*.......................................................................................11
    328 S.W.3d 526 (Tex. 2010)

*Kelly v. Rendon,* ........................................................................................6
    255 S.W.3d 665 (Tex. App.—Houston [14th Dist.] 2008, no pet.)

*Mack Trucks, Inc. v. Tamez,* ...................................................................... 1, 2, 6
    206 S.W.3d 572 (Tex. 2006)

*Rittger v. Danos,* .......................................................................... 13, 14
      332 S.W.3d 550 (Tex. App.—Houston [1st Dist.] 2009, no pet.)

*Salais v. Tex. Dept. Aging & Disability Serv's.,* .....................................8, 9
      323 S.W.3d 527 (Tex. App.—Waco 2010, pet. denied)

*Scoresby v. Santillan,* ........................................................... 10, 11, 15
      346 S.W.3d 546 (Tex. 2011)

*Tawa v. Gentry,* .................................................................................13
      No. 01–12–00407–CV, 2013 WL 1694869
      (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.)

*Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., LLP* ................................8
      185 S.W.3d 65 (Tex. App.—San Antonio 2005, pet. denied)

## STATUTES

TEX. ADMIN. CODE ANN. § 217.11(c) ...............................................9, 10

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351...................................9, 10

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6)...............................10

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402……................................6

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1)............................1, 2

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2)...........1, 2, 3, 4, 5, 6

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(3)............... 2, 3, 4, 5, 6

TO THE HONORABLE THIRTEENTH COURT OF APPEALS:

Appellants, Maria Zamarripa, as Guardian of the Estates of R.F.R. and R.J.R., minors, and Olga Flores, as Administrator of the Estate of Yolanda Iris Flores ("Appellants"), file this Reply to Appellee Bay Area Health Care Group, Ltd. d/b/a Corpus Christi Medical Center's ("CCMC") Brief, and would respond as follows:

**REPLY POINT ONE: Nurse Spears is qualified to opine on the applicable standard of care and CCMC's breach.**

**A.    CCMC has conceded that section 74.402(b)(1) does not apply**

Section 74.402(b)(1) does <u>not</u> apply to Nurse Spears, because that section only applies "if the defendant is an individual." TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2) (West).    **On appeal, CCMC does <u>not</u> dispute that 74.402(b)(1) only applies to individual defendants, and not a hospital**.  CCMC Appellee's Brief at 18-19.  Accordingly, 74.402(b)(1) does <u>not</u> apply in this case, as CCMC is not an individual.  To the extent the trial court granted CCMC's motion to dismiss based on Nurse Spears's failure to meet the requirements of section 74.402(b)(1), the court abused its discretion.

**B.    CCMC waived any challenge under section 74.402(b)(2) and (b)(3)**

Texas generally requires parties to properly raise an issue to the trial court in order to have that issue reviewed on appeal. *Mack Trucks, Inc. v. Tamez*, 206

1

S.W.3d 572, 577 (Tex. 2006). Additionally, when a party does not raise an issue of controlling law to the trial court, the ability to raise the issue on appeal is waived. *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993).

For the first time on appeal, CCMC contends Nurse Spears is unqualified under subsections 74.402(b)(2) and (b)(3). CCMC Appellee's Brief at 7. In the trial court, CCMC's motion to dismiss claimed only that Nurse Spears was unqualified under 74.402(b)(1). CR 237, n.22. Because CCMC did not properly raise the issues of 74.402(b)(2) and (b)(3) in their motion to dismiss, appellate review is limited to the issue of Nurse Spears's qualifications solely under 74.402(b)(1), which were addressed above. *See id.*[1]

For the sake of argument, even if this Court were to find that CCMC adequately objected in the trial court to Nurse Spears's qualifications under sections 74.402(b)(2) and 74.402(b)(3), CCMC's arguments that Nurse Spears is not qualified under these subsections fails.

Specifically, CCMC contends Nurse Spears is unqualified under section 74.402(b)(2) to testify as an expert on the standard of care for a hospital's labor and delivery department presented with the circumstances at issue in this case.

---

[1] In their Appellee's Brief, CCMC claims that in fact they did raise subsection (b)(2) and (b)(3) in the trial court, but all they cite in support of this statement is their generic reference to 74.402 in the motion to dismiss. CCMC Appellee's Brief at 19, n.9. Considering the motion to dismiss's footnote 22 (which states in full subsection (b)(1)) and complete failure to make any substantive arguments regarding (b)(2) and (b)(3), a mere reference to 74.402 itself does not preserve these arguments for appellate review. *See Tamez*, 206 S.W.3d at 577.

2

CCMC Appellee's Brief at 16-18. CCMC also asserts Nurse Spears does not satisfy Section 74.402(b)(3) because she was not actively practicing health care in a relevant field at the time of the incident or at the time she authored her reports. CCMC Appellee Brief at 16-18. Both of these arguments are misplaced.

Section 74.402(b)(2) requires that Nurse Spears "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." TEX. CIV. PRAC. & REM. Code Ann. § 74.402(b)(2); *see Group v. Vicento,* 164 S.W.3d 724, 734 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding doctor's own statement in his report that he has knowledge of accepted standard of care for the injury or illness at issue satisfies section 74.402(b)(2)). The illness, injury or condition involved in this claim is placenta accreta and pre-term labor. Nurse Spears's curriculum vitae and reports plainly establish that she has knowledge of accepted standards of care for the care and treatment of placenta accreta and pre term labor. CR 215.

Furthermore, this case specifically involves the issue of transferring a patient with placenta accrete and in pre-term labor, to another facility for treatment. Along these lines, Nurse Spears's qualifications include:

> In my nursing experience in the L&D Department and in the ER, I have provided instructions to EMS/transfer personnel's inquiries about whether or not to divert from the receiving hospital in a patient transfer, based on the reported signs and symptoms given by the EMS

3

personnel/EMTS. I am familiar with the standard of care for L&D and ER staff for processing such inquiries and the response to be given. I have also practiced as an EMT, and am familiar with the information that EMT provide to receiving hospitals in transfer when calls are made about seeking instructions about possible diversion to a different medical facility.

CR 218.

In light of this experience, CCMC cannot complain about any failure to satisfy 74.402(b)(2).  This is evident in the specific (and *only*) argument CCMC makes on this point:  "the vagueness in Nurse Spears' reports regarding the standard of care applicable to CCMC … indicates she does not have knowledge of the standard of care applicable to CCMC for the circumstances presented in this case."  CCMC Appellee's Brief at 16.

Thus, rather than claiming she lacks any substantive qualifications to render opinions in this case, CCMC raises a complaint about *her reports*, apparently trying to boot-strap its complaint about her reports into a complaint about her qualifications.  But such a complaint about her reports cannot render Nurse Spears unqualified.

The "knowledge" requirement of subsection (b)(2) is not determined based on the expert's own recitation of the standard of care in her report and CCMC fails to cite to any authority for this errant proposition.  Rather, an expert report satisfies the requirements of section 74.402(b)(2) if the expert is able to show that she has "knowledge of accepted standards of care for health care providers for the

4

diagnosis, care, or treatment of the illness, injury, or condition involved in the claim[.]" TEX. CIV. PRAC. & REM. Code Ann. § 74.402(b)(2). As demonstrated above, Nurse Spears's experience has given her knowledge of the accepted standards of care for treating placenta accrete and pre-term labor. Thus, any argument that she is unqualified under 74.402(b)(2) is undermined by the evidence in this case.

With regard to section 74.402(b)(3), that section requires an expert to be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." TEX. CIV. PRAC. & REM. CODE Ann. § 74.402(b)(3). As demonstrated above, Nurse Spears is qualified on the basis of her training and experience. CR 212-219.

On appeal, CCMC insists Nurse Spears is not qualified under subsection 74.402(b)(3) because she was not "fielding phone calls at a hospital's labor and delivery or emergency department from EMS or transfer personnel during" the time of the incident or at the time she offered her opinions. CCMC Appellee's Brief at 14-15. However, Nurse Spears does qualify under subsection (b)(3).

Nurse Spears' curriculum vitae demonstrates that at the time of the incident (May 15, 2012) she was actively practicing health care by rendering services relevant to Appellants' claim against CCMC in that she was supervising registered nurses who fielded triage phone calls. CR 265. The evidence specifically shows

5

that she was employed as a clinical supervisor between May 2011–June 2014 and supervised registered nurses to ensure the proper handling of triage calls[2] and patient safety. CR 265.[3]

In summary, CCMC waived any complaint that Nurse Spears is unqualified under 74.402(b)(2) or (b)(3) because it failed to make these complaints to the trial court. *See* CR 237, n.22. This argument should not be a part of the appellate review. *See Tamez*, 206 S.W.3d at 577. Nevertheless, even should this Court find this issue preserved for appeal, it is clear that Nurse Spears is qualified and any dismissal based on her failure to meet 74.402 requirements would have been an abuse of discretion.

**REPLY POINT TWO: Appellants' expert reports sufficiently connect CCMC's breach of the standard of care and Yolanda's injuries and death**

**A. Nurse Spears adequately stated the standard of care and breach.**

CCMC complains that Nurse Spears's opinions on the standard of care and the breach of the standard of care are conclusory. CCMC

---

[2] "Triage" means 1: the sorting of and allocation of treatment to patients and especially battle and disaster victims according to a system of priorities designed to maximize the number of survivors; 2: the sorting of patients (as in an emergency room) according to the urgency of their need for care. WEBSTER'S THIRD NEW WORLD DICTIONARY 1683 (2002).

[3] CCMC also argues that Nurse Spears had to have been practicing in labor and delivery or an emergency department to be qualified under section 74.402(b)(3). This is incorrect. *See Kelly v. Rendon*, 255 S.W.3d 665, 673–74 (Tex. App.—Houston [14th Dist.] 2008, no pet.). She only needed to have been actively practicing health care services that are relevant to Appellants' claim against CCMC. *See id*.

Appellee's Brief 22–24. As to the applicable standard of care, Nurse Spears stated:

> Standard of care requires the L&D receiving team personnel of the accepting hospital to give appropriate instructions to EMS transfer personnel who call for medical advice concerning a deteriorating pregnant patient.

CR 213. In her addendum, Nurse Spears elaborated that the standard of care required that CCMC personnel "give appropriate instructions to the inquiring Medic 192 about [Yolanda's] deteriorating condition." *Id.* 219. Nurse Spears explained CCMC's breach:

> The staff at [CCMC] L&D department breached the standard of care by advising Hidalgo County EMS to proceed to their facility while bypassing hospitals with the capabilities of care for [Yolanda] and the fetus when EMS called [CCMC] about diverting due to her deteriorating status.

*Id.* 213. In her addendum, she further detailed the breach, stating that "[t]he L&D staff [at CCMC] breached the standard of care by instructing Medic 192 not to divert to an alternate medical facility for evaluation." *Id.* 219.

CCMC considers Nurse Spears's opinion on the standard of care to be insufficient because she does not define what constituted "appropriate instruction," and does not set out what care was expected from CCMC. CCMC Appellee's Brief at 24. Similarly, CCMC argues that Nurse Spears's opinion on breach is vague and conclusory. CCMC Appellee's Brief at 24.

7

An expert report is adequate if it demonstrates a good-faith effort to comply with the chapter 74's requirements for expert reports, and no "magical words" are required for the report to be adequate. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002). Nurse Spears's reports adequately explain what was the standard of care required: give appropriate instructions to Hidalgo County EMS regarding Yolanda Flores' deteriorating status. Similarly, Nurse Spears's reports explain that CCMC breached the standard of care by instructing Hidalgo County EMS not to divert to another hospital. Nurse Spears's reports, thus, articulate that when faced with a patient en route from Brownsville to Corpus Christi, in pre-term labor with an abrupt placenta resulting in acute blood loss and oxygen deprivation, CCMC nurses should have given appropriate instructions to Hidalgo County EMS to divert to another hospital instead of advising them to continue on their trek to CCMC. *See* CR 213, 219.

Nurse Spears's reports inform CCMC "of the conduct the Appellants call into question and [provides] a basis for the trial court to conclude that the claims have merit." *Salais v. Tex. Dept. Aging & Disability Serv's.,* 323 S.W.3d 527, 533 (Tex. App.—Waco 2010, pet. denied) (citation omitted); *Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P.*, 185 S.W.3d 65, 68 (Tex. App.—San Antonio 2005, pet. denied) (citation omitted). Moreover, Nurse Spears's reports

8

demonstrate a good-faith effort to comply with chapter 74, and are therefore an adequate expert report.  *See Salais*, 323 S.W.3d at 538.

### B. Nurse Spears's reports do not impose a duty on CCMC that violates Texas law

CCMC asserts that Nurse Spears's reports are inadequate because nurses do not have the authority to render a medical diagnosis.  CCMC Appellee's Brief 26-30.  However, Nurse Spears's report on the standard of care did not impose on CCMC and its nurses to make a medical diagnosis.  *See generally* CR 212-19.  Nurse Spears states the standard of care in this case is for the nurses to correctly administer patient treatment by giving appropriate instructions to EMS transfer personnel who called concerning a deteriorating patient.  In fact, the correct administration of treatment is incorporated in the Texas Nurse Practices Act as one of the standards of nursing practice. 22 TEX. ADMIN. CODE § 217.11(C).  Nurse Spears was not stating the nurses should have diagnosed the patient, but rather the nurses should have taken adequate measures to correctly administer treatment.  *See id.* Thus, her report does not "violate Texas law."

**REPLY POINT THREE**: Dr. Harlass's report constitutes a good faith effort to comply with section 74.351

In compliance with chapter 74, Appellants served on CCMC the expert reports, and addenda, of Grace Spears, R.N. and Dr. Harlass.  Nurse Spears

addressed the applicable standard of care and CCMC's breaches, and Dr. Harlass discussed how those breaches led to Yolanda's injuries and death.

CCMC argues that Dr. Harlass's report does not constitute a good faith effort to comply with Section 74.351 because he does not offer a causation opinion, and even if he does, his opinion is conclusory. CCMC Appellee's Brief 37-38. This is incorrect.

### A. Dr. Harlass's report offers a causation opinion against CCMC that is not conclusory

CCMC states that Dr. Harlass's report "does not offer a true causation opinion against CCMC." CCMC Appellee's Brief at 31. CCMC specifically complains that Dr. Harlass never states in his report that CCMC's alleged failure to instruct Hidalgo County EMS to divert caused Yolanda's injuries or death. CCMC Appellee's Brief at 31.

The purpose of the causation expert's report is to provide a "fair summary of the expert's opinions regarding the causal relationship between the failure of the healthcare provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed." *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6)). "No particular words or formality are required, but bare conclusions will not suffice." *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011) (citations omitted). A causal relationship is established by proof that

10

a negligent act or omission constituted a substantial factor in bringing about harm and, absent the act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). The expert simply "must explain the basis of his statements and link his conclusions to the facts." *Id.* (citation omitted).

Dr. Harlass determined that CCMC's actions were a cause of Yolanda's injuries and death. CR 91. Specifically, Dr. Harlass stated, in relevant part:

> Due to the [CCMC's] personnel's breaches of care in informing the EMS personnel not to divert when [Yolanda] was in an emergency situation (oxygen deprivation and bleeding)…her bleeding continued unabated and she suffered cardiovascular arrest, DIC and death.

*Id.* at 91 (parentheses in original).

While CCMC is correct that Dr. Harlass does not use the word "cause" in his report, no particular words or formality are required. *See Scoresby,* 346 S.W.3d at 556. CCMC asserts that Dr. Harlass "simply state[s] that CCMC's alleged failure to divert resulted in her pre-existing condition (abrupted placenta and bleeding) to 'continue unabated.'" CCMC Appellee's Brief 32-33. According to CCMC, Dr. Harlass "never states that an instruction to divert would have allowed for timely intervention to save Ms. Flores' life." CCMC Appellee's Brief at 33.

An expert report must explain, to a reasonable degree, how and why the alleged breach caused the complained of injury based on the facts presented. *See Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010). Here, contrary to CCMC's

11

assertions, Dr. Harlass's report does just that. Dr. Harlass opines that CCMC's failure to inform "the EMS personnel not to divert when [Yolanda] was in an emergency situation" resulted in "her bleeding [to] continue unabated." CR 91. And the unabated bleeding resulted in Yolanda's "cardiovascular arrest, DIC and death." *Id.*

Thus, Dr. Harlass provided a causation opinion that was not conclusory and gave a "fair summary" of his opinions "regarding the causal relationship between the failure of [CCMC] to provide care in accord with the pertinent standard of care" and Yolanda's injuries and death. *See Cornejo*, 446 S.W.3d at 123; *Fortner v. Hosp. of the Sw.*, *LLP*, 399 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.).

**B. Dr. Harlass is qualified to render a causation opinion against CCMC**

CCMC asserts that chapter 74 requires Appellants to provide an expert report from someone qualified to offer opinions on the blood loss Yolanda suffered en route to CCMC. CCMC Appellee's Brief at 33. Dr. Harlass is so qualified.

In his expert report, Dr. Harlass notes that he has been practicing obstetrics and gynecology since 1980, and he is board certified in both Obstetrics and Gynecology and Maternal-Fetal Medicine ("OBGYN/MFM") by the American Board of Obstetrics and Gynecology. CR 92. He has experience treating hundreds of patients in preterm labor with placenta previa or accreta, like Yolanda. *Id.*

12

Dr. Harlass has been a professor of, and regional chair of, OB/GYN at Texas Tech University School of Medicine, and a director of that school's residency program. *Id.* at 99. He has published a paper on placenta accreta, among dozens of other papers. *Id.* at 102. In addition, Dr. Harlass's report established his familiarity with the issues involved in the claims in this case. *Id.* at 92.

Dr. Harlass's report shows that he has experience in treating and diagnosing patients with the conditions suffered by Yolanda, namely preterm labor and placenta accreta. CR 91. Dr. Harlass's report also states how Yolanda's condition, placenta accreta, can detach and cause a patient to bleed profusely. *Id.* As a result of Dr. Harlass's experience in treating hundreds of patients with Yolanda's exact condition, his is qualified to render an opinion as to the cause of Yolanda's death. *See Tawa v. Gentry,* No. 01–12–00407–CV, 2013 WL 1694869, at *7 (Tex. App.–Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.) (holding expert sufficiently qualified to opine on standard of care by "showing the injury involved was of the type [the expert] treated in his practice" (internal quotation marks omitted)); *Hillery v. Kyle,* 371 S.W.3d 482, 487 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding the expert was qualified, where expert stated familiarity "with the standards of care relevant to the condition involved in th[e] claim" and he had "diagnosed and treated, 'patients with the conditions similar to those experienced by'" plaintiff); *Rittger v. Danos,* 332 S.W.3d 550 at 558–59 (Tex. App.—Houston

13

[1ˢᵗ Dist.] 2009, no pet.) (noting focus not on defendant doctor's area of expertise, but on condition involved in claim).

**REPLY POINT FOUR: Alternatively, Appellants are entitled to amend reports.**

In the event this Court finds Appellants' expert reports deficient, CCMC argues Appellants are <u>not</u> entitled to remand for the trial court to consider a 30-day extension. CCMC contends that "Appellants have not produced a report concluding the claims against CCMC have merit." CCMC Appellee's Brief 33.

To be effective, an expert report must inform the defendant about the conduct complained of and must provide a basis from which the trial court can determine whether the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex. 2001). The report "must address all the" statutory elements, "and omissions may not be supplied by inference." *Scoresby,* 346 S.W.3d at 556.

The Supreme Court set out a "minimal standard" under which a claimant who timely files a deficient report may be entitled to a 30-day extension to cure the deficiencies rather than have his suit dismissed for failing to file a timely expert report. *Id.* at 557. Under this standard, a 30-day extension may be granted "if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Id.*

Here, the reports are not fatally deficient, nor can they be considered "no report" under the statute. The expert reports of Nurse Spears and Dr. Harlass in this case were timely served, were offered by individuals with expertise in caring for patients in emergency labor and delivery situations, and implicated CCMC's conduct. *See Scoresby*, 346 S.W.3d at 557. Because Appellants met these minimum qualifications, they should be entitled to one 30-day extension to cure the deficiencies in the reports. *See Christus Spohn Health Sys. Corp. v. Castro,* No. 13-13-00302-CV, 2013 WL 6576041, at *7 (Tex. App.—Corpus Christi Dec. 12, 2013, no pet.) (mem. op.).

## PRAYER

Appellants pray that the trial court's orders granting the motions to dismiss be reversed and the case be remanded for further proceedings.

Respectfully submitted,

**WEST, WEBB, ALLBRITTON & GENTRY, P.C.**
1515 Emerald Plaza
College Station, Texas 77845-1515
Telephone: (979) 694-7000
Facsimile: (979) 694-8000

By: /s Gaines West
Gaines West
State Bar No. 21197500
gaines.west@westwebblaw.com
Jennifer D. Jasper
State Bar No.: 24027026
E-mail: jennifer.jasper@westwebblaw.com

15

Donald Delgado
State Bar No. 24065139
donald.delgado@westwebblaw.com

Counsel for Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this **Reply BRIEF OF APPELLANTS** complies with the typeface and word-count requirement set forth in the Rules of Appellate Procedure. This motion has been prepared, using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This motion contains 3418 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions of the notice exempted by TEX. R. APP. P. 9.4(i)(1).

/s Gaines West
Gaines West

## CERTIFICATE OF SERVICE

On July 6, 2015, the undersigned certifies that he served a copy of this Reply Brief of Appellants on the following in the manner listed below, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

| | |
|---|---|
| Nichole G. Andrews | *Via Facsimile ~ 713.452.4499* |
| Christopher Knudsen | *ECF Email* |
| Margaret Garib | **nandrews@serpejones.com** |
| Serpe, Jones, Andrews, Collender & Bell | **cknudsen@serpejones.com** |
| 2929 Allen Parkway, Suite 1600 | **mgarib@serpejones.com** |
| Houston, Texas 77019 | |
| | |
| Jeffrey D. Roerig | *Via Facsimile ~ 956.542.0016* |
| David M. Roerig | *And ECF Email* |
| Roerig, Oliverira & Fisher, LLP | *ruthm@rofllp.com* |
| 855 West Price Road, Suite 9 | *jroerig@rofllp.com* |
| Brownsville, Texas 78520-8786 | |

/s Gaines West
Gaines West

# CASES AND STATUTES

79 S.W.3d 48
Supreme Court of Texas.

BOWIE MEMORIAL HOSPITAL a/
k/a Bowie Hospital District d/b/a
Bowie Hospital District Authority d/b/
a Bowie Memorial Hospital, Petitioner,
v.
Barbara WRIGHT and P.L. Wright, Respondents.

No. 01–0814.    |    June 13, 2002.

Patient brought medical malpractice action against hospital, physician, physician's assistant, and others, alleging that failure to timely discover that her foot was fractured led to necessity of two additional surgeries. The 78th District Court, Wichita County, Keith Nelson, J., dismissed patient's claims. Patient appealed. The Fort Worth Court of Appeals, 48 S.W. 3d 443, affirmed in part, reversed in part, and remanded. Upon grant of hospital's petition for review, the Supreme Court held that expert report submitted by patient did not constitute a good-faith effort to summarize causal relationship between hospital's alleged failure to meet applicable standards of care and patient's injury under Medical Liability and Insurance Improvement Act.

Reversed.

West Headnotes (8)

**[1]  Health**
🔑 Affidavits of merit or meritorious defense;
expert affidavits

Expert report submitted by patient did not constitute a good-faith effort to summarize causal relationship between hospital's alleged failure to meet applicable standards of care and patient's injury under Medical Liability and Insurance Improvement Act; report lacked information linking expert's conclusion, which was that patient might have had a better outcome, to hospital's alleged breach, which was that it did not correctly read and act upon x-rays, thus requiring dismissal of patient's medical malpractice action against hospital, alleging that failure to timely discover that her foot was

fractured led to necessity of two additional surgeries. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

213 Cases that cite this headnote

**[2]  Health**
🔑 Affidavits of merit or meritorious defense;
expert affidavits

For an expert's report to constitute a "good-faith effort" to comply with statutory definition of an expert report, pursuant to the Medical Liability and Insurance Improvement Act, report must provide enough information to fulfill two purposes: (1) report must inform defendant of specific conduct plaintiff has called into question, and (2) equally important, report must provide basis for trial court to conclude that claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

259 Cases that cite this headnote

**[3]  Health**
🔑 Affidavits of merit or meritorious defense;
expert affidavits

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, the trial court should look no further than the report. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

10 Cases that cite this headnote

**[4]  Health**
🔑 Affidavits of merit or meritorious defense;
expert affidavits

For an expert's report to satisfy the requirements of the Medical Liability and Insurance Improvement Act, the report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

115 Cases that cite this headnote

**[5]    Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, a report cannot merely state the expert's conclusions about standard of care, breach, and causal relationship; rather, the expert must explain the basis of his statements to link his conclusions to the facts. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

219 Cases that cite this headnote

**[6]    Appeal and Error**

👉 Rulings on Motions Relating to Pleadings

Trial court's order dismissing a claim for failure to comply with Medical Liability and Insurance Improvement Act's requirements for an expert report is reviewed under an abuse-of- discretion standard. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

73 Cases that cite this headnote

**[7]    Appeal and Error**

👉 Abuse of discretion

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles.

171 Cases that cite this headnote

**[8]    Appeal and Error**

👉 Power to Review

When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment.

89 Cases that cite this headnote

**Attorneys and Law Firms**

**\*50** Gregory J. Lensing, Charles T. Frazier, Jr. Cowles & Thompson, Dallas, Susan Irene Nelson, Dallas, for Petitioner.

Britta Jean Gordon, Michael Kevin Queenan, Queenan Law Firm, DeSoto, for Respondents.

**Opinion**

PER CURIAM.

This case involves the Medical Liability and Insurance Improvement Act's ("the Act") expert-report requirements. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01. The trial court dismissed the plaintiffs' medical malpractice claims after it determined that their expert report did not satisfy the Act's requirements. The court of appeals concluded that the trial court abused its discretion when it dismissed the plaintiffs' claims, because the expert report represented a good-faith effort to comply with the Act. 48 S.W.3d 443, 448. We disagree. Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie Memorial Hospital.

Barbara Wright was admitted to Bowie after she sustained injuries in a car accident. While at Bowie, Michael Layne, a physician's assistant that Bowie employed, x-rayed Barbara's right knee and foot and diagnosed her with a fractured patella. However, Layne allegedly misplaced or misread the foot x-ray and, therefore, did not discover that Barbara had also fractured her right foot in the accident. Shortly after Barbara was admitted to Bowie, Dr. Hodde, Layne's supervisor, recommended that Bowie refer her to an orthopedic surgeon. Barbara was immediately referred to an orthopedic surgeon and transferred to another hospital. Her accompanying medical report, which Layne prepared, only indicated that Barbara had a fractured knee.

Nearly a month after the accident, Barbara's orthopedic surgeon discovered Barbara's fractured foot. By that time, the surgeon had already operated on Barbara's knee. The Wrights claim that the surgeon could have operated on Barbara's foot at the same time if he had known about the injury. Instead, Barbara had two additional surgeries over the next ten months.

Barbara and her husband sued Bowie, Layne, and Dr. Hodde for medical malpractice. The Wrights also sued the orthopedic surgeon, another treating doctor, and three

medical clinics not associated with Bowie. The Wrights' allegations pertinent here are that Bowie personnel did not: diagnose Barbara's foot fracture; protect her foot; review diagnostic tests ordered and administered at the hospital; or properly supervise Layne.

The Wrights filed an expert medical report about Bowie's, Dr. Hodde's, and another doctor's alleged negligence. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(d). The expert report states, in part:

> I have reviewed the material you sent me on the above case. I believe that the hospital fell below the appropriate standard of care in not having a defined mechanism in place whereby x-rays taken in the E.R. are read by a physician specialized in interpreting the films in a timely manner (i.e., less than 24 hrs). X-rays taken in the E.R. need to have re-reads performed within 24 hrs and if **\*51** there is a discrepancy [sic] in the x-ray readings a system should be in place to inform the patient of this. There did not appear to be any procedure that the hospital has for tracking x-rays. The hospital also doesn't seem to have a system of orienting health care professionals working in the E.R. nor any form of Q/A for P.A.'s staffing the E.R. There didn't appear to be any organized system or protocols for P.A. supervision in the E.R.
>
> ...
>
> I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome.

Bowie moved to dismiss the Wrights' claims, alleging that the expert report "fails to establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to Ms. Wright's injuries." Therefore, Bowie argued, the report does not satisfy the Act's requirements.

The trial court held two hearings to determine if the report represents a good-faith effort to meet the Act's requirements. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ). At the first hearing, the trial court asked about the causal relationship between Bowie's conduct and Barbara's injury. The Wrights explained that if Bowie had diagnosed Barbara's fractured foot earlier, then she "probably would have had a better outcome." They also conceded that the orthopedic specialist Barbara saw immediately after leaving Bowie "had an independent duty to verify" Bowie's medical report.

Nevertheless, the Wrights claimed that, if Bowie's report had indicated that Barbara had a broken foot, it would have been "much easier" for the orthopedic doctor to make a proper diagnosis. After the second hearing, the trial court granted Bowie's motion to dismiss. The record indicates that the trial court did not believe the Wrights' claims against Bowie, "the people who transferred [Barbara]," had merit, given that the orthopedic surgeon "could have done his own work."

The court of appeals reversed and remanded, holding that the trial court abused its discretion when it dismissed the Wrights' claims against Bowie. 48 S.W.3d at 448. The court concluded that the report inadequately summarizes the causal relationship between Bowie's alleged negligence and Barbara's injury. However, it determined that the report represents a good-faith effort to comply with the Act, because it raises the possibility that, but for Bowie's breach, Barbara "would have had a better outcome." 48 S.W.3d at 447.

**[1]** Medical-malpractice plaintiffs must provide each defendant physician and health-care provider an expert report with the expert's curriculum vitae, or they must voluntarily nonsuit the action. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(d); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this **\*52** section." TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ) (emphasis added).

**[2]** We recently discussed the Act's expert-report requirement for medical-malpractice cases. *See Palacios,* 46 S.W.3d at 877–80. In *Palacios,* we explained that, when considering a motion to dismiss under section 13.01(*l* ), "[t]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report." *Palacios,* 46 S.W.3d at 878. To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform

the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

 **[3]** **[4]** **[5]** The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Palacios,* 46 S.W.3d at 878. The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about these elements. *Palacios,* 46 S.W.3d at 879. "[R]ather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999).

 **[6]** **[7]** **[8]** We review a trial court's order dismissing a claim for failure to comply with section 13.01(d)'s expert-report requirements under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *See Flores v. Fourth Ct. of Appeals,* 777 S.W.2d 38, 41 (Tex.1989).

Here, the parties do not dispute that the expert report fairly summarizes the alleged standard of care, because it states that a hospital should have established procedures to read and interpret x-rays in a timely manner and to inform patients about the results. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Also, the parties do not dispute that the report fairly summarizes how Bowie allegedly breached the standard of care, because the report states that Bowie did not have a procedure to track x-rays. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Consequently, the parties only contest whether the report constitutes a "good-faith effort" to fairly summarize the causal relationship between Bowie's alleged breach and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879.

Contrary to the court of appeals' conclusion, it is not enough that the expert report "provided insight" about the plaintiff's claims. *See* 48 S.W.3d at 447. Rather, to constitute a good-faith effort to establish the causal-relationship element, the

expert report must fulfill *Palacios* 's two-part test. *See Palacios,* 46 S.W.3d at 879. Thus, under the *Palacios* test, we must determine whether the trial court acted unreasonably and without reference to guiding principles when it dismissed the Wrights' claims against Bowie. *See Downer,* 701 S.W.2d at 241–42.

The Wrights primarily rely on one statement in the report to establish causation: "if the x-rays would have been correctly read and the appropriate medical personnel **\*53** acted upon those findings then Wright would have had the possibility of a better outcome." In their brief to this Court, the Wrights contend that this statement "explains why Petitioners' damages were caused by Bowie Hospital's breach: if the proper medical personnel at Bowie had reviewed the x-rays, [Barbara] would have had a chance of diagnosis and treatment of her foot fracture."

Bowie responds that the report's statement about causation is conclusory, because it does not explain how Bowie's failing to correctly read or act upon the x-rays caused injury to Barbara. Moreover, Bowie asserts, the statement does not even identify the specific injuries Bowie's conduct allegedly caused.

In reviewing the report's adequacy, the court of appeals focused on "whether the report provides a basis to conclude that the claims have merit." 48 S.W.3d at 447 (citing *Palacios,* 46 S.W.3d at 878–79). Although the causation statement recognizes only the "possibility"—rather than the "reasonable medical probability"—that Barbara might have had a better outcome, the court of appeals concluded that the report's adequacy should not turn "solely upon the claimant's failure to use magical words like 'reasonable probability.' " 48 S.W.3d at 447. Accordingly, the court of appeals held that the report met the good-faith effort test, because it gave the trial court a basis to conclude that the Wrights' claims against Bowie have merit. 48 S.W.3d at 448.

We agree with the court of appeals' conclusion that a report's adequacy does not depend on whether the expert uses any particular "magical words." Nothing in the Act's plain language, or in *Palacios,* suggests that, for these purposes, an expert report must express the causal relationship in terms of "reasonable medical probability." However, we disagree with the court of appeals' conclusion that the trial court abused its discretion in dismissing the Wrights' claims against Bowie. We have held that the only information relevant to whether a report represents a good-faith effort to comply with the statutory requirements is the report itself. *Palacios,* 46

S.W.3d at 878. And, we have held that we review a trial court's decision about whether a report constitutes a good-faith effort to comply with the Act under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878.

After reviewing this report, we conclude that the trial court could have reasonably determined that the report does not represent a good-faith effort to summarize the causal relationship between Bowie's failure to meet the applicable standards of care and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879. That is because the report simply opines that Barbara might have had "the possibility of a better outcome" without explaining how Bowie's conduct caused injury to Barbara. We cannot infer from this statement, as the Wrights ask us to, that Bowie's alleged breach precluded Barbara from obtaining a quicker diagnosis and treatment for her foot. Rather, the report must include the required information within its four corners. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r) (6); *Palacios,* 46 S.W.3d at 878. Because the report lacks information linking the expert's conclusion (that Barbara might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory. *See Palacios,* 46 S.W.3d at 880; *Earle,* 998 S.W.2d at 890. A conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test. *Palacios,* 46 S.W.3d at 879.

**\*54** For these reasons, we hold that the trial court did not abuse its discretion when it concluded that the report did not represent a good-faith effort to meet the Act's requirements. Therefore, the trial court had no discretion but to dismiss the plaintiffs' claims against Bowie. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ); *Palacios,* 46 S.W.3d at 880. In reviewing the trial court's order, the court of appeals improperly substituted its own judgment for the trial court's judgment. *See Flores,* 777 S.W.2d at 41. Accordingly, we grant Bowie's petition for review. Without hearing oral argument, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie. *See* TEX.R.APP. P. 59.1.

**All Citations**

79 S.W.3d 48, 45 Tex. Sup. Ct. J. 833

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6576041
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

MEMORANDUM OPINION
Court of Appeals of Texas,
Corpus Christi–Edinburg.

CHRISTUS SPOHN HEALTH
SYSTEM CORPORATION, Appellant,
v.
Jose CASTRO, Appellee.

No. 13–13–00302–CV.  |  Dec. 12, 2013.

On appeal from the 117th District Court of Nueces County,
Texas. Sandra Watts, Judge.

**Attorneys and Law Firms**

Lori W. Hanson, Beirne, Maynard & Parsons, LLP, San
Antonio, TX, for Appellant.

Collen A. Clark, The Clark Firm, Dallas, TX, for Appellee.

Before Chief Justice VALDEZ and Justices RODRIGUEZ
and GARZA.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice RODRIGUEZ.

**\*1**  Appellant Christus Spohn Health System Corporation
(Spohn) challenges the trial court's denial of its motion to
dismiss appellee Jose Castro's health care liability claim.
*See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)
(West 2011). By two issues, Spohn argues that: (1) Castro's
experts were not qualified to opine on the specific area of
health care involved in this suit; and (2) Castro's reports were
contradictory and conclusory and were therefore "no reports"
under the law. *See id.* § 74.351(*l* ), (r)(6). We reverse and
remand.

**I. Background**

Castro alleged the following facts in his petition:

On or about October 24, 2011, 50–year–old Jose Castro
was in a serious car accident. He was a belted passenger
in a Ford F–150 crew cab. The truck rolled and the roof
crushed, causing severe injuries to Mr. Castro. Mr. Castro
was transported via helicopter to the emergency room at
Christus Spohn Hospital in critical condition. Mr. Castro
sustained severe injuries including, but not limited to,
fracture and dislocation of his cervical spine at C5–C6,
multiple rib fractures, a collapsed lung, and damage to his
right phrenic nerve. He remained in intensive care through
most of December 2011. Mr. Castro had no sensation or
movement below the nipple line, putting him at high risk
of skin breakdown.

In November 2011, Mr. Castro developed a pressure ulcer
on his tail bone. The cause was the use of the tangible
property, the hospital bed. By the time Mr. Castro was
discharged from Christus Spohn Hospital in February
2012, the pressure ulcer had progressed to a grade III
decubitus ulcer....

At all relevant times hereto, Mr. Castro was a patient of
Christus Spohn Hospital.

Complaining of the pressure ulcer, in particular, Castro
brought a health care liability claim against Spohn. [1] In that
claim, Castro alleged that Spohn was negligent in: its use of
the hospital bed; its failure to develop and employ policies to
oversee patients like Castro; its failure to train and supervise
personnel to carry out such policies; its failure to render
appropriate medical and nursing intervention to Castro; its
failure to provide adequate nutritional support to Castro; its
failure to plan for and protect Castro from bedsores and
ulcers; its failure to follow Castro's doctors' orders; and
its failure to maintain the highest practical level of care
for Castro. Castro alleged that this negligence proximately
caused the injuries he suffered at Spohn.

[1]  In this same lawsuit, Castro has also alleged causes
of action against the driver of the truck for negligence
and against Ford Motor Company for products liability.
Neither of those causes of action are before us in this
accelerated, interlocutory appeal.

In support of his health care liability claim, Castro timely
filed two expert reports—one authored by Donna du Bois,
MPH, RN and another authored by Perry Starer, M.D. Both
du Bois and Dr. Starer are geriatric specialists with extensive
experience in caring for pressure ulcers in hospital and
nursing home settings. Spohn objected to both expert reports,

arguing that neither du Bois nor Dr. Starer was qualified to offer opinions as to the conditions under which Castro suffered his injuries, i.e., the development of a pressure ulcer in trauma care conditions while Castro was simultaneously suffering from quadriplegia, diabetes, bacterial infections, and respiratory distress. Spohn also filed motions to dismiss Castro's health care liability claim, arguing that Castro's reports are "no reports" and the claim should therefore be dismissed because neither du Bois nor Dr. Starer is qualified and the reports are contradictory and conclusory. After a hearing, the trial court denied Spohn's objections and motions to dismiss. This accelerated, interlocutory appeal followed. *See id.* § 51.014(a)(9) (West Supp.2011).

## II. Standard of Review

**\*2** We review a trial court's decision with respect to expert reports and the qualifications of experts for an abuse of discretion. *Larson v. Downing,* 197 S.W.3d 303, 304–05 (Tex.2006); *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 876 (Tex.2001). The trial court abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003).

## III. Applicable Law

Under Chapter 74, an expert report is defined as:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). When a document purporting to be an expert report is timely served and is properly challenged, as is the case here, the trial court "shall grant [the] motion challenging the adequacy of [the] report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to

comply with the definition of an expert report in Subsection (r)(6)."*Id.* § 74.351(*l* ); *see Loaisiga v. Cerda,* 379 S.W.3d 248, 260 (Tex.2012). To qualify as an objective good faith effort, the report must (1) inform the defendant of the specific conduct the plaintiff complains of, and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Palacios,* 46 S.W.3d at 879). The report and/or its accompanying curriculum vitae (CV) must also establish that the report's author is qualified to opine as an expert on the subject matter of the report.*Leland v. Brandal,* 217 S.W.3d 60, 62 (Tex.App.-San Antonio 2006), *aff'd on other grounds,*257 S.W.3d 204 (Tex.2008). Those qualifications must appear within the four corners of the expert report and cannot be inferred. *Id.; see also Palacios,* 46 S.W.3d at 878; *Baylor Coll. of Med. v. Pokluda,* 283 S.W.3d 110, 117 (Tex.App.-Houston [14th Dist.] 2009, no pet.). To meet the "good faith effort" requirement, "[n]o particular words or formality are required, but bare conclusions will not suffice. The report must address all the elements, and omissions may not be supplied by inference."*Scoresby,* 346 S.W.3d at 556 (citations omitted)."The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits."*Id.* at 554 (citation omitted).

A report meets the minimum qualifications for an expert report under the statute "if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated."*Id.* at 557.If a report meets these qualifications but is deficient, the claimant is entitled to one thirty-day extension to cure the deficiencies. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c)."All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case."*Scoresby,* 346 S.W.3d at 557;*see also Leland,* 257 S.W.3d at 207–08 (holding that when elements of a timely filed expert report are found deficient, either by the trial court or on appeal, one thirty-day extension to cure the report may be granted).

## IV. Qualifications of Experts

**\*3** By its first issue, Spohn contends that because the care provided to Castro by the hospital was under intensive care unit (ICU) or trauma conditions, his development of pressure ulcers must be addressed in the context of those conditions. And because neither du Bois nor Dr. Starer practice in the

field of ICU/trauma care, Spohn argues that they are not qualified to author expert reports in this case.

To be qualified to provide opinion testimony on whether a health care provider departed from the accepted standard of care, an expert must satisfy section 74.402. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(B).Section 74.402 lists three specific qualifications an expert witness must possess to provide opinion testimony on how a health care provider departed from accepted standards of health care —the expert must:

> (1) [be] practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) [have] knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) [be] qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b) (West 2011).

A plaintiff offering expert medical testimony must establish that the report's author has expertise regarding "the specific issue before the court which would qualify the expert to give an opinion on that particular subject."*Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996). Our analysis of the proffered expert's qualifications focuses on "the very matter" on which the expert is to give an opinion. *Id.*

Here, du Bois's CV shows that she has over thirty years' experience as a nurse, primarily in the field of nursing home care and other long-term facility care. In her report, du Bois stated that she is familiar with the standard of care for the "prevention of pressure ulcers... expected by ordinary prudent nurses in Texas."In his report, Dr. Starer states that he is "a practicing physician licensed by the State of New York."Dr. Starer states that he has been "board certified in Internal Medicine and Geriatrics" since 1985. Dr. Starer states that he teaches in the field of geriatrics at Mount Sinai School of Medicine and has given lectures on the prevention and

treatment of pressure ulcers to both physicians and nurses. Finally, Dr. Starer states:

> In the regular course of my medical practice, I have occasion to diagnose and treat patients with conditions substantially similar to or identical with those of Jose Castro, including mobility limitations. I have also served as a primary care physician for hospital and nursing home patients since 1985. Over the course of my career, I have been the primary care physician for more than 5,000 patients in hospitals and nursing homes. Many of those patients have struggled with disabilities similar to those Jose Castro experienced. Accordingly, I have cared for and treated numerous patients who, like Jose Castro, were at risk for development of pressure ulcers.

**\*4** In their reports and CVs, neither du Bois nor Dr. Starer states that they have experience preventing and treating bedsores in the context of ICU or trauma care or explains how their fields of practice involve the same type of ICU/trauma care Spohn provided to Castro.

Spohn does not dispute that du Bois is an expert in the field of nursing home care and Dr. Starer is an expert in the field of geriatrics and nursing home care, or that these fields regularly involve the prevention and treatment of pressure ulcers. Rather, Spohn argues that neither expert is practicing or has otherwise relevant experience in ICU/trauma care, which is the relevant field of practice in this case. We agree. In his petition, Castro alleges that he remained in Spohn's trauma unit and ICU from October 24, 2011 through most of December 2011 as a result of the severe injuries he sustained in the car accident, including a collapsed lung, multiple broken ribs, and a fractured and dislocated spine. In their descriptions of Castro's conditions, both du Bois and Dr. Starer acknowledge these serious injuries and that Castro was being cared for under intensive care or trauma conditions. Castro then alleges that his pressure ulcer developed in November 2011, which is while he was in the ICU. In short, under the facts alleged in his own petition, it is clear that the care provided to Castro by Spohn was trauma and ICU care. Castro's pressure ulcer developed in this context, and his experts must be qualified to opine on his injury in the

context of these conditions. Examining only what is within the four-corners of the experts' reports and CVs, *see Palacios, 46 S.W.3d at 878; Pokluda,* 283 S.W.3d at 117, we find nothing in either du Bois or Dr. Starer's reports that meets this requirement.

Castro argues that Spohn's characterization of the relevant field of practice in this case sets the bar too high, that Spohn is essentially requiring Castro to find a specialist in the treatment of "a 50–year–old quadriplegic with diabetes, PEG tube feeding, with a tracheostomy [sic] and neurologic deficits, with prior cardiac arrest and suffering from bacterial infections."This characterization overstates what is required in this case. Although it is true that an expert need not be a practitioner in the same specialty as the defendant to qualify as an expert, *see Broders,* 924 S.W.2d at 153, he or she is only competent if he or she has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant. *See Ehrlich v. Miles,* 144 S.W.3d 620, 625 (Tex.App.-Fort Worth 2004, pet. denied). In other words, the proper inquiry in assessing an expert's qualifications to submit a report is not his or her area of expertise but his or her familiarity with the specific issues involved in the claim before the court. *See Blan v. Ali,* 7 S.W.3d 741, 746 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *see also Broders,* 924 S.W.2d at 153. Here, as discussed above, Castro's petition includes facts showing that the circumstances under which he developed his pressure ulcer involved trauma and ICU treatment of his severe injuries following the accident. His expert must be qualified to render an opinion on the applicable standard of care in those circumstances—i.e., the prevention and/or treatment of pressure ulcers in the context of ICU/trauma care. [2] We are not persuaded by Castro's argument to the contrary.

[2] We note that neither du Bois nor Dr. Starer's reports foreclose the possibility that they are qualified in this case and may need only to connect the experience they have gained in their thirty-plus year careers to the conditions in this case. *See infra* sections V, VI (remanding for entry of an order granting Castro a thirty-day extension to amend his reports). During his thirty-day extension, *see id.,* Castro is also entitled to serve the reports of additional experts. *See In re Buster,* 275 S.W.3d 475, 477 (Tex.2008).

**\*5** While "[t]he qualification of a witness as an expert is [a matter] within the trial court's discretion,"*Larson,* 197 S.W.3d at 304 (citing *Broders,* 924 S.W.2d at 151), such discretion

is not without limits. *See Walker,* 111 S.W.3d at 62 (holding that a court abuses its discretion if it acts without reference to guiding rules and principles). Castro was required to submit reports authored by experts who are "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider," have "knowledge of accepted standards of care ... for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim," and are "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care."*See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b). Focusing on the specific issue before the trial court as alleged in Castro's petition, *see Broders,* 924 S.W.2d at 153, we cannot conclude that the information provided in du Bois and Dr. Starer's reports show them to be practicing in the relevant field of practice or show them to have any other relevant experience giving them knowledge of the standard of care for the specific conditions in this case. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b); *Blan,* 7 S.W.3d at 746. As such, the trial court did not follow guiding rules and principles in denying Spohn's objections to the expert's qualifications and motion to dismiss on this basis. Spohn's first issue is sustained.

### IV. Sufficiency of Report

By its second issue, Spohn argues that Castro's reports were contradictory and conclusory and are therefore "no report" under the statute. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6); *Scoresby,* 346 S.W.3d at 551–52.

First, Spohn argues that because du Bois and Dr. Starer identified different conduct as breaches of the standard of care, their reports, taken together, are inherently inconsistent. *See Fung v. Fischer,* 365 S.W.3d 507, 530 (Tex.App.-Austin 2012), *overruled on other grounds, Certified EMS, Inc. v. Potts,* 392 S.W.3d 625 (Tex.2013) ("Reliable expert opinion should ... be free from internal inconsistencies."). Spohn contends that du Bois identified only two breaches in her report: that the nurses caring for Castro failed to make accurate records and failed to create an appropriate treatment plan for the prevention of pressure ulcers. Spohn contends that Dr. Starer likewise identified only two breaches of care in his report: the nurses' failure to correctly use Castro's bed and failure to turn Castro more frequently. In our review of du Bois's report, we found that she also identified as breaches of the standard of care that the nurses caring for Castro failed to reposition Castro as needed, failed to assess his skin

after each turn, and failed to properly assess and provide for Castro's nutritional needs. And again, in our review of Dr. Starer's report, we found that he also identified as breaches of the standard of care that the Spohn staff caring for Castro "failed to properly develop a care plan for ulcer prevention" and "failed to maintain an accurate and complete clinical record." In light of the full range of conduct identified by du Bois and Dr. Starer, we disagree with Spohn that the breaches identified in the separate reports are contradictory; for that matter, having examined the reports in their entirety, we note that du Bois and Dr. Starer identified largely the same breaches.

**\*6** But assuming for the sake of argument that the breaches in the reports are limited to those identified by Spohn, we believe that Dr. Starer's report identified additional instances of conduct that breached the standard of care. Read together in the manner in which they are characterized by Spohn, the reports are not contradictory, but provide a more complete picture of the instances of conduct giving rise to Castro's claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i) ("Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider."). Thus, we are not persuaded by Spohn's argument in this regard, and the trial court did not abuse its discretion in denying Spohn's motion to dismiss on this basis. Spohn's second issue is overruled in so far as it depends on this argument.

Spohn next argues that du Bois's report, in particular, did no more than "state that nurses failed to keep accurate records or to implement appropriate plans of care." Spohn argues that du Bois was required to "state what documentation was inaccurate, what documentation was lacking, on what dates it was wrong or missing and who was responsible for that charting." But du Bois's report includes the exact elements that Spohn claims are required. Du Bois refers to specific medical record dates and page numbers throughout her report and specifically identifies what she characterizes as the deficiencies in those records. Where du Bois points out that certain details are missing from the records, she does not specify page numbers, but as she is pointing to the absence of something, we cannot fault her for failing to specify where that missing detail is *not* located. In short, we are not persuaded by Spohn's generalized assertions in this regard. Again, Spohn's second issue is overruled in so far as it depends on this argument.

Finally, Spohn argues that the reports do not adequately establish causation because they do not "explain how taking any particular action would have prevented the development of a pressure ulcer given the complex medical issues involved in [Castro]'s care." Spohn argues that "[w]ithout addressing [these] critical issues, it is impossible to know if [Castro]'s pressure ulcer could have been prevented." On this account, we agree with Spohn. Although du Bois and Dr. Starer's reports go into great detail about the procedures necessary to prevent pressure ulcers in standard conditions, they do not address the specific conditions present in Castro's care. As discussed in detail above, Castro's claim involves his development of a pressure ulcer while he was being treated in Spohn's ICU over the course of several months for severe injuries he suffered in an automobile accident. Neither du Bois nor Dr. Starer discusses Castro's injuries in the context of these conditions. And the omission of this context renders any conclusion on the cause of Castro's injuries incomplete. Because Castro's reports do not adequately address the causation element, they did not provide a basis for the trial court to conclude that Castro's claims have merit. *See Palacios,* 46 S.W.3d at 879. The reports therefore do not amount to a good faith effort to comply with the statute and are deficient. *See Scoresby,* 346 S.W.3d at 556 (requiring that the report adequately address all the elements to qualify as a good-faith effort). The trial court abused its discretion in denying Spohn's objections and motions to dismiss on this basis. *See Walker,* 111 S.W.3d at 62. Spohn's second issue is sustained as to its causation argument.

### V. Thirty–Day Extension

**\*7** Although Castro's expert reports are deficient in that they do not establish the authors' qualifications and do not adequately address causation, we do not believe the reports are fatally deficient, or "no report" under the statute. Both meet the minimum qualifications set out in *Scoresby*—both du Bois and Dr. Starer are individuals with expertise who opine about Castro's injuries in great detail and implicate the conduct of Spohn's staff. *See* 346 S.W.3d at 557. Because Castro met these minimum qualifications, he is entitled to one thirty-day extension to cure the deficiencies in his reports. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c); *see also Scoresby,* 346 S.W.3d at 557 (holding that all deficiencies, whether in an expert's opinion or qualifications, are subject to being cured). This disposition is consistent with the goal of the statute, which is to deter frivolous claims but

not dispose of claims regardless of their merits. *See Scoresby,* 346 S.W.3d at 554.

### VI. Conclusion

We reverse the order of the trial court denying Spohn's motion to dismiss and remand for entry of an order granting Castro

a thirty-day extension to amend his expert reports. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c).

**All Citations**

Not Reported in S.W.3d, 2013 WL 6576041

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

446 S.W.3d 113
Court of Appeals of Texas,
Houston (1st Dist.).

Angela CORNEJO and Carlos Portillo, Appellants

v.

Stephen J. HILGERS, M.D., Appellee.

No. 01–13–00752–CV.  |  Aug. 14, 2014.

**Synopsis**
**Background:** Mother sued obstetrics and gynecology resident for medical malpractice in connection with brain injury sustained by her newborn child. Defendant moved to dismiss mother's claims on grounds that one of mother's experts was not qualified to address causation, and her medical expert reports were insufficient as to element of causation. The 190th District Court, Harris County, granted motion. Mother appealed.

**Holdings:** The Court of Appeals, Terry Jennings, J., held that:

[1] mother's expert was qualified to opine on issue of causation, and

[2] mother's expert reports were sufficient as to causation.

Reversed and remanded.

West Headnotes (14)

**[1]     Appeal and Error**
          Dismissal or nonsuit before trial

Appellate review of a trial court's decision on a motion to dismiss a health care liability claim is for an abuse of discretion.

Cases that cite this headnote

**[2]     Appeal and Error**
          Abuse of discretion

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles.

Cases that cite this headnote

**[3]     Appeal and Error**
          Power to Review

When reviewing matters committed to a trial court's discretion, an appellate court may not substitute its own judgment for that of the trial court.

Cases that cite this headnote

**[4]     Appeal and Error**
          Abuse of discretion

A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance.

Cases that cite this headnote

**[5]     Health**
          Affidavits of merit or meritorious defense; expert affidavits

If a health care defendant files a motion to dismiss challenging the adequacy of a claimant's expert report, a trial court must grant the motion if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report, under Medical Liability Act, or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[6]     Health**
          Affidavits of merit or meritorious defense; expert affidavits

In setting out the expert's opinions in support of a health care liability claim, the expert's report must provide enough information to fulfill two purposes: first, it must inform the defendant of the specific conduct the plaintiff has called into

question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[7]  Evidence**

&#128273; Due care and proper conduct in general

Though not certified in neonatology, pediatric neurology, or maternal-fetal medicine, board-certified OB/GYN (obstetrics/gynecology) physician was qualified based on his experience and expertise to render expert opinion in medical malpractice action as to alleged cause of brain injury sustained by newborn child as result of failing to admit mother to hospital, continue to monitor fetal heart rate, the fetus for progressive hypoxia and ischemia, and expedite delivery. Rules of Evid., Rule 702.

Cases that cite this headnote

**[8]  Evidence**

&#128273; Determination of question of competency

Qualification of witness as expert is within trial court's discretion. Rules of Evid., Rule 702.

Cases that cite this headnote

**[9]  Evidence**

&#128273; Knowledge, experience, and skill in general

A physician need not practice in the particular field about which he is testifying to qualify as an expert witness so long as he can demonstrate that he has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify him to give an opinion on that subject. Rules of Evid., Rule 702.

Cases that cite this headnote

**[10]  Health**

&#128273; Affidavits of merit or meritorious defense; expert affidavits

Medical expert reports, provided a fair summary of the causal relationship between obstetrics and gynecology resident's failure to meet appropriate

standard of care and the injuries suffered by patient's baby upon delivery and, thus, presented an objective, good faith effort to comply with the statute governing expert reports in health care liability actions; reports explained link between brain injuries suffered by baby and resident's failure to recognize patient's risk factors and the late deceleration on the fetal heart monitor, and physician's failure to take action before delivery, by admitting patient to the hospital and continuing the fetal monitoring. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[11]  Health**

&#128273; Affidavits of merit or meritorious defense; expert affidavits

In assessing the sufficiency of an expert report in a health care liability action, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[12]  Health**

&#128273; Affidavits of merit or meritorious defense; expert affidavits

No particular words or formality are required in expert report under Medical Liability Act, but bare conclusions will not suffice. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[13]  Health**

&#128273; Affidavits of merit or meritorious defense; expert affidavits

In a health care liability action, the requirement that an expert report provide causal relationship between the failure to meet the applicable standard of care and the plaintiff's injury, harm, or damages claimed is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would

not have occurred. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[14]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

An expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial in a health care liability action, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court; rather the expert must simply provide some basis that a defendant's act or omission proximately caused injury and he must explain the basis of his statements and link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*115** L. Todd Kelly, The Carlson Law Firm, P.C., Austin, TX, for Appellants.

John C. Landa, Jr., Lucille Reiter King, Lapin & Landa, LLP, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, HIGLEY, and SHARP.

**OPINION**

TERRY JENNINGS, Justice.

In this interlocutory appeal,[1] appellants, Angela Cornejo and Carlos Portillo, challenge the trial court's dismissal of their health care liability claims[2] against appellee, Stephen Hilgers, M.D.[3] In two issues,[4] Cornejo and Portillo contend that the trial court erred in dismissing their claims against Dr. Hilgers on the grounds that one of their medical experts is not qualified to opine on the issue of causation and both of their medical expert reports[5] are insufficient as to causation.

1    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(10) (Vernon Supp. 2013).

2    *See id.* § 74.001(a)(13) (Vernon Supp. 2013).

3    Defendants Mae Kathleen Borchardt, M.D., formerly known as Mae Kathleen Hayes, M.D., John Cecil McBride, M.D., Bridgette Parish, M.D., Danielle Niemeyer, R.N., Jamie Respondek, R.N., Mayoor Bhatt, M.D., Sharon Ann Woodson, R.N., and St. Joseph Medical Center are not parties to this appeal.

4    Although Cornejo and Portillo present three issues, their first issue, in which they generally challenge the trial court's order dismissing their claims is, in fact, part of their second and third issues. Accordingly, we address Cornejo and Portillo's two substantive issues.

5    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2013).

We reverse and remand.

**Background**

In their amended petition, Cornejo and Portillo allege that on December 2, 2010, Cornejo, who was forty weeks' pregnant, presented at St. Joseph Medical Center with gestational hypertension and headaches. Dr. Hilgers, an obstetrics and gynecology resident, examined Cornejo and conducted an ultrasound and electronic fetal monitoring, which, at 8:28 p.m., showed increasing contractions and an irregularity in the fetal heart rate. Nevertheless, Hilgers discharged Cornejo at 8:40 p.m., with instructions to return in four days.

Cornejo returned to St. Joseph thirteen hours later with elevated blood pressure, headaches, "visual disturbances," and reporting decreased fetal activity. It was determined that the onset of Cornejo's labor occurred at 5:00 a.m. on December 3rd. Nurses J. Respondek and D. Niemeyer placed Cornejo on a fetal heart rate monitor, the readings of which were "reassuring, with good variability."[6] Minutes **\*116** later, however, there was a "dramatic decrease in fetal heart rate variability," and Cornejo was taken to labor and delivery. At 11:10 a.m., Drs. K. Hayes and B. Parish attended Cornejo, whose membranes were artificially ruptured, and they noted the presence of "thick meconium." Shortly thereafter, the fetal monitor showed "minimal variability" and "late decelerations."[7] At 11:20 a.m., Cornejo signed consent forms for a Cesarean section delivery. St. Joseph personnel

then repositioned Cornejo and continued to monitor the fetal heart strip, which showed "occasional late decelerations" with "no accelerations of the fetal heart." Cornejo was sent to the operating room shortly after 1:00 p.m., and her baby was delivered at 1:41 p.m. Although the baby was "blue" and did not cry, she was resuscitated.

6    A baby's heart rate is monitored as a means of assessing the baby's oxygenation, including oxygenation of the baby's brain. *See Morrell v. Finke,* 184 S.W.3d 257, 262 (Tex.App.-Fort Worth 2005, pet. denied). A fetal heart monitor strip is read at regular intervals to determine whether the baby's heart rate reflects "hypoxia," a deficiency of oxygen reaching the tissues of the body that could lead to depletion of the baby's oxygen reserves over time, resulting in brain damage. *See id.* A fetal heart monitor strip will be either "reassuring" or "nonreassuring." *See id.* Following a contraction, "reassuring" accelerations show that the baby is oxygenated and tolerating labor. *See id.* at 263. A normal variation in the fetal heart rate is also a reassuring sign of fetal well-being. *See id.* at 262–63.

7    In his medical expert report, Dr. Michael L. Hall, Cornejo and Portillo's expert, explained that "[d]ecreased long-term fetal heart rate variability" and "persistent late decelerations" in a baby's heart rate are "nonreassuring" and can be "ominous" signs of hypoxia or asphyxia.

Cornejo's baby was later diagnosed with hypoxic-ischemic encephalopathy, a severe, permanent brain injury caused by a lack of oxygen and blood flow.[8] At two months of age, she showed a history of renal injury, secondary to metabolic acidosis and hypoxic injury, and mild spasticity in all extremities. At two years of age, she presented with seizures and significant developmental impairment.

8    *See Morrell,* 184 S.W.3d at 275 & n. 12.

Cornejo and Portillo sued Dr. Hilgers for negligence, seeking damages for past and future medical expenses and mental anguish. To support their claims, they timely filed and served upon Hilgers medical expert reports[9] authored by Michael L. Hall, M.D., Jerry J. Tomasovic, M.D., and Bradley A. Yoder, M.D. Hilgers objected to Drs. Hall's and Tomasovic's reports on the ground that they failed to sufficiently address the element of causation. Hilgers also objected to Hall's report on the ground that Hall is not qualified to opine on the issue of causation. The trial court sustained Hilgers's objections and allowed Cornejo and Portillo thirty days to file and serve

amended reports. Cornejo and Portillo stipulated that Dr. Yoder's expert report would not be offered as to Hilgers.

9    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

Cornejo and Portillo then filed and served Dr. Hall's amended medical expert report. As Dr. Hilgers notes in his brief on appeal, Hall's curriculum vitae does not appear in the record before us. In his amended report, however, Hall notes that he is board certified in obstetrics and gynecology, is licensed to practice medicine in the state of Colorado, is affiliated with several hospitals, and serves as an assistant clinical professor at the University of Colorado. Hall further states:

I am familiar with the standard of care applicable to the management of medical and obstetrical complications in pregnancy, management of labor, use of Pitocin, interpretation of electronic fetal monitoring (EFM), abnormal fetal heart rate patterns, and evidence of fetal hypoxia as predicted by the fetal heart rate pattern. I am also very well aware, that regardless of who is caring for the laboring patient, whether Ob/Gyn, resident, or labor and delivery nurse, that the standards of care regarding recognition of ominous findings on fetal monitor strip are the same....

**\*117** As an obstetrician, I have cared for numerous pregnant patients with the same or similar clinical circumstances as those [Cornejo] presented with.... I have taught nurses and residents fetal monitoring and have worked closely with nurses and residents for 34 years, and I am familiar with what reasonable and prudent nurses, residents and obstetricians would or would not do in response to abnormal electronic fetal heart patterns and management of Pitocin. The standards of care in the interpretation of electronic fetal monitoring, recognition of abnormal patterns, and recognition of the need for intervention [are] the same across these professionals, although the roles of each may be different in intervening for the same.

....

Based on my education, training, years of experience, familiarity with the medical literature and my board certification in OB/GYN, I am familiar with the probable causes of ... hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to [Cornejo's baby] in this case. Specifically, during my many years of practice, I ... read the medical literature, reviewed

case studies and have followed the care for babies with the same or similar clinical presentation as [Cornejo's baby]. I have kept current on the medical studies and literature regarding babies who have suffered hypoxic-ischemic encephalopathy (HIE) from events at or around the time of birth. I have also seen infants in my education, training and experience who have suffered from hypoxic-ischemic encephalopathy (HIE) from events at around the time of birth.

Dr. Hall goes on to explain that he reviewed Cornejo's prenatal records, labor and delivery records, and the electronic fetal monitor strip. He notes that the applicable standard of care for Dr. Hilgers was to recognize certain risk factors with which Cornejo presented and are "well known to increase the risk of fetal intolerance to the uterine environment, increasing the foreseeability of progressive hypoxia and ischemia and need for expeditious delivery of the fetus." Specifically, Cornejo, prior to the time that Hilgers discharged her, presented with decreased fetal movement, gestational hypertension, suspected intrauterine growth restriction, and late deceleration on the electronic fetal monitor. Due to the risk factors present, and because there was a "late deceleration just prior to the end of the fetal monitor strip" at 8:28 p.m. on the evening that Hilgers examined Cornejo, Hall opines that Hilgers had a duty to admit Cornejo to the hospital, rather than discharge her, and continue to monitor the fetal heart rate, the fetus for progressive hypoxia and ischemia, and the need to expedite delivery.

Dr. Hall further opines that Dr. Hilgers breached "the standard of care of any resident providing obstetrical services" by:

- "failing to recognize the risk factors at the time of the premature discharge on December 2, 2010, discuss those with the 'OB/GYN specialist' and admit [Cornejo] to the Hospital";

- "discontinuing fetal heart rate monitoring on December 2, 2010, in the face of a late deceleration (a potentially ominous finding suggestive of uteroplacental insufficiency given the risk factors discussed above)";

- "failing to continuously monitor the fetal heart rate patterns on the evening and morning of December 2–3, 2010"; and

- "failing to deliver [Cornejo's baby] due to a progressively deteriorating **\*118** fetal status which would have been evident on fetal monitoring."

He added:

> We know that the deterioration would have been evident given the difference in the quality of the fetal monitor tracing ... between December 2, 2010 before the late deceleration at the end and the tracing the following morning when she presented again to the Hospital. Tracings do not suddenly become nonreassuring unless there is an acute cord accident that we know did not occur in this case. In reasonable medical probability, there was plenty of opportunity to see the deterioration occur had she been monitored, and any ordinary, reasonably prudent obstetrician (or resident acting under his or her supervision), would have delivered [Cornejo's baby] before she actually presented again the following morning according to the chronology.

As to causation, Dr. Hall opines that Dr. Hilgers "should have known" that the risk factors present in this case "may foreseeably cause fetal intolerance even to normal labor which may induce sufficient stress to produce a lack of blood flow to the fetus (hypoxia), which foreseeably may produce acidosis (asphyxia), which may foreseeably cause brain injury." And he notes that,

> [Cornejo's baby] suffered progressive hypoxia and acidosis, as a result of the delay in delivery caused by Dr. Hilgers'[s] ... breaches in the standard of care. Because [Cornejo] was not kept overnight, she arrived in a more critical state, setting into motion a chain of events which required more timely action after [she] returned [the next morning] with a persistently and progressively abnormal electronic fetal monitor pattern which was not resolved.

Dr. Hall further opines that,

more likely than not, had [Cornejo's baby] been delivered by Dr. Hilgers and/or the OB/GYN specialist assigned to supervise him, she would have been neurologically intact at the time of birth, would not have had difficulty with the newborn resuscitation, would not have developed pneumothoraces, would not have had an additional episode of documented severe metabolic acidosis, and would likely be normal today....

....

[T]he care rendered [Cornejo] by Dr. Hilgers was deficient —falling well below the standard of care owed to this patient.... Within a reasonable degree of medical probability, the negligent breaches in the standard of care by ... Dr. Hilgers substantially contributed to the direct and proximate cause of the hypoxic ischemic encephalopathy noted in [Cornejo's baby].

Cornejo and Portillo also filed and served Dr. Hilgers with Dr. Tomasovic's amended expert report. Although Tomasovic's curriculum vitae also does not appear in the record before us, he, in his amended report, notes that he is a board-certified pediatric neurologist and has been in private practice for twenty-eight years. He "remain[s] actively supportive of two major medical center neonatal intensive care units and [has] been involved in the care of neonates and infants who have experienced hypoxic-ischemic encephalopathy and hypoglycemia."

Dr. Tomasovic notes that he met with Cornejo's child on January 15, 2013 to address her "current neurologic condition as it relates to events involving her birth and subsequent treatment, and whether there is medical causation between such treatment" and her condition. After noting his discussion with her parents about the child's behavior and development and his own observations, Tomasovic states **\*119** that the child's "findings [are] consistent with microcephaly, a mild hemiparesis with motor coordination issues, and an encephalopathic condition with impaired expressive language." He concludes that "it is medically probable" that when she reaches adulthood, Cornejo's child "will not be able to be independent or employable."

After his review of Dr. Hall's report and the medical records of Cornejo and her baby, Dr. Tomasovic observes that "Cornejo was evaluated on December 2nd, 2010, for transient blood pressure elevations which were stable resulting in her discharge home on that date at 20:29 hours." Although he

cannot "address whether the standard of care was breached in doing so," he is able to opine that "the late deceleration of the fetal heart most likely relates to the beginning of a period of hypoxia." He further opines that, "to a reasonable degree of medical probability (and in reliance upon the expert opinions of Dr. Hall), ... [Cornejo's baby] suffered a significant portion of her injuries due to the failure to deliver her before progressive hypoxia and ischemia deprived her brain tissue of well-oxygenated blood and neuro[l]ogic injury occurred in utero." And, "[h]ad she been monitored throughout the night rather than discharged by Dr. Hilgers and the hospital personnel, ... her progressive intolerance of the uterine environment would have been evident and the opportunity would have presented itself to deliver her timely (as opined by Dr. Hall) and before permanent [and] irreversible brain damage occurred." "In other words," according to Tomasovic, "had she been delivered before her mother presented again the next morning to the Hospital, she would not have suffered her injuries."

Dr. Hilgers moved to dismiss Cornejo and Portillo's claims on the grounds that Dr. Hall "is not qualified to address causation" and the amended medical expert reports by Drs. Hall and Tomasovic are insufficient as to the element of causation because they are "inherently grounded in speculative assumptions." Specifically, Hilgers argued that the experts' theories that "had [Cornejo] been kept in the hospital longer on 12/2, the fetal heart tracing would, at some point or points that night, have shown a pattern indicative of fetal deterioration," and, "based on the assumed patterns on the heart tracing, at some unspecified time during the night of 12/2 or the early morning of 12/3, a health care provider would have interpreted the situation as requiring a cesarean delivery and proceeded with delivery" were conjectural. After a hearing, the trial court, without stating its reasons, granted Hilgers's motion to dismiss Cornejo and Portillo's health care liability claims.

### Standard of Review

 **[1]** **[2]** **[3]** **[4]** We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.).* A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas,*

328 S.W.3d 526, 539 (Tex.2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett,* 232 S.W.3d 170, 176 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

## *120 Sufficiency of Expert Reports

In their two issues, Cornejo and Portillo argue that the trial court erred in dismissing their claims against Dr. Hilgers because, contrary to his assertions, Dr. Hall is qualified to opine on the issue of causation and both Drs. Hall and Tomasovic adequately address the issue in their amended medical expert reports. [10]

10    The applicable standard of care and the manner in which Dr. Hilgers allegedly breached that standard are not at issue in this appeal.

A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp. 2013); *Gray,* 189 S.W.3d at 858. The report must provide a "fair summary" of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). The expert report requirement may be satisfied by utilizing more than one expert report, and a court may read the reports together. *See id.* § 74.351(i).

 [5]    [6]    If a defendant files a motion to dismiss challenging the adequacy of a claimant's expert report, a trial court must grant the motion if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. *Id.* § 74.351(1); *Scoresby v. Santillan,* 346 S.W.3d 546, 555–56 (Tex.2011). In setting out the expert's opinions, the report must provide enough information to fulfill two purposes: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby,* 346 S.W.3d at 553–54.

### Dr. Hall's Qualifications

 [7]    In their second issue, Cornejo and Portillo argue that, to the extent the trial court granted Dr. Hilgers's motion to dismiss their claims on the ground that Dr. Hall is not qualified to address the issue of causation, it erred because Hall's extensive expertise and training qualify him "to recognize the risk and to prevent the injury" suffered by Cornejo's baby and "to understand the causal link to" the baby's "neurologic injury" due to Hilgers's breach of the pertinent standard of care. In his motion to dismiss Cornejo and Portillo's claims, Hilgers argued that Hall "is not qualified to address causation" because he "is not certified in neonatology, pediatric neurology, or maternal-fetal medicine." And he complained that Hall "does not treat newborns."

To be qualified to opine on the causal relationship between a defendant-physician's alleged failure to meet an applicable standard of care and a plaintiff's injury, the author of an expert report must be a physician who is qualified to render opinions on such causal relationships under the Texas Rules of Evidence. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5); *see also id.* § 74.403(a) (Vernon 2011) ("[A] person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.").

 *121 An expert witness may be qualified on the basis of knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would "assist the trier of fact" in understanding the evidence or determining a fact issue. TEX.R. EVID. 702. Thus, a plaintiff must show that her expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders v. Heise,* 924 S.W.2d 148, 153–54 (Tex.1996).

 [8]    [9]    Whether an expert witness is qualified under rule 702 lies within the sound discretion of a trial court. *Id.* at 151–52. Not every licensed physician is qualified to testify on every medical question. *Id.* at 152–53. A physician need

not practice in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify him to give an opinion on that subject. *Roberts v. Williamson,* 111 S.W.3d at 113. Analysis of the expert's qualifications to opine as an expert on the subject matter of the report is limited to the four corners of the expert report or its accompanying curriculum vitae. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a); *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 463 (Tex.2008).

Here, Cornejo and Portillo were required to establish that Dr. Hall is qualified on the basis of "knowledge, skill, experience, training, or education" to offer opinions concerning the causal link between the alleged breaches of the standard of care by Dr. Hilgers and the injuries suffered by Cornejo's baby. *See* TEX.R. EVID. 702; *Roberts,* 111 S.W.3d at 122.

In his brief to this Court, Dr. Hilgers argues that Dr. Hall is not qualified to render an opinion as to causation because he is not a perinatologist, neonatologist, neurologist, "or any other medical specialist who routinely takes care of babies or who diagnoses and treats brain injuries"; "does not say he provides ongoing medical care or treatment to neonates (outside of the delivery process)"; "does not say he diagnoses or treats babies with brain damage"; and "does not identify any specific, relevant training or experience that would qualify him to provide expert opinions about how Dr. Hilgers'[s] conduct on 12/2 caused [Cornejo's baby's] injuries, sustained later." And Hilgers complains that Hall is "not shown to be qualified to address the opinions at the heart of his causation theory: what a fetal monitor tracing 'would have shown.' "

Dr. Hall, in his expert report, explains that he is board certified in obstetrics and gynecology, is licensed to practice medicine in the state of Colorado, is affiliated with several hospitals, and serves as an assistant clinical professor at the University of Colorado. He specifically states that he is "familiar with the standard of care applicable to the management of medical and obstetrical complications in pregnancy, management of labor, ... interpretation of electronic fetal monitoring (EFM), abnormal fetal heart rate patterns, and evidence of fetal hypoxia as predicted by the fetal heart rate pattern." Hall notes that, as an obstetrician, he has "cared for numerous pregnant patients with the same or similar clinical circumstances" as those Cornejo presented to Dr. Hilgers. Moreover, he has taught residents fetal monitoring and has "worked closely with ... residents for 34 years." And Hall specifically explained that he is "familiar with what reasonable and

prudent" residents and obstetricians "would or would not do in response to abnormal electronic fetal heart patterns."

**\*122** Dr. Hall further notes that, based on his "education, training, years of experience, familiarity with the medical literature[,] and ... board certification in OB/GYN," he is "familiar with the probable causes of ... hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to [Cornejo's baby] in this case." During his years of practice, he has "read the medical literature, reviewed case studies and ... followed the care for babies with the same or similar clinical presentation" as Cornejo's baby. Hall has "kept current on the medical studies and literature regarding babies who have suffered hypoxic-ischemic encephalopathy (HIE) from events at or around the time of birth." And he has "seen infants" in his "education, training and experience who have suffered from hypoxic-ischemic encephalopathy (HIE) from events at around the time of birth."

Dr. Hall's report demonstrates that he has specific expertise in the areas of obstetrical complications in pregnancy, management of labor, interpretation of electronic fetal monitoring, abnormal fetal heart rate patterns, and evidence of fetal hypoxia as predicted by fetal heart rate patterns. And he specifically notes that he is familiar, based on his education, training, and experience, with the probable causes of hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to Cornejo's baby in this case. This is the type of expertise involved in the claims asserted by Cornejo and Portillo in this case.

In *Roberts v. Williamson,* the Texas Supreme Court held that a board-certified pediatrician was qualified to render an expert opinion as to a newborn baby's neurological injuries. 111 S.W.3d at 121–22. There, after their baby suffered brain damage, parents sued two physicians, alleging that a malfunctioning ventilator, delay in treatment, and failure to transfer the baby to a better-equipped hospital combined to proximately cause the baby's injuries. *Id.* at 115. The physicians argued that the parents' expert, Dr. McGehee, a board-certified pediatrician, was not qualified to testify as to the nature and extent of the child's neurological injuries because he was not a neurologist. *Id.* at 121. The court considered that McGehee held certifications in pediatric advanced life-support and advanced trauma life-support, had studied the effects of pediatric neurological injuries, and had extensive experience advising parents about the effects of such injuries. *Id.* at 121–22. Accordingly, it held that the trial court did not err in admitting McGehee's testimony because,

although he was not a neurologist, the record reflected that he had experience and expertise regarding the specific causes and effects of the injuries at issue. *Id.* at 122.

In *Livingston v. Montgomery,* parents sued five physicians after their child suffered severe neurological injuries just prior to birth. 279 S.W.3d 868, 870 (Tex.App.-Dallas 2009, no pet.). The parents alleged that the physicians failed to "intervene in the face of fetal distress on non-reassuring fetal heart rate patterns." *Id.* The physicians argued that the parents' expert, an obstetrician, was not qualified to opine "as to causation of neurological injuries or conditions—much less pediatric neurological injuries." *Id.* at 873. The court explained that the issue was not who was qualified to testify about whether a neurologist could have saved the patient's life by treating his neurological injuries. *Id.* at 877. Rather, the causation issue related to the duty of health care providers to *recognize potential harm and take appropriate actions. Id.* Because the parents' expert had experience in managing labor and delivery, his expertise qualified him to opine on the causal relationship **\*123** between labor and delivery and the complications that stem from labor and delivery, including a newborn's neurological injuries. *Id.*

Here, based on his experience in managing obstetrical complications in pregnancy and labor, interpreting electronic fetal monitoring and abnormal fetal heart rate patterns, and recognizing fetal hypoxia as predicted by fetal heart rate patterns, Dr. Hall is qualified to opine as to the causal relationship between a newborn's injuries and the failure of a resident or obstetrician to recognize complications in pregnancy and take appropriate actions. The law does not require him to be "certified in neonatology, pediatric neurology, or maternal-fetal medicine" or "treat newborns" to be qualified to so opine. Accordingly, we hold that the trial court, to the extent that it granted Dr. Hilgers's motion to dismiss the claims of Cornejo and Portillo on the ground that Hall is not qualified to opine on the issue of causation, abused its discretion. *See Keo v. Vu,* 76 S.W.3d 725, 733 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

We sustain Cornejo and Portillo's second issue.

### Causation

[10]    In their first issue, Cornejo and Portillo argue that the trial court, to the extent it granted Dr. Hilgers's motion to dismiss their claims on the ground that Drs. Hall and Tomasovic did not adequately address the issue of causation in their amended medical expert reports, erred because

what Hilgers's "calls 'speculation' or 'conjecture' is, in fact, the physicians stating to a 'reasonable [degree of] medical probability' what most likely caused" the injuries to Cornejo's baby. In his motion to dismiss Cornejo and Portillo's claims, Hilgers argued that Hall and Tomasovic's amended medical expert reports do not adequately address the element of causation because their causation theory "is inherently grounded in speculative assumptions" and "conjecture."

[11]    [12]    An expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. *Wright,* 79 S.W.3d at 52. "No particular words or formality are required [in the expert report], but bare conclusions will not suffice." *Scoresby,* 346 S.W.3d at 556.

[13]    [14]    A causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 249 (Tex.App.-San Antonio 2004, no pet.). However, an expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright,* 79 S.W.3d at 52; *Fortner v. Hosp. of the Sw., LLP,* 399 S.W.3d 373, 383 (Tex.App.-Dallas 2013, no pet.). The expert must simply provide some basis that a defendant's act or omission proximately caused injury. *Id.* at 53. And the expert must explain the basis of his statements and link his conclusions to the facts. *Id.* at 52.

**\*124** In his amended medical expert report,[11] Dr. Tomasovic notes that he examined Cornejo's child specifically to assess her "current neurologic condition as it relates to events involving her birth and subsequent treatment, and whether there is medical causation between such treatment" and her condition. He concludes that his findings are "consistent with microcephaly, a mild hemiparesis with motor coordination issues, and an encephalopathic condition with impaired expressive language" and "it is medically

probable" that she "will not be able to be independent or employable."

11  The parties dispute whether Drs. Hall's and Tomasovic's original expert reports should be considered with their amended reports in evaluating whether the doctors adequately addressed the causation issue. Dr. Hilgers quotes extensively from the original expert reports and points out inconsistencies between the original and amended reports. Cornejo and Portillo argue that once they submitted amended expert reports, the original reports were supplanted. An amended expert report served after a thirty-day extension granted by the trial court, as here, supersedes any initial report filed by the claimant. *Otero v. Leon,* 319 S.W.3d 195, 204–05 (Tex.App.-Corpus Christi 2010, pet. denied); *HealthSouth Corp. v. Searcy,* 228 S.W.3d 907, 909 (Tex.App.-Dallas 2007, no pet.) (holding that amended expert report "supplants" previously filed report); *see also Packard v. Guerra,* 252 S.W.3d 511, 515–16, 534–35 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) (considering previously filed reports that were refiled and "supplemented"). Thus, we consider only the amended expert reports in conducting our analysis.

In regard to causation specifically, Dr. Tomasovic opines that "the late deceleration of the fetal heart most likely relates to the beginning of a period of hypoxia" and "to a reasonable degree of medical probability (and in reliance upon the expert opinions of Dr. Hall), ... [Cornejo's child] suffered a significant portion of her injuries due to the failure to deliver her before progressive hypoxia and ischemia deprived her brain tissue of well-oxygenated blood and neurolo[g]ic injury occurred in utero." And he emphasizes that, "[h]ad she been monitored throughout the night rather than discharged by Dr. Hilgers and the hospital personnel, ... her progressive intolerance of the uterine environment would have been evident and the opportunity would have presented itself to deliver her timely (as opined by Dr. Hall) and before permanent [and] irreversible brain damage occurred." "In other words," according to Tomasovic, "had she been delivered before her mother presented again the next morning to the Hospital, she would not have suffered her injuries." He emphasizes that,

> It is a legal fiction rather than a medical reality to suggest that any of the health care providers responsible for making decisions regarding delivery from the evening of December 2, 2010 until the time of [the child's]

birth are not responsible, at least in part, for her neurological injuries because they had not yet occurred. All are complicit in failing to rescue her from a foreseeably progressive hostile uterine environment which was the source of all of her injuries and complications ....

In his amended medical expert report, Dr. Hall states his familiarity "with the probable causes of ... hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to [Cornejo's baby] in this case." He notes that Dr. Hilgers "should have known" that the risk factors present in this case "may foreseeably cause fetal intolerance even to normal labor which may induce sufficient stress to produce a lack of blood flow to the fetus (hypoxia), which foreseeably may produce acidosis (asphyxia), which may foreseeably cause brain injury." And Hall emphasizes that,

> **\*125**  [Cornejo's baby] suffered progressive hypoxia and acidosis, as a result of the delay in delivery caused by Dr. Hilgers'[s] ... breaches in the standard of care. Because [Cornejo] was not kept overnight, she arrived in a more critical state, setting into motion a chain of events which required more timely action after [she] returned [the next morning] with a persistently and progressively abnormal electronic fetal monitor pattern which was not resolved.

Dr. Hall further opines that,

> more likely than not, had [Cornejo's baby] been delivered by Dr. Hilgers and/or the OB/GYN specialist assigned to supervise him, she would have been neurologically intact at the time of birth, would not have had difficulty with the newborn resuscitation, would not have developed pneumothoraces, would not have had an additional episode of documented severe metabolic acidosis, and would likely be normal today....
>
> ....
>
> [T]he care rendered [Cornejo] by Dr. Hilgers was deficient —falling well below the standard of care owed to this patient.... Within a reasonable degree of medical

probability, the negligent breaches in the standard of care by ... Dr. Hilgers substantially contributed to the direct and proximate cause of the hypoxic ischemic encephalopathy noted in [Cornejo's baby].

Further, Hall explains in great detail how the effects of hypoxia and asphyxia are cumulative and progressive, the role of fetal heart monitoring, and the medical relationship between the late deceleration on the monitor in this case and the injuries suffered by Cornejo's baby.

In his appellate brief, Dr. Hilgers argues, as he did in his motion to dismiss, that Drs. Hall's and Tomasovic's expert reports are insufficient because their "proximate causation theory ... is inherently grounded in speculative assumptions." Specifically, he characterizes their causation theory thusly: "had [Cornejo] been kept in the hospital longer on 12/2, the fetal heart tracing would, at some point or points that night, have shown a pattern indicative of fetal deterioration," and, "based on the assumed patterns on the heart tracing, at some unspecified time during the night of 12/2 or the early morning of 12/3, a health care provider would have interpreted the situation as requiring a cesarean delivery and proceeded with delivery." Hilgers notes that Tomasovic asserted no "identifiable injury" to Cornejo's baby during his treatment and neither expert asserted that "the standard of care required [him] to deliver [Cornejo's baby] during his care."

In their reports, however, Drs. Hall and Tomasovic do more than "speculate." They explain the link between the specific injuries suffered by Cornejo's baby and Dr. Hilgers's alleged failure to recognize Cornejo's risk factors and the late deceleration on the fetal heart monitor, and his failure to take action—by admitting Cornejo to the hospital and continuing the fetal monitoring. *See Jelinek,* 328 S.W.3d at 539–40 ("[T]he expert must ... explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented."). Hall opines that Hilgers's failure to comprehend the dangers and take appropriate action constituted a substantial factor in bringing about the injuries suffered by Cornejo's baby and, absent such omission, the harm would not have occurred. Likewise, Tomasovic agrees that had Cornejo's baby been monitored throughout the night, rather than discharged by Dr. Hilgers and the hospital personnel, "her progressive intolerance of the uterine environment would have been evident and the opportunity would have **\*126** presented itself to deliver her timely (as opined by Dr. Hall) and before permanent [and] irreversible brain damage occurred." Although neither Hall nor Tomasovic opines that a specific injury to Cornejo's

baby occurred during Hilgers's treatment of Cornejo on December 2nd, it is sufficient that, in their reports, the experts "state[ ] a chain of events that begin with a health care provider's negligence and end in personal injury." *McKellar v. Cervantes* 367 S.W.3d 478, 485 (Tex.App.-Texarkana 2012, no pet.); *see Patel v. Williams,* 237 S.W.3d 901, 905 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *Costello,* 141 S.W.3d at 249.

In *McKellar,* Cervantes was a patient of Dr. McKellar and saw him regularly for prenatal care of her high-risk twin pregnancy. 367 S.W.3d at 481. McKellar admitted Cervantes to the hospital during the course of her pregnancy with suspicion of preeclampsia. *Id.* When the twins were delivered via Caesarean section the day after admission, one of the babies, "Alek," was diagnosed with encephalopathy. *Id.* Cervantes brought a health care liability claim against McKellar, and her expert opined in his report that when a patient is admitted with Cervantes's conditions, the standard of care mandated that the fetal well-being be assessed upon admission, yet Cervantes was not placed on an external fetal monitor until more than twenty-eight hours after admission. *Id.* at 487. The expert opined that McKellar's failure to expeditiously discover and address the recurring variable decelerations with absent long-term variability in Alek's heart rate resulted in brain damage. *Id.* at 486. The court of appeals held that the report sufficiently put McKellar on notice of the conduct about which Cervantes complained and further provided the trial court with a basis to conclude that her claim against McKellar had merit. *Id.* at 490.

We conclude that Drs. Hall and Tomasovic, in their amended medical expert reports, provided a fair summary of the causal relationship between Dr. Hilgers's failure to meet the appropriate standard of care and the injuries suffered by Cornejo's baby. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). Thus, the reports presented an objective, good faith effort to comply with the statute. *Id.* § 74.351(1); *Scoresby,* 346 S.W.3d at 555–56. Accordingly, we hold that the trial court, to the extent that it granted Hilgers's motion to dismiss the claims of Cornejo and Portillo on the ground that the reports did not adequately address the issue of causation, abused its discretion.

We sustain Cornejo and Portillo's first issue.

**Conclusion**

We reverse the order of the trial court and remand the case to the trial court for further proceedings not inconsistent with this opinion.

**All Citations**

446 S.W.3d 113

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

141 S.W.3d 245
Court of Appeals of Texas,
San Antonio.

Alicia COSTELLO, Individually and on Behalf
of the Estate of Delia Lozano, Appellant,
v.
CHRISTUS SANTA ROSA HEALTH
CARE CORPORATION, Appellee.

No. 04–03–00597–CV.   |   June 23, 2004.

**Synopsis**
**Background:** Representative of patient's estate brought medical malpractice action against hospital, alleging that patient's death from cardiac arrest was caused by negligent care of hospital emergency room staff. Hospital moved to dismiss lawsuit on basis that representative's expert reports did not meet requirements of Texas Medical Liability and Insurance Improvement Act. The 288th Judicial District Court, Bexar County, Martha Tanner, J., dismissed lawsuit with prejudice. Representative appealed.

**Holdings:** The Court of Appeals, Phylis J. Speedlin, J., held that:

[1] registered nurse did not qualify as expert to provide her opinion as to cause of patient's death, and

[2] report of expert witness as to cause of patient's death was conclusory, and thus was insufficient to meet requirements of Texas Medical Liability and Insurance Improvement Act.

Affirmed.

West Headnotes (9)

**[1]      Health**
    Affidavits of merit or meritorious defense; expert affidavits

To meet the requirements of the Texas Medical Liability and Insurance Improvement Act, an expert report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l* ) (2003).

8 Cases that cite this headnote

**[2]      Appeal and Error**
    Dismissal or nonsuit before trial

Court of Appeals reviews a trial court's dismissal of a suit for failure to comply with the Texas Medical Liability and Insurance Improvement Act under an abuse of discretion standard. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l* ) (2003).

Cases that cite this headnote

**[3]      Evidence**
    Cause and effect

Registered nurse did not qualify as expert to provide her opinion as to cause of patient's death, in medical malpractice action; for nurse to give medical opinion as to cause of patient's death necessarily demanded ability to make medical diagnosis, but nurse was expressly prohibited under Nursing Practice Act from rendering medical diagnoses. V.T.C.A., Occupations Code § 301.002(2); Rules of Evid., Rule 702.

11 Cases that cite this headnote

**[4]      Evidence**
    Due care and proper conduct in general

Although it is generally true that a licensed registered nurse has more education and training on medical issues than a lay person, a nursing license does not automatically qualify the registered nurse as an expert on every medical subject in a medical malpractice action.

10 Cases that cite this headnote

**[5]      Evidence**
    Necessity of qualification

Trial court must ensure that those who purport to be experts truly have expertise concerning the

actual subject about which they are offering an opinion. Rules of Evid., Rule 702.

1 Cases that cite this headnote

**[6]** **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Report of expert witness as to cause of patient's death, which stated that "[i]f this patient would have been appropriately triaged and evaluated, then in all reasonable medical probability she would have survived," was conclusory, and thus was insufficient to meet requirements of Texas Medical Liability and Insurance Improvement Act, in medical malpractice action, as expert failed to explain causal connection between hospital's claimed omissions and patient's death. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*) (2003).

22 Cases that cite this headnote

**[7]** **Health**
👉 Proximate Cause

As is true in other types of negligence cases, causation in a medical malpractice action is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred.

28 Cases that cite this headnote

**[8]** **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

In reviewing the adequacy of an expert witness's report in a medical malpractice case, the court's inquiry is restricted to the four corners of the report, and inferences are not permitted. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

4 Cases that cite this headnote

**[9]** **Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

An expert witness's report in a medical malpractice action is insufficient under Texas Medical Liability and Insurance Improvement Act if it merely states the expert's conclusions. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*) (2003).

1 Cases that cite this headnote

**\*247** From the 288th Judicial District Court, Bexar County, Texas, Trial Court No. 2002–CI–03404; Martha Tanner, Judge Presiding. [1]

[1] The Honorable Frank Montalvo was the presiding judge of the 288th Judicial District Court, Bexar County, Texas in 2002. The Honorable Martha Tanner, presiding judge of the 166th Judicial District Court, signed the order granting Christus Santa Rosa's amended motion to dismiss.

**Attorneys and Law Firms**

Andrew E. Toscano, Gene Toscano, Inc., San Antonio, for appellant.

Laura A. Cavaretta, Jerry A. Gibson, Plunkett & Gibson, San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, PHYLIS J. SPEEDLIN, Justice.

**OPINION**

Opinion by: PHYLIS J. SPEEDLIN, Justice.

This case involves the adequacy of expert reports under the Texas Medical Liability and Insurance Improvement Act ("the Act"). The trial court dismissed the plaintiff's medical malpractice suit after it determined the expert reports did not satisfy the Act's requirements with respect to causation. We affirm the trial court's judgment.

**BACKGROUND**

Delia Lozano ("Lozano") was admitted to the emergency department of Christus Santa Rosa Hospital ("Christus") with the chief complaint of chest pain. She was initially "triaged" by the nursing staff and then asked to return to the waiting room. Forty minutes later, while in the waiting room, she suffered a cardiac arrest and was unable to be resuscitated. Mrs. Lozano's daughter, Alicia Costello ("Costello"), sued the hospital for medical malpractice. Costello filed two expert reports under the Act. The report of Pamela Zanes, R.N. ("Nurse Zanes") sets forth the applicable standard of nursing care. The second report by Dr. Steven Schilling ("Dr. Schilling") states in relevant part:

> Patients that present to emergency departments with the chief complaint of chest pain, especially in this age group, require immediate triage to an examination room, placement on a telemetry monitor, and a "stat" EKG followed by prompt physician evaluation.... If this patient would have been appropriately triaged and evaluated, then in all reasonable medical probability she would have survived.

The hospital ultimately moved to dismiss the lawsuit claiming the reports did not meet the statutory requirements. After a hearing, the trial court dismissed the lawsuit with prejudice. This appeal resulted.

## ANALYSIS

 **[1]**    **[2]**    In her sole issue on appeal, Costello contends that the trial court abused its discretion in determining the expert **\*248** reports did not constitute a good-faith effort to meet the requirements of the Act. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(*l* ) (Vernon 2003). [2] In order to meet the requirements of the Act, an expert report "must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit." *Bowie Memorial Hospital v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (citing the two-part test set forth in *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)). We review a trial court's dismissal of a suit for failure to comply

with the Act under an abuse of discretion standard. *Palacios,* 46 S.W.3d at 878.

[2]    Repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex Gen. Laws 847, 884. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(1) (Vernon Supp.2004) (effective Sept. 1, 2003).

### A. Pamela Zanes, R.N.

 **[3]**    **[4]**    **[5]**    In its order of dismissal, the trial court found that the report of Nurse Zanes did not establish her qualifications to express an expert opinion on causation. We agree. Although it is generally true that a licensed registered nurse has more education and training on medical issues than a lay person, a nursing license does not automatically qualify the registered nurse as an expert on every medical subject. *Cf. Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996) (a licensed medical doctor is not automatically qualified to testify as an expert on every medical question). The trial court instead must ensure that "those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Id.; see also* TEX.R. EVID. 702. Here, the relevant inquiry is whether Nurse Zanes has the necessary expertise to express an opinion about what caused Lozano's death.

 **[6]**    In her report, Nurse Zanes establishes that she is a registered nurse licensed in the State of Texas. As such, she is governed by the Texas Nursing Practice Act, which defines the privileges and limitations of her right to practice professional nursing in this State. *See* TEX. OCC.CODE ANN. §§ 301.001–.607 (Vernon 2004). Her license specifically allows her to be compensated for such acts as observing, assessing, evaluating, and caring for a person who is ill or injured, but precludes her from "acts of medical diagnosis." TEX. OCC.CODE ANN. § 301.002(2) (definition of "professional nursing"). [3] A licensed registered nurse who is expressly prohibited by law from rendering a medical diagnosis would also lack the expertise to testify on subjects that require making a medical diagnosis. *See Pace v. Sadler,* 966 S.W.2d 685, 690 (Tex.App.-San Antonio 1998, no pet.) (although qualified to render expert opinion on nursing standard of care, nurse was not qualified to medically diagnose heart condition); *Arlington Mem'l Hosp. Found., Inc. v. Baird,* 991 S.W.2d 918, 921 (Tex.App.-Forth Worth 1999, pet. denied) (nurse was not qualified to medically diagnose causation of thermal burns). To give a medical opinion on the cause of someone's death necessarily demands the ability to make a medical diagnosis. Nurse

Zanes is expressly prohibited by law from **\*249** doing that. Accordingly, the trial court properly refused to consider Nurse Zanes' affidavit on the issue of causation.

3    The Texas Nursing Practice Act does not define what is meant by "acts of medical diagnosis." *See* TEX. OCC.CODE ANN. § 301.002. Taber's Cyclopedia Medical Dictionary defines "diagnosis" as the use of scientific or clinical methods to establish the cause and nature of a person's illness; it defines "medical diagnosis" as the identification of the cause of the patient's illness or discomfort. *See* TABER'S CYCLOPEDIC MEDICAL DICTIONARY (19th ed.2001).

## B. Dr. Schilling

 **[7]**    **[8]**    The trial court also determined that Dr. Schilling's report was conclusory on the issue of causation. Again, we agree. The Act requires that an "expert report" provide a fair summary of the manner in which the care at issue failed to meet the applicable standards of care and the causal relationship between that failure and the harm or damages claimed. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6). As is true in other types of negligence cases, causation is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred. *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 400 (Tex.1993). In reviewing the report's adequacy, our inquiry is restricted to the four corners of the report. *Palacios,* 46 S.W.3d at 878. Inferences are not permitted. *Id.*

Dr. Schilling's report states, "If this patient would have been appropriately triaged and evaluated, then in all reasonable medical probability she would have survived." Costello maintains this statement of causation "clearly links" Christus to Lozano's death, and therefore meets the causation requirement of the Act. Christus responds that the report's one statement about causation fails to explain how the hospital's purported failure to act in a more timely manner caused the patient's death.

 **[9]**    Although the Act only requires a "fair summary" of his opinions, Dr. Schilling's mere assertion that the patient would have survived is conclusory and is not sufficient. Nowhere in Dr. Schilling's report does he explain the causal connection between Christus' claimed omissions (failure to appropriately triage and evaluate) and Lozano's death. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6); *Wright,* 79 S.W.3d at 53. Dr. Schilling offers no explanation of what medical information a more timely triage and evaluation would have revealed, nor does he state what would have been done had Christus not failed to act, what treatment would have or could have been available, that the patient was a candidate for the unknown treatment, or that the unknown treatment could have or would have been effective. Dr. Schilling's report fails to state how Christus' failure to act was a substantial factor in bringing about Lozano's death and without which her death would not have occurred. *See Kramer,* 858 S.W.2d at 400. A report is insufficient if, as in the instant case, it merely states the expert's conclusions. *Palacios,* 46 S.W.3d at 879; *see also Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999).

In addition, nowhere in his report does Dr. Schilling explain the medical basis or reasoning for his conclusion that Lozano "in all reasonable medical probability" would have survived. While no particular term or phrase is required for an expert to establish causation, the converse is also true. *See Wright,* 79 S.W.3d at 53. Without more, the magic words of "reasonable medical probability" provide no evidence of causation. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711–12 (Tex.1997).

Once the trial court determined that the two expert reports did not comply with the statutory requirements of the Act, the court had no discretion and was required to dismiss the suit against Christus with prejudice. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e)(3). We affirm the judgment of the trial court.

## All Citations

141 S.W.3d 245

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

399 S.W.3d 373
Court of Appeals of Texas,
Dallas.

Ronald FORTNER and Pam Fortner, Appellants

v.

HOSPITAL OF THE SOUTHWEST, LLP d/b/a
The Heart Hospital Baylor Plano; Gary E. Erwin,
Jr., M.D.; Jeff Taylor, M.D.; Gregory Messner,
D.O.; Health Texas Provider Network d/b/a Dallas
Diagnostic Association–Plano; James E. Rellas,
M.D., P.A. d/b/a HeartFirst Cardiology Center;
and Medical Edge Healthcare Group, P.A. d/b/
a The Texas Clinic at Prestonwood, Appellees.

No. 05–11–00971–CV.   |   April 5, 2013.

**Synopsis**
**Background:** Patient brought action against physicians and hospital for health care negligence and lack of informed consent. The 101st Judicial District Court, Dallas County, No. 10–02994–E, Martin Lowy, J., dismissed with prejudice. Patient appealed.

**[Holding:]** The Dallas Court of Appeals, Fillmore, J., held that expert report on basis for patient's claims was adequate.

Affirmed in part, reversed in part, and remanded.

West Headnotes (12)

**[1]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

Reports may be considered together in determining whether a health care liability claimant provided a report meeting the statutory requirements to provide a fair summary of expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and injury, harm, or damages claimed. V.T.C.A., Civil Practice & Remedies Code § 74.351(i).

3 Cases that cite this headnote

**[2]    Appeal and Error**
    Rulings on Motions Relating to Pleadings

Court of Appeals reviews a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[3]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

If an expert report on the basis for a health care liability claim omits any of the statutory elements, it cannot be a "good faith effort" for purposes of the rule that a trial court shall grant a motion challenging the adequacy of the expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

2 Cases that cite this headnote

**[4]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

In determining whether the expert report on the basis for a health care liability claim represents a good faith effort to comply with the statutory requirements, as would preclude the trial court from granting a motion challenging the adequacy of the expert report, the trial court's inquiry is limited to the four corners of the report. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[5]    Health**

 Affidavits of merit or meritorious defense; expert affidavits

For an expert report on the basis for a health care liability claim to represent an objective good faith effort to comply with statutory requirements, as would preclude the trial court from granting a motion challenging the adequacy of the expert report, the expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

3 Cases that cite this headnote

**[6] Health**
 Affidavits of merit or meritorious defense; expert affidavits

An expert report on the basis for a health care liability claim need not marshal all the plaintiff's proof, but it must do more than merely state the expert's conclusions about the standard of care, breach, and causation, and it must explain the basis of the expert's statements and link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[7] Health**
 Affidavits of merit or meritorious defense; expert affidavits

An expert report on the basis for a health care liability claim must contain sufficiently specific information to demonstrate causation beyond mere conjecture. V.T.C.A., Civil Practice & Remedies Code § 74.351.

3 Cases that cite this headnote

**[8] Health**
 Affidavits of merit or meritorious defense; expert affidavits

The statute requiring an expert report on the basis for a health care liability claim does not require that the expert report anticipate and rebut all possible defensive theories that may ultimately

be presented to the trial court. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[9] Health**
 Affidavits of merit or meritorious defense; expert affidavits

An expert report on the basis for a health care liability claim need not marshal all the plaintiff's proof necessary to establish causation at trial, and the fact a plaintiff may not prove causation at trial does not mean an expert report was inadequate. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[10] Health**
 Affidavits of merit or meritorious defense; expert affidavits

In an expert report on the basis for a health care liability claim, the expert must explain the basis of his statements and link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[11] Health**
 Affidavits of merit or meritorious defense; expert affidavits

Trial court abused its discretion in concluding that expert report on the basis for patient's health care liability claims for direct liability against hospital and physicians and for vicarious liability against physicians' employers was inadequate, where the report explained that the physicians failed to obtain timely attention and treatment for patient's vision loss caused by hypotension after coronary artery bypass, resulting in permanent blindness in both eyes. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[12] Health**

☞ Affidavits of merit or meritorious defense; expert affidavits

When a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious liability theory, and if any liability theory has been adequately covered, the entire case may proceed. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*375** Jeffrey S. Levinger, Levinger PC, Kenneth B. Chaiken, Robert L. Chaiken, Chaiken & Chaiken, P.C., Dallas, TX, for Appellants.

John A. Scully, Russell G. Thornton, Diana Wood, Stan Thiebaud, Michelle E. Robberson, Cory M. Sutker, Dallas, TX, Aaron D. Nadeua, Joel J. Steed, J., Rockwall, TX, Jennifer Gossom Martin, Addison, TX, for Appellees.

Before Justices FITZGERALD, FILLMORE, and RICHTER.[1]

[1] The Honorable Martin E. Richter, Retired Justice, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

**OPINION**

Opinion By Justice FILLMORE.

This appeal follows the trial court's dismissal of the health care liability claims asserted by appellants Ronald Fortner and Pam Fortner against appellees Hospital of the Southwest, LLP d/b/a The Heart Hospital Baylor Piano (Baylor Hospital), Gary E. Erwin, Jr., M.D. (Dr. Erwin), Jeff Taylor, M.D. (Dr. Taylor), Gregory Messner, D.O. (Dr. Messner), Health Texas Provider Network d/b/a Dallas Diagnostic Association—Plano (Dallas Diagnostic), James E. Rellas, M.D., P.A. d/b/a HeartFirst Cardiology Center (HeartFirst), and Medical Edge Healthcare Group, P.A. d/b/a The **\*376** Texas Clinic

at Prestonwood (Texas Clinic) as a result of appellees' challenges to the sufficiency of appellants' experts' reports. In a single issue, appellants contend the trial court abused its discretion in concluding the expert reports in this case fail to comply with the requirement of civil practice and remedies code section 74.351 that an expert report demonstrate a causal relationship between the failure of a physician or health care provider to meet an applicable standard of care and the injury, harm, or damage claimed. We affirm the trial court's judgment in part, reverse the trial's judgment in part, and remand this cause to the trial court for further proceedings.

**Background**

*Facts Alleged by Appellants*

We recite the facts as alleged in appellants' First Amended Petition, their live pleading at the time of the trial court's orders dismissing all claims brought by appellants against appellees. On July 14, 2008, appellant Ronald Fortner had an initial consultation with Dr. Messner, after a diagnostic test earlier that day indicated Mr. Fortner suffered from multi-vessel coronary disease and complex plaque. Dr. Messner recommended surgery on an emergent basis and performed a four vessel quadruple coronary artery bypass graft the following day at Baylor Hospital. Post-operatively, Drs. Messner, Erwin, and Taylor and employees of Baylor Hospital were responsible for providing Mr. Fortner's healthcare.

"During and/or after surgery," Mr. Fortner suffered from various problems including sustained periods of severe hypotension. "Shortly after surgery and contemporaneous with the hypotension," Mr. Fortner began complaining of visual disturbances and partial loss of vision, first in one eye and then in the other. Appellants claim Drs. Messner, Erwin, and Taylor and Baylor Hospital nursing or medical staff were aware of Mr. Former's vision-related complaints "when and as Mr. Fortner was experiencing and expressing such complaints in proximity to events which tended to explain their occurrence, cause and severity" but did not provide or obtain necessary medical intervention. An ophthalmologist was not consulted to evaluate Mr. Fortner until about twenty-seven hours after he began complaining about vision loss, by which time he was blind in both eyes.

### *Appellants' Theories of Liability*

Appellants allege Drs. Messner, Erwin, and Taylor, and Baylor Hospital were negligent and grossly negligent.[2] Appellants **\*377** further allege Dallas Diagnostic is vicariously liable for the negligence of its members, Drs. Erwin and Taylor; HeartFirst and Texas Clinic are vicariously liable for the negligence of its employee, Dr. Messner; and Baylor Hospital is vicariously liable for the negligence of its "employees, agents, ostensible agents and representatives."

[2]     Appellants allege Drs. Messner, Erwin, and Taylor were negligent and grossly negligent by failing to: (1) properly and thoroughly examine Mr. Fortner, (2) properly and thoroughly assess and diagnose Mr. Fortner, (3) properly document Mr. Fortner's physical condition, (4) provide Mr. Fortner with adequate and/or timely treatment for his medical conditions, (5) order required treatment or care for Mr. Fortner on a timely basis, (6) obtain appropriate specialized care and/or consultation for Mr. Fortner's condition which these appellees were unable to diagnose or treat.

     Appellants allege Baylor Hospital, either directly through its own acts or omissions or under the doctrine of *respondeat superior,* was negligent by: (1) failing to properly document Mr. Fortner's physical condition, (2) failing to properly transmit documentation concerning Mr. Fortner's physical condition to the appropriate and necessary recipients, (3) failing to properly and timely communicate or ensure proper and timely communication of information pertaining to Mr. Fortner's physical condition or changes in his diagnosis or condition among and between the health care providers who were responsible for treating and diagnosing his condition, (4) authorizing the "doing and the manner of the acts and omissions in question," (5) recklessly employing personnel who were unfit, incompetent, or unqualified to perform the duties assigned to them, (6) employing personnel in managerial positions who were acting within the course and scope of their employment at the time the negligent acts or omissions occurred and failed to prevent such acts or omissions, and (7) ratifying or approving the negligent acts or omissions in question through its officers, managers, supervisors, directors, administrators, or nurses.

### *Dismissal of Appellants' Claims*

Pursuant to section 74.351 of the civil practice and remedies code, appellants served appellees with an expert report prepared by John Kress, M.D., a board-certified pulmonary and critical care medicine physician, in support of their claims. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (West 2011) (in a health care liability claim, claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted). Appellees filed objections challenging the sufficiency of Dr. Kress's report as failing to comply with the requirements of section 74.351. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) ("expert report" means a written report by an expert that provides a fair summary of expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and injury, harm, or damages claimed).

At the November 2010 hearing on appellees' objections to the sufficiency of Dr. Kress's expert report, the parties announced on the record their agreement to an extension of time for appellants to attempt to cure deficiencies in Dr. Kress's expert report regarding the statutory requirement that the expert report demonstrate a causal relationship between the alleged failure to met the applicable standard of care and Mr. Fortner's injury. It was the parties' agreement that this extension would serve as the one-time extension authorized in section 74.351(c). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (if expert report has not been served within the period specified in section 74.351(a) because elements of report are found deficient, court may grant one 30–day extension to claimant in order to cure the deficiency). At the hearing, the trial judge stated he believed Dr. Kress's report was deficient with respect to causation.

 **[1]**   Appellants served appellees with a supplemental report from Dr. Kress and a report from a new expert, Alfredo A. Sadun, M.D., Ph.D., a board-certified ophthalmologist with a clinical specialty in neuro-ophthalmology. Appellees filed objections to the reports of Dr. Kress and the report of Dr. Sadun, asserting the reports, whether considered separately or collectively,[3] did not cure the alleged deficiencies, and moved to dismiss appellants' health care liability claims with prejudice **\*378** pursuant to section 74.351(b)(2). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)(2) (if health

care liability claimant does not serve expert report as required, the trial court must, upon motion by affected physician or health care provider, dismiss claim with prejudice).

3  Reports may be considered together in determining whether a claimant provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i).

The trial court conducted a March 2011 hearing on appellees objections to appellants experts reports and appellees motions to dismiss. The trial court concluded appellants' experts' reports fail to provide any opinion concerning a causal connection between any failure to meet the applicable standards of care and injuries and damages claimed by appellants, and, therefore, the experts' reports were insufficient and did not satisfy the requirements of section 74.351. Having concluded appellants' experts' reports did not meet the causation requirement of section 74.351, by order signed June 17, 2011, the trial court granted HeartFirst and Texas Clinic's motion to dismiss and ordered all claims brought by appellants against HeartFirst and Texas Clinic dismissed with prejudice. By order signed September 26, 2011, the trial court granted the motions to dismiss of Drs. Messner, Erwin, and Taylor, Dallas Diagnostic, and Baylor Hospital and ordered all claims brought by appellants against them dismissed with prejudice. [4] Appellants filed this appeal of the trial court's dismissal of their health care liability claims.

4  Section 74.351(b)(1) provides that if an expert report has not been served within the time period specified, the trial court, on a proper motion, shall award "reasonable attorney's fees and costs of court incurred by the physician or health care provider." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)(1). In its September 26, 2011 order, the trial court noted Drs. Messner, Erwin, and Taylor, Dallas Diagnostic, and Baylor Hospital waived recovery of attorneys' fees for defense of this lawsuit in the trial court and in any appellate court.

**Discussion**

***Standard of Review***

 [2]  We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Texas v. Palacios,* 46 S.W.3d 873,

875 (Tex.2001); *Nexion Health at Terrell Manor v. Taylor,* 294 S.W.3d 787, 791 (Tex.App.-Dallas 2009, no pet.). A trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding). An abuse of discretion occurs if the trial court clearly fails to analyze or apply the law correctly. *Id.*

***Expert Reports in Health Care Liability Claims***

 [3]  Under section 74.351 of the civil practice and remedies code, any person who brings suit asserting a health care liability claim must, within 120 days of filing the original petition, provide an expert report for each physician or health care provider against whom a claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). An "expert report" is defined as a written report that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6); *see also Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51 (Tex.2002). When a plaintiff sues more than one defendant in connection with a health care liability claim, the expert report must set forth the standard of care applicable to each defendant, show how that defendant's conduct failed to meet **\*379** that standard, and explain the causal relationship between each defendant's individual acts and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a), (r)(6); *see also Scoresby v. Santillan,* 346 S.W.3d 546, 555–56 (Tex.2011); *Eichelberger v. St. Paul Med. Ctr.,* 99 S.W.3d 636, 638 (Tex.App.-Dallas 2003, pet. denied). If a report omits any of these statutory elements of section 74.351(r)(6), it cannot be a good faith effort. *Palacios,* 46 S.W.3d at 879.

 [4]   [5]  A trial court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6). TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(0; *see also Loaisiga v. Cerda,* 379 S.W.3d 248, 260 (Tex.2012). In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the trial court's inquiry is limited to the four corners of the report. *Eichelberger v. Mulvehill,* 198 S.W.3d 487, 490 (Tex.App.-Dallas 2006, pet. denied) (citing

*Palacios,* 46 S.W.3d at 878)). To represent an objective good faith effort to comply with statutory requirements, the expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Leland v. Brandal,* 257 S.W.3d 204, 206–07 (Tex.2008); *Palacios,* 46 S.W.3d at 879.

 **[6]**    **[7]**    An expert report need not marshal all the plaintiff's proof. *Wright,* 79 S.W.3d at 52. However, it must do more than merely state the expert's conclusions about the standard of care, breach, and causation; it must explain the basis of the expert's statements and link his conclusions to the facts. *Id.; Quinones v. Pin,* 298 S.W.3d 806, 810 (Tex.App.-Dallas 2009, no pet.). The report must contain sufficiently specific information to demonstrate causation beyond mere conjecture. *See Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.,* 224 S.W.3d 448, 453 (Tex.App.-Fort Worth 2007, no pet.). Thus, courts have reasoned that an expert report that describes causation in terms of mere possibilities does not accomplish the purpose of providing "a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52; *see also Quinones,* 298 S.W.3d at 815–16.

### *Appellants' Experts' Reports*

Appellants served appellees with two reports from Dr. Kress and a report from Dr. Sadun. Appellees challenged the reports and moved to dismiss appellants' health care liability claims.

In Dr. Kress's July 8, 2010 expert report, he states his opinions are given "within a reasonable degree of medical certainty or probability." He indicates that he is familiar with the standard for delivery of healthcare in a critical or intensive care setting, "including the care provided by surgeons whose patients are in that setting, critical care specialists, nurses, physical therapists, and other health care providers and allied health care providers who practice or participate in the care of patients in a critical care setting." His first report includes the following:

> On post operative day one (7/16/08) Mr. Fortner noted visual changes. A physical therapist initial evaluation noted a "requirement for assistance secondary to visual impairment" at 3:04 PM. A nurse's note by Karla Jones on 7/16/08 at 18:10 notes "visual field disturbances...." At 18:40, Ms. Jones notified Dr. Erwin, and at 19:20,

Dr. Messner was notified. The first consultative evaluation of Mr. Fortner's visual complaints was a neurology consultation the **\*380** next day (7/17/08) at 9:51 AM.... Pulmonary/Critical care consultant (note dated 7/17/08) stated "Opthal consult if indicated". An ophthalmology consult was not obtained, however, until 7/17/08 at 17:38, approximately one day after the patient was initially noted to have acute visual changes. The patient was ultimately noted to have anterior ischemic optic neuropathy with permanent blindness in both eyes.

Whenever a patient experiences visual changes, this is a medical emergency that requires immediate and appropriate evaluation. Time is critical. It is my opinion that the potential for blindness in a post coronary bypass graft patient, particularly one who has experienced recent hypotension and anemia, is a foreseeable event. In a specialty heart hospital, the foreseeability of such an event would be greater than elsewhere, thus one would expect health care providers practicing in such a setting, including physicians, nurses and physical therapists, to be trained in identifying and responding to the signs and symptoms suggestive of potential vision loss.

It is my opinion that the applicable standard of care in the critical setting which Mr. Fortner was in, following his surgery—a critical care unit in a specialty heart hospital—is such that immediate ophthalmologic, as well as neurologic, consultation was required for Mr. Fortner upon first notice to any member of a the [sic] health care team, of any acute change in the patient's vision, and should have been obtained emergently. As a cardiothoracic surgeon, Dr. Messner should be familiar with and able to foresee the potential for ischemic injury to the brain and/or eyes given a past medical history of hypertension and peri-operative anemia and hypotension. As critical care physicians generally, and especially in a specialty heart hospital, Drs. Erwin, Taylor, and the PULM/CC PHYSICIAN (if other than Drs. Taylor and Erwin) should be familiar with and able to foresee the potential for ischemic injury to the brain and/or eyes given a past medical history of hypertension and peri-operative anemia and hypotension. Nurses and physical therapists in such a setting should be trained to immediately procure immediate physician attention for any patient who complains of visual changes.

It is my opinion that the applicable standard of care was breached by the physical therapist employed at [Baylor Hospital], when she merely noted Mr. Former's acute

visual change on 7/16/08, but apparently did nothing further, including communicating the condition to a physician so that immediate evaluation could occur. It is my opinion that Drs. Messner, Erwin, and Taylor and the PULM/CC PHYSICIAN (if other than Drs. Taylor and Erwin) each breached the applicable standard of care by not obtaining immediate ophthalmologic, as well as neurologic, consultation, and by not providing any appropriate therapy or intervention to address Mr. Fortner's visual changes, upon being notified of the same. It is my opinion that [Baylor Hospital] breached the applicable standard of care by apparently failing to provide training to its staff, including but not necessarily limited to its physical therapy providers, about the urgent need for intervention in the form of specialty consultative care, and when and how to access the same, in the event of a foreseeable emergent visual condition such as Mr. Fortner's.

Dr. Kress opines that each of the breaches of the standard of care by Baylor Hospital, Baylor Hospital's employees, Dr. Messner, Dr. Erwin, and Dr. Taylor proximately **\*381** caused or contributed to causation of Mr. Former's injury.

In his December 29, 2010 supplemental report, Dr. Kress notes the consulting ophthalmologist recommended correction of Mr. Fortner's hypotension and anemia. "However, by that time, the patient was noted to have blindness in both eyes which ultimately was determined to be anterior ischemic optic neuropathy." Dr. Kress opines that Baylor Hospital breached the applicable standard of care by either failing to have or enforce policies and procedures, or standing orders, directing practitioners, nurses, and other health care providers about when and how to access specialty consultative care in the event of a foreseeable visual condition such as Mr. Fortner's. He further opines the applicable standard of care was breached by a physical therapist employed by Baylor Hospital when she noted Mr. Fortner's acute visual change but did not communicate the condition to a physician so that immediate evaluation could occur and by a nurse at Baylor Hospital when she delayed communication to a physician about Mr. Fortner's visual changes after she was aware of the changes. With regard to Drs. Messner, Erwin, and Taylor, Dr. Kress states the physicians did not act to treat Mr. Fortner's anemia or hypotension during "the recognized window of opportunity" on July 16, 2008, when Mr. Fortner's acute visual changes were first noted. Dr. Kress specifically refers to the December 20, 2010 report of Dr. Sadun as describing the "window of opportunity" during which corrective action must be taken. Dr. Kress opines the breaches of the standards of care by Baylor Hospital,

Baylor Hospital's employees, and Drs. Messner, Erwin, and Taylor proximately caused or contributed to causation of Mr. Fortner's injury, and states causation is more fully described in Dr. Sadun's report.

In his December 20, 2010 report, Dr. Sadun states he "speak[s] to the issue of causation." Dr. Sadun notes that by postoperative day two, Mr. Fortner's drop in hematocrit and hemoglobin "meant that he had essentially lost half of his red blood cell volume," and shortly after surgery, Mr. Fortner's blood pressure was about half of his preoperative blood pressure. In his report, Dr. Sadun states:

> By postoperative day one, Mr. Fortner noted decreased vision in the right eye and then a day or two later in the left eye.... When he was seen by ophthalmology July 17, 2008 at about 5:30 in the evening the diagnosis was anterior ischemic optic neuropathy with a complete loss of vision in both eyes.

> There are two types of anterior ischemic neuropathy.... Bilateral loss of vision in conjunction with this type of surgery and at such a profound extent is almost certainly the rare second form of anterior ischemic optic neuropathy.... The mechanism of this type of post-surgical anterior ischemic optic neuropathy can ... be termed ... shock induced optic neuropathy.

According to Dr. Sadun, shock induced optic neuropathy, a "watershed infarct (a type of stroke)," is due to a combination of factors that decreases the supply of oxygen in a "more diffuse fashion" than other types of infarcts caused by blood vessel blockage or bleeding. He states that in circumstances where the patient becomes very anemic (low hematocrit) or experiences drops in blood pressure for a "reasonably long duration," shock induced optic neuropathy can occur. According to Dr. Sadun, the amount of time it takes the optic nerve to undergo "irreversible loss" following a lack of adequate blood supply "is in the order of a hundred minutes," although there are a number of factors **\*382** that "might make this longer." According to Dr. Sadun:

> Shock induced neuropathy occurs during but also after surgery. It is not uncommon for it to occur one or two days later.

> Once shock induced optic atrophy occurs there is probably only a narrow window of opportunity to reverse it. This is best done by blood transfusions, which increase the hematocrit or hemoglobin. There may be circumstances where raising the blood pressure is also useful.

In noting four units of blood to raise the hematocrit were not given to Mr. Fortner until the afternoon and evening of July 17 and the afternoons of July 19 and 20, Dr. Sadun states in his report:

> This delay in transfusion probably represented the last opportunity to reverse the visual loss for Mr. Fortner. Failure to do so at this time was inordinate and unfortunate. Indeed, the request for an ophthalmology consultation did result in a belated recommendation for blood transfusion (and to take efforts to maintain blood pressure). Specifically, Dr. Lu, at about 17:38 on the 17th and Dr. Brochner, the next day, expressly recommended efforts to raise the blood pressure and reverse the anemia as reflected by the low hemoglobin and hematocrit. This delay in boosting Mr. Fortner's blood pressure, and more particularly in correcting his severe anemia, nothwithstanding his having severe hypotension and anemia, while also complaining of visual disturbance, was, in my opinion, a breach in the standard of care.

In Dr. Sadun's opinion, Mr. Fortner's loss of vision was a consequence of a "drop in blood count as expressed by hemoglobin and hematocrit (anemia), possibly complicated by drops in blood pressure." With regard to causation, Dr. Sadun opines there was a failure by Baylor Hospital and Drs. Messner, Erwin, and Taylor to obtain timely consultation by an ophthalmologist and a resulting failure to timely commence transfusion therapy and blood pressure elevation. "In concert, this led to Mr. Fortner's permanent blindness."

### *Direct Liability Claims Against Baylor Hospital and Drs. Messner, Erwin, and Taylor*

Appellants' expert reports discuss the medical necessity of timely and appropriate evaluation when a post-surgical coronary artery bypass patient in critical care experiences vision impairment, particularly when the symptom arises in conjunction with recent hypotension and anemia. According to the expert report of Dr. Kress, Drs. Messner, Erwin,

and Taylor should be familiar with, and able to foresee, the potential for "ischemic injury to the brain and/or eyes given [Mr. Former's] past medical history of hypertension and peri-operative anemia and hypotension." In addition, Dr. Kress opined that nurses and physical therapists at a specialty heart hospital, such as Baylor Hospital, should be trained to immediately procure physician attention for any patient who complains of vision changes. The expert reports of Drs. Kress and Sadun make clear that the "watershed" post-surgical anterior ischemic optic neuropathy experienced by Mr. Fortner required timely response and intervention, and opine that the breaches of the applicable standards of care by appellees resulted in untimely and ineffective responses to Mr. Fortner's complaints about vision impairment and, consequently, Mr. Former's permanent blindness.

Dr. Messner argues that the expert reports of Drs. Kress and Sadun are inadequate with respect to causation because they require the trial court to make impermissible inferences concerning the timing **\*383** of the opening and closing of the "window of opportunity" to take corrective action, whether Dr. Messner became aware of Mr. Fortner's vision disturbance within the "window of opportunity," and whether Dr. Messner could have arranged for effective treatment by an ophthalmologist within the "window of opportunity." A similar argument is made by Drs. Erwin and Taylor. Baylor Hospital argues appellants' experts did not "explain how [Baylor Hospital's] alleged breach in failing to have policies and procedures caused Mr. Fortner's permanent blindness."

 [8]   [9]   [10]   Appellees demand too much from the expert report required by section 74.351. One of the fundamental purposes of the expert report requirement in section 74.351 is to deter frivolous claims. *Palacios,* 46 S.W.3d at 878 (Legislature has determined that filing expert report that does not evidence good faith effort to comply with definition of expert report means claim is either frivolous or, at best, has been brought prematurely). An expert report need not marshal all the plaintiff's proof necessary to establish causation at trial. *Wright,* 79 S.W.3d at 52; *Fagadau v. Wenkstern,* 311 S.W.3d 132, 138 (Tex.App.-Dallas 2010, no pet). Indeed, section 74.351 does not require that an expert report anticipate and rebut all possible defensive theories that may ultimately be presented to the trial court, and the fact a plaintiff may not prove causation at trial does not mean an expert report was inadequate. *See Fagadau,* 311 S.W.3d at 139. Instead, the expert report must represent a good faith effort to provide a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet

that standard, and the causal relationship between that failure and the claimed injury. *Palacios,* 46 S.W.3d at 878. The expert report must contain sufficiently specific information to demonstrate causation beyond mere conjecture. *Fagadau,* 311 S.W.3d at 138. Further, the expert must explain the basis of his statements and link his conclusions to the facts. *Wright,* 79 S.W.3d at 52; *Quinones,* 298 S.W.3d at 810.

 **[11]**   Here, within the four corners of the expert reports, Drs. Kress and Sadun collectively opine that Baylor Hospital employees and Drs. Messner, Erwin, and Taylor comprised the team responsible for Mr. Fortner's post-surgical critical care. The expert reports collectively indicate that, while Mr. Fortner's post-surgical complaints of vision impairment should have been recognized by these physicians and health care providers as problematic in light of Mr. Fortner's hypotension and anemia, Mr. Fortner did not receive timely attention and treatment, including timely consultation by an ophthalmologist, blood transfusion therapy, and measures to elevate blood pressure, which caused the optic nerve of each of Mr. Fortner's eyes to be deprived of an adequate blood supply over a period of time sufficient to result in permanent blindness in both eyes. The expert reports identify each physician and health care provider against which direct liability claims are asserted, including Baylor Hospital, and discuss how the provider breached the applicable standard of care and caused or contributed to causation of Mr. Fornter's injury. With regard to Baylor Hospital, Dr. Kress opines that the hospital breached the applicable standard of care by either failing to have or enforce policies and procedures, or standing orders, directing practitioners, nurses, and other health care providers about when and how to access specialty consultative care in the event of a foreseeable visual condition such as Mr. Former's, resulting in untimely health care intervention and Mr. Fortner's injury.

The expert reports in this case represent a good faith effort to provide a fair **\*384** summary of the experts' opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between the failure and the claimed injury. Collectively, the expert reports contain sufficient information to inform appellees of the specific conduct that appellants have called into question and to provide a basis for the trial court to conclude the claims have merit. *See Brandal,* 257 S.W.3d at 206–07; *Palacios,* 46 S.W.3d at 879. Therefore, we conclude the trial court abused its discretion in dismissing appellants' direct liability claims against Baylor Hospital and

Drs. Messner, Erwin, and Taylor. We resolve appellants' sole issue in their favor in part.

### *Direct Liability Claims Against Dallas Diagnostic, HeartFirst, and Texas Clinic*

In their First Amended Petition, appellants allege the "entity" appellees—Dallas Diagnostic, HeartFirst, Texas Clinic, and Baylor Hospital—were negligent. In their brief, appellants affirmatively state they are "not pursuing claims of direct negligence, as opposed to vicarious liability, against any of the entity [appellees] other than [Baylor Hospital]." Therefore, we conclude the trial court did not abuse its discretion by dismissing with prejudice appellants' direct liability claims of negligence, as opposed to vicarious liability, asserted against Dallas Diagnostic, HeartFirst, and Texas Clinic. We affirm the trial court's dismissal of appellants' direct liability negligence claims against Dallas Diagnostic, HeartFirst, and Texas Clinic, and we resolve appellants' sole issue against them in part.

### *Vicarious Liability Claims Against Baylor Hospital, Dallas Diagnostic, HeartFirst, and Texas Clinic*

Appellants allege Dallas Diagnostic is vicariously liable for the negligence of its members, Drs. Erwin and Taylor. Appellants likewise allege HeartFirst and Texas Clinic are vicariously liable for the negligence of their employee, Dr. Messner. Finally, appellants allege Baylor Hospital is vicariously liable for the negligence of its employees, agents, ostensible agents and representatives.

 **[12]**   With regard to appellants' theories of vicarious liability asserted against Dallas Diagnostic, HeartFirst, Texas Clinic, and Baylor Hospital, "when a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious liability theory. And if any liability theory has been adequately covered, the entire case may proceed." *Certified EMS, Inc. d/b/a CPNS Staffing v. Potts,* 392 S.W.3d 625, 632 (Tex.2013). *See also, TTHR Ltd. P'ship v. Moreno,* 401 S.W.3d 41 (Tex.2013), *available at* http://www.supreme.courts.state.tx.us/historical/2013/apr/110630.pdf. Having concluded appellants' experts' reports represent an objective good faith effort to comply

with the definition of an expert report in section 74.351(r)(6) with regard to appellants' direct liability claims against Drs. Erwin, Taylor, and Messner, those reports are sufficient to support appellants' vicarious liability claims against Dallas Diagnostic, HeartFirst, and Texas Clinic.

Dr. Kress expresses the following opinions regarding the negligence of Baylor Hospital employees: a physical therapist was negligent when she noted Mr. Fortner's acute visual change but did not communicate the condition to a physician so that immediate evaluation could occur, and Nurse Jones was negligent by delaying **\*385** communication to a physician about Mr. Fortner's visual changes after she was aware of the changes. Baylor Hospital argues the expert reports lack sufficient specificity on causation because the experts did not opine that any breach by hospital employees "occurred within the 100–minute window or the 'narrow window of opportunity,' during which the visual loss allegedly could have been reversed."

As discussed above, the expert reports opine Mr. Former's post-surgical complaints of vision impairment should have been recognized by the health care providers and physicians providing post-surgical critical care, including the Baylor Hospital employees, and the failure to provide timely attention and treatment caused the injuries to the optic nerves in each of Mr. Former's eyes, resulting in total blindness. With regard to appellants' clam of the vicarious liability of Baylor Hospital for the negligence of its employees, appellants' experts' reports represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6), and those reports are sufficient to support appellants' vicarious liability claim against Baylor Hospital.

Therefore, we conclude the trial court erred in dismissing appellants' vicarious liability claims against Baylor Hospital, Dallas Diagnostic, HeartFirst, and Texas Clinic. We resolve appellants' sole issue in their favor in part.

### *Informed Consent Claims*

In their First Amended Petition, appellants allege neither Dr. Messner nor Baylor Hospital disclosed to, or informed, Mr. Fortner that vision loss was a potential risk or hazard associated with the anticipated surgical or post-surgical procedures. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.101 (West 2011) (in health care liability claims based

on lack of informed consent, "the only theory on which recovery *may* be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent"); *Greenberg v. Gillen,* 257 S.W.3d 281, 282–83 (Tex.App.-Dallas 2008, pet. dismissed) (in cases alleging lack of informed consent, there are two separate parts to causation analysis: whether a reasonable person could have been influenced to decide to give or withhold consent by being informed of risks or hazards that were not disclosed, and whether injury complained of was caused in fact by the undisclosed risk). In their brief, appellants state, "Although [appellants] also asserted a lack of informed consent as part of their negligence claims against [Baylor Hospital], Dr. Messner, and his employers [HeartFirst, and Texas Clinic], the court dismissed the informed consent allegation by bench order." At the March 2011 hearing, appellants counsel stated he understood the informed consent claims would be taken off the table unless appellants provided an expert report addressing those claims, and he acknowledged there was no expert report addressing those claims. On appeal, appellants have not asserted the trial court erred by dismissing their direct liability claims of lack of informed consent against Dr. Messner or Baylor Hospital and their claims of vicarious liability for lack of informed consent against Dr. Messner's employers, HeartFirst or Texas Clinic. Therefore, we conclude the trial court did not abuse its discretion by dismissing with prejudice appellants' claims of lack of informed consent against Dr. Messner, Baylor Hospital, HeartFirst, and Texas Clinic. We affirm the trial court's dismissal of appellants' claims of lack of informed consent, and we resolve appellants' sole issue against them in part.

### \*386 Conclusion

We affirm the trial court's dismissal of appellants' claims of lack of informed consent against Baylor Hospital, Dr. Messner, HeartFirst, and Texas Clinic. We affirm the trial court's dismissal of appellants' direct liability claims against Dallas Diagnostic, HeartFirst, and Texas Clinic. We reverse the trial court's dismissal of appellants' direct liability claims against Baylor Hospital, Dr. Messner, Dr. Erwin, and Dr. Taylor and appellants' vicarious liability claims against Baylor Hospital, Dallas Diagnostic, HeartFirst, and Texas Clinic. We remand this cause to the trial court for further proceedings.

**All Citations**

399 S.W.3d 373

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

852 S.W.2d 916
Supreme Court of Texas.

GENERAL CHEMICAL CORPORATION, Petitioner,

v.

Gonzalo DE LA LASTRA and Amada De La Lastra,
Individually and as Personal Representative of
the Estates of Gustavo De La Lastra and Jose
Eduardo De La Lastra, Decedents, Respondents.

No. D–1799. | Feb. 24, 1993. | Rehearing
Overruled June 3, 1993. | Concurring
Opinion of Justice Cornyn June 3, 1993.

Parents of deceased shrimp fisherman brought products liability action against manufacturer of sodium metabisulfite ("shrimp dip"), asserting survival and wrongful death causes of action. Judgment in excess of $44 million was entered in the District Court Number 197, Cameron County, Menton Murray, Jr., J., and manufacturer appealed. The Court of Appeals, Thirteenth Judicial District, 815 S.W.2d 750, affirmed. On application for writ of error, the Supreme Court, Gonzalez, J., held that: (1) manufacturer waived application of maritime law, with its limited elements of damages, by failing to object to evidence and jury questions regarding damages not recoverable under maritime law; (2) evidence supported jury finding of gross negligence supporting award of punitive damages; but (3) parents could not recover punitive damages for wrongful death and thus punitive damages limit under statute generally limiting punitive damages to four time the actual damages awarded had to be based only on the survival recovery.

Affirmed in part and reversed and remanded in part.

Cornyn, J., filed concurring opinion.

Hecht, J., filed concurring and dissenting opinion in which Phillips, C.J., and Enoch, J., joined.

West Headnotes (12)

**[1]** **Admiralty**
 Causing death

Wrongful death action against manufacturer of product which caused death of commercial fisherman on board a fishing vessel in territorial waters fell within purview of maritime law.

2 Cases that cite this headnote

**[2]** **Admiralty**
 Effect of State Laws

When invoked, maritime law becomes the exclusive remedy under which party may proceed, preempting all state law grounds of recovery.

1 Cases that cite this headnote

**[3]** **Admiralty**
 Effect of State Laws

Maritime law, though properly invoked, can be waived.

1 Cases that cite this headnote

**[4]** **Admiralty**
 Remedies and procedure
**Admiralty**
 Saving of common-law remedy

State courts have concurrent jurisdiction with federal courts over maritime actions, constrained by "reverse-Erie doctrine," which requires that substantive remedies afforded by the states conform to governing federal maritime standards. 28 U.S.C.A. § 1333.

14 Cases that cite this headnote

**[5]** **Admiralty**
 Jurisdiction in general

Maritime law does not affect court's jurisdiction over claim, but merely dictates the substantive law that governs that claim's resolution.

2 Cases that cite this headnote

**[6]** **Admiralty**
 Wrongful death

Defendant manufacturer, in products liability wrongful death action, waived application of maritime law, though it had pled that case was

governed by maritime law, where it failed to object to evidence and jury questions regarding damages not recoverable under maritime law and where, at time of trial, there was available federal remedy and state and federal law contained separate and distinct elements of damages. Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

16 Cases that cite this headnote

[7]    **Appeal and Error**
　📌 Error Committed or Invited by Party Complaining

Parties may not invite error by requesting issue and then objecting to its submission.

25 Cases that cite this headnote

[8]    **Death**
　📌 Damages

Evidence supported finding of gross negligence on the part of manufacturer of sodium metabisulfite ("shrimp dip") in failing to place warning informing users of risk of death, supporting award of punitive damages, in light of evidence of nearly identical prior incident in which shrimpers were asphyxiated in boat's hold when they spread sodium metabisulfite across iced shrimp, as well as at least nine other incidents of death or injury involving the product.

5 Cases that cite this headnote

[9]    **Products Liability**
　📌 Warnings or Instructions

Presence on label of proper instructions regarding product's use would not preclude finding of failure to adequately warn of serious consequences associated with foreseeable use.

2 Cases that cite this headnote

[10]    **Death**
　📌 Statutory limitations

In light of state constitutional prohibition against recovery of punitive damages by parents in wrongful death action, permissible punitive damages in combined survival and wrongful death action brought by parents was limited to statutory maximum of four times the actual damages recovered in the survival actions. V.T.C.A., Civil Practice & Remedies Code §§ 41.001(6)(A), 41.007; Vernon's Ann.Texas Const. Art. 16, § 26.

15 Cases that cite this headnote

[11]    **Death**
　📌 Exemplary damages

Parents of deceased, while entitled to maintain action under the Wrongful Death statute, are unable to recover punitive damages. V.T.C.A., Civil Practice & Remedies Code §§ 71.001 et seq., 71.004; Vernon's Ann.Texas Const. Art. 16, §§ 26, 26 comment.

12 Cases that cite this headnote

[12]    **Statutes**
　📌 Motives, Opinions, and Statements of Legislators
　**Statutes**
　📌 Sponsors or authors

Intent of individual legislator, even statute's principle author, is not legislative history controlling construction given statute, but is at most persuasive authority.

19 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*917** W. James Kronzer, Jr., Leslie C. Taylor, Houston, Royal H. Brin, Jr., Dallas, John William Black, Brownsville, for petitioner.

Elizabeth A. Davis, Houston, Ray R. Marchan, Guy Allison, Thomas F. Nye, Corpus Christi, John R. Lyde, McAllen, for respondents.

**OPINION**

GONZALEZ, Justice.

This products liability case presents two principal issues. First, whether general maritime law or state law applies to the facts before us. Second, whether the punitive damages award was excessive under state law or the state constitution.

Two young men died at sea from asphyxiation on a shrimp boat expedition after using a chemical preservative on their catch. Their parents brought suit against General Chemical Corporation, the manufacturer of the chemical, and other defendants alleging negligence, gross negligence, and a violation of the Texas wrongful death statute. Among other things, General Chemical pled that this case was governed by federal maritime law. However, the jury was asked without objection to determine damages which are recoverable under state law but not under federal maritime law. Based on favorable jury findings of these issues, judgment was rendered in favor of the parents and the estates of the young men. In their individual capacity, the parents were awarded an amount for actual damages and, as representatives of the estates, they were awarded actual damages and punitive damages. The court of appeals affirmed, holding that this was not a maritime law case. 815 S.W.2d 750. We hold that state law applies because maritime law, although properly invoked, was waived in this case; we further hold that the punitive damage award exceeds the **\*918** four times actual damages cap found in TEX.CIV.PRAC. & REM.CODE § 41.007 and violates the Texas Constitution's prohibition (Art. XVI, section 26) against parents recovering punitive damages in wrongful death actions. Thus, we affirm in part and reverse and remand this cause to the trial court for a recalculation of damages consistent with this opinion.

**I.**

In June 1988, Jose De La Lastra and his brother Gustavo were commercial fishermen aboard the "Wilderness," a fishing vessel which operated in the waters off Brownsville, Texas. Sodium metabisulfite, colloquially called "shrimp dip," is a product manufactured by General Chemical that is commonly used in the shrimping industry to prevent "black spots" from marring freshly caught fish. The bags in which the shrimp dip is sold are marked with a warning in English and in Spanish that says, among other things:

CAN IRRITATE THE SKIN, EYES AND RESPIRATORY TRACT, PROLONGED EXPOSURE MAY CAUSE BURNS.

HARMFUL IF INGESTED, MAY CAUSE SEVERE ALLERGIC REACTION IN SOME ASTHMATICS AND SULFITE SENSITIVE INDIVIDUALS.

REACTS WITH ACIDS AND WATER, RELEASING TOXIC SULFUR DIOXIDE GAS.

AVOID CONTACT WITH SKIN AND EYES.

DO NOT BREATH PRODUCT DUST, USE WITH PROPER VENTILATION.

DO NOT SWALLOW.

AVOID CONTACT WITH ACIDS.

CONTACT WITH WATER SHOULD BE UNDER WELL VENTILATED CONDITIONS.

Do Not Use In Dry Form.

Prepare and use dip solution on deck—NOT IN HOLD. Toxic sulphur dioxide gas may be liberated.

The De La Lastras were either unaware of or consciously disregarded this warning. They used "shrimp dip" in their vessel's hold by layering ice and dry-form shrimp dip across their catch. They were overcome by the sulfur dioxide fumes, and died of asphyxiation shortly after losing consciousness.

The parents, individually and as personal representatives of the estates of their sons, brought suit against General Chemical, and against the owner of the vessel.[1] Their cause of action was based on strict liability, negligence, and gross negligence in manufacturing and distributing a product with knowledge that the product could cause serious bodily injury or death and in failing to adequately warn of such dangers.

[1] Only General Chemical is a party to this appeal. The claim against the owner of the vessel was severed.

General Chemical pled that the deceased brothers were seamen, that the occurrence occurred beyond the territorial waters of Texas, and that therefore the rights of the parties were governed by maritime law and the Death on the High Seas Act, 46 U.S.C.App. § 761–62 (DOHSA). Under DOHSA, a party is precluded from recovering any non-

pecuniary damages, such as mental anguish, loss of society, and punitive damages. General Chemical asserts that this pleading is sufficient to invoke the common law doctrine of general maritime law.

The jury found that the deaths occurred within the territorial waters of Texas, that General Chemical was guilty of negligence and gross negligence in failing to provide an adequate warning on their product of the dangers associated with its use, and that the failure to warn rendered the product in question unreasonably dangerous as marketed. Based on the jury verdict, the parents were awarded a $44,628,698.63 judgment against General Chemical. [2]

[2]  The damages awarded were as follows:

To the parents individually (wrongful death):

| | |
|---|---|
| Pecuniary loss (Gustavo) | $500,000.00 |
| Pecuniary loss (Jose) | $500,000.00 |
| Loss of companionship and society (Gustavo) | $2,500,000.00 |
| Loss of companionship and society (Jose) | $2,500,000.00 |
| Mental anguish (Gustavo) | $2,500,000.00 |
| Mental anguish (Jose) | $2,500,000.00 |
| Cost of psychological care | $5,000.00 |

To the parents as representatives of Gustavo's estate: (survival damages):

| | |
|---|---|
| Pain and mental anguish | $1,000,000.00 |
| Punitive damages | $15,000,000.00 |

To the parents as representatives of Jose's estate: (survival damages):

| | |
|---|---|
| Pain and mental anguish | $1,000,000.00 |
| Punitive damages | $15,000,000.00 |
| Prejudgment interest | $1,623,698.63 |
| Total | $44,628,698.63 |

**\*919  II.**

General Chemical argues that maritime law, and not state law, controls this case, and therefore nonpecuniary damages of loss of society and companionship, mental anguish, and punitive damages are not recoverable. *See Miles v. Apex Marine Corp.,* 498 U.S. 19, —— 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990). [3]

[3]  *Miles* impliedly overruled previous decisions recognizing a right of recovery for loss of society damages under general maritime law. *See Sea–Land Services v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), and *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). General Chemical argues that *Miles* would control here if maritime law applies, although that case involved a suit by a seaman against his employer. We do not today decide whether the *Miles* holding extends to actions against third parties, such as General Chemical.

 [1]   There is little question that the facts of this case come within the purview of maritime law. *See Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Although neither DOHSA, 46 U.S.C.App. § 761, nor the Jones Act, 46 U.S.C.App. § 688, provides a remedy under these circumstances, [4] the United States Supreme Court in *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 409, 90 S.Ct. 1772, 1792, 26 L.Ed.2d 339 (1970), has recognized a common law remedy for wrongful deaths occurring in territorial waters under the general maritime law. Therefore, general maritime law is applicable to the facts of this case.

[4]  DOHSA provides a remedy for wrongful death occurring on the high seas, beyond three nautical miles from shore, while the Jones Act provides a remedy for seamen against their employers. This incident occurred in the territorial waters of Texas, and is an action against a third party, not the decedents' employer.

 [2]   [3]   [4]   [5]   When invoked, maritime law becomes the exclusive remedy under which a party may proceed, preempting all state law grounds of recovery. *See Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986); *Mandell & Wright v. Thomas,* 441 S.W.2d 841 (Tex.1969). Nevertheless, the issue squarely before us is whether maritime law, although properly invoked, can be waived. We conclude that it can. Both the United States Supreme Court and this Court, as well as many federal circuits, have held that preemption arguments which affect the choice of law, and not the choice of forum, are waivable. *See International Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 393, 106 S.Ct. 1904, 1913, 90 L.Ed.2d 389 (1986); *Heci Exploration Co. v. Holloway,* 862 F.2d 513, 520 (5th Cir.1988); *Dueringer v. General American Life Ins. Co.,* 842 F.2d 127, 130 (5th Cir.1988); *Johnson v. Armored Transport of Calif., Inc.,* 813 F.2d 1041, 1043–

44 (9th Cir.1987); **\*920** *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1497 (9th Cir.1986); *Gorman v. Life Ins. Co. of North America,* 811 S.W.2d 542, 545 (Tex.1991). Pursuant to the "savings to suitors" clause of 28 U.S.C. § 1333, state courts have concurrent jurisdiction with the federal courts over maritime actions, constrained by the " 'reverse-Erie' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards." *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 223, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986); *see also Texaco Ref. and Mktg, Inc. v. Estate of Dau Van Tran,* 808 S.W.2d 61, 64 (Tex.), *cert. denied,* 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 245 (1991). Thus, maritime law does not affect a court's jurisdiction over the claim, it merely dictates the substantive law that governs that claim's resolution. As such, maritime law is a choice of law determination that can be waived.

 [6]    Under the facts of this case General Chemical waived the application of maritime law by failing to object to evidence and jury questions regarding damages which are not recoverable under maritime law.

 [7]    Although it asserted that DOHSA controlled, General Chemical failed to bring to the trial court's attention the potential applicability of general maritime law limitations on damages. Instead, General Chemical incorrectly assumed that, if the jury found that the deaths occurred in territorial waters, federal law supplied no remedy and the claim would therefore be governed by Texas law. General Chemical submitted an issue inquiring if the deaths occurred beyond three nautical miles from shore. After a negative jury finding, precluding the applicability of DOHSA, the remaining questions that were submitted were damages recoverable under the Texas wrongful death and survival statutes; including elements of damages not recoverable under general maritime law. General Chemical did not object to the submission of these issues, *see* TEX.R.CIV.P. 274, and in fact, requested the very issues that it now seeks to avoid.[5] Parties may not invite error by requesting an issue and then objecting to its submission. *See Daily v. Wheat,* 681 S.W.2d 747, 754 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *City of Amarillo v. Langley,* 651 S.W.2d 906, 914 (Tex.App.—Amarillo 1983, no writ); *Beasley v. Baker,* 333 S.W.2d 212, 214 (Tex.Civ.App.—Amarillo 1960, no writ). Further, it was not until its motion for rehearing in the court of appeals that General Chemical asserted the applicability of maritime law; and in its post submission brief to this Court,

General Chemical admits that the judgment was based on state law.[6]

5    Without a doubt it is evident that at trial, General Chemical relied on state law. In a response to a motion in the court of appeals, General Chemical stated:

[t]he judgment against the appellant herein is not under the Jones Act but rather under common law and statutory law of the state of Texas. Appellant is not appealing any claim under the Jones Act but rather a claim under the Texas common law of negligence and strict product liability.... Here the suit against the employer and shipowner ... was severed and made the subject of a separate action.

6    The liability issues under state and federal law are identical. The only potential distinction is the recoverable damages. Therefore, in order to determine under what law the judgment was based, this distinction becomes a critical inquiry.

General Chemical defends its submission of state law damages and its failure to assert the application of federal law in the trial court by claiming that the United States Supreme Court had not yet recognized a wrongful death action for seamen under general maritime law, and, alternatively, the damages recoverable under general maritime law had not been fully developed; it wasn't until *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1991), decided while this case was pending in the court of appeals, that the Supreme Court recognized this ground of recovery and established its available damages. This argument fails on both grounds.

As previously discussed, an action under general maritime law for wrongful deaths **\*921** occurring in territorial waters was recognized over twenty years ago in *Moragne v. States Marine Lines, Inc., supra.* While *Moragne* left open the question of what damages were available under this ground of recovery, subsequent Supreme Court and federal circuit decisions have addressed this issue. In *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 585, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974), the Court held that, in general maritime wrongful death actions, a decedent's dependents may recover damages for loss of support, services, and society, but not for mental anguish. This holding was reiterated in *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 216, 106 S.Ct. 2485, 2491, 91 L.Ed.2d 174 (1986) and *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 622, 98 S.Ct. 2010, 2013, 56 L.Ed.2d 581 (1978).[7]

7    Although *Tallentire* and *Higginbotham* addressed issues that are different than those facing us today, both expressly recognized that, under *Gaudet,* loss of society damages were available under general maritime law.

The fifth circuit has also addressed the damages available under general maritime law. In *Sistrunk v. Circle Bar Drilling Co.,* 770 F.2d 455, 459 (5th Cir.1985), and *Patton–Tully Trans. Co. v. Ratliff,* 797 F.2d 206, 213 (5th Cir.1986), the court, following *Gaudet,* held that parents could not recover loss of society damages absent a showing of dependency upon the deceased children. *See also Truehart v. Blandon,* 672 F.Supp. 929, 930 (E.D.La.1987); *Hebert v. Otto Candies, Inc.,* 402 F.Supp. 503, 507 (E.D.La.1975). Further, *Miles,* the very case General Chemical now relies upon, was a fifth circuit opinion, decided prior to the underlying trial of this case. 882 F.2d 976 (5th Cir.1989), *aff'd,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1991).

These cases illustrate that, at the time this case went to trial, not only was there an available federal remedy, but also that state and federal law contained separate and distinct elements of damages; under maritime law mental anguish damages were unavailable and loss of society could only be recovered upon a showing of dependency. General Chemical was obligated to object to jury questions on such damages in order to preserve error. Although the Supreme Court did not decide *Miles* until later, General Chemical was required to object to jury questions concerning these damages in order to receive the benefit of a change in the law—to the extent there was one—on appeal. By failing to pursue its available federal remedy at trial, instead choosing to submit issues based on state law, General Chemical has waived the application of general maritime law.

### III.

 [8]    We next consider the punitive damages issue. General Chemical asserts that the punitive damage award cannot stand because there was no evidence to support the jury finding of gross negligence. We disagree.

 [9]    There was evidence of a prior incident in 1973 involving the shrimping vessel "Cape Rojo." This case involved facts nearly identical to this one. Two shrimpers were asphyxiated in the boat's hold when they spread sodium metabisulfite across iced shrimp. Following an investigation of the deaths, the Coast Guard sent a letter to Allied Chemical, General Chemical's predecessor, advising them to adequately warn

consumers of the potential dangers associated with use of this product. While it is true that the Coast Guard report does not state that users of the product should be warned that the chemical is deadly, Commander Pangrass of the United States Coast Guard testified that this is the type of warning that they were trying to get the manufacturer to give. There was further testimony that Allied Chemical knew of at least nine other incidents of death and/or injury involving sodium metabisulfite.[8] **\*922** Despite this knowledge General Chemical failed to place warnings which informed users of the risk of death. There was also testimony from a warnings expert that General Chemical's warnings were grossly inadequate considering the known dangers and effects of sodium metabisulfite. We conclude that all of this evidence amounts to some evidence of gross negligence.[9]

8    The dissent suggests that the non-fatal injuries involved different circumstances and are therefore not probative evidence of General Chemical's gross negligence. We disagree. All of the injuries involved incidents of asphyxiation. One of the individuals injured was an employee of Allied Chemical who was merely transporting the sodium metabisulfite. This is competent evidence of General Chemical's actual knowledge of the risks involved with the handling of the product.

9    The dissent argues that if the De La Lastras would have used the product in accordance with the instructions, the chemical would not have been deadly. While perhaps this is true, it confuses the inquiry. Although the label contained proper *instructions* regarding the product's *use,* it failed to adequately *warn* of the serious *consequences* associated with this foreseeable use. Furthermore, as the dissenting opinion acknowledges, since General Chemical did not challenge the jury's finding that the warning was inadequate, "the inadequacy of the warning label must be taken as an established fact." At 926.

 [10]    Having concluded that there is some evidence upon which to base an award of punitive damages, we next consider whether the punitive damages awarded in this case were excessive under state law and the constitution. General Chemical asserts that the punitive damage award is governed by section 41.007 of the Texas Civil Practice and Remedies Code and must therefore be reduced to four times the actual damage award. At the same time General Chemical challenges the punitive damage award as unconstitutionally excessive under article I, section 19 of the Texas Constitution. TEX.CIV.PRAC. & REM.CODE § 41.007 states: "Except as provided by Section 41.008, exemplary damages awarded

against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater." Although this provision does not apply to intentional torts or torts in which there is finding of malice as defined by § 41.001(6)(A), when applicable, the amount of punitive damages to which a party is entitled is limited to four times the amount of actual damages recovered.

In determining the amount of actual damages to use as a base in calculating the four to one ratio, the trial court included the parents' wrongful death recovery. This represented an actual damage figure of over $6,500,000 on which the $15,000,000 punitive damages awarded to each estate was to be based; just over a 2 to 1 ratio. Accordingly, the trial court rendered judgment for the full amount of the jury award.

Petitioners assert that including the parents' wrongful death recovery as actual damages in the ratio calculation of section 41.007 allows the parents to recover punitive damages for wrongful death in violation of TEX. CONST. art. XVI, § 26. Rather, they contend that the amount of actual damages that should be used in determining the permissible ratio is the $1,000,000 each estate received under the survival recovery; thus, each estate would be limited to a punitive damages recovery of $4,000,000. We agree.

TEX. CONST. art. XVI, § 26 provides:

> Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

At common law, a cause of action for personal injuries and the right to exemplary damages for the willful or wanton conduct of the tortfeasor terminated with the deceased. In order to give the decedent's survivors an available remedy, Texas passed the Wrongful Death Act. However, this Act was said to have created a new cause of action, as opposed to a mere continuation of the deceased's cause of action, and thus the right to recover exemplary damages still terminated upon the death of the decedent. The constitutional provision **\*923** was enacted to allow the survivors to recover exemplary damages. TEX. CONST. art. XVI, § 26, interp. commentary;

*Scoggins v. Southwestern Elec. Serv. Co.,* 434 S.W.2d 376 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.).

 **[11]**   It is well established that this provision defines the class of persons who are entitled to recover punitive damages for wrongful death; parents of the deceased, while they are entitled to maintain an action under the Wrongful Death statute, are not included in article XVI, § 26 and are therefore unable to recover punitive damages. TEX.CIV.PRAC. & REM.CODE § 71.004; *Winnt v. Int'l & G.N. Ry. Co.,* 74 Tex. 32, 11 S.W. 907, 908 (1889); *see also Houston & T.C. Ry. Co. v. Baker,* 57 Tex. 419, 424 (1882) (holding that parents are not among those who are entitled to recover exemplary damages for wrongful death under article XVI, § 30 of the Texas Constitution of 1869). The Wrongful Death statute cannot broaden the class of persons entitled to recover punitive damages beyond the scope of article XVI, § 26 of the constitution. *Scoggins,* 434 S.W.2d at 380. In 1889 this Court, analyzing the relationship between article XVI, § 26 and the Wrongful Death Act said, "the right to maintain an action for the recovery of exemplary damages for the death of a person ... is confined to the class of persons who, by the terms of the constitution, are designated as entitled to maintain such action; namely the surviving husband or wife, or heirs of the body, of the deceased, and not to the parent." *Winnt,* 11 S.W. at 908.

In the instant case, the court of appeals affirmed the trial court's damage award, rejecting petitioner's argument that the constitution prohibits the inclusion of the parents' wrongful death recovery in the punitive damages calculation. 815 S.W.2d at 758. The court of appeals rested its conclusion on this Court's decision in *Hofer v. Lavender,* 679 S.W.2d 470 (Tex.1984) and on the definition of "claimant" as defined in TEX.CIV.PRAC. & REM.CODE § 41.001(1). [10] Under section 41.001(1), when a party is seeking exemplary damages for the death of an individual, both the deceased and the persons seeking recovery are defined as a claimant.

---

10     Section 41.001 defines claimant as:
> a party, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff, seeking recovery of exemplary damages. In a cause of action in which a party seeks recovery of exemplary damages related to injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of exemplary damages.

TEX.CIV.PRAC. & REM.CODE § 41.001(1).

 **[12]**    Although "claimant" appears nowhere in the punitive damages limitation provision of section 41.007 and would seem to have no application, Senator Montford, the author of this chapter, in an article in the Houston Law Review, gave his view that anyone who seeks recovery of exemplary damages under Chapter 41 is a claimant for all purposes of this chapter, including section 41.007, and that both the parent's and the child's recovery are to be included in calculating the punitive damages ratio. Montford and Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System Part Two,* 25 Houston L.Rev. 245, 316 (1988). Nevertheless, the intent of an individual legislator, even a statute's principal author, is not legislative history controlling the construction to be given a statute. It is at most persuasive authority as might be given the comments of any learned scholar of the subject. Even if Senator Montford's interpretation is correct, however, just as the Wrongful Death statute cannot expand upon the Constitution, neither can section 41.007.

As previously noted, the court of appeals also relied on our decision in *Hofer v. Lavender,* 679 S.W.2d 470 stating:

> [a]ppellants rely on *Hofer v. Lavender* (citations omitted), which held that parents cannot recover exemplary damages under the Wrongful Death Act. The court in *Hofer,* however, stated that "exemplary **\*924** damages survive to the estate, whoever the beneficiaries of that estate may be." *Id.* at 476. In the instant case, the beneficiaries of the estate are Gonzalo and Amada De La Lastra.

This conclusion is based upon a misapplication of *Hofer.* In *Hofer,* this Court addressed the issue of whether the parents, as beneficiaries, are entitled to punitive damages that are awarded to the estate of the deceased under a survival cause of action. Concluding that the parents were entitled to recover, we said,

> [t]he survival statute did not create a new cause of action, but kept alive the cause of action that the deceased might have had. It makes no sense to say that a tortfeasor may have exemplary damages assessed against him in favor of a decedent's estate if the beneficiaries of the estate are a spouse or children, but not if the beneficiaries are otherwise.... exemplary damages

survive to the estate, whoever the beneficiaries of that estate may be.

*Id.* at 476. The rationale behind allowing parents, as beneficiaries, such a recovery is that in a survival cause of action the *estate* is seeking punitive damages, not the parents; the classification of the beneficiaries of the estate should not determine the estate's ability to seek this recovery. However, to allow parents, as beneficiaries of an estate, to also include their recovery for *wrongful death* with their survival recovery would impermissibly extend *Hofer,* allowing parents to circumvent article XVI, § 26 by bootstrapping their wrongful death recovery to their survival damages in order to procure a larger punitive damage award. This should not and can not be the result. Wrongful death and survival recoveries are independent of one another, and the availability of one should in no way affect the other.

It is well settled that had the De La Lastras brought only a wrongful death action, they would not be entitled to recover punitive damages. *Hofer,* 679 S.W.2d at 475; *Winnt,* 11 S.W. at 908; *Houston,* 57 Tex. at 424 (1882). It is therefore illogical to allow these damages to be included when a survival recovery is also effectuated. If the parents, as representatives of the estate, were to bring a survival action only, each estate would be limited to a punitive damage recovery of $4,000,000; four times the actual damages award of $1,000,000. By including the wrongful death recovery, however, the punitive damage award of $15,000,000 falls within the permissible recovery ratio; a recovery that would not be allowed, but for the inclusion of the wrongful death damages. Thus, including these wrongful death damages effectively allows the parents to recover punitive damages of $11,000,000 for wrongful death, as opposed to receiving as beneficiaries what the estate was entitled to under their survival cause of action. Such a recovery clearly violates article XVI, § 26. Accordingly, we hold that the De La Lastra's wrongful death recovery cannot be used in calculating the amount of actual damages for purposes of determining the amount of recoverable punitive damages. Therefore, the award of $15,000,000 in punitive damages to each estate must be reduced.

General Chemical also asserts that the current Texas system of awarding punitive damages, and the resulting excessive punitive damage award deprived them of their constitutional rights of due process as guaranteed by article I, § 19 of the Texas Constitution and the Fourteenth Amendment to the United States Constitution. Petitioners rely on *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct.

1032, 113 L.Ed.2d 1 (1991), in which the United States Supreme Court addressed the question of whether an excessive punitive damage award violates due process under the Fourteenth Amendment. Although the Court found the damage award in that case to be constitutional, [11] it did recognize that in certain circumstances a **\*925** due process challenge to excessive punitive damages could be made. The Court undertook an individualized analysis, focusing on the procedural safeguards afforded a defendant, such as the amount of discretion the jury has in its determination of punitive damages, the instructions the jury received which inform the jury of the policy and purpose behind punitive damages, and the trial court and appellate review of the jury award. Nevertheless, because we conclude that section 41.007 mandates a reduction in the punitive damages, we need not address whether or not this award was unconstitutionally excessive in light of *Haslip.* [12]

[11]    The punitive damages awarded in *Haslip* were about $840,000. The compensatory damages were $200,000. This amounts to a ratio of approximately 4.2 to 1.

[12]    General Chemical asserts the applicability of section 41.007 and seeks to have the 4–1 ratio imposed. We need not address whether such a ratio will in all cases withstand a constitutional challenge. Contrary to the dissent's view, General Chemical has not raised a constitutional challenge to section 41.007.

The survival recovery for each estate was $1,000,000, thus each estate is entitled to receive $4,000,000 in punitive damages. This equates to a total punitive damage recovery of $8,000,000. We therefore reverse the judgment of the court of appeals as it relates to punitive damages and remand this cause to the trial court to render judgment consistent with this opinion.

Concurring opinion by CORNYN, J.

Concurring and dissenting opinion by HECHT, J., joined by PHILLIPS, C.J., and ENOCH, J.

CORNYN, Justice, concurring.

**[Filed June 3, 1993]**

I agree with the court that there was some evidence of gross negligence presented in the trial court. I concur in the judgment rather than join the court's opinion, however, because I cannot agree with the remainder of the opinion.

HECHT, Justice, concurring and dissenting.

**[Filed Feb. 24, 1993]**

I agree with the Court that General Chemical cannot complain on appeal that federal maritime law precludes recovery of damages for nonpecuniary loss—damages for mental anguish and loss of society, and punitive damages—when that complaint was not made in the trial court. Hence, I join in Part II of the Court's opinion. I write separately on this issue only because I believe that General Chemical's reliance upon *Texaco Ref. & Mktg., Inc. v. Van Tran,* 808 S.W.2d 61 (Tex.1991), deserves an additional response. I do not agree, however, that there is any probative evidence to support an award of punitive damages. Thus, while I believe the Court is correct in Part III of its opinion that TEX.CIV.PRAC. & REM.CODE § 41.007 limits the amount of punitive damages which *could* be awarded in this case, I would hold that there is no basis for any award at all, not the $30 million found by the jury nor the $8 million approved by the Court. I also believe the Court is remiss in refusing to address General Chemical's arguments that the award of punitive damages in this case violates constitutional due process guaranties. I discuss first the evidence to support punitive damages, then the constitutional arguments, and finally our decision in *Van Tran.*

I

There is no question that if Gustavo and Jose Eduardo De La Lastra had followed the warnings and instructions printed on the sack of sodium metabisulfite they were using, their tragic deaths would have been avoided. Sodium metabisulfite, commonly referred to as "shrimp dip" by those associated with the shrimp fishing industry, is a chemical used to preserve shrimp after they are caught. It is called "dip" because, as properly used, the chemical, a dry powder, is mixed with water and shrimp are dipped in the solution and then removed, drained and stored. Like many chemicals, **\*926** sodium metabisulfite is not dangerous if it is used properly, but there are dangers associated with its misuse. Specifically, it reacts with water to produce sulfur dioxide gas, which if inhaled can cause asphyxiation. Since this gas

is heavier than air and thus will accumulate in any confined space, the chemical should be used only in an area that is well ventilated.

General Chemical sells sodium metabisulfite in 50–pound bags. On each bag is a warning label which covers about two-thirds of one side. The text on the left side of the label is in English, and the text on the right side is in Spanish. Each side is about the size of a letter-sized sheet of paper (8–/$_2$″ x 11″). The English text is printed in all capital letters, while the Spanish text is in both lower and upper case. Portions of the text are in black print and portions are in red print. All of the print is larger than that in the text of ordinary reading materials, such as newspapers and magazines. There is no contention in this case that the label is inconspicuous, or that the print is too small, or that the warnings are hard to understand.

The label begins in large capital letters: WARNING! (in Spanish, *PELIGRO* ). It states that the chemical should not be ingested, inhaled or touched. It gives instructions for the proper use and handling of the chemical as well as for remedies if the chemical is mishandled. A propos of this case, the warning label states in part:

> WARNING!

. . . . .

> REACTS WITH ACIDS AND WATER, RELEASING TOXIC SULFUR DIOXIDE GAS....

> USE WITH PROPER VENTILATION....

> CONTACT WITH WATER SHOULD BE UNDER WELL–VENTILATED CONDITIONS....

> **SPECIAL INSTRUCTIONS**

> **CONTROL OF "BLACK SPOT" ON SHRIMP**

> Use as 1 ¼% solution. Stir 3 ¼ pounds (about 2 ½ pints) of Sodium Metabisulfite in 30 gallons of fresh clean seawater until dissolved. Use plastic, rubber or plastic lined container of adequate size and a wood or plastic stirrer. Dehead shrimp and place in plastic sieve. Dip in solution and agitate 1 minute. Drain well and pack in ice as usual.

> WARNING!

> Do Not Use In Dry Form.

> Prepare and use dip solution on deck—NOT IN HOLD. Toxic sulfur dioxide gas may be liberated.

There is no evidence that a more extensive warning label was used by any other manufacturer of the chemical. A copy of the entire label is attached as an appendix to this opinion.

The De La Lastras did precisely what the instructions warned against. They used the chemical in dry form instead of mixing it with water as the label instructed, and they sprinkled the chemical on their shrimp in the unventilated hold of their boat instead of using it on deck. When they did, toxic sulfur dioxide gas was released—exactly as the label warned it would be—and asphyxiated them. No one disputes that if the De La Lastras had followed the warnings and instructions on the label, they would not have died; but there is nothing to indicate that the De La Lastras ever even read the label.

The jury found that the warning label was inadequate because it did not expressly state that the toxic gas produced by misuse of the product could be fatal. The jury also found that this inadequacy in the label caused the De La Lastras' deaths. General Chemical challenged these findings unsuccessfully in the court of appeals, but it has not raised those challenges in this Court. Consequently, the inadequacy of the warning label must be taken as an established fact.

The award of punitive damages in this case is based upon the jury's finding that General Chemical was grossly negligent in failing to warn expressly that misuse of its product could be fatal. The trial court **\*927** correctly defined gross negligence for the jury to mean:

> more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

This definition is taken verbatim from TEX.CIV.PRAC. & REM.CODE § 41.001(5). The jury also found, in answer to a separate question, that General Chemical's failure "was with a flagrant disregard for the rights of others and with actual awareness on [its] part ... that such a failure [would], in reasonable probability, result in human death or great bodily

harm." The parties do not argue that this second finding provides a different basis for punitive damages, and it is not clear why the trial court thought it appropriate to submit two separate questions. In any event, it is necessary to consider only whether there is evidence to support a finding of gross negligence.

In *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981), this Court stated:

> The essence of gross negligence is not the neglect which must, of course, exist. What lifts ordinary negligence into gross negligence is the mental attitude of the defendant; that is what justifies the penal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e. knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril but his acts or omissions demonstrated that he didn't care.

We also held that evidence that a defendant exercised *some* care cannot be considered in determining the legal sufficiency of the evidence to support a finding of gross negligence. *Id.* at 920–922. While this part of our holding in *Burk Royalty* has been the subject of substantial criticism, General Chemical does not challenge *Burk Royalty* in this case. Rather, General Chemical argues that even under the restricted review allowed by *Burk Royalty,* there is no probative evidence in this case of gross negligence. Thus, the continued validity of the *Burk Royalty* standard of review for the sufficiency of the evidence of gross negligence is not at issue here.

While plaintiffs are entitled to have the evidence and all reasonable inferences which can be drawn from it viewed in the light most favorable to the verdict, there must nevertheless be evidence in the record that General Chemical was knowingly indifferent to the rights, welfare and safety of those who used its product. Even by plaintiffs' account, there is not a wealth of such evidence in this record. Although the trial of this case consumed six days, plaintiffs cite only three pieces of evidence in support of the jury's finding of gross negligence. The Court discusses only two of them. None provides sufficient support for the finding.

The piece of evidence on which plaintiffs place principal reliance, is that General Chemical failed to change its warning despite its awareness of, in plaintiffs' words, "nine prior deaths and/or injuries from the chemical." Actually, plaintiffs offered evidence of three prior deaths and six prior injuries from the use of sodium metabisulfite. Of the non-fatal injuries, none was shown to have involved shrimpers in similar circumstances. Even if the circumstances of any injury had been similar and had been known to General Chemical, such knowledge of non-fatal injuries would not suggest that its warning was inadequate in failing to warn that misuse of the product could be fatal. Of the three deaths, there is no evidence concerning the circumstances of one which appears to have occurred in 1981, seven years before the De La Lastras' accident. The other two deaths did occur in circumstances similar to the De La Lastras', and it is on this incident that plaintiffs rely for their contention that General Chemical knowingly failed to change its warning label.

**\*928** The parties refer to these two deaths as the "Cape Rojo" incident. It occurred in 1973, 15 years before the accident in this case.[1] The Coast Guard investigated the incident and afterward wrote General Chemical and other manufacturers of the same chemical, stating that "[p]romulgation and dissemination of safety information regarding this product may be indicated." The Coast Guard report stated: "It is recommended that since it was reported that Sodium Bisulfite Anhydrous is widely used by fisherman [sic] throughout the industry, that an expeditious means be devised to warn users of the chemical, aboard vessels, of the potential dangers involved in its use in a confined and unventilated space." After receiving this report, General Chemical changed its warning twice, cautioning against the dangers involved in the Cape Rojo incident, viz., use of the product in an unventilated space or in the hold of a boat. The Coast Guard report does not state that users of the product should be warned that the chemical is deadly; in fact, if used properly in accordance with the instructions, the chemical was not deadly.[2]

[1] Although General Chemical was not in existence at the time, its predecessor corporation was, and the parties agreed at trial that notice of the Cape Rojo incident to General Chemical's predecessor was notice to General Chemical. Thus, by referring to the manufacturer as General Chemical I include both that corporation and its predecessor.

[2]    At trial, when plaintiffs' counsel asked the Coast Guard official who wrote the report whether he had been trying by his report to get General Chemical to warn that its product could be deadly, he replied, "basically". Whatever the official may have been "basically" trying to do, the report itself neither stated or suggested that General Chemical should warn that its product was deadly. General Chemical was not simply being obtuse; none of the other manufacturers alerted to the Cape Rojo incident changed their warnings to include that their products could be deadly.

There is no dispute that General Chemical modified its warning label following the Cape Rojo incident. Plaintiffs may of course argue that General Chemical's modifications did not go far enough, and the finding that the warning label was inadequate indicates that the jury was persuaded by that argument. Gross negligence, however, requires more than an inadequate response to perceived dangers; it requires actual conscious indifference. Not only is there no evidence that General Chemical reacted with indifference to the Cape Rojo incident, the evidence establishes that it attempted to comply with the Coast Guard's recommendations.

Plaintiffs' assertion that General Chemical knew of other occurrences involving fatalities from the misuse of sodium metabisulfite but did not care enough to change its warning is based upon one incident 15 years before, after which General Chemical changed its warning twice. Assuming that General Chemical should have warned that misuse of its chemical could be fatal, I fail to see how that failure was gross negligence—"actual conscious indifference" of others' safety —when it changed its warning twice after the earlier incident, used the most extensive warning of any other manufacturer of the product, and warned explicitly against the exact misuse which occurred in both the Cape Rojo and De La Lastra incidents. The fact that there were only three deaths involving the product over the 15 years before the accident in this case also suggests that General Chemical did not fail to respond appropriately.

The second piece of evidence on which plaintiffs rely to support the finding of gross negligence is that General Chemical's representative testified in response to cross-examination by plaintiffs' counsel at trial that the company did not intend to change its warning despite the De La Lastras' deaths. Given General Chemical's position that its warning was adequate, its representative's testimony is hardly surprising. The jury's finding that the warning was inadequate does not transform the testimony of General Chemical's representative into evidence of conscious indifference. Again, even if General Chemical did not do everything it should have done, and even if it intended not to do all it could **\*929** have done, there is still no probative evidence that it was actually indifferent to its responsibility to warn of the dangers associated with its product. Moreover, the representative's testimony at trial of his intention at that time is, logically, no evidence of General Chemical's intention prior to the De La Lastras' deaths several years before.

The last piece of evidence cited by plaintiffs is the testimony of their expert at trial that in his opinion General Chemical had been grossly negligent. The expert based his opinion exclusively on the Cape Rojo incident and other instances of injuries cited by plaintiffs. For reasons already discussed, none of those prior incidents are evidence that General Chemical was grossly negligent. Stripped of all support, the expert's opinion is entitled to no weight and thus does not support a finding of gross negligence.

There is no probative evidence that General Chemical was grossly negligent, and therefore there is no basis for an award of punitive damages. Even applying the restrictive standard of *Burk Royalty,* plaintiffs must still show that General Chemical knew of the peril its warning could cause and yet did not care. General Chemical simply cannot be said to have been indifferent to the dangers which could result from misuse of its product when it gave clear, conspicuous, bilingual warnings, more thorough than any others in the industry, which would have prevented the De La Lastras' deaths if only they had heeded those warnings. The world is full of products, from cars to cleansers, which if misused may cause death. One should certainly expect that misuse of toxic chemicals may be lethal. Manufacturers may be obliged to warn against misuse of their products. When they do, however, and when the warnings given would have prevented an accident if they had been followed, it is wrong to assign liability for the accident to the manufacturer. It is worse still, however, to *punish* it for not caring. General Chemical has been held liable for an accident its warning would have prevented. It has been assessed over $13 million for the actual damages suffered in the accident, including $2 million for the mental anguish the De La Lastras suffered during the thirty seconds before each lost consciousness. On top of this, the Court holds that General Chemical should be assessed a penalty of $8 million because it did not care that the De La Lastras might die from misusing its product. Absent any evidence to support it, the award of punitive damages in this case is an injustice.

## II

General Chemical challenges the award of punitive damages in this case on three separate grounds: that there is no probative evidence of gross negligence to support an award of punitive damages, that punitive damages cannot exceed four times actual damages under TEX.CIV.PRAC. & REM.CODE § 41.007, and that an award of punitive damages in this case violates the due process and due course of law guaranties of the United States Constitution and the Texas Constitution. The Court rejects the evidentiary argument, accepts the statutory argument, and ignores the constitutional argument. Because I accept the evidentiary argument, I need not consider the statutory argument, although I do not disagree with the Court's analysis of the application of section 41.007 in this case. I also need not reach General Chemical's constitutional arguments. The Court, however, cannot avoid them.

In a footnote, the Court suggests that General Chemical concedes that an award of punitive damages equal to four times actual damages in this case does not offend due process. *Ante* at 925 n. 12. In the text of its opinion, however, the Court acknowledges that "General Chemical ... asserts that the current Texas system of awarding punitive damages, *and* the resulting excessive punitive damage award deprived them of the constitutional rights of due process...." *Ante* at 924. The text is correct; the footnote is not. Although **\*930** General Chemical argues that punitive damages cannot exceed four times actual damages under section 41.007, it does not concede that such an award comports with due process. The Court's footnote adds a non sequitur: "Contrary to the dissent's view, General Chemical has not raised a constitutional challenge to section 41.007." While it is true that General Chemical has not attacked the constitutionality of section 41.007, that fact is not "contrary to the dissent's view". Nor is the fact significant. Section 41.007 caps punitive damages; it does not immunize any award up to the cap from constitutional scrutiny. General Chemical need not attack the statutory cap to argue that the system of awarding punitive damages is flawed. General Chemical can and does argue that an award of punitive damages cannot exceed those allowed by statute, *and also* that any award in these circumstances offends due process.

The Court itself recognizes in the text of its opinion that General Chemical argues that the system itself, both before and after judgment in the trial court, is invalid. The Court

rejects this argument without explaining why. There are only two possible bases for the Court's conclusion: either that a punitive damage award of four times actual damages never violates due process, or that such an award of punitive damages does not violate due process in this case. The Court disavows the former premise: "We need not address whether [a 4–1] ratio will in all cases withstand a constitutional challenge." *Ante* at 925 n. 12. The second premise is thus the only remaining basis for the Court's decision.

It may be perfectly reasonable to conclude that an award of $8 million punitive damages in this case does not violate due process. It is not reasonable, however, or even acceptable, to reach this conclusion without saying why. The parties have argued the issue fully in their briefs, and we have received amicus curiae briefs on the issue. The issue is among those on which we granted General Chemical's application for writ of error. 35 TEX.SUP.CT.J. 508–509. The issue was addressed at oral argument. The issue is an important one in this state, in other states, and in the United States. The Court makes no attempt to justify its refusal to address the issue. It delivers the parties an edict rather than an opinion.

## III

As I stated at the outset, I agree with the Court that General Chemical has not preserved a complaint that recovery of nonpecuniary damages is barred by the application of federal maritime law. General Chemical makes an additional argument, however, that the Court does not address. General Chemical contends that in circumstances indistinguishable from this case, the Court reversed an award of loss of society damages in *Van Tran.* General Chemical is correct. In *Van Tran,* Texaco objected to an award of mental anguish damages as being precluded by federal maritime law, but it did not raise a similar objection to the award of loss of society damages. While *Van Tran* was on appeal, the United States Supreme Court held in *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), that loss of society damages cannot be recovered under federal maritime law. We reversed the award of mental anguish damages to which Texaco properly objected, but we also reversed the award of loss of society damages to which Texaco did not object.

Following *Van Tran,* General Chemical's failure to object in the trial court to an award of nonpecuniary damages not allowed under maritime law should not preclude it from obtaining reversal on appeal. In my view, however, *Van Tran*

was wrongly decided in this respect. A party, whether plaintiff or defendant, is entitled to the benefit of changes in the law while a case is on appeal as long as those changes are fully retroactive. However, the party should ordinarily be required to have raised the issue at trial in order to assert it on appeal. I would not extend the error in *Van Tran* to this case.

* * * * * *

 **\*931** For all these reasons, I concur in affirming the award of actual damages but dissent from the award of punitive damages.

PHILLIPS, C.J., and ENOCH, JJ., join in this concurring and dissenting opinion.

**APPENDIX**

**WARNING!**

CAN IRRITATE THE SKIN. EYES AND RESPIRATORY TRACT. PROLONGED EXPOSURE MAY CAUSE BURNS.
HARMFUL IF INGESTED. (MAY CAUSE SEVERE ALLERGIC REACTION IN SOME ASTHMATICS AND SULFITE SENSITIVE INDIVIDUALS).
REACTS WITH ACIDS AND WATER, RELEASING TOXIC SULFUR DIOXIDE GAS.

AVOID CONTACT WITH SKIN AND EYES.
DO NOT BREATHE PRODUCT DUST. USE WITH PROPER VENTILATION.
DO NOT SWALLOW.
AVOID CONTACT WITH ACIDS.
CONTACT WITH WATER SHOULD BE UNDER WELL-VENTILATED CONDITIONS.

FIRST AID:
IN CASE OF CONTACT: SKIN: PROMPTLY WASH WITH PLENTY OF SOAP AND WATER. EYES: IMMEDIATELY FLUSH WITH PLENTY OF WATER FOR 15 MINUTES. GET MEDICAL ATTENTION. IF SWALLOWED: IF CONSCIOUS, IMMEDIATELY DRINK 2 TO 4 GLASSES OF WATER OR MILK AND INDUCE VOMITING BY TOUCHING FINGER TO BACK OF THROAT. GET IMMEDIATE MEDICAL ATTENTION. IF INHALED: REMOVE TO FRESH AIR. GET MEDICAL ATTENTION FOR IRRITATION OR ANY OTHER SYMPTOMS.

IN CASE OF FIRE:
WEAR SELF CONTAINED RESPIRATORY PROTECTION. PRODUCT DOES NOT BURN BUT WILL RELEASE TOXIC SULFUR DIOXIDE GAS WHEN HEATED IN A FIRE. USE ANY AGENT APPROPRIATE FOR FIRE SITUATION.

IN CASE OF SPILL: WEAR PROPER PROTECTIVE EQUIPMENT. PROMPTLY SWEEP UP WITH MINIMUM DUSTING AND SHOVEL INTO AN EMPTY CONTAINER AND COVER. CAUTIOUSLY SPRAY RESIDUE WITH PLENTY OF WATER. PROVIDE VENTILATION DUE TO TOXIC SULFUR DIOXIDE GAS WHICH WILL BE LIBERATED UPON PRODUCT CONTACT WITH WATER.

STORAGE AND HANDLING: WEAR PROPER PROTECTIVE CLOTHING WHEN HANDLING PRODUCT (SEE PRODUCT SAFETY DATA SHEET). STORE IN A COOL, DRY, WELL VENTILATED PLACE, AWAY FROM ACIDS AND OXIDIZING AGENTS. KEEP CONTAINERS CLOSED.

ATTENTION: EMPTY CONTAINER CONTAINS PRODUCT RESIDUE AND/OR VAPORS. ALL LABEL WARNINGS APPLY TO EMPTY CONTAINER.

IN CASE OF AN EMERGENCY INVOLVING THIS PRODUCT CONTACT CHEMTREC 800-424-9300 ANYTIME. DAY OR NIGHT.
F.D.A. RESTRICTIONS ON FOOD USE OF SULFITING AGENTS
NOT FOR USE ON FRUITS AND VEGETABLES SERVED OR SOLD RAW TO CONSUMERS.
NOT FOR USE ON FOODS AND MEATS RECOGNIZED AS SOURCE OF VITAMIN B.
MUST BE DECLARED ON LABEL OF FINISHED FOODS WHERE AMOUNT OF SULFITE IS 10 PPM OR MORE.

SPECIAL INSTRUCTIONS
CONTROL OF "BLACK SPOT" ON SHRIMP

Use as 1¼% solution. Stir 3¼ pounds (about 2½ pints) of Sodium Metabisulfite in 30 gallons of fresh clean seawater until dissolved. Use plastic, rubber or plastic lined container of adequate size and a wood or plastic stirrer. Dehead shrimp and place in plastic sieve. Dip in solution and agitate 1 minute. Drain well and pack in ice as usual.

WARNING!
Do Not Use In Dry Form.
Prepare and use dip solution on deck · NOT IN HOLD. Toxic sulfur dioxide gas may be liberated.

For Manufacturing Use Only

**\*932**

**PELIGRO**

Este producto puede causar irritación de la piel, ojos y vías respiratorias. Contacto prolongado puede producir quemaduras. Peligroso al ingerirse, (puede causar serias reacciones alérgicas en ciertas personas asmáticas).

Reacciona con agua y ácidos produciendo gases tóxicos de anhidrido sulfuroso.

Evítese el contacto con la piel y los ojos.

No debe respirarse el polvo y manipúlese sólo con buena ventilación.

No debe ingerirse.

Evítese contacto con ácidos.

Contacto con agua debe hacerse en condiciones de buena ventilación.

**Primeros Auxilios:**

**En caso de contacto:** Piel: Lávese inmediatamente con mucha agua y jabón. Ojos: Lávese inmediatamente con mucha agua durante 15 minutos y obténgase atención médica.

**En caso de ingestión:** Si la persona está conciente, darle de beber inmediatamente 2-4 vasos de agua o leche e inducir el vómito tocando con el dedo la pared posterior de la garganta. Obtener atención médica inmediata.

**En caso de inhalación:** Trasladar la persona al aire fresco. Ver al médico si hay irritación o cualquier otro síntoma.

**En caso de incendio:** Usar equipo de protección respiratoria integral.

El producto no arde pero desprende gas anhidrido sulfuroso cuando es calentado al fuego. Usar cualquier agente extinguidor de fuego apropiado a la situación.

**En caso de derrame:** Usar equipo de protección apropiado. Barrer en seguida evitando levantar polvo y recoger en un recipiente vacío con tapa. Con cuidado, mojar el residuo con mucha agua. Ventilar el ambiente ya que el contacto con el agua produce gases tóxicos de anhidrido sulfuroso.

**Almacenaje y manipuleo:**

Usar ropa protectora apropiada para manipular este producto.

(Ver hoja de información de seguridad).

Almacenar en lugar fresco y seco con buena ventilación, lejos de ácidos y agentes oxidantes. Mantener los recipientes cerrados.

IMPORTANTE: Los recipientes vacíos contienen vapores y/o residuos del producto. Todas las instrucciones de la etiqueta se aplican también a los recipientes vacíos.

En casos de emergencia con este producto llame a CHEMTREC 800-424-9300 a cualquier hora del día o de la noche.

INSTRUCCIÓN ESPECIAL PARA EL
CONTROL DE "MARCAS NEGRAS" EN EL CAMARON

Use como una solución de 1¼%. Agite 3¼ libras (casi 2½ pintas) de metabisulfito de sodio en 30 galones de agua de mar fresca y limpia hasta que se disuelva. Use una vasija de plástico, de caucho o una forrado con plástico de tamaño adecuado y una varilla agitadora de madera o de plástico. Ponga los camarones decapitados en un cedazo plástico. Sumérgalos en la solución y agítelos por 1 minuto. Drénelos bien y empaquételos en hielo como de costumbre.

CUIDADO!

NO USE EN FORMA SECA. Use este proceso en la cubierta del barco.

NO EN LA BODEGA. Posibilidad de gases tóxicos en este proceso.

**All Citations**

852 S.W.2d 916, Prod.Liab.Rep. (CCH) P 13,415

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

164 S.W.3d 724
Court of Appeals of Texas,
Houston (14th Dist.).

Edward F. GROUP, III, D.C., Appellant

v.

Mark VICENTO, Appellee.

No. 14–04–00908–CV.  |  May 10, 2005.

**Synopsis**
**Background:** Patient brought medical malpractice action against chiropractor, alleging that chiropractor should have referred him to an expert spine surgeon for specialized treatment upon reviewing his MRI results and that chiropractor's failure to do so delayed patient's eventual surgery for approximately one year, exacerbating his injuries. The 190th District Court, Harris County, Jennifer Elrod, J., denied chiropractor's motion to dismiss, and chiropractor appealed.

**[Holding:]** The Court of Appeals, John S. Anderson, J., held that, as matter of apparent first impression anesthesiologist was "practicing health care" in a field of practice that involved the same type of care as chiropractor, and thus, anesthesiologist satisfied statutory requirements so as to be expert witness.

Affirmed.

West Headnotes (10)

**[1]**   **Appeal and Error**
    Rulings on Motions Relating to Pleadings

Appellate court reviews for abuse of discretion a trial court's decision on a motion to dismiss under statute permitting dismissal of medical malpractice claim against defendant physician or health care provider who has not been served with expert report within specified time period. V.T.C.A., Civil Practice & Remedies Code § 74.351.

20 Cases that cite this headnote

**[2]**   **Evidence**
    Due care and proper conduct in general

In contrast to an expert who provides opinion testimony about how a health care provider departed from accepted standards of health care, an expert who provides opinion testimony about the *causal* relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in a health care liability claim *must be a physician* who is otherwise qualified to render opinions on such a causal relationship under the Rules of Evidence. V.T.C.A., Civil Practice & Remedies Code §§ 74.351(r)(5)(C); 74.403(a).

9 Cases that cite this headnote

**[3]**   **Appeal and Error**
    Cases Triable in Appellate Court

Statutory construction is a question of law, and appellate court reviews a trial court's interpretation of a statute under a de novo standard of review.

2 Cases that cite this headnote

**[4]**   **Statutes**
    Intent

When interpreting statutes, courts' primary objective is to ascertain and give effect to legislative intent.

1 Cases that cite this headnote

**[5]**   **Statutes**
    Plain Language;  Plain, Ordinary, or Common Meaning
**Statutes**
    Statute as a Whole;  Relation of Parts to Whole and to One Another

When interpreting statute, courts look first to the plain and common meaning of the language of the statute, and courts must read the statute as a

whole and not just isolated portions. V.T.C.A., Government Code § 311.011.

Cases that cite this headnote

**[6]**    **Statutes**
    Giving effect to statute or language; construction as written
    **Statutes**
    Statute as a Whole; Relation of Parts to Whole and to One Another

If the meaning of the statutory language is unambiguous, court must interpret it according to its terms, giving meaning to the language consistent with other provisions in the statute.

1 Cases that cite this headnote

**[7]**    **Statutes**
    Superfluousness
    **Statutes**
    Absent terms; silence; omissions

When interpreting statute, court reads every word as if it was deliberately chosen and presumes that omitted words were excluded purposefully.

1 Cases that cite this headnote

**[8]**    **Statutes**
    Construction in View of Effects, Consequences, or Results
    **Statutes**
    Purpose

When interpreting statute, courts consider the objective the law seeks to obtain and the consequences of a particular construction.

Cases that cite this headnote

**[9]**    **Evidence**
    Due care and proper conduct in general

For purpose of statute providing that expert witness whose report plaintiff offers in support of health care liability claim must be "practicing health care" in field of practice that involves same type of care or treatment as that delivered by defendant health care provider, "practicing health care" is not limited to particular activities, specified in separate statute, of training others in same field or serving as consulting health care provider and being licensed, certified, or registered in same field as defendant; term "includes," in statute setting forth those two alternatives, was term of enlargement and not of limitation or exclusive enumeration. V.T.C.A., Civil Practice & Remedies CodeT § 74.402(a)(1,2), (b); V.T.C.A., Government Code § 311.005(13).

9 Cases that cite this headnote

**[10]**    **Evidence**
    Due care and proper conduct in general

Anesthesiologist, who specialized in anesthesia and pain management, was "practicing health care" in a field of practice that involved the same type of care or treatment as chiropractor, and thus, anesthesiologist satisfied statutory requirements so as to be expert witness in medical malpractice action brought against chiropractor; anesthesiologist stated that he knew accepted standard of care required of chiropractors, he stated that pain management modalities he used were same ones that chiropractors used, he stated that chiropractors and pain management physicians used similar methods to evaluate patients and determine whether to refer them to specialists. V.T.C.A., Civil Practice & Remedies Code § 74.402(b)(1,2,3).

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*725** Michele Quattlebaum and Tammy Savidge–Moore, Houston, for appellants.

R. Gary Stephens and Maggie D. Conner, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and FROST.

## OPINION

[JOHN S. ANDERSON](), Justice.

In this medical malpractice case, appellant appeals the trial court's denial of his motion to dismiss challenging the sufficiency of the appellee's expert report. In a single issue, appellant argues the trial court erred in denying his motion to dismiss as a matter of law because the appellee's expert is not qualified to render an opinion regarding the chiropractic standard of care under Chapter 74 of the Texas Civil Practice and Remedies Code. We affirm.

## *726 FACTUAL AND PROCEDURAL BACKGROUND

Appellee Mark Vicento, a police officer, was injured in an automobile accident in September 2001. Vicento immediately sought treatment for his injuries at a chiropractic clinic. Appellant Edward F. Group, III, D.C., a chiropractor, treated Vicento's injuries. In November 2001, Group referred Vicento for an MRI ([magnetic resonance imaging]()) of the lumbar spine. Group continued to treat Vicento over the next year. In 2003, Vicento underwent back surgery.

Vicento contends Group should have referred him to an expert spine surgeon for specialized treatment upon reviewing his MRI results in November 2001, [1] and Group's failure to do so delayed Vicento's eventual surgery for approximately one year, exacerbating his injuries. Vicento filed this medical malpractice lawsuit against Group in January 2004, alleging claims of medical negligence. Specifically, Vicento claims Group "was negligent in failing to comply with the standard of care by failing to timely and adequately (i) test, (ii) assess, (iii) diagnose, (iv) treat, and (v) refer [Vicento] to a specialist when his condition worsened and deteriorated." Vicento asserts Group should have known his condition was such that he needed a specialist for treatment, and he contends Group's negligent acts and omissions delayed his spine surgery for a period of approximately two years, thereby aggravating his condition.

[1]  The MRI report showed herniated lumbar discs with significant spine and foramen stenosis at four different lumbar spine levels.

Vicento timely filed the expert report of Rezik Saqer, M.D., pursuant to [Texas Civil Practice and Remedies Code section 74.351](). *See* [TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon 2005)](). In response, Group filed a motion to dismiss Vicento's case on the ground that Dr. Saqer's expert report did not comply with [section 74.351 of the Texas Civil Practice and Remedies Code](). Group alleged in his motion to dismiss that Dr. Saqer was not qualified to opine on the chiropractic standard of care and Dr. Saqer's expert report was inadequate. Group requested the trial court to order Vicento to cure the deficiency within 30 days or dismiss Vicento's cause of action. The trial court ordered Vicento to file a report complying with the statute within thirty days.

Vicento timely filed an amended expert report by Dr. Saqer. Group responded by filing a motion re-urging his prior motion to dismiss, arguing the amended expert report is deficient because (1) Dr. Saqer is not qualified to render an opinion on the chiropractic standard of care because he does not fit the statutory definition of "practicing health care" and is not qualified "on the basis of training and experience" as these terms are defined by [section 74.402 of the Texas Civil Practice and Remedies Code](), (2) Dr. Saqer's report does not state how Group deviated from the chiropractic standard of care, and (3) Dr. Saqer's report fails to comply with section 74.403 in failing to state how Group's actions caused any injury to Vicento.

The trial court denied Group's second motion to dismiss. Group filed this interlocutory appeal from the trial court's order. [2]

[2]  [Texas Civil Practice and Remedies Code section 51.014]() permits an interlocutory appeal to be filed from an order of a district court that denies all or part of the relief sought by a motion under [section 74.351(b) of the Texas Civil Practice and Remedies Code](). [TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9)]() (Vernon Supp.2005). Group's motion to dismiss sought relief under section 73.351(b) and alleged Vicento's expert report was deficient. *See* [TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)](). [Section 74.351(b)]() permits a trial court to award a defendant health care provider reasonable attorney's fees and costs and to dismiss a plaintiff's claims if an expert report is not timely served. *See id.* An expert report "has not been served" for purposes of [section 74.351(b)]() if elements of the report are found deficient. [TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c)]().

## *727 DISCUSSION

### A. Standard of Review

 [1]    We review a trial court's decision on a motion to dismiss a case under Texas Civil Practice and Remedies Code section 74.351 for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (holding trial court's decision to dismiss a case under former article 4590i, section 13.01(e) (predecessor to Texas Civil Practice and Remedies Code section 74.351) is reviewed for an abuse of discretion).

### B. Expert Reports and Texas Civil Practice and Remedies Code Section 74.351

In 2003, the Texas Legislature enacted significant changes in the expert report requirement for medical malpractice cases. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.001–.507 (Vernon 2005) (effective September 1, 2003, formerly article 4590i of the Texas Revised Civil Statutes, the Medical Liability and Insurance Improvement Act). Section 74.351 of the Texas Civil Practice and Remedies Code requires a plaintiff who files a "health care liability claim" to file an expert report within 120 days of filing its claim:

> (a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). A "health care liability claim" is defined as "a cause of action *against a health care provider or physician* for treatment,

lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(13) (Vernon 2005) (emphasis added). Chiropractors fall under the definition of a "health care provider." TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(12)(A)(v).

Under section 74.351(*l* ), "[a] court shall grant a motion challenging the adequacy of an expert report only it if appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report...." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ). An "expert report" is defined as:

> [A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider **\*728** failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

### C. Qualifications of an Expert Witness in a Suit Against a Health Care Provider and Texas Civil Practice and Remedies Code Section 74.402

An expert providing opinion testimony about how a "health care provider," such as chiropractor Group, departed from accepted standards of health care must be qualified to testify under the requirements of section 74.402. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(B). Section 74.402(b) lists three specific qualifications an expert witness must possess in order to provide opinion testimony on how a health care provider departed from accepted standards of health care:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is *practicing health care* in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is *qualified on the basis of training or experience* to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b) (Vernon 2005) (emphasis added). The above emphasized terms are specifically defined in subsections (a) and (c) of section 74.402. "Practicing health care" is defined as *including:*

(1) training health care providers *in the same field* as the defendant health care provider *at an accredited educational institution;* or

(2) serving as a consulting health care provider and *being licensed, certified, or registered in the same field* as the defendant health care provider.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(a)(1), (2) (emphasis added). To determine whether an expert "is qualified on the basis of training or experience" under subsection (b)(3), a court is to consider whether the expert:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively *practicing health care* in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(c)(1), (2) (emphasis added).

Section 74.402(d) provides a court "shall apply" the criteria specified in section 74.402(a)-(c) in determining whether an expert is qualified to offer expert testimony on the issue of whether a defendant health care provider departed from accepted standards of health care. TEX. CIV. PRAC. &

REM.CODE ANN. § 74.402(d). A court may depart from the criteria if, under the circumstances, there is good reason to admit **\*729** the expert's testimony, but if the court departs from the criteria, the court shall state on the record the reason for admitting the testimony. *Id.* Here, the trial court's order denying Group's motion to dismiss does not state the court departed from section 74.402's criteria.

 **[2]**    In contrast to an expert who provides opinion testimony about how a health care provider departed from accepted standards of health care, an expert who provides opinion testimony about the *causal* relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in a health care liability claim *must be a physician* who is otherwise qualified to render opinions on such a causal relationship under the Texas Rules of Evidence. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.351(r)(5)(C), 74.403(a) (Vernon 2005).

This is a case of first impression under newly enacted section 74.402.

**D. Group's Motion to Dismiss**

Group argues the trial court erred in denying his motion to dismiss because Dr. Saqer is not qualified to render an expert opinion regarding the chiropractic standard of care. Group's challenges to Dr. Saqer's qualifications focus on section 74.402, subsections (a), (b)(1), (3) and (c)(2). [3] First, Group asserts Dr. Saqer is not statutorily qualified to render an opinion regarding the chiropractic standard of care or a breach thereof because he is not "practicing health care" as defined by section 74.402(a). Group contends section 74.402(a) requires Dr. Saqer to be (1) practicing health care in a field of practice involving the same type of care or treatment as Group, the field of chiropractic, (2) licensed as a chiropractor, or (3) teaching chiropractic at an accredited chiropractic school. Second, Group argues Dr. Saqer is not qualified "on the basis of training or experience" under section 73.402(b)(3) because he is not a chiropractor and is not actively "practicing health care" in the field of chiropractic.

3    In his motion to dismiss, Group also complained Dr. Saqer's report does not state how Group deviated from the chiropractic standard of care, and Group challenged Dr. Saqer's qualifications to render an expert opinion on causation, under section 74.403, arguing Dr. Saqer's testimony was not based on a reasonable medical

probability. On appeal, Group has abandoned these two grounds for dismissal.

In response, Vicento asserts the trial court's denial of Group's motion to dismiss was proper because Dr. Saqer's expert report demonstrates he has the requisite knowledge, skill, experience, training, and education regarding the treatment of patients with conditions similar to Vicento's to qualify him as an expert as to the standard of care and causation in this case. Vicento contends Dr. Saqer's report establishes he practices health care in a field that involves the same type of care and treatment as that delivered by Group, and he has expertise in the particular areas involved in this case. Vicento further asserts section 74.402 *does not require* an expert in a suit against a chiropractor *to be* a chiropractor in order to be qualified to opine on the standard of care. [4]

[4]  In *Nicodeme v. Bailey,* 243 S.W.2d 397, 399–402 (Tex.Civ.App.-El Paso 1951, writ ref'd n.r.e.), two physicians testified on behalf of a patient in a medical malpractice suit the patient filed against a chiropractor. The court held the patient's evidence failed to establish the chiropractor's negligence was a proximate cause of the plaintiff's injuries. *Nicodeme* does not address the specific issue of the doctors' qualifications to render an opinion against the defendant chiropractor, but the court does acknowledge the chiropractor's conduct should be judged against the chiropractic system of healing. *Nicodeme,* 243 S.W.2d at 401 ("The lawful activity of a chiropractor is confined to the treatment of the spine in a certain manner. In substance, the treatment is limited to the adjustment of the joints or vertebrae of the spine.").

Other cases cited by Vicento in his brief involve medical malpractice claims brought against physicians analyzing whether expert physicians who do not specialize in the same area as a defendant physician are qualified to render an expert opinion. *See, e.g., Roberts v. Williamson,* 111 S.W.3d 113 (Tex.2003); *Broders v. Heise,* 924 S.W.2d 148 (Tex.1996); *Silvas v. Ghiatas,* 954 S.W.2d 50 (Tex.App.-San Antonio 1997, pet. denied). These cases do not apply newly enacted section 74.402, but they are nevertheless instructive and provide guidance on the issue presented.

**\*730  1. Rules of Statutory Construction**

 [3]    [4]    [5]    [6]    [7]    [8]    Statutory construction is a question of law, and we review a trial court's interpretation of a statute under a de novo standard of review. *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002). When interpreting statutes, our primary objective is to ascertain and give effect to legislative intent. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex.1999); *see* TEX. GOV'T CODE ANN. § 311.023 (Vernon 2005). We look first to the plain and common meaning of the language of the statute. *Fitzgerald,* 996 S.W.2d at 865; *see* TEX. GOV'T CODE ANN. § 311.011 (Vernon 2005). We must read the statute as a whole and not just isolated portions. *Tex. Dep't. of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004). If the meaning of the statutory language is unambiguous, we must interpret it according to its terms, giving meaning to the language consistent with other provisions in the statute. *Id.* We read every word as if it were deliberately chosen and presume that omitted words were excluded purposefully. *See Cornyn v. Universe Life Ins. Co.,* 988 S.W.2d 376, 378–79 (Tex.App.-Austin 1999, pet. denied). We also consider the objective the law seeks to obtain and the consequences of a particular construction. *Sunset Valley,* 146 S.W.3d at 642.

We apply the above principles in construing section 74.402, and we examine Dr. Saqer's qualifications in light of section 74.402's requirements.

**2. Section 74.402(a) and (b)(1): "Practicing Health Care"**
First, under section 74.402(b)(1), to qualify as an expert witness on the issue of whether Group departed from accepted standards of care, Dr. Saqer must be "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose." TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(1).

Group argues the term "practicing health care" as defined by subsection (a) *requires* a qualified expert in a chiropractic malpractice case to either be a chiropractor, train chiropractors at an accredited educational institution, or serve as a consulting health care provider to chiropractors and be licensed, certified, or registered as a chiropractor. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(a)(1), (2) ("For purposes of [section 74.402], 'practicing health care' *includes:* (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.") (emphasis added). Group contends Dr. Saqer does not meet the statutory definition of "practicing health care." In response, Vicento argues Dr. Saqer's report demonstrates

he has **\*731** adequate knowledge, skill, experience, training, and education regarding his treatment of patients with conditions similar to Vicento's to qualify him as an expert under subsection (b)(1).

 **[9]** Group's asserted construction of section 74.402, subsections (a)(1)-(2) and (b)(1), improperly limits and confines the definition of the term "practicing health care." Subsection (a) uses the term "includes" in defining "practicing health care." Although Chapter 74 does not define the term "includes," the Code Construction Act defines "includes" as a term "of enlargement and not of limitation or exclusive enumeration, and use of [includes] does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE ANN. § 311.005(13) (Vernon 2005); *see Jackson Law Office, P.C. v. Chappell,* 37 S.W.3d 15, 25–26 (Tex.App.-Tyler 2000, pet. denied). Thus, section 74.402(a)'s two definitions of "practicing health care" are not exclusive.

In addition, under the literal language of section 74.402(b)(1), an expert is only required to be "practicing health care *in a field of practice that involves the same type of care or treatment* as that delivered by the defendant health care provider." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(1) (emphasis added). Subsection (b)(1) does not require an expert to be practicing health care *in the same field* as the defendant health care provider, here, the field of chiropractic. Instead, under subsection (b)(1), the expert only must practice health care in a field of practice *involving the same type of care or treatment.* [5]

[5]   A conference committee report on House Bill 4 conducts a side-by-side comparison of the Texas House of Representatives' version of the bill with the Senate's version. CONFERENCE COMM. REPORT, Tex. H.B. 4, 78th Leg., R.S. (2003). The report shows the House's version of section 74.402(b)(1) stated a person may qualify as an expert under that subsection if the person "(1) is practicing health care *in the same field of practice as the defendant health care provider ....*" In contrast, the Senate's version of subsection (b)(1) stated a person may qualify as an expert if the person "(1) is practicing health care *in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual ....*" The Conference Committee on House Bill 4 adopted the Senate's version, which *does not* require a qualified expert to practice *in the same field* as the defendant health care provider, and this version was enacted into law. *See id.* The difference

in the wording between the House and Senate versions may be due to concerns expressed by individuals who testified at public hearings conducted by the Senate State Affairs Committee on House Bill 4 regarding potential problems with the "in the same field" language. *Hearings on Tex. H.B. 4 Before the Senate State Affairs Committee,* 78th Leg., R.S. 17–18 (April 15, 2003) (transcript available from Senate Staff Services Office).

Reading section 74.402 subsections (a) and (b)(1) together, subsection (a) expands upon the definition of "practicing health care" to *include* qualified teachers and consulting health care providers who may not otherwise be qualified under subsection (b)(1) because they are not *practicing* health care and instead teach or consult. Group's proffered construction of subsection (a) and (b)(1) results in a person being qualified as an expert *only if* the person trains health care providers *in the same field* as the defendant health care provider *or* if the person serves as a consulting health care provider and is licensed, certified, or registered in the same field as the defendant health care provider. According to Group, if a person practices health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, but the person is not certified in the same field of practice as the defendant **\*732** health care provider, is not a teacher, or is not a qualified consultant, the person is unqualified.

Group's asserted construction of section 74.402(a) is unnecessarily restrictive and is contrary to the plain and common meaning of the language of the statute. Having considered the language of section 74.402 in its entirety, we disagree with Group that the two definitions of "practicing health care" under section 74.402(a) are exclusive.

### 3. Dr. Saqer's Qualifications and Section 74.402

#### a. Section 74.402(b)(1)

 **[10]** We now analyze whether Dr. Saqer satisfies the requirements of section 74.402(b)(1). Dr. Saqer's expert report and curriculum vitae reveal he is a licensed medical doctor, an anesthesiologist, who specializes in anesthesia and pain management. He has been practicing anesthesia and pain management in the Houston area for the past seven years. Dr. Saqer is the owner and president of Houston Preferred Anesthesia, a group of anesthesiologists that provide anesthesia services to different hospitals and outpatient surgery centers. He is board eligible by the American Board of Anesthesiologists and a Board Diplomat by the American Academy of Pain Management. He also

is the founder and manager of Texas Pain Solutions, which provides invasive and non-invasive pain services through different hospitals and multiple clinics in the Houston area.

Although Dr. Saqer does not train chiropractors at an accredited educational institution, does not serve as a consulting health care provider to chiropractors, and is not licensed, certified, or registered as a chiropractor, [6] as discussed above, this is not determinative of Dr. Saqer's qualifications under subsection (b)(1). Rather, the focus of our inquiry is whether Dr. Saqer practices health care in a field of practice that involves the same type of care or treatment as that delivered by Group. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(1).

[6]      Under the Occupations Code, "[a] person practices chiropractic" ... if the person:
> (1) uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body;
> (2) performs nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system;
> (3) represents to the public that the person is a chiropractor; or
> (4) uses the term "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative of those terms or initials in connection with the person's name.
> TEX. OCC.CODE ANN. § 201.002(b) (Vernon 2004). The statute further provides the practice of chiropractic *does not* include incisive or surgical procedures, the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription, or the use of x-ray therapy or therapy that exposes the body to radioactive materials. TEX. OCC.CODE ANN. § 201.002(c).

In his report, Dr. Saqer states the following with regard to his qualifications:

As a practicing medical doctor specializing in anesthesia and pain management, I know the accepted standard of care required of chiropractors practicing under the same or similar circumstances as was Chiropractor Edward F. Group during the past seven years. As a pain specialist, I treat patients with all types of pain, including be [sic] related to work, motor vehicle accident, arthritis, cancer pain, or post-surgical pain. I treat on average more than 100 patients every week, and more than 20% of them suffer from conditions similar to Mr. Vicento. I know the accepted standard of care required of chiropractors regarding *733 the type of injury and treatment involved in this case, because my specialty overlaps and intertwines with chiropractic practice. Specifically, I engage in modalities of treatment, which include but are not limited to pain management modalities. These areas include but are not limited to the following:

1. Massage Therapy;

2. Oscillation of pain centers;

3. Relief of complications of muscle spasms;

4. Neurological pain causation;

5. Accupuncture treatment;

6. Modern methods of physical therapy.

These are the same areas that chiropractors use to manipulate and treat patients. For example, massage therapy includes, but is not limited to: [i] increasing circulation to promote healing, [ii] relieving cramps and muscle spasm, [iii] pain relief of spinal injuries and headaches by decreasing muscle tension, [iv] manipulating limbs and the spine to relieve impingement of nerve roots and other complications from injuries, and [v] manipulation of the body to increase mobility due to the effects of degenerative disc disease and the aging process. These treatments are utilized by chiropractors and pain management physicians alike.

Additionally, chiropractors and pain management physicians use similar methods to evaluate patients and determine whether to refer them to a specialist for surgical consultation. For example, during massage therapy, I often become aware of other additional needs in connection with pain management. Some of the methodology indicates an absence of pain in certain manipulations of the human body which further delineates the nature and extent of the injury. By performing pain management methods, either by way of injection, manipulation, or massage, I am able to further isolate the cause of the injury and then concentrate on alleviation of the pain by non-surgically treating the area of the injury which is causing the pain in the arm and the hand or by referring for surgical intervention, if needed.

A chiropractor, though he cannot do or perform injections, utilizes similar methodology in making determinations as

to the cause of pain. It is ... during that determination/diagnostic period that a chiropractor should become aware of the need to send that patient for further and additional medical care and treatment that is more sophisticated than he either legally or ethically can perform.

I am qualified to do and perform many of the same things that chiropractors are competent to do and perform, but my level of expertise, by reason of my training, experience and education, enables me to perform a magnitude of other procedures that chiropractors cannot use. As a pain management physician I work closely together with chiropractors; I have supervised chiropractors, evaluated patients of chiropractors, been assisted by chiropractors and taught chiropractors modern pain relief methodology. It is by reason of this overlapping area between chiropractic measures and pain management areas that I am qualified to testify regarding chiropractic procedures. Specifically, because determining when to refer a patient for neurosurgical consultation is common to both pain management and chiropractic, I am qualified to testify as to the standard of care for referral of a patient to a specialized spine surgeon.

**\*734** We conclude, based on the foregoing, Dr. Saqer is "practicing health care" in a field of practice that involves the same type of care or treatment as chiropractor Group. Accordingly, Dr. Saqer satisfies section 74.402(b)(1)'s requirements.

**b. Section 74.402(b)(2)**

Under section 74.402(b)(2), Dr. Saqer must have "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(2). On appeal, Group does not specifically argue Dr. Saqer does not satisfy subsection (b)(2). Dr. Saqer explains in his report he has knowledge of the accepted standards of care for chiropractors for the diagnosis, care, and treatment of the type of injury involved in this claim. Thus, Dr. Saqer satisfies section 74.402(b)(2).

**c. Section 74.402(b)(3)**

Finally, we examine whether Dr. Saqer satisfies the third requirement set forth in section 74.402(b)(3), that he be "qualified on the basis of training or experience to offer an expert opinion regarding ... accepted standards of health care." *See* TEX. CIV. PRAC. & REM.CODE ANN. §

74.402(b)(3). To determine whether an expert is qualified "on the basis of training or experience," subsection (c) of the statute instructs courts to consider whether the expert "(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience in the area of health care relevant to the claim; and (2) is actively *practicing health care* in rendering health care services relevant to the claim." TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(c)(1)-(2) (emphasis added).

Dr. Saqer states in his report that he has experience in the area of chiropractic, his "specialty overlaps and intertwines with chiropractic practice," and 20% of his patients suffer from injuries similar to Mr. Vicento's. In addition, Dr. Saqer states he is a licensed physician practicing anesthesiology and pain management. Dr. Saqer satisfies subsection (c)(1).

With regard to subsection (c)(2), Group argues Dr. Saqer does not satisfy this subsection because he is not "practicing health care." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(c)(2). Subsection(c)(2) inquires whether the person "is actively practicing health care in rendering health care services relevant to the claim." *Id.* As discussed above with regard to subsection (b)(1), Dr. Saqer's expert report shows he is actively practicing health care services relevant to Vicento's claim. Thus, he satisfies subsection (c)(2).

Having concluded Dr. Saqer satisfies both prongs of subsection (c), he, therefore, is qualified on the basis of training or experience under subsection (b)(3) to offer an expert opinion regarding accepted chiropractic standards of care.

**CONCLUSION**

Dr. Saqer satisfies the requirements of section 74.402(b)(1)-(3). Accordingly, we hold the trial court did not abuse its discretion in denying Group's motion to dismiss Vicento's expert report and overrule appellant's sole issue.

We affirm the trial court's order denying appellant's motion to dismiss.

**All Citations**

164 S.W.3d 724

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

371 S.W.3d 482
Court of Appeals of Texas,
Houston (1st Dist.).

Robert HILLERY, M.D., and Southwest
Surgical Associates, P.A., Appellants,
v.
Suzette KYLE, Patrice Ward, Vicki, Kyle, and
Jamessee Kesee, individually and on behalf of
the Estate of Melinda Kyle, Deceased, Appellees.

No. 01–11–00708–CV.    |    May 17, 2012.

**Synopsis**
**Background:** Surviving family members of patient who died after suffering post-operative complications brought health care liability claim against physician who performed below-knee amputation on patient's right leg. Physician moved to dismiss suit, objecting to medical expert report on the ground that medical expert, who was a cardiologist, was not qualified to opine on the standard of care applicable to physician, a general surgeon. The 240th District Court, Fort Bend County, Thomas R. Culver III, J., denied physician's motion to dismiss. Physician appealed.

**Holdings:** The Court of Appeals, Rebeca Huddle, J., held that:

[1] medical expert who was a cardiologist was qualified to opine on the standard of care applicable to physician who was a general surgeon;

[2] physician waived for appellate review issue as to whether patient's medical expert report was insufficient with respect to elements of standard of care and breach; and

[3] report provided a fair summary of the causal relationship between physician's alleged failure to administer post-operative medication and patient's development of blood clots and pulmonary emboli.

Affirmed.

West Headnotes (12)

[1]    **Appeal and Error**
       👉 Rulings on Motions Relating to Pleadings

A trial court's ruling on a motion to dismiss a health care liability lawsuit based on adequacy of an expert report under the Medical Liability and Insurance Improvement Act is reviewed under an abuse of discretion standard; a trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles, or if it clearly fails to analyze or apply the law correctly. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

[2]    **Health**
       👉 Affidavits of merit or meritorious defense; expert affidavits

In reviewing whether an expert report complies with the Medical Liability and Insurance Improvement Act, courts evaluate whether the report represents a good-faith effort to comply with the statute; in making this evaluation, courts must look only at the information contained within the four corners of the report. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

[3]    **Health**
       👉 Affidavits of merit or meritorious defense; expert affidavits

Medical expert who was a cardiologist was qualified to opine on the standard of care applicable to physician, who was a general surgeon, for purposes of satisfying requirements of medical expert report pursuant to Medical Liability and Insurance Improvement Act, in medical malpractice action involving a patient who died following amputation of leg; expert's report and curriculum vitae demonstrated his knowledge and experience treating patients in circumstances similar to those that formed the basis of the allegations in instant claim,

which specifically involved the alleged failure to properly anti-coagulate patient following the surgery. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(A).

1 Cases that cite this headnote

**[4]** **Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

Although the medical expert report necessary to support a health care liability claim need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements of standard of care, breach, and causation. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[5]** **Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

In detailing the three statutory elements of standard of care, breach, and causation., the medical expert report necessary to support a health care liability claim must provide enough information to fulfill two purposes: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[6]** **Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

A medical expert report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill the purposes of an expert report in a health care liability case, which is to inform the defendant of the specific conduct the plaintiff has called into question and provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

4 Cases that cite this headnote

**[7]** **Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

In a health care liability action, the medical expert must, in his report, explain the basis of his statements to link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[8]** **Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

In assessing the sufficiency of a medical expert report in a health care liability action, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[9]** **Appeal and Error**

👉 Objections to evidence and witnesses

Physician waived for appellate review issue as to whether patient's medical expert report was insufficient with respect to elements of standard of care and breach, in health care liability action, where, at trial, physician objected only on grounds that the report was conclusory concerning the element of causation. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[10]** **Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

Medical expert's report provided a fair summary of the causal relationship between physician's alleged failure to administer post-operative medication and patient's development of blood clots and pulmonary emboli, which resulted in

patient's death, and thus, report was sufficient to support health care liability claim; report explained how formation of clots caused inadequate oxygenation, respiratory arrest, and brain injury, report described and explained risk factors for developing clots and pulmonary emboli, many of which existed in patient's case, predisposing her to their development, including a trauma in the form of a surgical amputation of patient's leg below the knee. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

[11] **Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

To support a health care liability claim, an expert cannot merely state in a medical expert report his conclusions or provide insight about the plaintiffs' claims, but must instead explain the basis of his statements to link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

[12] **Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

In explaining causation to support health care liability claim, the expert report must explain how the physician's conduct caused the plaintiff's injuries. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*484** Divya Reddy Chundru, Harris, Hilburn & Sherer, Houston, TX, for Appellants.

Monica C. Vaughan, Houssiere, Durant & Houssiere, L.L.P., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and HUDDLE.

**\*485  OPINION**

REBECA HUDDLE, Justice.

Robert Hillery, M.D. and Southwest Surgical Associates, P.A. bring this interlocutory appeal challenging the trial court's denial of their motion to dismiss a health care liability claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West Supp.2011). Suzette Kyle, Patrice Ward, Vicki, Kyle, and Jamessee Kesee, individually and on behalf of the Estate of Melinda Kyle, deceased (collectively, "the Kyles"), brought a health care liability claim against Hillery and Southwest, among other defendants, asserting that negligence in their care and treatment of Melinda Kyle caused her death. After the Kyles served an expert report as required by section 74.351 of the Texas Civil Practice and Remedies Code, Hillery and Southwest (collectively, "Hillery") moved to dismiss under section 74.351, contending the report is inadequate. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(a) (West 2011). The trial court denied the motion to dismiss, and, on appeal, Hillery contends the trial court erred because Dr. Goldman, the Kyles' expert, is not qualified and because the report is inadequate concerning causation. We affirm.

**Background**

On September 15, 2008, Melinda Kyle was admitted to Oak Bend Medical Center with a gangrenous right toe. Melinda was sixty-nine years old with a history of diabetes, hypertension, coronary artery disease, and peripheral vascular disease. She also took blood-thinning medication to prevent clotting.

Melinda's attending doctor was Dr. Mark Murray. Shortly after being admitted, Melinda had a stent placed in her leg to try to restore blood flow to her foot. She also saw a cardiologist, Dr. James McClamroch, on September 17. The procedure did not restore blood flow to Melinda's foot, and, on September 22, 2008, Dr. Uttam Tripathy, a vascular surgeon performed a bypass graft. Although it is unclear when, at some point, Melinda was placed on a Heparin drip to prevent clotting. Dr. Tripathy ordered that the Heparin drip be

discontinued one hour before surgery and resumed four hours after surgery.

The bypass graft was not successful. Accordingly, Hillery, a general surgeon, was consulted. He performed a below knee amputation on Melinda's right leg on September 24, 2008. Hillery ordered the Heparin drip discontinued before surgery. After the surgery was completed, the Heparin drip was not resumed.

Melinda was monitored in the intensive care unit after the amputation. On September 25, while Melinda was still in the ICU, testing by Dr. McClamroch and Dr. Tripathy showed inadequate anti-coagulation. On September 26, Melinda was extubated. A test performed that day again showed inadequate anti-coagulation. On September 29, 2008, despite a still inadequate level of anti-coagulation, Dr. McClamroch approved Melinda's transfer out of ICU. Dr. Tripathy also examined Melinda and ordered her transfer. Dr. Murray also ordered Melinda's transfer. Approximately one hour after her transfer, a nurse found Melinda lethargic and unresponsive. Melinda was resuscitated and reintubated. However, she had suffered anoxic encephalopathy—brain damage caused by lack of oxygen.

Melinda was transferred back to the ICU. At that time, she was placed back on the Heparin drip. Dr. McClamroch ordered a test that showed myocardial infarction was not the cause of Melinda's respiratory arrest. Further testing indicated that there was no significant blood **\*486** flow to the brain. Melinda was declared brain dead. She was extubated on October 6, 2008. Melinda was transferred for hospice care where she remained until she died on October 12, 2008.

The Kyles brought this health care liability claim against Dr. Tripathy, Dr. Murray, Dr. McClamroch, Hillery, and the professional associations with which each doctor was associated. As required by statute, the Kyles filed an expert report by Dr. Stephen Goldman. Hillery moved to dismiss the Kyles' suit against him, objecting to the report on the ground that Dr. Goldman, who is a cardiologist, is not qualified to opine on the standard of care applicable to Hillery, a general surgeon. Hillery also objected that Dr. Goldman's opinion is conclusory because it does not link the facts of the case to his conclusion that Hillery's breach of the standard of care caused Melinda's death. The trial court denied the motion to dismiss and Hillery appealed.

## Standard of Review

 **[1]**  **[2]**  We review a trial court's ruling on a motion to dismiss a health care liability lawsuit pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code under an abuse of discretion standard. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (reviewing dismissal under predecessor statute, section 13(e) of article 4590i); *Runcie v. Foley,* 274 S.W.3d 232, 233 (Tex.App.-Houston [1st Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles, or if it clearly fails to analyze or apply the law correctly. *Runcie,* 274 S.W.3d at 232. In reviewing whether an expert report complies with Chapter 74, we evaluate whether the report "represents a good-faith effort" to comply with the statute. *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 221 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In making this evaluation, we must look only at the information contained within the four corners of the report. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002).

## Qualifications

 **[3]**  In his first issue, Hillery contends that the trial court abused its discretion in not dismissing the Kyles' claim because Dr. Goldman is not qualified to offer an opinion concerning the standard of care in this claim.

Section 74.351(r)(5)(A) requires that an expert opining on "whether a physician departed from accepted standards of medical care" meet the qualifications set forth in section 74.401. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(A) (West 2011). Section 74.401(a) provides:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a) (West 2011). Section 74.401 continues:

**\*487** (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(c).

The first requirement set forth in section 74.401(a) is that Dr. Goldman "is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose." TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(1). Hillery does not challenge this requirement.

The second and third requirements of section 74.401(a) are that Dr. Goldman have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care." *Id.* § 74.401(a)(2), (3). These are the requirements Hillery contends Dr. Goldman fails to meet.

Specifically, Hillery argues that Dr. Goldman is not qualified because he is a cardiologist who is board certified in cardiovascular disease and internal medicine, but nothing in his report or curriculum vitae shows that he is qualified to opine on the area of general surgery or below-knee amputation, the medical care provided by Hillery in this case. An expert need not be practicing in the same field as a defendant in a health care liability claim in order to qualify as an expert. *Rittger v. Danos,* 332 S.W.3d 550, 558 (Tex.App.-Houston [1st Dist.] 2009, no pet.); *Blan v. Ali,* 7 S.W.3d 741, 745 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Rather the statute requires that the expert have knowledge of the condition involved in the claim. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2); *Rittger,* 332 S.W.3d

at 558 (noting focus is not on defendant doctor's area of expertise, but on the condition involved in the claim). The mere fact that Dr. Goldman is not a general surgeon, therefore, does not necessarily render him unqualified.

In his report, Dr. Goldman states that he is familiar with the standards of care relevant to the condition involved in this claim. Specifically, Dr. Goldman states that, as part of his practice, he treats, and has diagnosed and treated, "patients with conditions similar to those experienced by Melinda Kyle including coronary artery disease, hypertension, hyperlipidemia, diabetes, and peripheral vascular disease." He also states that

> [T]here is considerable overlap in my specialty and that of physicians caring for patients in a critical care setting including pulmonology, vascular disease and internal medicine. My area of specialties overlaps the physicians involved in the care of Melinda Kyle in the diagnosis, treatment and management of patients with stents.... By virtue of my education, training and experience, I am well familiar with the standards of care applicable to the diagnosis and treatment of patients like Melinda Kyle with a history of coronary artery disease, hypertension, hyperlipidemia, diabetes and peripheral vascular disease who have undergone surgery.

Dr. Goldman also explains the basics of the cardiovascular system and how blood clots in the legs may develop. The risk of **\*488** clots is "significantly increased in patients who have suffered a trauma in the lower extremities such as would occur during a surgical procedure." He further elaborates,

> The risk of pulmonary embolism and thrombotic complications following surgery or immobilization has been well-known for decades. It is well established that patients who are unable to move well, who are obese or bedridden, and therefore have markedly decreased movement in their legs and bodies, should be given some type of thrombo-embolism prophylaxis. .... It has been

well established that administration of anticoagulant medications like Heparin can prevent clots from forming thereby preventing the development of pulmonary emboli.

Within the section of his report dealing with Hillery's alleged breach of the standard of care, Dr. Goldman also states,

> The standard of care required Robert Hillery, M.D., the general surgeon attending to Ms. Kyle, to ensure that proper anticoagulation occurred following surgery. The standard of care required Dr. Hillery to order administration of Heparin for Mrs. Kyle to prevent the formation of pulmonary embolism and thrombotic complications. This standard applies to all of the healthcare providers involved in the care of Mrs. Kyle as the need for administration [of] Heparin to anti-coagulate a patient following surgery involving the hip, leg or lower extremities is well known among physicians practicing surgery, cardiology and internal medicine.

Furthermore, as stated above, the statute setting forth the qualifications required of an expert does not focus on the defendant's specialty but on the condition involved in the claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2); *Rittger,* 332 S.W.3d at 558. Hillery asserts that he was "consulted solely regarding amputation" and not to provide any other care. However, in this case, Hillery's conduct related to the amputation or general surgery is not the basis of the Kyles' claim. Rather, the basis of the claim and the focus of Dr. Goldman's report is the failure to properly anti-coagulate Melinda following the surgery. The Kyles alleged that Hillery and the other defendants were negligent by failing to "properly diagnose and prescribe necessary medications to Melinda Kyle," "anticoagulate Melinda Kyle," "properly recognize and diagnose the condition of Melinda Kyle, deceased, including, but not limited to hypercoaguable state," and "properly and timely treat Melinda Kyle." Hillery does not assert that Dr. Goldman, who is board-certified in cardiovascular diseases and internal medicine, is not qualified to offer an opinion on the standard of care relating to the need to administer anti-coagulation medication following surgery.

Because Dr. Goldman's report and curriculum vitae demonstrate his knowledge and experience treating patients in circumstances similar to those that form the basis of the allegations in this claim, the trial court did not abuse its discretion in finding Dr. Goldman qualified. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2); *Rittger,* 332 S.W.3d at 558 (neurologist qualified to provide expert opinion on standard of care or breach thereof by emergency room physician where prospective medical expert had practical knowledge of what is usually and customarily done by practitioners under similar circumstances); *see also Barber v. Mercer,* 303 S.W.3d 786, 795 (Tex.App.-Fort Worth 2009, no pet.) (holding anesthesiologist qualified to opine on conduct of surgeon in health care liability claim because anesthesiologist's report tied his education, training, and experience to **\*489** the specific alleged breach—the positioning and padding of a patient during surgery, not the conduct of the actual operating techniques); *Blan,* 7 S.W.3d at 746 (condition involved in claim was stroke, therefore, neurologist qualified as expert although defendants were emergency room physician and cardiologist).

### Adequacy of Report

In his second issue, Hillery contends that Dr. Goldman "fails to adequately set forth the standard of care, breach of the standard of care, and the causal relationship between the breach and injury" as required by section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

### A. Chapter 74 expert report requirements

Pursuant to section 74.351, medical-malpractice plaintiffs must provide each defendant physician and health care provider with an expert report. TEX. CIV. PRAC. & REM.CODE § 74.351(a). If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* The trial court shall grant the motion only if it appears, after hearing, that the report does not represent an objective good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l* ). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the expert's opinions, as of the date of the report, regarding: (1) the applicable standards of care; (2) the manner in which the care rendered failed to meet the standards; and (3) the

causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855, 858–59 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

 [4]    [5]    [6]    [7]    [8]    Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878; *Gray,* 189 S.W.3d at 859. In detailing these elements, the report must provide enough information to fulfill two purposes: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Palacios,* 46 S.W.3d at 879). A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* " '[T]he expert must explain the basis of his statements to link his conclusions to the facts.' " *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. *See Scoresby,* 346 S.W.3d at 556 (citing *Palacios,* 46 S.W.3d at 878); *Wright,* 79 S.W.3d at 53.

**B. Hillery's objection**

 [9]    Hillery's objection to Dr. Goldman's report in the trial court stated, in its entirety:

> Dr. Goldman's report is inadequate because it is conclusory and fails to provide any factual support for the opinion expressed within. Dr. Goldman states that myocardial infarction was ruled out as the cause of Mrs. Kyle's arrest. However, Dr. Goldman fails to provide any factual support for his conclusion that Mrs. Kyle developed blood clots and **\*490** pulmonary emboli that were the cause of her respiratory arrest as a result of failure [t]o provide appropriate post operative drugs.

Because Hillery objected only on the grounds that the report was conclusory concerning the element of causation, and did

not mention the elements of standard of care or breach, we do not address that portion of Hillery's issue concerning standard of care and breach. *See* TEX.R.APP. P. 33.1(a); *Hawkins v. Herrera,* 296 S.W.3d 366, 370 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (refusing to address objections by defendant physician who did not raise objections in trial court); *see also Plemons v. Harris,* No. 02–08–00326–CV, 2009 WL 51290, *3 (Tex.App.-Fort Worth Jan. 8, 2009, no pet.) (mem. op.) (holding objection to expert report made in trial court must comport with complaint asserted on appeal); *Williams v. Mora,* 264 S.W.3d 888, 891(Tex.App.-Waco 2008, no pet.) (holding that when defendant's only timely filed objections to expert report were that two statements were speculative, defendant waived all other objections).

**C. Adequacy of report concerning causation**

 [10]    [11]    [12]    As set forth above, Hillery's objection to the adequacy of Dr. Goldman's report is that "Dr. Goldman fails to provide any factual support for his conclusion that Mrs. Kyle developed blood clots and pulmonary emboli that were the cause of her respiratory arrest as a result of failure [t]o provide appropriate post operative drugs." An expert report must include a fair summary of the causal relationship between the defendant's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). An expert cannot merely state his conclusions or "provide insight" about the plaintiffs' claims, but must instead "explain the basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52. In explaining causation, the report must explain how the physician's conduct caused the plaintiff's injuries. *Id.* at 53.

Dr. Goldman's report concerning causation is not conclusory. As discussed above, Dr. Goldman explains the functioning of the cardiovascular system, including how decreased physical movement causes a patient to be more prone to clotting, and how formation of clots causes inadequate oxygenation, respiratory arrest, and brain injury. He also describes and explains the risk factors for developing clots and pulmonary emboli, many of which existed in Melinda's case, predisposing her to their development:

> Melinda Kyle had multiple risk factors that predisposed her to the development of blood clots and pulmonary emboli. Ms. Kyle was obese, had heart disease, peripheral vascular disease and was

immobile. Ms. Kyle had also just undergone a below knee amputation, a procedure that is in itself a risk factor for development of pulmonary emboli. Ms. Kyle should have been placed back upon Heparin following this surgery. In reasonable medical probability, had the Heparin drop been resumed for Ms. Kyle following her amputation surgery, she would not have developed the blood clots and pulmonary emboli that were, in all probability, the cause of her respiratory arrest on September 29, 2008. Ms. Kyle would not have suffered the respiratory arrest on September 29, 2008 if Heparin had been reinstituted and would not have sustained the anoxic brain injury caused by her arrest.

Concerning Hillery's conduct, Dr. Goldman states:

The standard of care required Robert Hillery, M.D., the general surgeon attending to Ms. Kyle, to ensure that **\*491** proper anticoagulation occurred following surgery. The standard of care required Dr. Hillery to order administration of Heparin for Ms. Kyle to prevent the formation of pulmonary embolism and thrombotic complications. This standard applies to all of the health care providers involved in the care of Ms. Kyle as the need for administration Heparin to anti-coagulate a patient following surgery involving the hip, leg or lower extremities is well known among physicians practicing surgery, cardiology and internal medicine. Ms. Kyle was a patient with multiple risk factors for the development of pulmonary emboli notably including surgery on the leg which is itself a risk factor sufficient to warrant administration of Heparin prophylactically following surgery. For Ms. Kyle, a patient with multiple

risk factors that placed her at an even greater risk for the development of pulmonary emboli, administration of Heparin was essential to prevent formation of blood clots. By failing to order the Heparin resumed and failing to ensure that Ms. Kyle was receiving Heparin following her surgery, Dr. Hillery breached and violated the standard of care. In reasonable medical probability, if Dr. Hillery had met the standard of care and ordered Heparin following surgery, Heparin would have been resumed in Ms. Kyle and she would not have developed the pulmonary emboli that caused her respiratory arrest and anoxic brain injury and she would have survived her hospitalization.

In the "Conclusion" section of the report, Dr. Goldman summarizes:

Ms. Kyle had several strong and obvious risk factors for pulmonary emboli yet she was not placed back on Heparin following her below knee amputation. This was below the standard of care for all of the physicians attending to Ms. Kyle. The failure to resume Heparin following her surgery, in reasonable medical probability, caused the formation of blood clots that blocked the flow of oxygen and caused her to suffer a respiratory arrest on September 29, 2008.

Dr. Goldman does more than just state his conclusions or provide insight regarding the Kyle's claims. *See Wright,* 79 S.W.3d at 52. He explains the medical causes of the formation of clots, including conditions that increase the risk, and that these risks are well-known. He identifies Melinda as having several of these risk factors, including a trauma in the form of a surgical amputation of her leg below the knee. He explains that treatment using a drug such as Heparin is well-established to help prevent clots from forming and that the standard of care required the defendants, including Hillery, to administer Heparin following surgery. He explains that

the test ordered by other defendants ruled out a myocardial infarction. And, finally, he opines that the likely cause of Melinda's death was the development of blood clots and pulmonary emboli and that she would not have developed the clots and pulmonary emboli had the Heparin been resumed following the amputation surgery. We conclude that this is a fair summary of the causal relationship between Hillery's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. *See Manor Care Health Servs., Inc. v. Ragan,* 187 S.W.3d 556, 564 (Tex.App.-Houston [14th Dist.] 2006, pet. granted, judgment vacated w.r.m.) (concluding report adequate concerning causation where report stated that administration of anticoagulant medication was necessary to prevent pulmonary emboli and that as result of failure to administer drugs patient probably suffered pulmonary emboli and consequently died); *cf.* **\*492** *Shenoy v. Jean,* No. 01–10–01116–CV, 2011 WL 6938538, at \*7 (Tex.App.-Houston [1st Dist.] Dec. 29, 2011, no pet. h.) (mem op.) (holding report inadequate concerning causation because it failed to link decedent's pre-existing conditions to an increased risk for the injury involved in that claim).

In his appellate brief, Hillery also argues that Dr. Goldman's opinion is speculative because he "fails to offer any factual data, clinical, radiological and the like[,] to support his assumption that blood clots and pulmonary emboli formed which caused Ms. Kyle's respiratory arrest. There are a multitude of causes for respiratory arrest for a 5–day postoperative patient." To the extent this is an argument, distinct from the one discussed above, that Dr. Goldman did not rule out all possible causes of death, we overrule it. *See Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace,* 278 S.W.3d 552, 562 (Tex.App.-Dallas 2009, no pet.) ("Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed."); *see also Methodist Hosp. v. Shepherd– Sherman,* 296 S.W.3d 193, 199 n. 2 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (whether expert's opinion is correct or not is issue for summary judgment, not Chapter 74 motion to dismiss); *Manor Care Health Servs., Inc.,* 187 S.W.3d at 564 (report stating failure to administer anticoagulant drugs probably caused pulmonary emboli that caused death sufficient statement of causation).

### Conclusion

We affirm the order of the trial court.

### All Citations

371 S.W.3d 482

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

328 S.W.3d 526
Supreme Court of Texas.

Michael T. JELINEK, M.D. and Columbia
Rio Grande Healthcare, L.P. d/b/a Rio
Grande Regional Hospital, Petitioners,
v.
Francisco CASAS and Alfredo DeLeon, Jr.,
as Personal Representatives of the Estate
of Eloisa Casas, Deceased, Respondents.

No. 08–1066.   |   Argued Feb.
18, 2010.   |   Decided Dec. 3, 2010.

**Synopsis**
**Background:** Patient's surviving family members brought medical malpractice action against hospital and physician, arising out of treatment of patient at hospital. Following non-suiting of physician, and following jury trial, the 275th District Court, Hidalgo County, Juan R. Partida, J., entered judgment for family members. Hospital and physician appealed. The Corpus Christi Court of Appeals, 2008 WL 2894889, affirmed. Hospital and physician petitioned for review.

**Holdings:** The Supreme Court, Guzman, J., held that:

[1] lay testimony of family members did not present some evidence in support of finding that hospital's alleged negligence caused patient's additional pain and suffering;

[2] expert testimony did not present some evidence in support of finding that hospital's alleged negligence caused patient's additional pain and suffering; and

[3] expert report was conclusory with regard to causation and, thus, was deficient.

Reversed and rendered in part; reversed and remanded in part.

Jefferson, C.J., dissented in part, and filed opinion in which Green and Lehrmann, JJ., joined.

Lehrmann, J., filed opinion dissenting in part.

**West Headnotes (23)**

**[1]** **Health**
 Proximate Cause

At a trial concerning a medical malpractice claim, the plaintiff must establish two causal nexuses in order to be entitled to recovery: (1) a causal nexus between the defendant's conduct and the event sued upon; and (2) a causal nexus between the event sued upon and the plaintiff's injuries.

6 Cases that cite this headnote

**[2]** **Appeal and Error**
Total failure of proof

In a legal sufficiency review, when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.

30 Cases that cite this headnote

**[3]** **Appeal and Error**
Total failure of proof

In a legal sufficiency review, when the circumstances are equally consistent with either of two facts, neither fact may be inferred.

2 Cases that cite this headnote

**[4]** **Appeal and Error**
On conflicting evidence

In a legal sufficiency review, when the evidence equally supports two alternatives, the Supreme Court must view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances, and must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

Cases that cite this headnote

**[5]** **Health**

🔑 Proximate cause

To meet the legal sufficiency standard in medical malpractice cases, plaintiffs are required to adduce evidence of a reasonable medical probability, or reasonable probability, that their injuries were caused by the negligence of one or more defendants, meaning simply that it is more likely than not that the ultimate harm or condition resulted from such negligence.

18 Cases that cite this headnote

**[6]** **Health**

🔑 Diagnosis and treatment of cancer

Lay testimony of patient's surviving husband and son regarding patient's discomfort while obtaining treatment for cancer in hospital did not present some evidence in support of finding that hospital's alleged negligence caused patient's additional pain and suffering, in their medical malpractice action against hospital; testimony of husband and son raised no more than mere suspicion of causation, inasmuch as they were unable to assert whether it was cancer, surgery, other infections, or lapse in medication that caused such discomfort.

Cases that cite this headnote

**[7]** **Health**

🔑 Proximate cause

**Health**

🔑 Gross or obvious negligence and matters of common knowledge

Lay testimony may be used as evidence of causation in certain circumstances in medical malpractice actions, but when expert testimony is required, lay evidence supporting liability is legally insufficient.

8 Cases that cite this headnote

**[8]** **Health**

🔑 Proximate cause

A general rule in medical malpractice actions is that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors.

13 Cases that cite this headnote

**[9]** **Health**

🔑 Proximate Cause

Correlation does not necessarily imply causation, for purposes of a medical malpractice action; evidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions, but suspicion has not been and is not legally sufficient to support a finding of legal causation.

4 Cases that cite this headnote

**[10]** **Health**

🔑 Gross or obvious negligence and matters of common knowledge

Non-expert evidence alone is sufficient in a medical malpractice action to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence.

9 Cases that cite this headnote

**[11]** **Evidence**

🔑 Cause and effect

**Evidence**

🔑 Conflict with other evidence

**Health**

🔑 Infections and infectious diseases

Expert testimony did not present some evidence in support of finding that hospital's alleged negligence through lapse in medication caused patient's additional pain and suffering, in medical malpractice action by patient's surviving family members against hospital; competing explanations existed for presence of negligence-induced infection, and expert did not explain why presence of such infection was medically more probable than competing explanations.

3 Cases that cite this headnote

**[12] Evidence**
　　Medical testimony

**Trial**
　　Expert and other opinion evidence

If no basis for the expert opinion in a medical malpractice action is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection; a claim will not stand or fall on the mere ipse dixit of a credentialed witness.

10 Cases that cite this headnote

**[13] Evidence**
　　Medical testimony

When the only evidence of a vital fact is circumstantial, an expert witness in a medical malpractice action cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence; rather, the expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts, and thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion.

26 Cases that cite this headnote

**[14] Health**
　　Proximate cause

The proof in a medical malpractice action must establish causal connection beyond the point of conjecture; it must show more than a possibility.

Cases that cite this headnote

**[15] Health**

　　Degree of proof

Verdicts in a medical malpractice action must rest upon reasonable certainty of proof.

1 Cases that cite this headnote

**[16] Appeal and Error**
　　Sufficiency of Evidence in Support

**Trial**
　　Credibility of Witnesses

Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another; but when reviewing a verdict for sufficiency of the evidence, courts need not, indeed, must not, defer to the jury's findings when those findings are not supported by credible evidence.

Cases that cite this headnote

**[17] Appeal and Error**
　　Total failure of proof

When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge.

22 Cases that cite this headnote

**[18] Costs**
　　Nature and Grounds of Right

**Health**
　　Affidavits of merit or meritorious defense; expert affidavits

Expert report was conclusory with regard to causation, and thus, was deficient, in medical malpractice action by patient's surviving family members against physician arising out of treatment of patient, so as to entitle physician to award of attorney fees and costs in action; report offered no more than bare assertion that physician's alleged breach resulted in increased pain and suffering as well as prolonged hospital stay, but did not offer explanation of how breach caused injury. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(e) (Repealed).

10 Cases that cite this headnote

**[19]  Health**

    Affidavits of merit or meritorious defense;
expert affidavits

If a plaintiff in a medical malpractice action
timely files an expert report and the defendant
moves to dismiss because of the report's
inadequacy, the trial court must grant the motion
only if it appears to the court, after a hearing, that
the report does not represent a good faith effort
to comply with the definition of an expert report
in the governing statute. Vernon's Ann.Texas
Civ.St. art. 4590i, § 13.01(*l* ), (r)(6) (Repealed).

20 Cases that cite this headnote

**[20]  Health**

    Affidavits of merit or meritorious defense;
expert affidavits

All information needed for an inquiry into
whether a good-faith effort was made to comply
with expert report requirements in the governing
statute is found within the four corners of the
expert report, which need not marshal all the
plaintiff's proof, but must include the expert's
opinion on each of the three main elements:
standard of care, breach, and causation. Vernon's
Ann.Texas Civ.St. art. 4590i, § 13.01(*l* ), (r)(6)
(Repealed).

19 Cases that cite this headnote

**[21]  Health**

    Affidavits of merit or meritorious defense;
expert affidavits

An expert report in a medical malpractice action
cannot merely state the expert's conclusions
about the elements of standard of care, breach,
and causation, but must explain the basis of the
statements to link the conclusions to the facts; a
report that merely states the expert's conclusions
about the elements does not fulfill the purposes
of a good-faith effort in complying with the
expert report requirements in the governing
statute. Vernon's Ann.Texas Civ.St. art. 4590i, §
13.01(*l* ), (r)(6) (Repealed).

39 Cases that cite this headnote

**[22]  Appeal and Error**

    Rulings on Motions Relating to Pleadings

The Supreme Court reviews the trial court's grant
or denial of a motion for sanctions and dismissal
of a medical malpractice action on the ground
of a deficient expert report under the abuse-of-
discretion standard. Vernon's Ann.Texas Civ.St.
art. 4590i, § 13.01(e) (Repealed).

5 Cases that cite this headnote

**[23]  Appeal and Error**

    Abuse of discretion

A district court abuses its discretion if it acts
in an arbitrary or unreasonable manner without
reference to any guiding rules or principles.

30 Cases that cite this headnote

**Attorneys and Law Firms**

**\*529**  Ronald G. Hole, Ida Cecilia Garza, Hole & Alvarez,
L.L.P., McAllen, for Michael T. Jelinek, M.D.

John N. Mastin, San Antonio, Francisco J. Rodriguez,
Rodriguez Tovar & Lopez, LLP, McAllen, for Francisco
Casas.

Mike A. Hatchell, Sarah B. Duncan, Elissa Gail Underwood,
Locke Lord Bissell & Liddell, LLP, Austin, Raul Javier
Guerra, Green, DuBois & Guerra, San Antonio, Susan A.
Kidwell, Locke Lord Bissell & Liddell, LLP, Austin, for
Columbia Rio Grande Healthcare, L.P.

**Opinion**

Justice GUZMAN delivered the opinion of the Court, in
which Justice HECHT, Justice WAINWRIGHT, Justice
MEDINA, Justice JOHNSON, and Justice WILLETT joined,
and in which Chief Justice JEFFERSON, Justice GREEN,
and Justice LEHRMANN joined as to Parts I and II.A.

When circumstantial evidence is consistent with several
possible medical conclusions, only one of which establishes
that the defendant's negligence caused the plaintiff's injury,

an expert witness must explain why, based on the particular facts of the case, that conclusion is medically superior to the others. If the expert fails to give any reason beyond an unsupported opinion, the expert's testimony is legally insufficient evidence of causation. In this case, we determine whether legally sufficient evidence supports the jury's verdict in favor of the estate of Eloisa Casas [1] against Rio Grande Regional Hospital (the Hospital). [2] Following her admission to the Hospital with abdominal pain, doctors placed Casas on antibiotics used to treat and prevent certain intra-abdominal infections. Two days later she underwent major abdominal surgery and continued on the antibiotics for another five days, but the Hospital allowed the prescriptions to lapse for four-and-a-half days. The Hospital admits it should have continued the antibiotics but denies that the lapse caused Casas any additional pain. We hold that the Casases failed to present legally sufficient evidence that Casas suffered from an infection the omitted antibiotics would have treated. Accordingly, we reverse the court of appeals' judgment and render judgment that the Casases take nothing. [3]

[1]     Francisco Casas and Alfredo DeLeon Jr., Casas's husband and son, respectively, serve as personal representatives of her estate. We refer to them collectively as "the Casases."

[2]     Columbia Rio Grande Regional Healthcare, L.P., d/b/a/ Rio Grande Regional Hospital.

[3]     Because we conclude legally insufficient evidence supports the jury's verdict, we do not reach the Hospital's second issue—whether the Hospital preserved error regarding its proposed unavoidable accident instruction.

In a separate petition, Dr. Michael Jelinek, one of Casas's treating physicians sued by the Casases, argues that the trial court should have granted his motion for sanctions and dismissal because the Casases' expert report was deficient. We agree and hold that an award of attorney's fees is proper. Therefore, we reverse and remand to the trial court for an award of attorney's fees and costs.

### *530  I. Background

In 2000, Eloisa Casas was diagnosed with colon cancer and underwent surgery, radiation, and chemotherapy. A year later, doctors told her that the cancer appeared to be in remission, and she thought she was cured. But on July 10, 2001, she was admitted to the Hospital with abdominal pains;

she also had a fever and a mildly elevated white-blood-cell count, potentially indicating an infection. To treat this possible infection, her surgeon and primary physician, Dr. Carlos Garcia–Cantu, consulted with an infectious disease specialist at the Hospital, Dr. Michael Jelinek, who on July 11 prescribed two medications, Maxipime (a broad-spectrum antibiotic), and Flagyl (an antibiotic used to treat anaerobic bacteria).

The Hospital performed several diagnostic tests, which revealed abnormal collections of fluid in Casas's abdomen. On July 13, she underwent major abdominal surgery during which Dr. Garcia–Cantu discovered that "fairly extensive" metastatic cancer had perforated Casas's colon and allowed material to leak into her abdominal cavity, causing an intra-abdominal abscess. Dr. Garcia–Cantu drained the abscess, repaired Casas's colon, and inserted a Jackson–Pratt drain to prevent further problems. Following the surgery, Dr. Garcia–Cantu continued the Maxipime and Flagyl prescriptions, and a culture of the removed abscess revealed an E. coli infection, which is effectively treated with Maxipime. Casas received Maxipime and Flagyl for another five days, but hospital staff inadvertently failed to place a prescription renewal form on Casas's chart, resulting in a four-and-a-half-day period between July 18 and 23 during which Casas did not receive either medication. Even so, Casas never tested positive for E. coli again and a culture of the incision site on July 18 instead grew Candida (a fungus) for which Diflucan (an antifungal) was prescribed. Then, on July 21, a second culture from a blood sample grew coagulase-negative staph, for which Vancomycin was prescribed. [4] Neither Maxipime nor Flagyl would have treated the Candida or coagulase-negative staph infection.

[4]     There was a several-day lag between taking the culture and ordering the prescription, presumably to allow the culture to grow and to transmit the results to the treating physicians. Thus, the Diflucan was prescribed on July 21 and the Vancomycin on July 23.

On July 23, Dr. Garcia–Cantu noted an abscess in the wound, which he drained by removing the staples and opening the wound. The next day, records indicate that a foul smell was emanating from the wound site, and hospital staff brought fans into the room to dissipate the odor. When Dr. Jelinek learned of the lapsed prescription on July 23, he informed Casas and then prescribed different antibiotics, Levaquin and Vancomycin. On July 25, after a CAT scan showed no abscess, Dr. Garcia–Cantu removed the drain. Casas left the

Hospital on August 23, but she returned in early September and died two months later.

In May 2003, several members of Casas's family, including her husband and son, filed suit against the Hospital, Dr. Garcia–Cantu, and Dr. Jelinek. The plaintiffs claimed that the defendants' negligence caused Eloisa Casas to "suffer grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree or extent if properly diagnosed, treated and cared for." The plaintiffs sought to recover damages for Casas's injuries and mental anguish. They twice amended their petition, ultimately leaving the Casases as the sole plaintiffs.

**\*531** As required by former article 4590i § 13.01 of the Medical Liability and Insurance Improvement Act, *see* TEX.REV.CIV. STAT. art. 4590i § 13.01, [5] the Casases filed an expert report within 180 days of filing the original petition. In the report, Dr. John Daller opined that Dr. Garcia–Cantu and Dr. Jelinek were negligent in failing to discover that the antibiotics were not being given to Casas and that within "reasonable medical probability" this negligence resulted in a prolonged hospital stay and increased pain and suffering. Dr. Jelinek later filed a motion for sanctions and dismissal under article 4590i § 13.01(e), alleging that the expert report was deficient because, among other things, it failed to explain any causal connection between the negligence and the purported injury. The trial court denied the motion. Before trial began, however, the Casases nonsuited Dr. Jelinek and Dr. Garcia–Cantu.

[5]   *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. Former article 4590i § 13.01 was replaced by Texas Civil Practice and Remedies Code § 74.351, as amended.

At trial, Dr. Daller testified as the Casases' medical expert. During direct examination, he analyzed the Hospital's daily patient notes regarding Casas and identified the significant events. He noted changes in Casas's vital signs on July 21 and 22, such as increased heart rate and temperature, inflammation, and tenderness of the surgery site. Dr. Daller stated that "in medical probability" there was an infection in the abdomen, but on cross-examination he admitted that

"there was no objective evidence present to demonstrate that intra-abdominal infection." When reviewing the patient notes for July 24, which noted the presence of a foul smell, he suggested that the smell was consistent with an anaerobic infection that would be difficult to culture because anaerobic bacteria die when exposed to air. Dr. Carl Berkowitz, the Hospital's expert, offered several other explanations for the smell, such as the Candida infection or dying tissue.

The Casases also called Casas's relatives to testify about her condition. Consistent with Dr. Daller's testimony, Casas's son linked the smell with the opening of the wound to drain the abscess: "The odor that I noticed was after they had taken out the staples on her incision, and one day that I went to see her as soon as they opened the door the whiff of this putrid smell just engulfed me." He also testified that Casas was upset upon learning that she had not received the antibiotics but was even more upset when the incision had to be opened and drained: "Well, after she was told and I was told that she wasn't getting antibiotics, like I said, she was upset. What really upset her more was when they had to—they had to take out the staples out of her incision, and they had to open her incision up again." Casas's husband testified that, while she was upset and did not trust the nurses or doctors after learning of the lapsed prescription, "she was still fighting. She ... wanted to beat this cancer she had." The son testified that Casas did not lose hope until she witnessed the events of September 11, 2001, following her re-admission to the Hospital: "That's why I remember that day so vividly in my mind because that was the turning point in my mom. She seemed to just give up, not fight, not want to fight anymore like she used to. And that was a very, very sad day."

**\*532** The jury found that the negligence of the Hospital, Dr. Jelinek, and Dr. Garcia–Cantu proximately caused Casas's injury. The jury apportioned ninety percent of the negligence to the Hospital, five percent to Dr. Jelinek, and five percent to Dr. Garcia–Cantu. It awarded $250,000 in damages to the Casases as compensation for Casas's pain and mental anguish.

The Hospital appealed, arguing that the evidence was legally and factually insufficient to prove causation or damages for mental anguish. Dr. Jelinek also appealed, challenging the trial court's denial of his motion for sanctions and dismissal. The court of appeals affirmed on all issues. —— S.W.3d ——.

## II. Analysis

We address in turn the two issues raised in this appeal: the legal sufficiency of the causation evidence and the sufficiency of the Casases' expert report.

**A. Sufficiency of the Evidence**

 [1]    The facts of this case are unfortunate: a woman with advanced colon cancer underwent surgery to repair her cancer-perforated and infected colon, and in the course of treatment for her many symptoms the Hospital failed to renew her antibiotic prescriptions for a four-and-a-half-day period. The Hospital admits it should have continued the antibiotics. Even so, the plaintiff bears the burden to prove that the negligence caused an injury: "[A]t trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries." *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 731 (Tex.1984). Only the second nexus is at issue here.

 [2]    [3]    [4]    In *City of Keller v. Wilson,* we considered at length the parameters of legal sufficiency review, quoting with approval Chief Justice Calvert's seminal article on the topic:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

168 S.W.3d 802, 810 (Tex.2005) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The same is true when the evidence equally supports two alternatives: " 'When the circumstances are equally consistent with either of two facts, neither fact may

be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991)). When considering such cases, "we must 'view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances,' " *id.* at 813–14 (quoting *Lozano v. Lozano,* 52 S.W.3d 141, 167 (Tex.2001) (per curiam)), and we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id.* at 814.

 [5]    To meet the legal sufficiency standard in medical malpractice cases "plaintiffs are required to adduce evidence of a **\*533** 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 399–400 (Tex.1993) (citations omitted). Thus, we examine the record to determine if the Casases presented legally sufficient evidence that "in reasonable medical probability" the Hospital's negligence caused Casas additional pain and suffering.

When distilled to its essence, the Casases' claim is predicated on the presence of an infection—treatable by the lapsed antibiotics—that caused Casas pain and mental anguish above and beyond that caused by the cancer, the surgery, and the other known infections. The absence of an infection treatable by Maxipime and Flagyl would undermine the Casases' claim, for then the prescription lapse would amount to an unfortunate, but harmless, occurrence. The Hospital argues that the Casases presented no evidence that the Hospital's negligence caused such an infection. The Casases' expert admitted there is no direct evidence of an anaerobic infection, leaving the jury to consider the circumstantial evidence and make proper inferences from it. In reviewing the record, we initially decide if jurors can determine causation under these facts unaided by expert testimony—that is, whether lay testimony regarding causation is legally sufficient.

**1. Lay Testimony of Causation**

 [6]    [7]    [8]    [9]    Lay testimony may be used as evidence of causation in certain circumstances, but "[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *City of Keller,* 168 S.W.3d at 812. In medical malpractice cases, expert testimony regarding causation is the norm: "The general rule has long been

that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer,* 247 S.W.3d 662, 665 (Tex.2007); *see also Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949) ("It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."). We have allowed lay evidence to establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Morgan,* 675 S.W.2d at 733 (citing *Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex.1970)). Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first. Stated simply, correlation does not necessarily imply causation. As we noted in *Guevara,* "[e]vidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions. But suspicion has not been and is not legally sufficient to support a finding of legal causation." 247 S.W.3d at 668.

 [10]    When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer. In *Morgan,* for example, a previously healthy employee, upon exposure to leaking chemicals, suffered watering of the eyes, blurred **\*534** vision, headaches, and swelling of the breathing passages. 675 S.W.2d at 733. In such a circumstance, lay testimony sufficed to connect the specific injury to the negligence with no evidence of causation beyond the leaking chemicals. *Id.* Likewise in *Guevara,* we stated that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors. 247 S.W.3d at 668. But we held that expert testimony was required to prove that a patient's medical expenses resulted from the accident, noting that "[p]atients in hospitals are often treated for more than one condition brought on by causes independent of each other." *Id.* at 669. These cases illustrate this basic premise: "[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense

of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 668.

The present case does not fall within this rule. Unlike in *Morgan,* an otherwise healthy person did not suddenly experience health difficulties following the defendant's negligent conduct when the plaintiff's symptoms were reasonably attributable to the negligence and to nothing else. Rather, a patient with terminal colon cancer did not receive antibiotics for four-and-a-half days following major abdominal surgery and after having received the medications for eight days. There is no direct evidence that she suffered from an infection treatable by the omitted antibiotics, but there is evidence that she had two other infections that accounted for all of her symptoms during that time. Given Casas's medical condition, expert testimony was crucial to link the prescription lapse to an infection causing additional pain and suffering beyond what she would otherwise have experienced. *See Kaster v. Woodson,* 123 S.W.2d 981, 983 (Tex.Civ.App.-Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."); *see also Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.").

The Casases point to testimony by Casas's husband and son to support their argument that she deteriorated rapidly after discovering she did not receive the antibiotics. But this characterization overstates the evidence. While Casas's husband testified she was upset and did not trust her doctors following the discovery, she was still determined to fight her cancer. The son also observed Casas's anger and lack of trust but testified that the opening of her wound, which occurred the same day she learned of the lapse, upset her even more. As Dr. Daller admitted, Candida likely caused the abscess that required Dr. Garcia–Cantu to drain the wound. Further, based on his experience at Casas's bedside, her son pinpointed the tragic events of September 11, 2001, and their effect on his mother as the turning point in her mental state. The latter event was some seven weeks after discovery of the lapsed prescriptions and after Casas's discharge from and re-admission to the Hospital. This evidence does not bear out the

Casases' claim of a marked shift in Casas's mental resilience following the omission of the medications.

**\*535** More importantly, Casas's husband and son were unable to precisely identify the cause of her suffering. While they could accurately describe her discomfort, they were unable to say if it was the cancer, the surgery, the other infections, or the lapse that caused it. Even testimony that Casas suffered after learning of the omission raises no more than a mere suspicion of causation, and that is not enough, *see Guevara,* 247 S.W.3d at 668, particularly in light of the evidence that Casas thought she was cured of cancer before the surgery and then learned that not only was it "back with a vengeance," it was terminal. The testimony of Casas's husband and son is evidence of her suffering, but not of its cause. Thus, we hold that the lay testimony presented by the Casases is legally insufficient to establish that the Hospital's negligence caused Casas additional pain and suffering.

### 2. Expert Testimony

**[11]** The Casases also presented expert testimony regarding causation. The Casases' expert, Dr. Daller, testified that the Hospital's negligence "in medical probability" caused Casas additional pain and suffering. He based this opinion on the presence of an intra-abdominal infection that could have been treated using Maxipime and Flagyl. Admitting that no direct evidence indicated such an infection, Dr. Daller pointed to various circumstantial indicators that suggested an infection. These indicators were primarily Casas's changed vital signs, such as fever and increased heart rate: "Well, given the fact that two to three days after the antibiotics had been mistakingly [sic] stopped her fever curve went up and her heart rate went up, to me that suggests the presence of on going [sic] infection." [6] But on cross-examination, he conceded these data were equally consistent with two other infections cultured from Casas's incision and blood—Candida and coagulase—negative staph—neither of which is treatable by Maxipime or Flagyl:

6        When asked if the lapsed prescriptions affected Casas's hospital stay, Dr. Daller equivocated:
>        A. I think that it certainly did impact it. However, I cannot quantitate that because there are multiple variables that are present in a clinical condition. Whether it lengthened her stay by one day, two days, three days, I cannot say that. What I would say from a scientific standpoint is that for four and a half

days she did not receive appropriate therapy. Had she received the appropriate therapy then *you would expect* her length of stay to be shortened somewhat. To quantitate that, I could not do that.
....
A. Obviously, not receiving antibiotics is not going to shorten your stay. Therefore, *if it impacted the stay* it must have lengthened it. (emphases added).

Q. Now, Candida, infection of a wound like this, they can cause high temperatures. Correct?

A. Fungal infections can cause a high temperature, yes.

Q. It can cause increased heart rate?

A. That is correct.

Q. And inflammation?

A. That is correct.

Q. Pain?

A. That is correct.

Q. How about an abscess?

A. It caused or is part of the abscess in that wound that was present, that wound infection that needed to be opened.

Q. So when Doctor Garcia went in on 7/23 ... and drained that wound at bedside that abscess was within a reasonable degree of medical probability caused by the Candida?

**\*536** A. That was one of the organisms that was there. It was the organism that was cultured. That is correct.

....

Q. ... This coagulase negative staph causes fever?

A. Correct.

Q. Increased heart rate?

A. The fever will cause increased heart rate.

....

Q. It can cause pain?

A. Depending upon the site. Correct.

Q. Okay. All of these things can be caused by coagulase negative staph and Candida, which we know were present 7/18 through 7/23, the time period she did not get antibiotics?

A. That's correct.

Q. Neither one would have been killed by Maxipime or Flagyl?

A. That's correct.

[12] [13] It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. We have rejected expert opinions not grounded in a sound evidentiary basis: "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. '[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.' " *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009) (quoting *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999)); *see also Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 637 (Tex.2009) ( "Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable."). When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *See Lenger,* 455 S.W.2d at 707 ("[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event."); *Hart,* 399 S.W.2d at 792 ("The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence

and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury.").

By conceding that Casas's symptoms were consistent with infections not treatable by Maxipime or Flagyl, Dr. Daller undermined his conclusion that an undetected infection was also present. While it is possible that Casas did have such an infection, its presence can only be inferred from facts that are equally consistent with the Candida and coagulase-negative staph infections. " 'When the circumstances are **\*537** equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite,* 819 S.W.2d at 805). Here, objective data —the cultures—support the Candida and staph infections but not the supposed anaerobic infection. [7]

[7] Admittedly, anaerobic bacteria are hard to culture because they are averse to oxygen.

[14] [15] Based on the record evidence, an anaerobic infection cannot be proved or disproved. It is equally plausible that Casas had such an infection or that she did not. Dr. Daller opined that she did, but he did not explain why that opinion was superior to the opposite view. Such evidence raises no more than a possibility of causation, which is insufficient. As we said in *Bowles v. Bourdon,* " '[t]he proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.' " 219 S.W.2d at 785 (quoting *Ramberg v. Morgan,* 209 Iowa 474, 218 N.W. 492, 498–99 (1928)).

The Casases argue that the foul smell, which is consistent with an anaerobic infection, is strong evidence of such an infection. Looking at the patient notes for July 24, Dr. Daller commented on the smell:

A. The text says something about drainage to the abdomen with moderate amount of drainage. And it says that it is foul smelling.

....

Q. The [previous notes] that I remember that we have gone over didn't say anything about foul smelling?

A. That's correct. They were just described as I recall as being purulent and looking like puss [sic].

Q. What does that mean when it says "foul smelling"?

A. When you have foul smelling, it suggests that the organism is an anaerobe. In other words, one of those bacteria that didn't need oxygen in order to grow that, for example, Flagyl would treat.

Q. Okay. Does that give you clinical evidence that had she been continued on Maxipime and Flagyl that they would have had some effect with regards to the condition as we see it on the 24th?

A. Well, like I said, most anaerobes are sensitive or susceptible to Flagyl. And she had previously been on Flagyl and at this time she is not. So I would have expected that that would be an appropriate antibiotic that would have covered the organism that's causing that foul smell.

Dr. Berkowitz, the Hospital's expert, offered several other explanations for the smell, including necrotic tissue, dead cancer tissue, and the Candida infection. [8] As **\*538** noted, Casas's son noticed the smell after the incision was opened to drain the abscess, which Dr. Daller admitted was likely caused by Candida.

[8]    Dr. Berkowitz testified:

> I think that there are a number of things that can cause things smelling bad besides just infection. Tissue that dies doesn't smell good. There's bacteria and products released by the dead tissue that don't smell good.
> And we know based on the pathology report of the cancer that they took out of her abdomen, that this had grown enough that it was dying. In other words, it was probably outgrowing it's [sic] blood supply and was starting to die. That in and of itself can smell bad. Then you have a wound that is infected; although Candida itself does not typically smell bad, not like something dead. It smells funky and people don't like the way it smells. The wound itself when it wasn't healing was probably having some necrotic tissue, as well, or dead tissue that is in the wound. I'm sure that smelled bad, as well. And they were never able to completely get rid of all that dead cancer tissue that was in her abdomen.

> I think there's a number of reasons why she would have had a bad smell, none of which can be explained by four or five days of not getting Flagyl [or] Maxipime.

 [16]    [17]    Here again, there are competing explanations for the smell, which amounts to no more than circumstantial evidence of some kind of infection or possibly dying tissue. Because there is no direct evidence of the infection and the circumstantial evidence is meager, we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *City of Keller,* 168 S.W.3d at 814. Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another. But when reviewing a verdict for sufficiency of the evidence, courts need not—indeed, must not—defer to the jury's findings when those findings are not supported by credible evidence. When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge. The evidence in this case—being consistent with an anaerobic infection that was treatable by Flagyl, a fungal infection that was not, or even with dying tissue, cancerous or otherwise—did not provide the jury a reasoned basis from which to infer the presence of a negligence—induced infection. Because the jury could not reasonably infer an infection caused by the Hospital's negligence, we agree with the Hospital that no evidence supports the jury's verdict.

We understand the Casas family's predicament and frustration at the Hospital's conduct, and we recognize the difficulty of proving that the lapsed prescriptions caused a painful infection. But the Casases shouldered that burden and must prove the causal link with reasonable certainty. In that quest, the Casases offered the testimony of Dr. Daller, but he did not explain why an undetected, anaerobic infection is medically more probable than one based on the known infections and the dying tissue, leaving the jury to guess if the lapsed prescriptions caused additional pain and suffering. Without probative medical testimony that the lapse caused—by means of an infection treatable by Maxipime and Flagyl—more pain than the cancer, the surgery, and the other infections already inflicted, there is no legally sufficient evidence of causation. Dr. Daller did not provide that causal link; accordingly, we hold that his testimony is legally insufficient to support the jury's verdict. Because the Casases failed to prove causation, we reverse the judgment of the court of appeals and render judgment that the Casases take nothing.

## B. Adequacy of the Expert Report

 [18]    [19]    In his petition, Dr. Jelinek raises a single issue: whether the trial court abused its discretion by denying his motion for sanctions and dismissal because the Casases' expert report was deficient under former article 4590i § 13.01, the statute in effect at the time. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01. Article 4590i required the report to provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that **\*539** failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). "If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion '*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this section.' " *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (per curiam) (quoting § 13.01(*l* )). Dismissal for failure to serve an adequate expert report also carried mandatory sanctions, requiring an award to the defendant of his costs and attorney's fees against the plaintiff or the plaintiff's attorney. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001) (citing § 13.01(e)).

 [20]    [21]    We have defined a "good-faith effort" as one that provides information sufficient to (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 879). All information needed for this inquiry is found within the four corners of the expert report, which need not "marshal all the plaintiff's proof" but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. *Id.* Importantly for this case, the "report cannot merely state the expert's conclusions about these elements," but " 'the expert must explain the basis of his statements to link his conclusions to the facts.' " *Id.* (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). "A report that merely states the expert's conclusions about the standard of care, breach, and causation" does not fulfill the two purposes of a good-faith effort. *Palacios,* 46 S.W.3d at 879.

 [22]    [23]    We review the trial court's grant or denial of a motion for sanctions and dismissal under the abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 877–78. A district court "abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Wright,* 79 S.W.3d at 52 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)).

Dr. Jelinek argues that the Casases' report is deficient in two ways, failing (1) to state the applicable standard of care, and (2) to provide more than conclusory statements of causation. We focus on the latter. Dr. Daller's report concluded that Dr. Jelinek's breach of the appropriate standard of care in "reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by Ms. Casas." Aside from repeating essentially the same phrase twice more, the report says nothing more regarding causation. The Casases argue this statement is sufficient to meet the good-faith requirement. We disagree.

An expert cannot simply opine that the breach caused the injury. Stated so briefly, the report fails the second *Palacios* element—it does not give the trial court any reasonable basis for concluding that the lawsuit has merit. *See* 46 S.W.3d at 879. An expert's conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit,* which we have consistently criticized. *See Pollock,* 284 S.W.3d at 818 (citing *Burrow,* 997 S.W.2d at 235); *Earle,* 998 S.W.2d at 890 ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."). Instead, the expert must go further and explain, to a reasonable degree,  **\*540**  how and why the breach caused the injury based on the facts presented. While we have said that no "magical words" need be used to meet the good-faith requirement, mere invocation of the phrase "medical probability" is likewise no guarantee that the report will be found adequate. *See Wright,* 79 S.W.3d at 53.

Under these standards, the Casases' report is conclusory on causation. It offers no more than a bare assertion that Dr. Jelinek's breach resulted in increased pain and suffering and a prolonged hospital stay. Beyond that statement, the report offers no explanation of how the breach caused the injury. Again, the plaintiff need not marshal all of his proof in the report, but he must include sufficient detail to allow the trial court to determine if the claim has merit. Because the Casases' report lacks any explanation linking the expert's conclusion to the relevant facts, we hold that the trial court abused its discretion by denying Dr. Jelinek's motion and the court

of appeals erred by affirming that ruling.[9] *See id.* at 52. Accordingly, we remand the case to the trial court for an award of attorney's fees and costs[10] under former article 4590i § 13.01(e) against the Casases and their counsel.[11]

[9]    In his dissent, CHIEF JUSTICE JEFFERSON argues that an expert report need not meet the legal sufficiency requirements necessary to support a judgment and suggests that we hold it must. We agree that an expert report need not "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879. But, as we stated earlier, the report must provide more than conclusory statements concerning applicable standards of care, breach of those standards, and causation. *See id.* An expert report must instead, within its four corners, provide some explanation as to each of these elements. TEX.REV.CIV. STAT. art. 4590i § 13.01(r) (6); *Wright,* 79 S.W.3d at 52. The report here offered only a conclusory statement concerning causation with no explanation as to how the lapse in antibiotic treatment resulted in longer hospitalization, increased pain and suffering, or ultimately Casas's death.

[10]    In her dissent, JUSTICE LEHRMANN indicates that (1) she would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference, and (2) Dr. Jelinek should not be entitled to attorney's fees and costs if the Casases can make this showing and submit an adequate report. We note that the Casases did not request a remand of this nature, nor brief the attorney's fees issue. *See State v. Brown,* 262 S.W.3d 365, 370 (Tex.2008) (observing that "[a] party generally is not entitled to relief it does not seek" and refusing to sua sponte grant relief that was not sought); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 410 (Tex.1997) (noting that ordinarily, failure to brief an argument waives error on appeal); TEX.R.APP. P. 38.1(h).

[11]    We briefly note that under former article 4590i a trial court's order denying a motion to dismiss premised on an inadequate expert report was not immediately appealable, as it now is under Texas Civil Practice and Remedies Code §§ 51.014 and 74.351. Nor did we definitively say that mandamus review was appropriate for such orders until almost four years after the trial court denied Dr. Jelinek's motion for dismissal and sanctions. *See In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461– 62 (Tex.2008). Thus, we do not fault Dr. Jelinek for waiting until final judgment to seek review of the trial court's order. *See Hernandez v. Ebrom,* 289 S.W.3d 316, 318 (Tex.2009) ("Generally, appeals may only be taken from final judgments....").

    We mention this point because we have since cautioned that a defendant—having foregone the interlocutory appeal now available—risks losing the right to appeal following final judgment if, after a trial on the merits, the jury finds the defendant liable. *See id.* at 321. Even if the present statute applied here, this caution would not bar Dr. Jelinek's appeal because he was not a party at trial, having been nonsuited earlier. We will not bar a nonsuited defendant's appeal after final judgment because the jury finds him liable at a former codefendant's trial. Such a defendant did not call or cross-examine witnesses, present evidence, or otherwise participate at trial and should not be bound by what happens there.

## *541 III. Conclusion

For the foregoing reasons, we reverse the court of appeals' judgment, render judgment that the Casases take nothing, and remand to the trial court for an award of Dr. Jelinek's attorney's fees and costs consistent with this opinion.

Chief Justice JEFFERSON filed an opinion, dissenting in part, in which Justice GREEN and Justice LEHRMANN joined.

Justice LEHRMANN filed an opinion, dissenting in part.

Chief Justice JEFFERSON, joined by Justice GREEN and Justice LEHRMANN, dissenting in part.

We must decide whether an expert report gave a "fair summary" of the expert's opinions regarding standard of care, failure to meet the standard, and the link between that failure and the patient's damages. We must consider the expert's opinions "as of the date of the report." TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6) (repealed 2003). To do so, we must disregard today's holding that, at trial, there was no evidence linking the discontinuation of antibiotics to increased suffering by Casas. The expert report submitted in this case gave fair notice of a meritorious claim—that the doctor failed to ensure that his patient received antibiotics, thereby increasing her pain and suffering. I would affirm the court of appeals' judgment with respect to the doctor.

## I. Background

Eloisa Casas, a patient recently diagnosed with colon cancer, was admitted to Rio Grande Hospital for abdominal pain. The cancer had perforated her colon, the contents of which leaked into her abdominal cavity, causing an abscess. After the doctor drained and surgically removed the abscess, he discovered that Casas had an E. coli infection, for which the doctor prescribed two antibiotics. Although those prescriptions were supposed to have been renewed five days later, they lapsed. Casas contends this mistake occurred because the doctor failed to ensure that hospital staff complied with his renewal order. During the four days after the prescriptions expired, Casas's surgical incision began to emit a putrid odor. She developed several infections in addition to E. coli, exacerbating her pain and extending her stay in the hospital. Casas died two months after she was discharged.

Casas's estate sued the Hospital and two of the treating doctors, Dr. Garcia–Cantu and Dr. Jelinek, for negligently causing Mrs. Casas "grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree if properly diagnosed, treated and cared for...." The trial court denied Dr. Jelinek's motion to dismiss the case against him. Nevertheless, the estate nonsuited both doctors more than a year before Casas's claim against the Hospital was tried to a jury. At that trial, the jury found the hospital 90% negligent, and each doctor 5% negligent. The trial court rendered judgment against the hospital, and the court's order non-suiting Dr. Jelinek "with prejudice" merged into that final judgment.

Dr. Jelinek and the hospital appealed the trial court's judgment. The hospital complained that the evidence was legally insufficient to support the verdict. Dr. Jelinek complained that the trial court improperly denied him attorney's fees, as the expert report was not a good faith effort to comply with statutory requirements. The court of appeals affirmed, 2008 WL 2894889, *9–*10, 2008 Tex.App. LEXIS 5647, *28–*29 (Tex.App.-Corpus Christi July 29, 2008), and the appellants below are now petitioners here. I fully join the **\*542** Court's rendition of judgment for the hospital. I disagree with the Court's holding as to the doctor.

## II. Good faith effort; fair summary

Former article 4590i provided that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in [the statute]." TEX.REV.CIV. STAT. art. 4590i § 13.01(*l* ). "That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (citing TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6)). Because an expert report is filed long before discovery is complete, we cannot judge it according to what subsequent discovery reveals or how the evidence develops at trial. The question is whether the report fairly summarizes the malpractice elements before the case is tested in a full adversary process. For that reason, "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

The report must also give the defendant notice of the conduct the plaintiff challenges, and the trial court must have a basis to determine whether the claim has merit. *Id.* The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved the issue, but instead whether the trial court abused its discretion. *See, e.g., Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

## III. Dr. Daller's report

Dr. Daller is a physician and an expert on intra-abdominal abscesses and infection. His report states that a doctor treating a patient like Casas must ensure that the antibiotics he prescribes are actually administered. Despite that standard, Dr. Daller states that antibiotics prescribed for Ms. Casas were not administered from July 17 through July 23, even though "[t]here [wa]s no order to discontinue the antibiotic therapy." He concluded that Dr. Jelinek breached the standard of care by his "failure to recognize that the antibiotics were not being administered as ordered." Dr. Daller concludes that "[t]his breach in the standard of care ..., within reasonable

medical probability, resulted in a prolonged hospital course and increased pain and suffering....”

## IV. Dr. Daller gave a “fair summary” of the required standard of care and how the allegedly inadequate care fell below that standard.

The Court concludes that Dr. Daller's report lacks the detail necessary to conclude that the estate's lawsuit has merit. But the cases it cites as support involve situations in which a hindsight view is entirely appropriate. *Earle v. Ratliff,* for example, is a summary judgment case; it presents the higher evidentiary standard that *Palacios* rejected for expert reports. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) (“Summary judgment can be granted on the affidavit of an interested expert **\*543** witness, ... but the affidavit must not be conclusory.... [R]ather, the expert must explain the basis of his statements to link his conclusions to the facts.”). Similarly, the standard employed in *City of San Antonio v. Pollock,* 284 S.W.3d 809, 817–18 (Tex.2009), also cited by the Court, is inapplicable here, since it examined an expert report under the “no evidence” standard of review. *See* —— S.W.3d at ——.

In *Palacios* we held that an expert report that failed to articulate a standard of care or explain how the defendant hospital breached that standard was not a good faith effort to comply with the statutory requirements. *Palacios,* 46 S.W.3d at 880. The expert in that case blamed the hospital for taking no action to prevent a patient from falling out of his bed, even though the patient “had a habit of trying to undo his restraints.” *Id.* at 879–880. The report, as such, was not a fair summary of the evidence because it neglected to articulate what actions the hospital *should* have taken that it did not. *Id.* at 880. Thus, the trial court did not abuse its discretion by dismissing the plaintiff's claim for lack of a good faith effort to summarize the expert's opinions.

Subsequently, in *Bowie Memorial Hospital v. Wright,* we held that the trial court did not abuse its discretion in concluding that an expert report failed to comply with the statute, as the report did not “establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to [the patient's] injuries.” *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–53 (Tex.2002) (quoting the expert in that case as speculating, “I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [the plaintiff] would have had the possibility of a better outcome.”). We observed that a report

must satisfy *Palacios*'s two-part test. *Id.* at 52. Because the report “lack[ed] information linking the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the defendant's] alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory.” *Id.* at 53.

In each of those cases, the trial court could not have evaluated the claim's merit without speculating about actions the defendant could have taken to prevent injury. No such speculation is required here. Dr. Daller states that had the antibiotics been administered from July 17 through July 23, Eloisa Casas would have suffered less. Dr. Daller could have stated that conclusion in greater detail, of course, but “[a] report need not marshal all the plaintiff's proof.” *Palacios,* 46 S.W.3d at 878. Daller's report includes his opinions on (1) the applicable standard of care (to maintain vigilance over a patient's treatment), (2) the manner in which the care failed to meet that standard (failing to ensure the treatment he ordered was actually administered), and (3) the causal connection between the failure and the claimed injury (without the antibiotics, the patient's pain and suffering increased and she required additional hospitalization).

A “good faith effort” does not require that the report “meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial”; therefore, an expert report does not fail the good faith effort test merely because it may not later prove legally sufficient to support a judgment. *Id.* at 879. So, here, whether the Casas estate ultimately amassed sufficient proof in an adversarial trial is beside the point; the claim itself was far from frivolous. *See id.* at 878 (noting that “one purpose of the expert-report requirement is to deter frivolous **\*544** claims”). The law imposes a penalty for filing a frivolous suit. Only by today's decree does it also punish a claimant for failing to win an arguably meritorious case. *Cf. TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (1991) (holding that “sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the ... process justifies a presumption that its claims or defenses lack merit.”).

I agree with the Court that the Estate failed to prove causation at trial; I disagree that, as to Dr. Jelinek, the expert report was not a good faith attempt to comply with the statute. I respectfully dissent in part from the Court's judgment.

Justice LEHRMANN, dissenting in part.

I fully join Chief Justice Jefferson's dissent. I write separately, however, to highlight the incongruity inherent in the Court's decision to remand the case for an award of attorney's fees and costs under former article 4590i § 13.01(e), given this case's circumstances. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01(e) (repealed 2003) [1]. The Court presumes that Dr. Michael Jelinek is entitled to attorney's fees because the expert report filed by Eloisa Casas's estate [2] was, on appeal, determined to be insufficient. But, after a pre-trial hearing was held on the defendant's motion to dismiss the lawsuit, the trial court rejected Dr. Jelinek's contention that the report was inadequate; consequently, the Casases had no opportunity to rectify any deficiencies as the statute and our precedent would have allowed.

[1]     *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. For ease of reference, I will refer to the relevant provisions as they were identified in article 4590i.

[2]     I refer to the estate, which was represented by Casas's husband and son, as "the Casases."

Section 13.01(e) of article 4590i provided for an order awarding attorney's fees and costs if a health care claimant failed to supply an expert report within the time required under subsection (d)—180 days. But the statute provided several avenues for health care claimants to obtain an extension of the 180–day deadline, including section 13.01(g). That provision required the trial court to grant a thirty-day extension of the statutory deadline if a claimant's failure to provide an expert report was not intentional or the result of conscious indifference. And we have expressly held that "a party who files a timely but inadequate expert report may seek relief under the grace period provisions

of section 13.01(g)." *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). Thus, health care claimants could receive an opportunity to rectify deficiencies in a report if they could show that they did not intentionally, or with conscious indifference, submit an inadequate report.

Here, the Casases never had the chance to request an opportunity to cure any deficiencies in their report because the trial court determined that the report adequately complied with section 13.01(d). In *Gutierrez,* we were guided by our recognition that it would be "perverse" to allow a claimant who filed no report a second chance to comply with the statute's expert report requirement, while "punishing those who attempt to comply with the statute but fail." *Id.* In this case, perversely, the Casases may have been in a better position **\*545** than they are now if the trial court had found that the report was inadequate; they might have had an opportunity to eliminate any deficiencies.

I agree fully with Chief Justice Jefferson that the report represents a good-faith effort to comply with section 13.01. Even if it did not, however, I would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference. *See City of DeSoto v. White,* 288 S.W.3d 389, 401 (Tex.2009) (remanding in the interest of justice *sua sponte* to allow police officer "to make an appellate election with full knowledge of his appellate rights and with knowledge of" the guidance provided in Court's opinion). In my view, the Casases should not be assessed attorney's fees and costs if they can make the showing section 13.01(g) requires and then submit a report complying with the statute. For these reasons, as well as those expressed by Chief Justice Jefferson, I respectfully dissent in part.

**All Citations**

328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

255 S.W.3d 665
Court of Appeals of Texas,
Houston (14th Dist.).

Michael V. KELLY, II, M.D. and Michael V. Kelly, II, M.D., P.A. d/b/a Aesthetic Surgery Center of Houston; Amit Annamaneni, M.D. and Respiratory Center of North Houston, P.A.; Luis Enrique Castillo, M.D. and North Houston Infectious Disease Associates Correctly Named North Houston Infectious Disease Associates, P.A.; and Houston Northwest Partners Ltd. d/b/ a Houston Northwest Medical Center; Appellants

v.

Isidro RENDON, Individually and as Representative of the Estate of Yolanda Leal Rendon; Julian Rendon; and Lauren Rendon; Appellees.

No. 14–07–00622–CV.   |   March 27, 2008.

**Synopsis**

**Background:** Estate of patient, who died as a result of complications from necrotizing fasciitis following tummy tuck procedure, brought medical malpractice action against doctors, surgery center, and hospital. The 80th District Court, Harris County, Lynn M. Bradshaw-Hull, J., denied defendants' motions to dismiss, and they appealed.

**Holdings:** The Court of Appeals, John S. Anderson, J., held that:

[1] doctor, who was board certified in both general surgery and plastic surgery and who had experience treating individuals with the same condition as patient, was qualified to render expert opinion on standard of care for plastic surgeon;

[2] internal medicine specialist/ infectious disease physician and internal medicine/critical care physician were qualified to render expert opinions on the standard of care for a plastic surgeon; and

[3] nurses' reports, standing alone, could not meet the statutory expert report requirement on medical causation.

Affirmed.

West Headnotes (25)

[1]     **Health**
      ⚷ Affidavits of merit or meritorious defense; expert affidavits

Expert report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the health care liability statute. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

2 Cases that cite this headnote

[2]     **Health**
      ⚷ Affidavits of merit or meritorious defense; expert affidavits

In setting out the expert's opinions in health care liability action, the plaintiff is not required to present evidence in the expert report as if it were actually litigating the merits at this preliminary stage of the lawsuit, and instead, the information in the report can be informal as it does not have to meet the same standards as evidence offered in a summary judgment proceeding or at trial. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

2 Cases that cite this headnote

[3]     **Health**
      ⚷ Affidavits of merit or meritorious defense; expert affidavits

Expert report in health care liability action is not required to prove the defendant's liability. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

1 Cases that cite this headnote

[4]     **Health**
      ⚷ Affidavits of merit or meritorious defense; expert affidavits

Expert report in health care liability action must provide only enough information to fulfill two

purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

3 Cases that cite this headnote

**[5]** **Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

In deciding whether the statutory standard has been met for expert report under health care liability statute, the trial court examines only the four corners of the expert's report and curriculum vitae. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

5 Cases that cite this headnote

**[6]** **Appeal and Error**
🔑 Rulings on Motions Relating to Pleadings

Appellate courts review a trial court's ruling as to the adequacy of an expert report under health care liability statute for an abuse of discretion standard. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

2 Cases that cite this headnote

**[7]** **Appeal and Error**
🔑 Abuse of discretion

Appellate court may not reverse a trial court's discretionary ruling simply because appellate court might have decided it differently.

Cases that cite this headnote

**[8]** **Evidence**
🔑 Due care and proper conduct in general

Doctor, who was board certified in both general surgery and plastic surgery and who had experience treating individuals with the same condition as patient, was qualified to render expert opinion on the standard of care for plastic surgeon in health care liability action involving patient, who died as a result of complications

from necrotizing fasciitis following tummy tuck procedure. V.T.C.A., Civil Practice & Remedies Code § 74.401(a)(1).

1 Cases that cite this headnote

**[9]** **Evidence**
🔑 Due care and proper conduct in general

An internal medicine specialist/infectious disease physician and internal medicine/critical care physician were qualified to render expert opinions on the standard of care for a plastic surgeon in health care liability action involving patient, who died as result of complications from necrotizing fasciitis following tummy tuck procedure; the relevant medical services were those for a post-surgical patient showing signs and symptoms of infection, and both experts had extensive education, training, and experience in treating individuals similarly situated to patient. V.T.C.A., Civil Practice & Remedies Code § 74.401(a)(1), (c)(2).

6 Cases that cite this headnote

**[10]** **Evidence**
🔑 Due care and proper conduct in general

Health care liability statute does not require a medical expert be practicing in the exact same field as the defendant physician, but, instead, requires only that the expert be actively practicing medicine in rendering medical care services relevant to the claim. V.T.C.A., Civil Practice & Remedies Code § 74.401(c)(2).

5 Cases that cite this headnote

**[11]** **Evidence**
🔑 Due care and proper conduct in general

Doctor, who was board certified in both general surgery and plastic surgery, was qualified to render expert opinion on standard of care for infectious disease specialist in health care liability action involving patient, who died as result of complications from necrotizing fasciitis following tummy tuck procedure; fact that doctor was plastic surgeon did not automatically preclude him from rendering

an expert opinion against infectious disease specialist, and doctor stated that he had treated many individuals with the same condition as patient, and he had performed diastasis recti abdominoplasty surgery on numerous occasions and had diagnosed and treated patients who had been diagnosed as having necrotizing fasciitis. V.T.C.A., Civil Practice & Remedies Code § 74.401(a)(1).

3 Cases that cite this headnote

**[12]    Evidence**
   Due care and proper conduct in general

Fact that doctor was a plastic surgeon and not an infectious disease specialist did not automatically preclude doctor, who was plastic surgeon, from rendering an expert opinion against an infectious disease expert in health care liability action. V.T.C.A., Civil Practice & Remedies Code § 74.401(c)(2).

Cases that cite this headnote

**[13]    Evidence**
   Due care and proper conduct in general

Doctor, who was board certified in both general surgery and plastic surgery, and internal medicine/infectious disease physician were both qualified to render expert opinions on the standard of care for pulmonologist in health care liability action involving patient, who died as a result of complications from necrotizing fasciitis following tummy tuck procedure. V.T.C.A., Civil Practice & Remedies Code § 74.401(a)(1).

Cases that cite this headnote

**[14]    Health**
   Standard of Care

The public or private status of a hospital does not impact the standard of care expected of a doctor practicing in that hospital.

Cases that cite this headnote

**[15]    Evidence**
   Due care and proper conduct in general

Because the plain language of the health care liability statute defined "physician" to include a person licensed to practice medicine in one or more states in the United States and each of patient's experts met that requirement, experts were not unqualified on the basis that they were not licensed in the State of Texas. V.T.C.A., Civil Practice & Remedies Code § 74.401(g)(1).

Cases that cite this headnote

**[16]    Health**
   Affidavits of merit or meritorious defense; expert affidavits

Under the health care liability statute, a nurse was not qualified to render an opinion on medical causation, and accordingly, nurses' reports, standing alone, could not meet the statutory expert report requirement on medical causation. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(C).

2 Cases that cite this headnote

**[17]    Health**
   Affidavits of merit or meritorious defense; expert affidavits

While a nurse's report, standing alone, is inadequate to meet the requirements of the health care liability statute as to medical causation, nothing in the statute prohibits an otherwise qualified physician from relying on a nurse's report in the formation of the physician's own opinion. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(C); Rules of Evid., Rule 703.

7 Cases that cite this headnote

**[18]    Health**
   Affidavits of merit or meritorious defense; expert affidavits

Because doctors incorporated nurse's report into their own expert reports and relied on nurse's report in the formation of their opinions regarding the standard of care and causation as it applied to hospital, trial court did not abuse its discretion in considering nurse's report

in its determination of hospital's motion to dismiss patient's health care liability claim for inadequacy of patient's expert reports since it had become part of the reports of patient's physician experts. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(C).

4 Cases that cite this headnote

**[19]  Health**
 Affidavits of merit or meritorious defense; expert affidavits

There is no requirement that a health care liability plaintiff file a single, all-encompassing expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(i).

Cases that cite this headnote

**[20]  Health**
 Affidavits of merit or meritorious defense; expert affidavits

The fact that expert's report addressed only one of the defendant physicians was of no consequence because there was no requirement that a health care liability plaintiff file a single, all encompassing expert report and because, when all of the expert reports were considered together, they addressed all the defendant physicians. V.T.C.A., Civil Practice & Remedies Code § 74.351(i).

Cases that cite this headnote

**[21]  Health**
 Affidavits of merit or meritorious defense; expert affidavits

The two-fold purpose of an expert report under health care liability statute is to inform the defendants of the specific conduct the plaintiff has called into question, and to provide the trial court with a basis to determine whether or not the plaintiff's claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[22]  Health**

 Affidavits of merit or meritorious defense; expert affidavits

Doctor's expert report was not deficient under health care liability statute as it addressed the standard of care in sufficient detail to apprise each defendant physician of patient's complaints regarding their alleged violations of the standard of care, and with regard to his causation opinions, doctor's expert report specifically addressed each defendant physician and linked his causation opinions to specific facts, such that each defendant physician had notice of the complaints against them. V.T.C.A., Civil Practice & Remedies Code § 74.351.

6 Cases that cite this headnote

**[23]  Health**
 Affidavits of merit or meritorious defense; expert affidavits

Under health care liability statute, expert reports are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

5 Cases that cite this headnote

**[24]  Health**
 Affidavits of merit or meritorious defense; expert affidavits

Because patient's experts reviewed doctor's autopsy reports in the preparation of their opinions and addressed the final cause of death, necrotizing fasciitis, following tummy tuck procedure, the expert reports met the statutory requirements under health care liability statute. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[25]  Costs**
 Injuries to persons

Because trial court did not abuse its discretion when it denied defendant physicians' motions to dismiss patient's health care liability claim for inadequacy of expert reports, defendant

physicians were not entitled to their reasonable attorney fees and costs. V.T.C.A., Civil Practice & Remedies Code § 74.351(b)(1).

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*668** Curry L. Cooksey, Spring, Alicia T. Kramer, Angela N. Clarke, Houston, D. Allan Jones, The Woodlands, Gary Sommer, James R. Boston, Marion Woodrow Kruse, Jr., Richard M. Law, Houston, for appellants.

John M. O'Quinn, Stacy Lee Little, Neil C. McCabe, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON, and BOYCE.

### OPINION

JOHN S. ANDERSON, Justice.

Appellees, Isidro Rendon, individually and as representative of the estate of Yolanda Rendon, Julian Rendon, and Lauren Rendon, filed suit against appellants, Michael V. Kelly, II, M.D. and Michael V. Kelly, II, M.D., P.A. d/b/a Aesthetic Surgery Center of Houston (collectively "Dr. **\*669** Kelly"); Amit Annamaneni, M.D. and Respiratory Center of North Houston, P.A. (collectively "Dr. Annamaneni"); Luis Enrique Castillo, M.D. and North Houston Infectious Disease Associates, correctly named North Houston Infectious Disease Associates, P.A. (collectively "Dr. Castillo"); and Houston Northwest Partners Ltd. d/b/a Houston Northwest Medical Center ("Houston Northwest"), for medical malpractice. Appellants each filed objections to appellees' expert witness reports and moved to dismiss appellees' suit pursuant to section 74.351 of the Texas Civil Practice and Remedies Code. The trial court denied appellants' motions. Appellants then filed this interlocutory appeal contending the trial court abused its discretion when it denied their motions to dismiss. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 20, 2004, forty-three year old Yolanda Rendon consulted Dr. Kelly complaining of weakness and protrusion of the abdomen. Dr. Kelly examined Ms. Rendon and recommended she have diastasis recti abdominoplasty surgery, a surgical procedure commonly called a tummy tuck. On October 20, 2004, Ms. Rendon had preoperative lab work performed with many bacteria noted in the urine. No further lab work was done and no preoperative antibiotic therapy was ordered. On November 1, Dr. Kelly performed the tummy tuck procedure on Ms. Rendon with no complications reported.

On the evening of November 2, Ms. Rendon experienced a fever of 101.3. The Northwest Houston nurse contacted Dr. Kelly by telephone. Dr. Kelly ordered Tylenol for the fever. Dr. Kelly did not order any lab work or x-ray testing and did not go to the hospital to evaluate Ms. Rendon's condition.

Beginning soon after midnight on November 3, Ms. Rendon's condition began to rapidly worsen. In addition to fever, Ms. Rendon experienced nausea, vomiting, burning abdominal pain, decreased urine output that was dark and concentrated, and weakness. The nurse determined Ms. Rendon was experiencing decreased oxygen saturation and her lungs were congested. Despite Ms. Rendon's deteriorating condition, the nurses made no effort to contact Dr. Kelly. Dr. Kelly finally saw Ms. Rendon at 10:00 a.m. the morning of November 3. Dr. Kelly concluded Ms. Rendon's fever was caused by her getting out of bed. Dr. Kelly ordered no diagnostic tests, discontinued the Tylenol and started her on pain medication and an oral antibiotic.

About noon on November 3, Ms. Rendon's oxygenation level continued to decrease and she complained of dizziness. The nurses started Ms. Rendon on supplemental oxygen therapy that resulted in a small increase in Ms. Rendon's oxygenation level. The duty nurses did not report this development to Dr. Kelly.

During the afternoon of November 3, Ms. Rendon's condition continued to worsen as it was determined her urine output over the past eight hours was only fifty milliliters. When the nurses did contact Dr. Kelly, he ordered additional supplemental oxygen and ordered a chest x-ray, which was performed at 2:00 p.m. This x-ray revealed no acute disease. At 4:30 p.m., the nurses again contacted Dr. Kelly by telephone and he ordered a CBC test and IV fluid hydration. The CBC test noted the white blood count was at a normal level but with bands exhibiting high critical at 40%. Starting

at 4:31 p.m. and continuing for the rest of the evening, Ms. Rendon's condition severely deteriorated. Ms. Rendon's blood pressure was critically low and she required continued supplemental **\*670** oxygen therapy to maintain her oxygen saturation levels. At 5:00 p.m., a Foley catheter was inserted and Ms. Rendon produced only a small amount of urine, which was cloudy and had a foul odor. Throughout the afternoon of November 3, Ms. Rendon was kept on the regular post op inpatient unit.

At 6:00 p.m., Dr. Kelly consulted with Dr. Annamaneni, a critical care specialist and pulmonologist. Dr. Annamaneni saw Ms. Rendon an hour later and ordered she be transferred to the intensive care unit ("ICU"). Dr. Annamaneni noted Ms. Rendon had fever, tenderness in the midepigastric and lower rib cage areas, feeble pulse, headache, shortness of breath, and severe hypotension. Dr. Annamaneni also noted Ms. Rendon complained of having burning, crawling pain extending from below the left breast area all the way to the left ankle for the last day or so. Dr. Annamaneni's differential diagnosis included likely sepsis and septic shock, and he noted the source could be the abdomen, urinary tract infection, or the lungs. Ms. Rendon's white blood count was now twenty-three. As part of his transfer of Ms. Rendon to the ICU, Dr. Annamaneni ordered additional tests. Following Dr. Annamaneni's evaluation, Ms. Rendon was transferred to the ICU at 7:45 p.m.

At 7:50 p.m., Dr. Castillo, an infectious disease specialist, assessed Ms. Rendon and noted she looked acutely ill with low blood pressure, elevated heart rate, edema of the abdomen, and erythema. In addition, Dr. Castillo noted Ms. Rendon's abdomen was so tender he could not deeply palpate it. Dr. Castillo noted Ms. Rendon was in shock two days after her abdominoplasty, this shock was probable septic, and the operative site was the most likely source of infection. Dr. Castillo then recommended Ms. Rendon have a CT scan of her abdomen and pelvis. However, he did not order the CT be performed, nor did Dr. Kelly or Dr. Annamaneni.

At 9:30 p.m., Ms. Rendon's condition was so critical, she was started on two pressor medications to keep her systolic blood pressure up. At 10:00 p.m., Ms. Rendon complained of pain of such severity in her abdomen and legs that Dr. Annamaneni ordered she be given morphine every two hours as needed for pain. Ms. Rendon developed generalized edema and a third medication was added at 11:45 p.m. for blood pressure support. Ms. Rendon had been started on two intravenous

antibiotics at 7:50 p.m. and at 11:50 p.m., a third antibiotic was added.

As November 3 came to a close, all three doctors treating Ms. Rendon agreed she was in septic shock, but none recommended she be taken back to surgery for exploration and drainage of the surgical wound.

Throughout November 4, Ms. Rendon's condition continued to decline. Ms. Rendon's white blood count was high and continued to increase. She continued to receive morphine for the severe pain she suffered in her abdomen and legs. Ms. Rendon also began to experience additional complications as a result of the severe sepsis: pulmonary edema, kidney failure, and multi-system organ failure. At 5:30 p.m., Dr. Kelly aspirated a small amount of fluid from the lower area of the abdominal wound, which was sent to the lab for testing.

On November 5, Ms. Rendon had severe difficulty breathing, which required she be intubated and placed on a ventilator. At 9:40 a.m., the lab notified the ICU that the body fluid collected by Dr. Kelly the previous evening was positive for Beta Hymolytic Streptococcus Group A bacteria. Dr. Kelly noted the lab results revealed necrotizing fasciitis. Also on November 5, Dr. Castillo called in another surgeon for evaluation **\*671** of Ms. Rendon for a possible return to surgery for debridement of the necrotizing fasciitis. Additional antibiotic therapy was also ordered. While Dr. Castillo agreed Ms. Rendon had to be taken back to surgery for exploration, drainage, and debridement of her abdominal wound, because of her critically low platelet count, her return was delayed while she was given platelets and fresh, frozen plasma.

Ms. Rendon was taken into surgery at 9:05 p.m. in critical condition. While Ms. Rendon was in the operating room, a code was called at 9:27 p.m. and all efforts to resuscitate her were unsuccessful with those efforts ending at 9:45 p.m. Prior to the code, Dr. Kelly opened the surgical wound and discovered a considerable amount of necrotic fatty tissue and suctioned off the necrotic tissue and a large amount of murky fluid from Ms. Rendon's abdomen. Dr. Kelly did not send any of the removed necrotic tissue or the fluid to pathology, but instead, discarded it. The Death Summary, signed by Dr. Kelly noted the diagnoses at death of "diastasis recti"[1] and necrotizing fasciitis. Dr. Kelly also signed Ms. Rendon's Certificate of Death, which noted the immediate cause of death to be septic shock with the underlying cause of necrotizing fasciitis.

This is the original diagnosis leading to the tummy tuck procedure.

On November 7, 2004, Dr. Albert Chen conducted an autopsy. Dr. Chen issued a Preliminary Report on November 7, 2004. Dr. Chen issued his Final Report on January 19, 2005, and a Supplemental Report on September 14, 2006. Dr. Chen concluded Ms. Rendon died as a result of complications from necrotizing fasciitis.

Appellees eventually filed a health care liability lawsuit against appellants. Pursuant to section 74.351 of the Texas Civil Practice and Remedies Code, appellees served on appellants the reports of six different experts: (1) Dr. Hubert Weinberg, a board certified plastic surgeon; (2) Dr. Richard F. Edlich, a board certified general and plastic surgeon; (3) Dr. Paul Marik, who is board certified in internal medicine and critical care medicine; (4) Dr. C. David Bakken, who is board certified in internal medicine and infectious disease; (5) Lisa Ruth–Sahd, a registered nurse certified in critical care and emergency nursing; and (6) Sharla Shumaker, a registered nurse with experience in critical care nursing. In response, appellants, arguing the reports were deficient, filed objections to each of the expert reports and moved the trial court to dismiss appellees' suit. Following a hearing, the trial court denied appellants' motions. This interlocutory appeal followed.

## DISCUSSION

In this appeal, each set of appellants filed separate briefs raising issues challenging the trial court's denial of their motions to dismiss. As might be expected, there is significant overlap between many of these issues. Therefore, to more efficiently resolve this appeal, and for the sake of clarity, we will consolidate these common issues and address them together. These consolidated issues can be broken down as follows: (1) the qualifications of some or all of appellees' experts to render expert opinions against appellants; (2) the adequacy of the appellees' expert reports as some fail to name a specific defendant; and (3) the adequacy of the appellees' expert reports on the appropriate standard of care and on causation. After addressing these consolidated issues, we will then turn to the remaining issues raised by a single appellant.

### I. Expert Report Requirements

**[1] [2] [3] [4]** This is a health care liability lawsuit governed by chapter 74 of the Civil **\*672** Practice & Remedies Code. Tex. Civ. Prac. & Rem.Code Ann. § 74.001 et seq. (Vernon 2005). Under these provisions, a claimant is required to produce an expert report within 120 days of the date the claim is filed. *Id.* at § 74.351(a). Under the statute, the expert report must provide a fair summary of the expert's opinions regarding the applicable standards of care, the manner in which the care rendered by the defendant physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* at § 74.351(r)(6). An expert report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (applying predecessor statute). In setting out the expert's opinions on each of these elements, the plaintiff is not required to present evidence in the report as if it were actually litigating the merits at this preliminary stage of the lawsuit. *Id.* at 879. Indeed, the information in the report can be informal as it does not have to meet the same standards as evidence offered in a summary judgment proceeding or at trial. *Id.* The expert report is not required to prove the defendant's liability. *See Russ v. Titus Hosp. Dist.,* 128 S.W.3d 332, 341 (Tex.App.-Texarkana 2004, pet. denied) (applying predecessor statute). Instead, the report must provide only enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

**[5]** In deciding whether the statutory standard has been met, the trial court examines only the four corners of the expert's report and curriculum vitae. *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 758 (Tex.App.-Houston [14th Dist.] 2007, no pet.). If the trial court determines the expert report does not represent a good faith effort to comply with the statutory definition, then the trial court, subject to its discretionary authority to grant a thirty day extension to cure the deficiencies in the report, must grant a motion to dismiss challenging the report's adequacy. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c), (*l* ).

### II. The Standard Of Review

**[6] [7]** We review a trial court's ruling as to the adequacy of an expert report under an abuse of discretion standard. *Estate of Regis ex rel. McWashington v. Harris County Hosp. Dist.,* 208 S.W.3d 64, 67 (Tex.App.-Houston [14th Dist.] 2006,

no pet.). The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Burrell,* 230 S.W.3d at 757. We may not reverse a trial court's discretionary ruling simply because we might have decided it differently. *Id.*

## III. Are Appellees' Experts Qualified To Render Opinions Against Appellants?

### A. Appellees' Physician Experts

Each of the physician appellants contend some or all of appellees' doctors are not qualified to render expert opinions against them. In their challenges to appellees' physician experts, appellants attempt to unduly limit the field of experts qualified to render opinions against them to (1) doctors licensed only in the State of Texas; (2) who practice in the same medical discipline; and (3) in the same type of hospital as each appellant. The statute does not require such specificity when deciding a challenge to an expert's qualifications.

 ***673** An expert providing opinion testimony regarding whether a physician departed from the accepted standards of health care must satisfy the requirements set forth in section 74.401. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(5)(A). Section 74.401 provides:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

(b) For the purpose of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

* * *

(g) In this subchapter, "physician" means a person who is:

(1) licensed to practice medicine in one or more states in the United States....

*Id.* § 74.401.

### 1. Dr. Kelly's Qualification Challenges

#### a. Dr. Edlich

 **[8]** Dr. Kelly initially contends Dr. Edlich is not qualified to provide expert opinions because, in Dr. Kelly's view, he is not currently practicing medicine in a field relevant to the claims against Dr. Kelly and also was not doing so when Dr. Kelly treated Ms. Rendon. We disagree. The combination of Dr. Edlich's report and curriculum vitae establish he is still practicing medicine as a physician board certified in both general surgery and plastic surgery, and he has experience treating patients with the same condition as Ms. Rendon. As this health care liability case involves the care of a patient following plastic surgery, we hold Dr. Edlich meets the requirements set forth in section 74.401(a)(1) of the Civil Practice and Remedies Code. *See Sanjar v. Turner,* 252 S.W.3d 460, 465 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.) (citing *In re Stacy K. Boone, P.A.,* 223 S.W.3d 398, 407 (Tex.App.-Amarillo 2006, no pet.) (holding cardiologist was qualified to render expert opinion as to general surgeon's care because opinion was on post-operative therapy and surgeon participated in management of that therapy)).

#### b. Doctors Bakken and Marik

 **[9]** Next, Dr. Kelly attacks the credentials of both Dr. Bakken, an internal medicine and infectious disease physician, and Dr. Marik, an internal medicine and critical care physician, to render opinions on the standard of care for

a plastic surgeon **\*674** such as Dr. Kelly. Once again, we disagree.

 **[10]** Here, Dr. Kelly takes the position that both Dr. Bakken and Dr. Marik are not qualified to render opinions against him because their medical specialty is in a different medical discipline from his own. However, the statute does not require a medical expert be practicing in the exact same field as the defendant physician, but instead must only be actively practicing medicine in rendering medical care services relevant to the claim. Tex. Civ. Prac. & Rem.Code Ann. § 74.401(c)(2). Here, the relevant medical services are those for a post-surgical patient showing the signs and symptoms of infection.

In his report, Dr. Bakken states he has thirty-three years of experience specializing in infectious disease. Dr. Bakken also states he has "treated many patients in the past with similar conditions as [Ms.] Rendon. As [an] infectious disease specialist, [he has] been consulted multiple times for patients with diagnoses of postoperative wound infections, sepsis, and necrotizing fasciitis." In his report, Dr. Marik states he has twenty-five years experience in the fields of pulmonary and critical care medicine and is a professor of medicine and chief of the division of pulmonary and critical care medicine at Thomas Jefferson University. Dr. Marik also states he has "treated many patients diagnosed with the same conditions as [Ms.] Rendon, including post-operative infection, sepsis, septic shock syndrome, and necrotizing fasciitis." Because both Dr. Bakken and Dr. Marik have extensive education, training, and experience in treating patients similarly situated to Ms. Rendon, they are qualified to render an opinion on the standard of care at issue in this case. *See Sanjar,* 252 S.W.3d at 465; *see also Blan v. Ali,* 7 S.W.3d 741, 746–47 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding, in a summary judgment case, that an expert physician-witness in a healthcare liability case need not practice medicine in the same field as the defendant physician but only establish they are qualified to render an opinion on the condition involved in the claim).

### 2. Dr. Castillo's Qualification Challenge

 **[11]** Dr. Castillo only challenges the qualifications of Dr. Edlich. In support of his position, Dr. Castillo argues the medical services relevant to appellees' claims "are the services provided by an infectious diseases consultant requested to provide *specialized* knowledge about the management of antibiotic therapy for a patient following abdominoplasty and to *assume in lieu of the attending plastic*

*surgeon* the antibiotic therapy for the patient." Dr. Castillo then goes on to conclude that since Dr. Edlich is a plastic surgeon and not an infectious disease specialist, Dr. Edlich is not qualified to render an expert opinion against him.

 **[12]** While Dr. Castillo is correct Dr. Edlich is a plastic surgeon and not an infectious disease specialist, we do not agree this fact automatically precludes Dr. Edlich from rendering an expert opinion against an infectious disease expert. *See Broders v. Heise,* 924 S.W.2d 148, 154 (Tex.1996) (applying predecessor statute). In his report, Dr. Edlich states: "I have treated many patients with the same condition as [Ms.] Rendon. I have performed diastasis recti abdominoplasty surgery on numerous occasions. I have also diagnosed and treated patients who have been diagnosed as having necrotizing fasciitis." For the same reasons we found Dr. Bakken and Dr. Marik qualified to render an opinion relative to Dr. Kelly, we hold Dr. Edlich is qualified to render an opinion regarding Dr. Castillo's treatment of Ms. **\*675** Rendon. *See Sanjar,* 252 S.W.3d at 465; *see also Blan,* 7 S.W.3d at 746–47.

### 3. Dr. Annamaneni's Qualification Challenges

 **[13]** Dr. Annamaneni, a pulmonologist and critical care specialist, challenges the qualifications of each of appellees' physician experts to render expert opinions against him.[2] According to Dr. Annamaneni, the medical services relevant to appellees' claims against him are the services provided by a pulmonologist/critical care specialist practicing in a private as opposed to a public hospital who was consulted by the operating plastic surgeon to evaluate a patient in multi-system organ failure and to manage that patient's hemodynamics and who then brought in an infectious disease specialist to evaluate, manage, and treat a suspected infectious process.

[2]     In the same issue on appeal, Dr. Annamaneni also challenges the qualifications of appellees' two nurse experts to render expert opinions against him. We address that contention below in section III(B).

 **[14]** Based on that statement of the medical services at issue, Dr. Annamaneni then contends Dr. Weinberg, Dr. Edlich, and Dr. Bakken all lack the training, education, and experience to serve as medical experts against him.[3] For the reasons stated in sections III(A)(1) and (2) above, we disagree these doctors are not qualified to render an opinion against Dr. Annamaneni. Dr. Annamaneni also asserts that Dr. Marik, a pulmonologist and critical care specialist like himself, is not qualified to render an opinion in this suit because he

practices in a large, public hospital setting as opposed to a private hospital setting. Dr. Annamaneni does not cite any legal authority for this unique argument, and we are not persuaded the public or private status of a hospital impacts the standard of care expected of a doctor practicing in that hospital.

3    Because Dr. Weinberg addresses only Dr. Kelly's treatment of Ms. Rendon and does not name Dr. Annamaneni in his expert report, his opinions cannot be used against Dr. Annamaneni. Therefore, we need not reach the issue of whether Dr. Weinberg is qualified to render an opinion against Dr. Annamaneni.

 **[15]**    Finally, Dr. Annamaneni contends appellees' physician experts are not qualified under the statute because they are not licensed in the State of Texas. Because the plain language of the statute defines "physician" to include a person licensed to practice medicine in one or more states in the United States and each of appellees' physicians meets that requirement, we refuse to find them unqualified on that basis. Tex. Civ. Prac. & Rem.Code Ann. § 74.401(g)(1). Having addressed each of Dr. Annamaneni's qualification arguments, we hold that Dr. Edlich, Dr. Bakken, and Dr. Marik are qualified to render an expert opinion against Dr. Annamaneni. *See Sanjar,* 252 S.W.3d at 465; *see also Blan,* 7 S.W.3d at 746–47.

### B. Appellees' Nurse Experts

 **[16]**    In addition to the reports of the four physicians, appellees also filed reports prepared by two nurses. Each appellant challenges these reports by pointing out that nurses are not qualified under the statute to render expert opinions on the issue of causation. We agree with appellants that, under the statute, a nurse is not qualified to render an opinion on medical causation. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(5)(C). Accordingly, the reports of Nurse Shumaker and Nurse Ruth–Sahd, standing alone, can not meet the statutory report requirement on medical causation. *Id.* However, this does not end our analysis because appellees filed **\*676** physician reports in addition to the reports prepared by the nurses.

 **[17]**    **[18]**    In the present case, Dr. Edlich, Dr. Bakken, and Dr. Marik reviewed the report of Nurse Ruth–Sahd and incorporated it by reference into their own reports. Each physician then relied on Ruth–Sahd's report in rendering their own opinions regarding the standard of care and medical causation as it applies to Houston Northwest. While a nurse's report, standing alone, is inadequate to meet the

requirements of the statute as to medical causation, nothing in the health care liability statute prohibits an otherwise qualified physician from relying on a nurse's report in the formation of the physician's own opinion. *See* Tex.R. Evid. 703 (stating an expert may base his opinion on facts or data that is not admissible in evidence if it is of a type reasonably relied on by experts in that particular field); *see also Packard v. Guerra,* 252 S.W.3d 511, 532–33 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.) (holding physician experts could rely on the expert opinion of an attorney in the formation of their own opinions regarding the standard of care and causation). Because Dr. Edlich, Dr. Bakken, and Dr. Marik incorporated Nurse Ruth–Sahd's report into their own and relied on it in the formation of their opinions regarding the standard of care and causation as it applies to Houston Northwest, we conclude the trial court did not abuse its discretion in considering Nurse Ruth–Sahd's report in its determination of Houston Northwest's motion to dismiss since it had become part of the reports of appellees' physician experts.

We overrule appellants' issues challenging the qualifications of appellees' expert witnesses. 4

4    The fact we agree with appellants that Nurse Shumaker's report, standing alone, cannot address the issue of medical causation, does not change our holding overruling appellants' issues challenging the qualifications of appellees' experts because appellees filed adequate reports which address medical causation in addition to the report of Nurse Shumaker. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i) (stating there is no requirement that a health care liability plaintiff file a single, all encompassing report).

### IV. Did Appellees' Expert Reports Fail To Address Any Appellants?

 **[19]**    **[20]**    Dr. Castillo, Dr. Annamaneni, and Houston Northwest point out that Dr. Weinberg does not address their role in the events underlying this lawsuit. Dr. Castillo also complains Dr. Marik does not address Dr. Castillo's role in his report. Appellants are correct that Dr. Weinberg's report does not address any appellant's actions except those of Dr. Kelly, and Dr. Marik does not address Dr. Castillo. Therefore, if these two reports were the only reports filed by appellees, then the trial court would have abused its discretion in finding appellees had met the statutory expert report requirement as to each appellant. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (requiring a health care liability plaintiff to serve an expert report addressing each physician or health care

provider defendant). However, there is no requirement that a health care liability plaintiff file a single, all encompassing report. *Id.* § 74.351(i). Here, in addition to Dr. Weinberg's and Dr. Marik's reports, appellees filed expert reports by two other physicians, as well as two nurses. Thus, when all of appellees' expert reports are considered together, they address all appellants. Therefore, the fact Dr. Weinberg's report addressed only Dr. Kelly and Dr. Marik's ignored Dr. Castillo, is of no benefit to appellants. *Packard,* 252 S.W.3d at 526–27.

We overrule appellants' issues arguing the trial court abused its discretion based **\*677** on the fact each of appellees' expert reports do not address every appellant.

## V. Are Appellees' Expert Reports Deficient Because They Do Not Adequately Address The Standard Of Care And Causation?

Appellants contend appellees' expert reports are deficient on the issues of the standard of care [5] and causation because they are conclusory and do not specifically address each appellant. Because Dr. Edlich is qualified to render an opinion as to the liability of each appellant, for reasons of judicial economy, we initially focus our analysis on his report and will only examine the sufficiency of the remaining expert reports if we determine Dr. Edlich's report is deficient on the issues of the standard of care and causation.

[5]    Houston Northwest does not raise any standard of care complaints on appeal.

### A. Is Dr. Edlich's Expert Report Deficient?

The physician appellants generally assert Dr. Edlich's expert report is conclusory because it lacks sufficient specific factual detail to adequately apprise appellants of the basis of appellees' claims against them as to the standard of care. [6] With regard to causation, appellants complain appellees' expert reports are deficient because they only collectively address causation and fail to link their causation opinions to specific facts thus rendering them conclusory.

[6]    In addition to a failure to state exactly what the standard of care was and what each appellant should have done differently to comply with that standard, examples of appellants' specificity complaints include: (1) a failure to specify which antibiotics appellants should have ordered for Ms. Rendon; (2) the timing for the administration of those antibiotics; (3) the exact time during Ms. Rendon's

hospitalization when her necrotizing fasciitis became irreversible; and (4) morbidity and mortality rates for patients similarly situated to Ms. Rendon. Appellants do not cite any authority in support of their position that a section 74.351 report requires the type of extreme detail listed above to give defendants notice of the basis of the claims against them and we are not persuaded the statute dictates such a level of detail. Accordingly, we reject appellants' request to require that level of detail in a section 74.351 expert report.

Dr. Edlich filed a twenty-six page report detailing his opinions regarding the care and treatment Ms. Rendon received from appellants. Dr. Edlich stated that, in the preparation of his report, he reviewed Ms. Rendon's death certificate, Ms. Rendon's autopsy reports, and medical records from Houston Northwest, Dr. Kelly, and Kelsey Seybold Clinic, Willowbrook. Dr. Edlich's report contains a section titled "Summary of Facts" that details, almost hour by hour, the events underlying this lawsuit beginning with Ms. Rendon's initial consultation with Dr. Kelly, continuing through the tummy tuck procedure, her post-surgical care, and concluding with her death less than five days after the surgery. This summary includes Ms. Rendon's condition throughout that time period. [7] Dr. Edlich **\*678** then lists multiple standards of care for diagnosing and treating patients demonstrating symptoms like Ms. Rendon's. [8] Dr. Edlich then embarks on a detailed explanation of how each appellant violated the required standard of care. [9] In the final section of his report, Dr. Edlich addresses causation. In the causation section, Dr. Edlich begins by generally stating that, as a result of their deviations from the standard of care, each individually named appellant caused Ms. Rendon's death. Dr. Edlich then provides a more detailed analysis explaining how each separate appellant's violations of the standard of care caused Ms. Rendon's death. [10]

[7]    As an example of the level of detail found in Dr. Edlich's report, we include a small excerpt here:

On post op day # 2 (11/03/04), Ms. Rendon's condition severely worsened. At midnight, she continued to have fever of 101.9, followed by nausea and vomiting at 0045, dark concentrated urine with increased burning abdominal pain noted at 0215, and decreased oxygen saturation of 94% at 0400 with further decrease to 93% at 0500. At 0645, the nurse assessed that Ms. Rendon's lungs were congested and her urine continued to be dark and concentrated. The patient complained of weakness. At 0800, Ms. Rendon had further temperature

elevation of 101.4 with increased tenderness of the abdomen and declining blood pressure of 100/50. No telephone call was made to Dr. Kelly by the nurses to report Ms. Rendon's deteriorating condition. Finally, at 1000 on 11/03/04, Dr. Kelly saw Ms. Rendon and documented that her continued fever was caused by her getting out of bed. Dr. Kelly wrote, "Temp spike to 101 after she got up. This is commonly seen when pts get up." Dr. Kelly ordered no diagnostic tests, but merely discontinued the Tylenol # 3, started Vicodin for pain, and Keflex antibiotic therapy.

We include an example of one of the standards of care listed by Dr. Edlich:

> Standard of Care requires that postoperatively patients be assessed for signs and symptoms of infection to ensure early diagnosis and appropriate treatment. Success of treatment of necrotizing fasciitis depends upon this assessment and early treatment of this condition.
>
> [1.] The most common presenting symptom of necrotizing fasciitis is pain out of proportion to the local inflammatory response noted by the patient.
>
> [2.] The patient must be closely monitored for signs and symptoms of infection, including fever, elevated white blood cell count, pain out of proportion to the operative procedure, lethargy, quickly spreading erythema of the wound, and progressive anesthesia at the site of infection.
>
> [3.] Early clinical diagnosis of group A Strep necrotizing infection can be made by taking a careful history of the patient and performing an MRI with aspiration biopsy.
>
> [4.] For patients with symptoms of necrotizing fasciitis, the standard of care mandates that the wound site be immediately assessed as the possible site for infection.

We include an example of a specific violation of the standard of care as it applies to Dr. Kelly:

> Dr. Kelly breached the standard of care when he failed to adequately assess Ms. Rendon on the night of 11/02/04 when she developed fever of 101.3 at 2115. Standard of care requires prompt assessment, work-up, and treatment of a post surgical patient who develops this type of elevated temp within the first post op day.
>
> [1.] Upon a report of this high of fever on post op day # 1, standard of care required that Dr. Kelly go to the hospital immediately to assess Ms. Rendon's condition and her post op wound, order diagnostic lab tests, order intravenous empiric broad spectrum antibiotic therapy, perform an MRI and/or CT scan for evaluation of the abdomen, and, if infection were found, take Ms. Rendon back to surgery for debridement and drainage of the wound.
>
> [2.] Instead, Dr. Kelly merely ordered Tylenol per phone order. He did not order any tests or IV antibiotic therapy, and he did not return to the hospital to assess Ms. Rendon.

Dr. Edlich's causation opinion as to Dr. Kelly is quoted here in its entirety:

> Dr. Kelly failed to properly assess the condition of Yolanda Leal Rendon prior to performing surgery on 11/02/04. Dr. Kelly used surgical techniques that increased Ms. Rendon's risk for acquiring an infection at Houston Northwest Medical Center, including use of inadequate preoperative scrub, improper use of hospital equipment, lack of appropriate pre-operative antibiotic therapy and improper closure of the surgical wound. Dr. Kelly then delayed in assessment of Ms. Rendon's condition on 11/02/04, one day after surgery, when she developed a high fever. He did not order diagnostic tests on 11/02/04 to determine the cause of her elevated temperature, which was an indicator of Strep A infection in a postoperative patient less than 24 hrs after surgery. By 11/03/2004, Dr. Kelly again failed to recognize the rapidly deteriorating condition of Ms. Rendon with signs and symptoms of elevated white blood cell count, critical levels of bands in the CBC (left shift indicating bacterial infection), lethargy, decreased urine output, and critically low blood pressure. Dr. Kelly did not appropriately treat this condition, perform the proper diagnostic tests for determination of causation of the infection, refer Ms. Rendon in a timely manner to a surgeon for consultation, nor did he take Ms. Rendon back for exploratory surgery. In addition, on 11/04/2004, when Ms. Rendon's only hope for survival was to be taken back to surgery for exploration and debridement of the postoperative abdominal wound along with administration of aggressive antibiotic therapy, Dr. Kelly merely aspirated fluid near the incision cite, without use of an MRI, and sent the specimen to the lab for testing.
>
> Research supports that the most important predictor of morbidity and mortality in this severe life threatening infection is the time interval between the onset of symptoms and definitive surgical therapy. Necrotizing fasciitis is a progressive, rapidly spreading inflammatory infection located in

the deep fascia, causing secondary necrosis of the subcutaneous tissues. For treatment of necrotizing fasciitis to be successful, this condition must be diagnosed early on with administration of broad-spectrum antibiotics and rapid surgical debridement of the involved area. Once necrotizing fasciitis is suspected as being present, the patient should be immediately taken to the operating room to open up the surgical wound and debride the infected tissue. Dr. Kelly should have been alert to the methods to diagnose serious surgical wound infections, like necrotizing fasciitis, which include: a diagnostic incision to search for infection, ultrasound of the wound, as well as an MRI of the wound. If Dr. Kelly had ordered an MRI exam as early as 11/02/04, he would have diagnosed the abdominal infection of Ms. Rendon. With early diagnosis of this infection, Ms. Rendon could have received appropriate therapy, which would have saved her life. The MRI would have permitted the visualization of soft tissue edema in the fascial planes of the abdomen for localization of necrotic tissue and fluid accumulation. With this early diagnosis of suspected Group A infection, Ms. Rendon could have received immediate appropriate treatment, including antibiotic therapy, surgical debridement of the wound with excision of devitalized tissue, bacteriologic analysis of the wound, and appropriate antibiotic therapy followed by open wound management.

**\*679** **[21]** **[22]** **[23]** The two-fold purpose of an expert report under section 74.351 is to inform the defendants of the specific conduct the plaintiff has called into question, and to provide the trial court with a basis to determine whether or not the plaintiff's claims have merit. *Patel v. Williams,* 237 S.W.3d 901, 906 (Tex.App.-Houston [14th Dist.] 2007, no pet.). Pursuant to this standard, we conclude Dr. Edlich's report is not deficient as it addresses the standard of care in sufficient detail to apprise each appellant of appellees' complaints regarding their alleged violations of the standard of care. Further, we conclude, with regard to his causation opinions, Dr. Edlich's report specifically addresses each appellant and links his causation opinions to specific facts such that each appellant had notice of the complaints against them. Therefore, keeping in mind that expert reports, such as that of Dr. Edlich, are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support, we hold the trial court did not abuse its discretion when it denied appellants' motions to dismiss based on their complaints that appellees' expert reports were deficient as to the standard of care and causation elements. [11]

*Id.* Because we have determined **\*680** Dr. Edlich's report meets the statutory requirements as to each appellant, we need not address appellants' complaints regarding the other expert reports filed by appellees on the issues of the standard of care and causation. Tex.R.App. P. 47.1.

[11] Appellants cite a litany of cases they contend support their contention that appellees' expert reports are deficient in their standard of care and causation opinions. We disagree as all of the cases can be distinguished from the present case. Most can be distinguished because, unlike the present case where the trial court denied appellants' motions to dismiss, the trial court in the cited cases granted the defendants' motions to dismiss and the appellate courts found the trial court's dismissal of the plaintiff's claims for deficient expert reports was within the trial court's discretion. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48 (Tex.2002) (affirming trial court's dismissal of plaintiff's claims); *Am. Transitional Care Ctr. of Tex., Inc. v. Palacios,* 46 S.W.3d 873 (Tex.2001) (same); *Apodaca v. Russo,* 228 S.W.3d 252 (Tex.App.-Austin 2007, no pet.) (same); *Talmore v. Baptist Hosp. of Southeast Tex. d/b/a Mem'l Hermann Hosp.,* No. 09–06–024–CV, 2006 WL 2883124 (Tex.App.-Beaumont Oct.12, 2006, no pet.) (mem.op.) (same); *Lopez v. Sinha,* No. 14–05–00606–CV, 2006 WL 2669355 (Tex.App.-Houston [14th Dist.] Sept. 19, 2006, no pet.) (mem.op.) (same); *Clark v. HCA, Inc.,* 210 S.W.3d 1 (Tex.App.-El Paso 2005, no pet.) (same); *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (same); *Longino v. Crosswhite,* 183 S.W.3d 913 (Tex.App.-Texarkana 2006, no pet.) (same); *Hardy v. Marsh,* 170 S.W.3d 865 (Tex.App.-Texarkana 2005, no pet.) (same); *Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241 (Tex.App.-Corpus Christi 2004, no pet.) (same); *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245 (Tex.App.-San Antonio 2004, no pet.) (same); *Russ v. Titus Hosp. Dist.,* 128 S.W.3d 332 (Tex.App.-Texarkana 2004, pet. denied) (same); *Hawkins v. Gomez,* No. 01–02–01195–CV, 2004 WL 306077 (Tex.App.-Houston [1st Dist.] Feb. 19, 2004, no pet.) (mem.op.) (same); *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (same); *Villa v. Hargrove,* 110 S.W.3d 74 (Tex.App.-San Antonio 2003, pet. denied) (same); *Kirksey v. Marupudi,* No. 07–03–0076–CV, 2003 WL 23096028 (Tex.App.-Amarillo Dec. 30, 2003, no pet.) (mem.op.) (same); *Leston v. Cwikla,* No. 05–02–01712–CV, 2003 WL 22332371 (Tex.App.-Dallas Oct. 14, 2003, rule 53.7(f) motion granted)(mem.op.) (same); *Shaw v. BMW Healthcare, Inc.,* 100 S.W.3d 8 (Tex.App.-Tyler 2002, pet. denied)

(same); *Nichols v. Nacogdoches Hosp. Dist.,* 96 S.W.3d 582 (Tex.App.-Tyler 2002, no pet.) (same); *De Leon v. Vela,* 70 S.W.3d 194 (Tex.App.-San Antonio 2001, pet. denied) (same); *Rittmer v. Garza,* 65 S.W.3d 718 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (same); *Hightower v. Saxton,* 54 S.W.3d 380 (Tex.App.-Waco 2001, no pet.) (same). The remaining cases cited by appellants can be factually distinguished. *See CHCA Mainland, L.P. v. Burkhalter,* 227 S.W.3d 221 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (appellate court reversed holding the trial court abused its discretion when it denied defendant's motion to dismiss because the plaintiff's expert reports completely failed to address the hospital defendant's standard of care or the breaches of those standards); *Wells v. Ashmore,* 202 S.W.3d 465 (Tex.App.-Amarillo 2006, no pet.) (appellate court reversed holding the trial court abused its discretion when it denied defendant's motion to dismiss because the plaintiff's expert reports failed to include any facts connecting the expert's conclusions with the breaches of the standard of care); *Methodist Health Care Sys. of San Antonio, Ltd. v. Martinez–Partido,* No. 04–05–00868–CV, 2006 WL 1627844 (Tex.App.-San Antonio June 14, 2006, pet. denied) (appellate court reversed holding the trial court abused its discretion when it denied defendant's motion to dismiss because the plaintiff's experts were not qualified).

We overrule appellants' issues asserting the trial court abused its discretion when it denied appellants' motions to dismiss because appellees' expert reports are deficient as to the standard of care and causation.

### VI. Were Appellees' Expert Reports Deficient Because They Did Not Address Each Autopsy Report Prepared By Dr. Chen?

Houston Northwest complains appellees' expert reports are deficient because they do not address the causes of death found in each of the three autopsy reports drafted by Dr. Chen, the pathologist who conducted Ms. Rendon's autopsy.

Dr. Chen conducted an autopsy of Ms. Rendon on November 7, 2004. Subsequent to the actual autopsy, Dr. Chen issued three reports on his findings as a result of that autopsy. His provisional **\*681** report was issued the same day the autopsy was conducted. In his provisional report, Dr. Chen opined Ms. Rendon died as the result of multiple occlusive pulmonary thromboemboli. Dr. Chen's final report was issued on January 19, 2005. In that report, Dr. Chen gave the cause of Ms. Rendon's death as lethal levels of ephedrine. However, despite the classification of the January 19, 2005 report as

his final report, Dr. Chen issued a supplemental report on September 14, 2006. In his September 14, 2006 report, Dr. Chen states the reason he issued the supplemental report was to "render the final cause of death as complications from necrotizing fasciitis."

[24] Houston Northwest argues appellees' expert reports are deficient because they did not address each of Dr. Chen's reports and each of his conclusions as to the cause of Ms. Rendon's death. Here, Dr. Chen issued a supplemental report in which he rendered his final opinion that Ms. Rendon's death was caused by complications from necrotizing fasciitis. Each of appellees' physician experts noted they reviewed Dr. Chen's autopsy reports in the preparation of their opinions and addressed necrotizing fasciitis as the cause of Ms. Rendon's death. Houston Northwest does not cite any legal authority that requires an expert, in a section 74.351 preliminary report, to specifically address every autopsy report found in the medical records, particularly reports that have been supplanted by later reports. Because appellees' experts reviewed Dr. Chen's autopsy reports in the preparation of their opinions in this case and addressed the final cause of death, necrotizing fasciitis, we hold the reports meet the statutory requirements. We overrule Houston Northwest's issue on appeal based on the autopsy reports.

### VII. Appellants Are Not Entitled To An Award Of Their Attorney's Fees and Costs

[25] Dr. Annamaneni contends the trial court abused its discretion when it did not award appellants their reasonable attorney's fees and costs pursuant to section 74.351(b)(1). Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)(1). Because we have determined the trial court did not abuse its discretion when it denied appellants' motions to dismiss, appellants were not entitled to their reasonable attorney's fees and costs. We overrule Dr. Annamaneni's issue on appeal contending appellants were entitled to an award of their attorney's fees and costs.

### CONCLUSION

Having addressed and overruled all issues raised by appellants in this appeal, we affirm the trial court's order denying each appellant's motion to dismiss.

**All Citations**

255 S.W.3d 665

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

206 S.W.3d 572
Supreme Court of Texas.

MACK TRUCKS, INC., Petitioner,

v.

Elizabeth TAMEZ et. al., Respondent.

No. 03–0526.   |   Argued Oct. 20, 2004.   |   Decided Oct. 27, 2006.   |   Rehearing Denied Dec. 22, 2006.

**Synopsis**

**Background:** Survivors of petroleum tanker driver who died when his truck burst into flames brought action against the tanker manufacturer, asserting claims for negligence, strict liability, breach of implied warranty, and misrepresentation. The 105th District Court, Nueces County, J. Manuel Banales, J., granted summary judgment for the defendant manufacturer. The survivors appealed. The Corpus Christi–Edinburg Court of Appeals, Thirteenth District, 100 S.W.3d 549, reversed and remanded. Tanker manufacturer appealed.

**Holdings:** The Supreme Court, Phil Johnson, J., held that:

[1] the Court of Appeals could not consider expert's causation testimony from bill of exceptions, and

[2] testimony on causation from post-collision fuel-fed fire expert was not admissible.

Reversed and rendered.

West Headnotes (19)

**[1]** **Appeal and Error**
 Consideration of evidence excluded

The Court of Appeals could not consider expert's causation testimony from bill of exceptions, in strict liability and negligence action arising from petroleum tanker fire that allegedly resulted from defective fuel line, where the Court of Appeals did not first determine that the trial court erred when it refused to admit expert's testimony and reconsider its decision to exclude expert's

causation opinions. Rules App.Proc., Rule 33.2; Rules of Evid., Rule 103(a)(2).

9 Cases that cite this headnote

**[2]** **Appeal and Error**
 Necessity of presentation in general

Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties.

26 Cases that cite this headnote

**[3]** **Evidence**
 Necessity and sufficiency

In determining whether expert testimony is reliable, a court should examine the principles, research, and methodology underlying an expert's conclusions. Rules of Evid., Rule 702.

10 Cases that cite this headnote

**[4]** **Evidence**
 Necessity and sufficiency

When the testimony involves scientific knowledge, the expert's conclusions must be grounded in the methods and procedures of science. Rules of Evid., Rule 702.

Cases that cite this headnote

**[5]** **Evidence**
 Necessity and sufficiency

Trial court should consider the following factors when determining the reliability of expert testimony involving scientific knowledge; (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique. Rules of Evid., Rule 702.

12 Cases that cite this headnote

**[6]    Evidence**
👉 Determination of question of competency

A trial court has broad discretion in determining whether expert testimony is admissible. Rules of Evid., Rule 702.

10 Cases that cite this headnote

**[7]    Appeal and Error**
👉 Competency of witness

The trial court's ruling concerning the admissibility of expert testimony will be reversed only if that discretion is abused.

5 Cases that cite this headnote

**[8]    Evidence**
👉 Preliminary evidence as to competency

Because the party sponsoring the expert bears the burden of showing that the expert's testimony is admissible, the burden of presenting understandable evidence that will persuade the trial court to admit the expert's testimony is on the presenting party. Rules of Evid., Rule 702.

6 Cases that cite this headnote

**[9]    Evidence**
👉 Necessity and sufficiency

When an expert's processes or methodologies are obscured or concealed by testimony that is excessively internally contradictory, non-responsive or evasive, a trial court will not have abused its discretion in determining that the expert's testimony is not admissible. Rules of Evid., Rule 702.

3 Cases that cite this headnote

**[10]    Evidence**
👉 Necessity and sufficiency

A trial court should consider the factors mentioned in *E.I. du Pont de Nemours and Co. v. Robinson* for determining the admissibility

of an expert's testimony when doing so will be helpful in determining reliability of an expert's testimony, regardless of whether the testimony is scientific in nature or experience-based. Rules of Evid., Rule 702.

17 Cases that cite this headnote

**[11]    Evidence**
👉 Necessity and sufficiency

In determining the reliability of an expert's testimony, the trial court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. Rules of Evid., Rule 702.

9 Cases that cite this headnote

**[12]    Evidence**
👉 Automobile Cases

Testimony on causation from post-collision fuel-fed fire expert was not admissible, in strict liability and negligence action arising from petroleum tanker fire that allegedly resulted from defective fuel line; at the hearing to determine the admissibility of expert's testimony expert opined that the fire began in the fuel and battery systems of the tractor, he did not identify an alleged defect in the tractor's fuel system that was the source of the fire, he did not specify which studies supported his conclusions, he did not testify that he analyzed or tested characteristics of batteries like the battery in the wrecked tractor, and he did not describe the process in which he excluded other sources of ignition. Rules of Evid., Rule 702.

4 Cases that cite this headnote

**[13]    Products Liability**
👉 Proximate Cause
**Products Liability**
👉 Design
**Products Liability**
👉 Miscellaneous products
**Sales**

 Damages from breach

There was no evidence that alleged defects in petroleum tanker's fuel system, which allegedly caused diesel fuel leak, caused fire that occurred in connection with tanker accident, as required to support claims asserted against tanker manufacturer by survivors of tanker driver, alleging negligence, misrepresentation, breach of warranty, and design, manufacturing, and marketing defects.

4 Cases that cite this headnote

**[14]    Evidence**

 Particular Facts or Issues

Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition.

24 Cases that cite this headnote

**[15]    Evidence**

 Weight and Conclusiveness in General

Expert testimony is required when an issue involves matters beyond jurors' common understanding.

12 Cases that cite this headnote

**[16]    Trial**

 Province of Court and Jury

Whether expert testimony is necessary to prove a matter or theory is a question of law.

3 Cases that cite this headnote

**[17]    Products Liability**

 Trailers

**Products Liability**

 Design defect

Expert testimony was required, in design defect action brought by survivors of petroleum tanker driver against tanker manufacturer, to establish

that alleged defects caused diesel fuel leak in tanker and that leak caused by the defect was ignition point for fire that occurred in connection with accident; such causation issues presented matters beyond the general understanding and common knowledge of lay jurors.

16 Cases that cite this headnote

**[18]    Judgment**

 Torts

Expert testimony that an arced battery cable found in tractor of petroleum tanker could possibly have ignited fire that occurred in connection with tanker accident, offered in opposition to tanker manufacturer's motion for summary judgment in strict liability and negligence action by driver's survivors alleging design defects, was speculative, and thus insufficient to prevent summary judgment, since expert did not testify that battery or its cable probably ignited the fire, and expert could not determine whether cable arced before the fire was ignited or as it was being burned by an otherwise-ignited fire.

24 Cases that cite this headnote

**[19]    Judgment**

 Torts

Circumstantial summary judgment evidence suggesting that fire that occurred in connection with petroleum tanker accident quickly reached tanker driver, though consistent with theory asserted by driver's survivors, in strict liability and negligence action against tanker manufacturer, that fire originated with fuel from tractor's allegedly defective diesel fuel system, did not make it more likely than not that the battery or some other allegedly improperly located ignition source ignited diesel from the tractor, as opposed to other possible sources of ignition such as the cargo of crude oil, and thus such evidence was insufficient to preclude summary judgment for manufacturer in survivors' action alleging negligence, misrepresentation, breach

of warranty, and design, manufacturing, and marketing defects.

209 Cases that cite this headnote

**Attorneys and Law Firms**

**\*575** Sean E. Breen, Randy Howry, Herman Howry & Breen, L.L.P., Austin, Robert Lee Galloway, Kellye Ruth Koehn, Thompson & Knight LLP, Houston, for petitioner.

John Blaise Gsanger, William R. Edwards, William R. Edwards III, The Edwards Law Firm, L.L.P., Corpus Christi, John Gonzales, John Gonzales & Associates, San Antonio, David O. Gonzalez, Law Offices of Baldemar Gutierrez, Alice, Glenn M. Boudreaux, Maryellen Hester, Boudreaux Leonard & Hammond, P.C., Houston, for for respondent.

**Opinion**

Justice JOHNSON delivered the opinion of the Court.

In this truck accident case the trial court excluded expert testimony as to what caused a post-accident fire that burned the truck and the driver. After excluding the expert testimony because it was not reliable, the trial court granted summary judgment. The court of appeals reversed. We hold that the trial court did not err, reverse the court of appeals' judgment, and render judgment that the plaintiffs take nothing.

**I. Background**

On October 19, 1996, Abram Tamez was operating a Mack Truck tractor hauling a trailer of crude oil. Tamez was rounding a curve in the road when the tractor and trailer overturned. A fire erupted and burned the trailer, its cargo, and the tractor. Tamez was able to climb out of the tractor, but he was badly burned and died as a result of his injuries.

As a result of Tamez's death, suit was filed [1] against the tractor's manufacturer, Mack Trucks, Inc., and others. [2] The Tamezes alleged that Mack defectively designed, manufactured and marketed the tractor. They claimed that Mack was liable for negligence, gross negligence, strict products liability, breach of warranty, and misrepresentation. All five theories were based on the same complaint: diesel fuel from the truck's fuel system originated the fire that burned

Abram Tamez. Specifically, the Tamezes alleged that the tractor had design and manufacturing defects because (1) the fuel system was unreasonably prone to fail and release diesel fuel in an environment conducive to ignition and fire; and (2) the tractor had ignition sources **\*576** such as hot manifolds and electric batteries in areas likely to contain released flammable fluids. The Tamezes also alleged that Mack failed to provide warnings about the defects.

[1]  Elizabeth Tamez filed suit. Elsa Guerrero, Rosendo Tamez, Sr., Dora Tamez, Rosa Elvia Gonzales, Donna Kim Cantu, and Terrie L. Zay intervened. Rosa subsequently nonsuited. For ease of reference all the claimants will be referred to collectively as "the Tamezes" or "the plaintiffs."

[2]  Other defendants were Fruehauf Trailer Corporation, Norco Crude Gathering, Inc., Glitsch Canada, Ltd., and Snyder Tank Corp. The claims against those defendants were either nonsuited or settled and were severed from the claims against Mack.

In connection with its claims against Mack, the Tamezes identified Ronald Elwell as an expert on post-collision, fuel-fed fires. Mack moved to exclude his testimony as unreliable and moved for summary judgment. Mack asserted multiple grounds for seeking summary judgment. Some grounds for its motion were directed at particular plaintiffs, while some grounds were directed at all the Tamezes. One part of Mack's motion directed at all the Tamezes was a Rule 166a(i) motion urging that the Tamezes could present no evidence that any alleged defects caused the fire. The Tamezes responded to the no-evidence part of Mack's motion, in part, by filing Elwell's deposition and his expert report. They also later submitted Elwell's testimony from a bill of exceptions.

Pretrial matters, including a *Robinson* [3] hearing pursuant to Mack's motion to exclude Elwell's testimony, were scheduled and heard. During the *Robinson* hearing Elwell testified. He expressed the opinion that the fire was started by the tractor's battery, which was located too near the fuel tanks, igniting the tractor's diesel fuel, which in turn ignited the trailer's cargo of crude oil.

[3]  *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995).

The trial court granted Mack's motion to exclude Elwell's testimony as to causation. The Tamezes later moved the trial court to reconsider its decision. The court denied the motion but allowed the Tamezes to have Elwell testify again

to create a bill of exceptions. [4] The court signed an order excluding the causation portion of Elwell's testimony from being considered as evidence at any trial or hearing because it was not sufficiently reliable. Mack's motion for summary judgment was granted.

[4]     An offer of proof is sometimes referred to as a bill of exceptions. *See* TEX.R. EVID. 103(a)(2); TEX.R.APP. P. 33 (comment to 1997 change). As the court of appeals and the parties refer to the offer of proof in this case as a bill of exceptions, we will, also.

The court of appeals reversed the summary judgment, concluding that the trial court abused its discretion in excluding Elwell's causation testimony, [5] and also concluding that Elwell's testimony provided some evidence of causation. The court of appeals' opinion indicates that in reaching its decision it considered Elwell's testimony from both the *Robinson* hearing and the bill of exceptions. *See* 100 S.W.3d 549, 556, 559, 561.

[5]     After Elwell's expert testimony was excluded by the trial court, the Tamezes obtained testimony from another expert witness, Douglas Holmes. Mack moved to exclude Holmes's testimony, and the trial court orally granted the motion. The court of appeals upheld the exclusion of Holmes's testimony. 100 S.W.3d 549, 559. The Tamezes do not challenge the court of appeals' ruling as to Holmes.

Mack urges that the trial court correctly excluded Elwell's testimony on causation, did not abuse its discretion in refusing to reconsider that ruling, and properly granted summary judgment because the Tamezes presented no evidence of causation. Mack asserts, among other matters, that the court of appeals erred by (1) considering Elwell's causation testimony from both the *Robinson* hearing and the bill of exceptions; (2) reversing the trial court's ruling as to admissibility of Elwell's causation testimony; and (3) reversing the summary judgment.

We conclude that the trial court did not abuse its discretion in excluding Elwell's testimony on causation and that the court **\*577** of appeals erred in considering testimony from the bill of exceptions in evaluating the trial court's exclusion of Elwell's causation testimony. We further conclude that the Tamezes presented no summary judgment evidence of causation and summary judgment was properly granted.

### II. Elwell's Bill of Exceptions Testimony

 **[1]**     Mack argues that the court of appeals erred by considering testimony admitted only for the bill when it reviewed the trial court's exclusion of Elwell's causation testimony. The Tamezes claim that whether Elwell's bill of exceptions testimony is considered is not relevant because his bill testimony added nothing to his *Robinson* hearing testimony. Further, in their brief and at oral argument the Tamezes disclaim having urged in the court of appeals that the trial court erred in (1) holding a *Robinson* hearing, (2) the manner in which the hearing was conducted, (3) the timing of the hearing, or (4) denying their motion for reconsideration. Our review of their briefs in the court of appeals confirms the Tamezes' position. They do not contend here either that the bill of exceptions testimony was improperly excluded or that the trial court erred in denying their motion to reconsider.

The purpose of a bill of exceptions is to allow a party to make a record for appellate review of matters that do not otherwise appear in the record, such as evidence that was excluded. TEX. R. APP. P. 33.2; TEX. R. EVID. 103(a)(2); *see also In re Ford Motor Co.,* 988 S.W.2d 714, 721 (Tex.1998). The court of appeals' opinion indicates that it considered Elwell's bill of exceptions testimony in evaluating the admissibility of his opinions even though the trial court did not. *See* 100 S.W.3d at 556, 559. As one example, the court of appeals referenced Elwell's opinion that at least one of the tractor's side fuel tanks became displaced during the rollover and separated the balance line connecting the two fuel tanks. *Id.* at 557. The court pointed to Elwell's testimony interpreting photographic evidence of steel straps which held the tanks as support for his opinion. *Id.* The referenced testimony as to Elwell's opinion and interpretation of photographic evidence was given as part of his bill of exceptions testimony, but he did not give similar testimony during the *Robinson* hearing.

 **[2]**     Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties. *See In the Interest of B.L.D.,* 113 S.W.3d 340, 350–52 (Tex.2003). We have described fundamental error as those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State, or instances in which the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter. *See McCauley v. Consol. Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (1957).

The court of appeals did not classify the trial court's refusal to allow the Tamezes to present further evidence and to then reconsider its ruling to exclude Elwell's causation testimony as fundamental error, and neither do we. The court of appeals erred in considering Elwell's causation testimony from the bill of exceptions without having first determined, pursuant to properly assigned error, that the trial court erred in refusing to admit the testimony and reconsider its decision to exclude Elwell's causation opinions. Under the record and issues presented to us, we may not consider Elwell's testimony from the bill of exceptions in determining whether the trial court erred in excluding Elwell's causation **\*578** testimony. *See Exito Elecs. Co. v. Trejo,* 142 S.W.3d 302, 304 n. 1 (Tex.2004).

### III. Reliability of Elwell's Testimony

### A. Standard of Review

**[3]** **[4]** **[5]** An expert witness may testify regarding "scientific, technical, or other specialized" matters if the expert is qualified and if the expert's opinion is relevant and based on a reliable foundation. TEX. R. EVID. 702; *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex.2001); *Robinson,* 923 S.W.2d at 556. In determining whether expert testimony is reliable, a court should examine "the principles, research, and methodology underlying an expert's conclusions." *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). When the testimony involves scientific knowledge, the expert's conclusions must be "grounded 'in the methods and procedures of science.' " *Robinson,* 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Otherwise, the testimony is "no more than 'subjective belief or unsupported speculation.' " *Id.* (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786). We have identified several non-exclusive factors that trial courts should consider when determining the reliability of expert testimony involving scientific knowledge.[6] We recognize that these factors may not apply when testimony is not scientific, but, rather, involves technical or other specialized knowledge. *Gammill v. Jack Williams Chevrolet,* 972 S.W.2d 713, 726 (Tex.1998). Even then, however, there must be some basis for the opinion to show its reliability. *Id.* An expert's bare opinion will not suffice. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). And, there cannot be " 'too great an analytical gap between the data and the

opinion proffered.' " *Gammill,* 972 S.W.2d at 726 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

6    *Id.* (identifying the following considerations regarding reliability of scientific testimony: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique).

**[6]** **[7]** **[8]** **[9]** A trial court has broad discretion in determining whether expert testimony is admissible. *Zwahr,* 88 S.W.3d at 629. Its ruling will be reversed only if that discretion is abused. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000). Because the party sponsoring the expert bears the burden of showing that the expert's testimony is admissible, the burden of presenting understandable evidence that will persuade the trial court is on the presenting party. *See Robinson,* 923 S.W.2d at 557. When an expert's "processes" or "methodologies" are obscured or concealed by testimony that is excessively internally contradictory, non-responsive or evasive, a trial court will not have abused its discretion in determining that the expert's testimony is not admissible. *See GMC v. Iracheta,* 161 S.W.3d 462, 470–72 (Tex.2005).

### B. Reliability Factors

The court of appeals noted that Elwell's testimony largely applied his knowledge, training, and experience to the underlying data and that his methodology was not easily tested by objective criteria such as identifiable scientific formulas. The court of appeals concluded that under such circumstances **\*579** the reliability of Elwell's opinion is not properly measured by a *Robinson*-factor analysis, but that the "analytical gap" test should be applied. 100 S.W.3d at 555–56.

Mack argues that the court of appeals' analysis is flawed. Mack urges that Elwell's inability to demonstrate at least one of the *Robinson* factors, coupled with his inability to eliminate the crude oil tanker as the source of the fire, rendered Elwell's testimony unreliable. The Tamezes, on the other hand, argue that because Elwell's testimony was based on his training and

experience, and not science, application of the analytical gap test, as opposed to use of *Robinson* factors, was appropriate. They contend that Elwell's opinion was reliable because there were no analytical gaps in his testimony. *See Gammill, 972 S.W.2d at 726.*

In *Gammill* we clarified that the list of non-exclusive factors listed in *Robinson* may not be applicable when assessing certain kinds of expert testimony. 972 S.W.2d at 720. We held that *Robinson* factors did not apply to the mechanical engineer expert under consideration in *Gammill,* even though his claimed expertise was scientific in nature. *Id.* at 727. In so holding, however, we did not mean to imply that a trial court should never consider the *Robinson* factors when evaluating the reliability of expert testimony that is based on knowledge, training or experience, or that the factors can only be applied when evaluating scientific expert testimony. We recognized that the criteria for assessing reliability must vary depending on the nature of the evidence. *Id.* at 726.

 **[10]** The United States Supreme Court has noted that it is not possible to "rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert." Kumho Tire v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Nor can the Court "now do so for subsets of cases categorized by category of expert or by kind of evidence," as "[t]oo much depends upon the particular circumstances of the particular case at issue." *Id.* In *Robinson* we likewise explained that the factors mentioned do not constitute an exclusive list and that the trial court's gatekeeping inquiry will differ with each particular case depending on the "[t]he factors a trial court will find helpful in determining whether the underlying theories and techniques ... are scientifically reliable." *Robinson,* 923 S.W.2d at 557. Thus, a trial court should consider the factors mentioned in *Robinson* when doing so will be helpful in determining reliability of an expert's testimony, regardless of whether the testimony is scientific in nature or experience-based. *See Kumho Tire,* 526 U.S. at 139, 119 S.Ct. 1167; *Gammill,* 972 S.W.2d at 726.

 **[11]** In determining reliability, the trial court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *See Amorgianos v. Amtrak,* 303 F.3d 256, 267 (2d Cir.2002). A significant part of the trial court's gatekeeper function is to evaluate the expert's qualifications, listen to the testimony, view the evidence,

and determine which factors and evaluation methodology are most appropriate to apply. For example, in the present case the trial court would have been within its discretion to measure the reliability of Elwell's testimony, at least in part, by considering (1) the extent to which Elwell's theory had been or could be tested; (2) the extent to which his methodology relied upon his subjective interpretation; (3) the methodology's potential rate **\*580** of error; (4) whether the underlying theory or methodology has been generally accepted as valid by the accident reconstruction and post-collision fire investigation community; and (5) the non-judicial uses that have been made of his methodology. These are similar to factors 1, 2, 4, 5 and 6 of those enumerated in *Robinson.* But, as we have said above, that is not to imply that the trial court was precluded from measuring Elwell's methodology by *Gammill's* analytical gap analysis.

## C. Elwell's Causation Testimony

 **[12]** At the *Robinson* hearing, Elwell testified that the fuel and battery system on the tractor were designed improperly, and suggested safer designs. He criticized the placement of the fuel tanks and also of the batteries'[7] proximity to the fuel tanks. He criticized certain parts of the fuel system such as the crossover or "balance line" hose between the two fuel tanks and the spigots by which the hose was attached to each of the tanks. He referenced a particular report, which was not introduced, which he asserted supported his design critiques and his suggested safer designs.

[7]     The record is not clear whether the tractor had one battery or two.

Elwell's analysis and conclusion that the fire began with the fuel system and the battery system were based on the "fire triangle" theory. He explained that under the fire triangle theory, a post-collision fuel-fed fire such as the one under consideration must be analyzed with an eye toward the ignition, fuel, and oxygen sources that were available. Because the air provided oxygen, his analysis centered on the other parts required to complete the triangle, "the source of fluids that could be ignited and what would it take to ignite those fluids and fuel, of course, is the primary suspect, either fuel or crude oil in this particular case."

He did not testify that he inspected the remnants of the burned tractor and trailer or that he performed or reviewed any accident reconstruction analysis as to how the rollover

occurred and how different parts of the vehicle would have been affected or harmed thereby. His *Robinson* hearing testimony did not identify a particular alleged defect of the tractor's fuel system that he concluded was the source of a diesel fuel leak that initiated the fire.

On cross-examination he testified that he had read and relied on "over 5,000" studies on the subject of the causes of post-collision fuel-fed fires. He did not specify any studies that supported his conclusion as to the specifics involved in the accident, and none were offered as evidence for the trial court to consider in evaluating his testimony.

In coming to his conclusion that the fire began with the fuel system and battery system of the tractor, Elwell asserted that he relied on several specific factors and facts. Each of the factors and facts he enumerated supported conclusions that Tamez was burned by diesel and that the diesel ignited so quickly that Tamez could not escape.

Even assuming that what Elwell relied on and classified as "factors" and "facts" were true, however, which Mack denies, the factors and facts are merely consistent with diesel fuel having been released during the rollover and Tamez having been burned by part of the fire fed by the tractor's diesel fuel. They are not probative evidence that diesel fuel was released because of one of the asserted defects in the fuel system or that it was ignited by the battery system. He did not testify to having analyzed, tested, or investigated the characteristics of batteries like the battery in the wrecked tractor to support his **\*581** opinion that the battery system was involved in causing the fire. He failed to set out any process by which he excluded other sources for ignition of the diesel fuel such as mechanical sparks which could be generated when parts of a truck make contact with the pavement, or ignition of the cargo fuel which in turn could have ignited the diesel fuel. *See Gammill,* 972 S.W.2d at 728; *see also Robinson,* 923 S.W.2d at 559 (noting that an expert who is trying to find a cause of something should carefully consider alternative causes). For example, when Elwell was asked during the *Robinson* hearing why he concluded that the fire originated with the fuel and battery systems instead of with the crude oil cargo, his response was that "if [crude oil] remains to be burned, that after five or ten or fifteen minutes, then that's not the fuel that started the fire." He did not explain any investigation or research that supported such a conclusion. He did not elaborate on the amount of crude that was in the trailer when the wreck occurred, calculate the amount of time it would take the cargo to burn, or discuss or compare the relative ease of

ignition or flash points of the crude and diesel fuel. He did not address any analysis or process by which he concluded that some part of a trailer of crude oil would continue to burn for several minutes only if it was ignited by, rather than being the ignitor of, diesel fuel from the tractor's fuel system.

In sum, Elwell did not testify at the *Robinson* hearing to a methodology by which he reached the conclusions as to the fire having been caused by defects in the tractor's fuel and battery systems. In order for Elwell's testimony on causation to be reliable, he was required to present some methodology that reliably supported his opinions that the "fuel" and "ignition" parts of the fire triangle were supplied, respectively, by the tractor's alleged fuel system defects and battery system. He did not do so. The mere fact that the fuel system had a design that could cause the hoses to separate is not evidence that the hoses separated in this case.

Elwell's testimony did no more than set out "factors" and "facts" which were consistent with his opinions, then conclude that the fire began with diesel fuel from the tractor. The reliability inquiry as to expert testimony does not ask whether the expert's conclusions appear to be correct; it asks whether the methodology and analysis used to reach those conclusions is reliable. *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004). The trial court was not required to accept his opinions at face value just because Elwell was experienced in examining post-collision fuel-fed fires. *See Gammill,* 972 S.W.2d at 726 (holding that a court should not admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert).

We conclude that the trial court did not abuse its discretion when it excluded Elwell's testimony on causation. The court of appeals erred when it determined otherwise.

## IV. The Summary Judgment

Mack moved for summary judgment on multiple grounds, including the ground that there was no evidence Mack's fuel system design was a producing or proximate cause of Tamez's injuries. The Tamezes contend that even without Elwell's testimony as to causation, they presented sufficient evidence to survive summary judgment.

### A. Standard of Review

A summary judgment motion pursuant to TEX. R. CIV. P. 166a(i) is essentially a motion for a pretrial directed verdict. See **\*582** *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Id.; W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). We review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005); *Johnson v. Brewer & Pritchard, P. C.,* 73 S.W.3d 193, 208 (Tex.2002).

### B. Causation

Producing or proximate cause is an element of all of the Tamezes' claims, which included negligence, misrepresentation, breach of warranty, and design, manufacturing, and marketing defects. Causation-in-fact is common to both proximate and producing cause, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the injuries in question. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995).

All the Tamezes' theories regarding the fire's cause were based on allegations that the tractor's fuel system was defectively designed and manufactured so as to be unreasonably prone to fail and release flammable fluids in an environment conducive to ignition and fire; that such defects caused the release of diesel fuel; and that a defectively designed and placed ignition source then caused ignition of the released diesel.

 **[13]** To survive summary judgment on their theory that a defect in the tractor's fuel system was the cause of the fire, the Tamezes were required to present more than evidence of a fuel leak. *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600–01 (Tex.2004) (affirming summary judgment because the plaintiffs' evidence "establishe[d] only that a fire occurred, and [the plaintiffs' expert] could say no more than that he 'suspects' the electrical system caused the fire"). They had to present evidence that (1) the diesel fuel leaked because of one or more of the alleged defects, and (2) the leak caused by the defect was the ignition point for the fire.

*See Iracheta,* 161 S.W.3d at 470 (holding that the possibility that the fire occurred in the manner the plaintiff suggested is not enough to support the jury's findings); *Nissan Motor Co. v. Armstrong,* 145 S.W.3d 131, 137 (Tex.2004).

The Tamezes point to several parts of their summary judgment evidence that they say are sufficient, individually or collectively, to defeat summary judgment: (1) an accident witness's "personal assumption," based on his averred experience with and ability to recognize the smell of diesel fuel, that Tamez was burned by diesel fuel because Tamez was coated with a shiny, oily substance and did not smell like crude oil; (2) a notation by Mack's accident reconstruction expert noting a diesel fuel spill on the road; (3) a statement by Elwell that the design of the system was such that if there was any significant dislodgement of the fuel tanks, the fuel line would separate;[8] (4) a statement by Mack's expert witness that it was possible that a battery cable found in the tractor had arced and ignited the fire, although **\*583** the witness ultimately concluded that the crude-oil cargo caused the fire; and (5) an eyewitness's statement implying that it took the fire a short period of time to reach Tamez, who exited and crawled away from the tractor after the accident.

---

[8]     Elwell's testimony on design defect, as opposed to his testimony on causation, was not excluded.

 **[14]**     **[15]**     **[16]**     Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition. Expert testimony is required when an issue involves matters beyond jurors' common understanding. *See Alexander v. Turtur & Assocs.,* 146 S.W.3d 113, 119–20 (Tex.2004). Whether expert testimony is necessary to prove a matter or theory is a question of law. *See FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 89 (Tex.2004). In *Fulgham* we held that expert testimony was necessary to establish the standard of care for connecting refrigerated trailers to tractors and for the frequency and type of inspection and maintenance of such connectors, because those matters were not within the general experience and common understanding of laypersons. *Id.* at 91; *See also Turbines, Inc. v. Dardis,* 1 S.W.3d 726, 738 (Tex.App.-Amarillo 1999, pet. denied) (holding that performance of mechanical work on turbine aircraft engines is not within the experience of a layperson).

 **[17]** A lay juror's general experience and common knowledge do not extend to whether design defects such as those alleged in this case caused releases of diesel fuel during a rollover accident. *See Nissan Motor Co.,* 145 S.W.3d at 137 (stating that we have consistently required competent expert testimony and objective proof that a defect caused the condition complained of). Nor would a lay juror's general experience and common knowledge extend to determining which of the fire triangle's fuel sources, diesel from the tractor or crude from the tanker, would have first ignited, or the source for the first ignition. That part of Elwell's testimony that was properly before the trial court and the testimony of other experts as to the amount of time they spent in studying, investigating, and working in the field of post-collision, fuel-fed fires demonstrated the intricacies of such subject matter. Issues such as those regarding the fire's cause(s) present matters beyond the general understanding and common knowledge of lay jurors. Proof of causation in this case also required expert testimony.

The summary judgment evidence presented by the Tamezes did not contain proof that any of the possible sources of diesel fuel was more likely than any other, or more likely than the crude oil cargo, to have been the source of liquids that first caught fire. Accordingly, there is no evidence that the source was one of the alleged fuel system defects. *Kindred v. Con/ Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

 **[18]** The Tamezes also alleged that several ignition sources were located in areas likely to contain diesel that would be released in a wreck. The Tamezes point to expert testimony that an arced battery cable found in the tractor could possibly have ignited the fire. But, testimony that the battery or its cable could possibly have ignited the fire is not evidence that it probably did so. The expert who provided this testimony could not determine whether the cable arced before the fire was ignited or as it was being burned by an otherwise-ignited fire. As proof of what caused the fire, such evidence is speculative and is insufficient to prevent summary judgment. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998).

 **\*584** **[19]** The plaintiffs also rely on circumstantial evidence suggesting that the fire quickly reached Tamez. That evidence is consistent with the Tamezes' theory that the fire originated with fuel from the tractor's diesel fuel system. But, such evidence does not make it more likely than not that the battery or some other allegedly improperly located ignition source ignited diesel from the tractor, as opposed to other possible sources of ignition such as the cargo of crude oil. Accordingly, the circumstantial evidence is not sufficient to prevent summary judgment. *Id.*

### V. Conclusion

The plaintiffs produced no evidence that the alleged defects of the Mack tractor were a cause-in-fact of injuries to Abram Tamez. Because causation is a required element of each of the Tamezes' claims, the trial court properly granted summary judgment. Accordingly, we reverse the court of appeals' judgment and render judgment that the plaintiffs take nothing.

### All Citations

206 S.W.3d 572, 50 Tex. Sup. Ct. J. 80

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

332 S.W.3d 550
Court of Appeals of Texas,
Houston (1st Dist.).

Kevin RITTGER, M.D., Appellant,

v.

Virginia Lou DANOS, Individually and as Next
Friend of Ryan Cochran, a Minor, Appellees.

No. 01–08–00588–CV.  |  June 18,
2009.  |  Rehearing Overruled July 17, 2009.

**Synopsis**
**Background:** Patient, individually and on behalf of newborn
child, brought medical malpractice action against emergency
room physician and obstetrician, based on defendants' failure
to timely diagnose stroke when she, while pregnant, presented
to emergency room with numbness in right arm. The 55th
District Court, Harris County, Jeffrey Brown, J., granted
emergency room physician's motion to dismiss on grounds
that expert reports did not comply with Medical Liability
and Insurance Information Act, and patient appealed. The
Court of Appeals, 253 S.W.3d 294, affirmed. On review, the
Supreme Court, 253 S.W.3d 215, reversed judgment of The
Court of Appeals, and remanded matter back to District Court.
On remand, the District Court, Jeffrey A. Shadwick, J., denied
physician's motion to dismiss, and physician appealed.

**Holdings:** The Court of Appeals, George C. Hanks, Jr., J.,
held that:

[1] expert obstetrician was not required to submit separate
expert reports for emergency room physician and pregnant
patient's obstetrician who owed patient same standard of care;

[2] expert emergency room physician's report provided
defendant emergency room physician with adequate notice of
what standard of care was and what action defendant should
have taken;

[3] expert neurologist's report was not merely conclusory on
issue of causation of pregnant patient's stroke; and

[4] board-certified neurologist was qualified to give expert
opinion regarding applicable standard of care for pregnant
emergency room patient who presented with numbness in
right arm.

Affirmed.

West Headnotes (14)

**[1]** **Health**
 ⚬ Affidavits of merit or meritorious defense;
expert affidavits

In reviewing whether an expert report complies
with the Medical Liability and Insurance
Improvement Act, the court evaluates whether
the report represents a good-faith effort to
comply with the Act, and in making this
evaluation, the court must look only at the
information that is contained within the four
corners of the report. V.T.C.A., Civil Practice &
Remedies Code § 74.351(a).

Cases that cite this headnote

**[2]** **Health**
 ⚬ Affidavits of merit or meritorious defense;
expert affidavits

Although an expert's report pursuant to the
Medical Liability and Insurance Information Act
need not marshall all the plaintiff's proof, it
must include the expert's opinions on the three
statutory elements-standard of care, breach, and
causation. V.T.C.A., Civil Practice & Remedies
Code § 74.351(r)(6).

Cases that cite this headnote

**[3]** **Health**
 ⚬ Affidavits of merit or meritorious defense;
expert affidavits

In order to constitute a good faith effort to
comply with the Medical Liability and Insurance
Information Act, an expert's report must provide
enough information to fulfill two purposes: first,
the report must inform the defendant of the
specific conduct the plaintiff has called into
question; and second, the report must provide a
basis for the trial court to conclude that the claims

have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[4]** **Health**

  Affidavits of merit or meritorious defense; expert affidavits

An expert report that merely states the expert's conclusions as to the standard of care, breach, and causation does not constitute a good faith effort to comply with the Medical Liability and Insurance Information Act; the expert must explain the basis for his statements and link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[5]** **Health**

  Affidavits of merit or meritorious defense; expert affidavits

In assessing an expert report's sufficiency, for the purposes of determining whether the report complies with the requirements for such reports under the Medical Liability and Insurance Information Act, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[6]** **Health**

  Affidavits of merit or meritorious defense; expert affidavits

Expert obstetrician was not required to submit separate expert reports detailing applicable standard of care, breach of care, and causation with respect to both emergency room physician and pregnant patient's obstetrician, in patient's suit against both, where both emergency room physician and obstetrician owed same duty to patient when she presented to emergency room with numbness in arm. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

5 Cases that cite this headnote

**[7]** **Health**

  Affidavits of merit or meritorious defense; expert affidavits

An expert's report under the Medical Liability and Insurance Information Act is not required to specifically state the same standard of care for each individual defendant physician practicing on the same patient when each physician owes the same duties to the patient. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

2 Cases that cite this headnote

**[8]** **Health**

  Affidavits of merit or meritorious defense; expert affidavits

Expert emergency room physician's report provided defendant emergency room physician with adequate notice of what standard of care was and what action defendant should have taken when presented with pregnant patient who complained of numbness in right arm, as required to comply with expert report requirements under Medical Liability and Insurance Information Act, in patient's action against defendant physician; report indicated that, upon recognizing high risk of transient ischemic attack and stroke, defendant should have admitted patient for further evaluation and treatment. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[9]** **Health**

  Affidavits of merit or meritorious defense; expert affidavits

Expert neurologist's report was not merely conclusory on issue of causation of pregnant patient's stroke, for purposes of determining whether report complied with requirements under Medical Liability and Insurance Information Act, in patient's action against emergency room physician; expert expressly linked emergency room physician's alleged

breach of standard of care, specifically, failure to admit and treat patient for pregnancy-related toxemia, to patient's thrombosis. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

1 Cases that cite this headnote

**[10]** **Evidence**
🔑 Due care and proper conduct in general

The expert testifying in a medical malpractice case need not be a specialist in the particular branch of the profession for which testimony is offered; the statute setting out the requisite qualifications focuses not on the defendant doctor's area of expertise, but on the condition involved in the claim. V.T.C.A., Civil Practice & Remedies Code § 74.401(a).

Cases that cite this headnote

**[11]** **Evidence**
🔑 Due care and proper conduct in general

Board-certified neurologist was qualified to give expert opinion regarding applicable standard of care for pregnant emergency room patient who presented with numbness in right arm, in medical malpractice action brought against emergency room physician; neurologist had knowledge of standard of care for brain trauma, and treatment of patients with brain trauma was common in field of neurology, and fact that patient was pregnant when she suffered stroke or was in emergency room did not require expert to be either emergency room physician or obstetrician. V.T.C.A., Civil Practice & Remedies Code § 74.401(a).

4 Cases that cite this headnote

**[12]** **Evidence**
🔑 Preliminary evidence as to competency
**Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

The expert's proponent has the burden to show that their expert is qualified to give an opinion on the applicable standard of care, breach of that care, and causation elements

of a medical malpractice claim, and that the report satisfies the statutory requirements of the Medical Liability and Insurance Information Act. V.T.C.A., Civil Practice & Remedies Code § 74.401(a).

1 Cases that cite this headnote

**[13]** **Evidence**
🔑 Due care and proper conduct in general

No definitive guidelines exist for determining whether a proffered medical expert witness's education, experience, skill, or training qualify him as an expert to provide an opinion regarding the applicable standard of care, breach of that care, and causation elements of a medical malpractice claim, for the purposes of the Medical Liability and Insurance Information Act. V.T.C.A., Civil Practice & Remedies Code § 74.401(a).

Cases that cite this headnote

**[14]** **Evidence**
🔑 Due care and proper conduct in general

Where a particular subject of inquiry is common to and equally developed in all fields of practice, and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those which confronted the practitioner charged with malpractice, the witness is qualified to testify. V.T.C.A., Civil Practice & Remedies Code § 74.401(a).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*553** Jeffrey H. Uzick, Uzick, Oncken, Scheuerman & Berger, P.C., Houston, TX, for Appellant.

Joshua Paul Davis, Youngdahl & Citti, P.C., Houston, TX, for Appellee.

Panel consists of Justices KEYES, HANKS, and BLAND.

**OPINION**

[GEORGE C. HANKS, JR.](), Justice.

In this interlocutory appeal, appellant, Kevin Rittger, M.D., challenges the trial court's order denying his motion to dismiss the medical malpractice claims made against him by appellee, Lou Virginia Danos, individually and as next friend of Ryan Cochran, a minor. In his sole issue, Rittger contends that the trial court erred by not dismissing the suit on the ground that Danos submitted expert reports that did not satisfy the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. We affirm.

## I. Background

On May 30, 2003, Danos, who was 28–weeks pregnant with her second child, went to St. John Hospital's emergency room complaining of right arm numbness. Rittger, the emergency room physician, obtained a [CT scan of her head]() and called for a consultation by Danos's obstetrician, Dr. Victor Patel. Dr. Patel evaluated Danos and ordered a neurological examination. Before the scheduled neurological exam could take place, Patel discharged Danos with a diagnosis of "generalized anxiety." Two days later, Danos went to Memorial Hermann Hospital with weakness of her right upper and lower extremities. Medical Professionals there found that she had experienced a left middle cerebral artery ("MCA") [stroke]() due to a clot at the bifurcation of the left MCA.

Danos sued Rittger and other healthcare providers for medical negligence. [1] Pursuant to [section 74.351 of the Texas Civil Practice and Remedies Code,]() [2] Danos timely **\*554** filed expert reports from Dave David, M.D., an obstetrician, and Frank Baker, M.D., an emergency room physician. Dr. David's report did not address the care provided by Rittger. Rittger objected to the sufficiency of Baker's report and moved to dismiss. The trial court ruled that the report did not comply with [section 74.351]() and gave Danos 30 days to cure the deficiency. [3] Within the 30 days, Danos served a new report from Baker as well as a report from John Meyer, M.D., a neurological expert not previously designated. The trial court found that Baker, although qualified to opine on the standard of care and its breach, failed to show the nexus between the negligence and the injury. The trial court further

found that, [section 74.351(c)]() did not permit Danos to serve a report from a new expert. The trial court dismissed Danos's case and awarded Rittger $10,000 in attorney's fees.

[1]  All defendants except Rittger were eventually nonsuited.

[2]  [Section 74.351(a)]() provides as follows:

> In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert report, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.
> [TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a)]() (Vernon Supp. 2008).

[3]  [Section 74.351(c)]() provides: "[i]f an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency." *See [id.]() § 74.351(c).*

Danos appealed the dismissal of her case to this court, and a panel of this court affirmed the judgment of the trial court. *[Danos v. Rittger,]() 253 S.W.3d 294, 295 (Tex.App.-Houston [1st Dist.] 2007, pet. granted).* The Supreme Court reversed, holding that [section 74.351(a)]() allows a claimant to cure a deficiency in a report by serving a report from a separate expert during the 30–day cure period. *[Danos v. Rittger,]() 253 S.W.3d 215 (Tex.2008).* The Supreme Court remanded the case to the trial court to consider the adequacy of Dr. Meyer's expert report. *[Id.]() at 215–16.* Following an oral hearing, the trial court denied Rittger's motion to dismiss, and this interlocutory appeal followed.

On appeal, Rittger reasserts his challenges to the adequacy of the plaintiff's expert reports, claiming that the reports of Baker and Meyer, considered together or separately, fail to satisfy Chapter 74's requirements. Rittger also seeks remand on the issue of attorney's fees.

## II. Medical Expert Reports

## A. Standard of Review

We review all section 74.351 rulings under an abuse of discretion standard. *Am. Transitional Care Centers v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985).

**\*555** Although we may defer to the trial court's factual determinations, we review questions of law de novo. *Rittmer v. Garza,* 65 S.W.3d 718, 722 (Tex.App.-Houston [14th Dist.] 2001, no pet.). To the extent resolution of the issue before the trial court requires interpretation of the statute itself, we apply a de novo standard. *Buck v. Blum,* 130 S.W.3d 285, 290 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

 [1]    In reviewing whether an expert report complies with Chapter 74.351, we evaluate whether the report "represents a good-faith effort" to comply with the statute. *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 221 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In making this evaluation, we must look only at the information that is contained within the four corners of the report. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002).

## B. Chapter 74 Expert Report Requirements

Pursuant to section 74.351, medical-malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2008). If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(1). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the expert's opinions as of the date of the report regarding: (1) applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and (3) the causal relationship between

that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Palacios,* 46 S.W.3d at 877.

 [2]    [3]    [4]    [5]    Although the report need not marshall all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878; *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.). In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Palacios,* 46 S.W.3d at 879. Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52 (citing *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. *See Palacios,* 46 S.W.3d at 878.

## C. Adequacy of Experts' Reports

Reading both the Baker and Meyer reports together, we conclude that the documents satisfy all three elements under *Palacios.* Specifically, they identify the standard of care, describe the conduct that allegedly breached that standard, and identified a causal relationship between the alleged breach and Danos's injury.

### 1. Dr. Baker's Reports

 **\*556** [6]    First, we review the adequacy of Dr. Baker's reports as it pertains to the standard of care for Rittger and the breach of that standard. The initial report by Baker collectively addressed the negligence of Rittger and others. Specifically, the report alleged that:

> Dr. Rittger and Dr. V. Patel deviated from the standard of care by failing to diagnose TIA [transient ischemic attack] and by failing to admit the patient for further evaluation and treatment of her TIA. That evaluation should have initially consisted of laboratory work such as a CBC with platelet count, prothrombin time, and partial thromboplastin time in an effort to explore hypercoagulabile states, an echocardiogram looking for

cardiac sources of emboli, and a carotid Dopplar ultrasound to evaluate the patient for carotid sources of emboli, and, if warranted, an MIR/MRA for further evaluation. It is well-known that pregnancy predisposes patients to thrombo-embolic phenomenon including TIA's and strokes. This is because physiologic states associated with elevated estrogen and progesterone levels such as pregnancy and the use of birth control pills cause hypercoagulabile states that are associated with increased clotting resulting in strokes [sic] and other thrombo-embolic phenomenon. Failure to make the diagnosis of TIA and to formulate a plan to treat Virginia Danos was a deviation from the standard of care and causally related to her subsequent stroke.

...

With a reasonable degree of medical certainty, had she been admitted and treated, her TIA would not have progressed to a left MCA stroke.

In the second report, Baker added the following paragraph:

> Virginia Danos was pregnant at the time of this incident and, because of her pregnancy, she had elevated estrogen and progesterone levels. As a direct result, she was predisposed to thrombo-embolic events including TIA's and strokes. Dr. Rittger and Dr. V. Patel should have recognized that she was predisposed to these thrombo-embolic events because of her elevated estrogen and progesterone levels. High suspicions should have led them to diagnose TIA which should have resulted in admission for further evaluation and treatment.

Dr. Baker's reports detail the standard of care to which Rittger was required to conform and the breach of that standard. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). The reports provide Rittger with a fair summary of Baker's opinions concerning the standard of care and how Rittger failed to meet that standard of care. *Palacios,* 46 S.W.3d at 880. Nevertheless, Rittger argues that the reports are insufficient because Baker collectively referenced Rittger and Patel in discussing the standard of care. We disagree.

 **[7]**    Appellees are not required to specifically state the same standard of care for each individual physician practicing

on the same patient when each physician owes the same duties to the patient. *In re Boone,* 223 S.W.3d 398, 405–06 (Tex.App.-Amarillo 2006, no pet.) (holding expert report sufficient with same standard of care for multiple defendants when each defendant was performing same duties on same patient); *Romero v. Lieberman,* 232 S.W.3d 385, 391–92 (Tex.App.-Dallas 2007, no pet.) (defendants' argument that expert report was insufficient because they were not given individual standards of care and were being held to "one size fits all" standard were unmeritorious as each physician owed same duties and were held to same standard).

 **\*557**  Rittger relies on *Taylor v. Christus Spohn Health System Corp.* and *Rittmer v. Garza* to support his contention that Baker's reports are inadequate as to the standard of care and breach because it collectively refers to a group of doctors rather than setting forth individual standards as to Rittger. *See Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 243 (Tex.App.-Corpus Christi 2005, no pet.); *Rittmer v. Garza,* 65 S.W.3d 718, 721 (Tex.App.-Houston [14th Dist.] 2001, no pet.). We find both *Taylor* and *Rittmer* distinguishable.

In *Taylor,* the defendants included a hospital, a doctors' association, an emergency room physician, and a cardiologist, and the expert failed to state what each defendant should have done to meet the standard of care and failed to do, and how the failure led to the patients death. *Taylor,* 169 S.W.3d at 243. Here, Baker's report comments on the failure of a uniform duty owed by both doctors to the same patient. And, also unlike *Taylor,* Baker specifically names the individual doctors, identifies their specific negligent actions, and discusses their failures according to the uniform standard of care that both doctors owed to Danos.

In *Rittmer,* the plaintiff conceded her report failed to set out specific standards of care for two distinct specialists—an oncologist performing a mastectomy and a plastic surgeon performing reconstructive surgery. *Rittmer,* 65 S.W.3d at 722. This is distinct from Baker's articulation of a standard of care for a duty owed to a patient in an emergency room setting.

 **[8]**    Rittger argues further that Baker's report failed to specify what particular actions or what additional specific care Rittger should have provided Danos. On the contrary, Baker's supplemental report indicates that, upon recognizing the high risk of TIA and stroke present during pregnancy,

Rittger and Patel should have admitted Danos for further evaluation and treatment.

For the foregoing reasons, we conclude that Baker's report provides a sufficiently specific standard of care and specifically identifies the breach of that standard of care for an emergency room physician. Thus, Baker's reports meet the first and second prongs of *Palacios.*

## 2. Dr. Meyer's Report

 **[9]**    Next, we review Dr. Meyer's report to determine whether it sufficiently links the alleged breaches of the standard of care with Danos's injuries. Meyer's report reads, in pertinent part:

> Dr. Rittger and Dr. Patel and the triage staff at Christus St. John Hospital all fell below [the] standard of care for not admitting [Danos] and working her up for probable stroke with diagnosis of left middle cerebral artery impending thrombosis or stroke due to toxemia of pregnancy.
>
> ...
>
> Christus St. John Hospital and the conduct of ER Triage nurse, C. Southard, RN, Kevin Rittger, MD, John Gillespie, MD and Victor Patel, MD were all negligent and all fell below the standard of care in their treatment of Lou Virginia Danos by not admitting her to the hospital with diagnosis of impending stroke and treating her with anti-platelet drugs, control of her BP and treatment of her eclampsia or toxemia of pregnancy and arranging for immediate Caesarian Section by delivering her child for prevention of complications or pre-eclampsia or toxemia pregnancy.
>
> As a result, Ms. Virginia Danos suffered from thrombosis of her left middle cerebral artery as a complication of toxemia of pregnancy, which if treated early, [the] stroke would have been prevented **\*558** and she would have remained neurologically normal. Apart from termination of pregnancy by Caesarian section, control of her elevated blood pressure, plus treatment with anti-platelet drugs would have all been indicated to prevent her stroke.

We conclude that Meyer's report is sufficient to establish causation because it links Rittger's alleged breaches of the standard of care with Danos's injuries. Meyer unequivocally states that Danos suffered neurological injury as the result of appellant's breach of the standard of care. Meyer reaches this conclusion after he sets forth the pertinent standard of care and how Danos's injury could have been prevented.

Nevertheless, Rittger contends that Meyer's report is conclusory as to causation. We disagree. Meyer causally links Rittger's failure to admit and treat Danos for her pregnancy-related toxemia directly to Danos's thrombosis of her left middle cerebral artery and thus provides a sufficient basis for his opinion. Consequently, we conclude that Meyer's report satisfies the third prong of *Palacios.*

## D. Qualifications of Experts

Section 74.351 defines an "expert" with respect to a person opining as to whether a physician departed from accepted standards of medical care, as one who is qualified to testify under the requirements of Section 74.401. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(A) (Vernon Supp. 2008). Section 74.401 states that a physician is qualified to give such testimony against a physician if he: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. REM.CODE ANN. § 74.401(a) (Vernon 2005).

When determining whether a witness is qualified on the basis of training or experience, the court considers whether, "at the time the claim arose or at the time the testimony is given, the witness (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and (2) is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c) (Vernon 2005).

 **[10]**    The expert testifying in a medical malpractice case need not be a specialist in the particular branch of the profession for which testimony is offered; the statute setting out the requisite qualifications focuses not on the defendant doctor's area of expertise, but on the condition involved in the claim. *Blan v. Ali,* 7 S.W.3d 741, 745 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

## 1. Dr. Baker

Baker is board certified in emergency medicine. As such, he has the training and experience to testify concerning the appropriate standard of care for an emergency room physician. TEX. CIV. PRAC. & REM.CODE ANN. §

74.401(a)(3) (Vernon 2005). Rittger does not dispute that Baker is qualified to testify regarding the standard of care and breach. *Danos,* 253 S.W.3d at 299.

### 2. Dr. Meyer

 **[11]** **[12]** **[13]** Rittger argues that neither Meyer's report nor his curriculum vitae qualify Meyer, a neurologist, to provide an opinion on the pertinent standard of care or breach thereof by Rittger as an emergency room physician. Danos, as the expert's **\*559** proponent, has the burden to show that Meyer is qualified and that Meyer's report satisfies the statutory requirements. *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 757 (Tex.App.-Houston [14th Dist.] 2007, no pet.). No definitive guidelines exist for determining whether a witness's education, experience, skill, or training qualify him as an expert. *Id.* at 762.

 **[14]** As a board-certified neurologist and professor in Baylor College of Medicine's Department of Neurology, Meyer has knowledge of the accepted standards of care for brain trauma. Where a particular subject of inquiry is common to and equally developed in all fields of practice, and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those which confronted the practitioner charged with malpractice, the witness is qualified to testify. *Simpson v. Glenn,* 537 S.W.2d 114, 117 (Tex.App.-Amarillo 1976, writ ref'd n.r.e.). The treatment of patients with brain trauma is common in the field of neurology; therefore Dr. Meyer qualifies as an expert. The fact that Danos was pregnant when she experienced her stroke or that she presented herself in an emergency room setting does not require that Dr. Meyer be an obstetrician or emergency room physician. Dr. Meyer is shown to be sufficiently competent and qualified to testify as to the care of patients with stroke as a complication of pregnancy-related toxemia. *See Simpson,* 537 S.W.2d at 116–18 (concluding that general physician qualified to testify as expert against physician specializing in obstetrics and gynecology).

### III. Conclusion

The expert reports, considered together, satisfy the requirements provided in *Palacios* by informing the appellant of the specific conduct called into question and giving the trial court a basis to conclude whether or not the claims have merit. *See Palacios,* 46 S.W.3d at 879. The reports comply with section 74.351 by detailing the standard of care to which Rittger was required to conform, the breach of that standard, and causation. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6); *Palacios,* 46 S.W.3d at 878. Based on the standards articulated in *Palacios,* we conclude that Danos made a good faith effort to comply with the statute and that the trial court did not err in overruling Rittger's objections to the expert reports. Accordingly, we hold that the trial court did not abuse its discretion in denying Rittger's motion to dismiss. We overrule Rittger's issue on appeal and affirm the order that denied Rittger's motion to dismiss.

**All Citations**

332 S.W.3d 550

---

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

323 S.W.3d 527
Court of Appeals of Texas,
Waco.

Ana Maria Gonzalez SALAIS, Individually
and as Representative of the Estate of
Ruben Gonzalez, Deceased, Appellants,
v.
TEXAS DEPARTMENT OF AGING
& DISABILITY SERVICES, Appellee.

No. 10−09−00155−CV.    |    Aug. 4, 2010.

**Synopsis**
**Background:** Mother of patient who died at a Texas Department of Aging and Disability Services (TDADS) facility brought a health-care liability action against TDADS. The 77th District Court, Limestone County, Deborah Oakes Evans, J., granted motion to dismiss by TDADS, and mother appealed.

**Holdings:** The Court of Appeals, Rex D. Davis, J., held that:

[1] paramedic was qualified to provide an expert opinion on the accepted standard of care in restraining patients;

[2] paramedic's expert report represented a good-faith effort to comply with the expert report statute;

[3] physician's expert report did not establish he was qualified to provide an opinion on the cause of patient's death; but

[4] expert reports of paramedic and physician together constituted a good-faith effort to provide a fair summary of the cause of patient's death; and

[5] case would be remanded so that trial court could exercise its discretion regarding mother's request for an extension to cure technical deficiency in physician's report.

Reversed.

Tom Gray, C.J., dissented and filed opinion.

West Headnotes (17)

**[1]    Appeal and Error**
  Rulings on Motions Relating to Pleadings
A trial court's decision to dismiss a health-care liability claim under the expert report statute is reviewed by the abuse-of-discretion standard. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[2]    Appeal and Error**
  Competency of witness
A trial court's decision on whether a person is qualified to offer an expert opinion in a health-care liability claim is reviewed under the abuse-of-discretion standard. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[3]    Appeal and Error**
  Nature and Extent of Discretionary Power
A trial court has no discretion in determining what the law is or applying the law to the facts.

Cases that cite this headnote

**[4]    Appeal and Error**
  Abuse of discretion
A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion.

Cases that cite this headnote

**[5]    Evidence**
  Due care and proper conduct in general
Paramedic, who provided opinion for mother of developmentally disabled patient who died after being physically retrained by healthcare staff at Texas Department of Aging and Disability Services (TDADS) facility, was qualified to offer an expert opinion on the accepted standards

of care in mother's health-care liability action against TDADS, where, based on mother's allegations, the type of care or treatment and the condition involved was the use of physical restraint and a restraint board on a combative person, and paramedic was a certified practitioner familiar with the standard of care in restraining combative persons and instructed others on such standard of care. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[6]**     **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

When considering a motion to dismiss under the expert report statute for health-care liability claims, the issue is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[7]**     **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

In determining whether a report represents a good-faith effort to comply with the expert report statute for health-care liability claims, the inquiry is limited to the four corners of the report. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[8]**     **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

An expert report need only represent a good-faith effort to provide a fair summary of the expert's opinions, in order to comply with the expert report statute for health-care liability claims; the report does not have to marshal all of the plaintiff's proof and the plaintiff need not present evidence in the report as if it were actually litigating the merits, and, instead, to comply with

the statute the report must address the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff calls into question and to provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[9]**     **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Paramedic's expert report, provided on behalf of mother of developmentally disabled patient in health-care liability action brought against Texas Department of Aging and Disability Services (TDADS) after patient died while being physically restrained by TDADS facility, represented a good-faith effort to comply with the expert report statute for health-care liability claims, where report noted that paramedic had been qualified as an expert in restraint asphyxia, stated he was familiar with the standard of care for restraining combative persons, stated what steps should be taken to monitor for respiratory distress, and stated that had any of the restrainers prevented the application of the restraint board it was more likely than not that the patient would not have suffered from restraint asphyxia. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[10]**     **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Expert reports can be considered together in determining whether the plaintiff in a health care liability action has provided adequate expert opinion regarding the standard of care, breach, and causation. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[11]**     **Health**

☞ Affidavits of merit or meritorious defense; expert affidavits

A physician's report on causation should not be read in isolation, for purposes of the expert report statute for health-care liability claims. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

[12] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

The qualifications of an expert must appear in the report itself and cannot be inferred, for purposes of the expert report statute for health-care liability claims. V.T.C.A., Civil Practice & Remedies Code § 74.351.

3 Cases that cite this headnote

[13] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Expert report of physician did not establish that he was qualified to opine on the causal relationship of employees' conduct and patient's death, as required in order for the report to satisfy the expert report statute for health-care liability claims in health care liability action mother of developmentally disabled patient brought against Texas Department of Aging and Disability Services (TDADS) after patient died while being restrained by health care workers at TDADS facility, where physician's curriculum vitae (CV) only disclosed that he was practicing in the field of emergency medicine, and in the past held positions as an emergency medicine physician and a general and trauma surgeon. V.T.C.A., Civil Practice & Remedies Code § 74.351.

3 Cases that cite this headnote

[14] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Merely being a physician is insufficient to qualify as a medical expert under the expert

report statute for health-care liability claims. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

[15] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Expert reports of paramedic and emergency medicine physician, in health care liability action mother of developmentally disabled patient brought against Texas Department of Aging and Disability Services (TDADS) after patient died while being physically restrained by TDADS employees, together constituted a good-faith effort to provide a fair summary of the causal relationship between employees' conduct and patient's death by restraint asphyxia as required by the expert report statute for health-care liability claims, though physician's report did not show that he was qualified to give an expert opinion on causation, as the reports provided enough information linking the breach of the standard of care to the death. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

[16] **Judgment**
☞ Necessity for entry
**Motions**
☞ Entry or Filing of Orders

Any order or judgment, to be effective, must be entered of record.

1 Cases that cite this headnote

[17] **Appeal and Error**
☞ Ordering New Trial, and Directing Further Proceedings in Lower Court

Health care liability action, brought by mother of developmentally disabled patient against Texas Department of Aging and Disability Services (TDADS) after patient died while being physically restrained by TDADS employees, would be remanded by Court of Appeals to the trial court so that the trial court could exercise

its discretion under the expert report statute regarding whether mother should be granted an extension to cure technical deficiency in physician's report, i.e., report did not set forth his qualifications to give an expert opinion on causation, as only the docket sheet indicated that mother's motion for an extension was denied, but docket-sheet entries were not "of-record" rulings. V.T.C.A., Civil Practice & Remedies Code § 74.351(c).

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*530**  R. Keith Weber, Woodfill & Pressler LLP, Houston, for Appellants.

John P. Giberson, Atty. General's Office, Tort Litigation Division, Austin, Neal E. Pirkle, Naman, Howell, Smith & Lee LLP, Waco, for Appellee.

Before Chief Justice GRAY, Justice REYNA, and Justice DAVIS.

**OPINION**

REX D. DAVIS, Justice.

Ana Maria Gonzalez Salais appeals the trial court's order dismissing her health-care liability claim against the Texas Department of Aging and Disability Services (TDADS).

Salais's live petition alleges that her son Ruben Gonzalez was a patient at the Mexia State School, a TDADS facility, because of his developmental disability. Late one evening (after midnight), Ruben had refused to go to bed and was then physically restrained by Sheri Thornton and Charles Korn, two TDADS employees. After Joel Thomas, a third employee, arrived, they placed Ruben on a restraint board. Sue Sanderson, a TDADS nurse, was called to the scene and found Ruben pale with no pulse or blood pressure. Sanderson was unable to resuscitate Ruben. An automated external defibrillator (AED) was employed, but it was not used to shock Ruben. Paramedics arrived and their monitor showed a flat line and no cardiac rhythm. Ruben was taken to a hospital, where he was pronounced dead.

Salais also pleads:

In the Prevention & Management of Aggressive Behavior Course Synopsis allegedly provided by Defendant Mexia [State School] to its employees, employees are warned that "[e]xtreme care must be exercised during any horizontal restraint to insure that the person's ability to breathe is not restricted.... [D]uring all horizontal restraints, the person must remain in a side-lying position and monitored continuously. Failure to do so may risk serious injury and death from positional asphyxia, [which] occurs when there is insufficient intake of oxygen as a result of body positioning that interferes with one's ability to breathe." [Ellipsis and brackets in original].

She further pleads that the "Mexia State School Annual Retraining Course Synopsis," allegedly provided to every participant, gives the same warning and also provides "that the person who is restraining the lower body has an important role in monitoring breathing, circulation, and general condition of the restrained individual, and in assisting in maintaining the restrained individual in a side-lying position."

 **\*531**  In her health-care liability cause of action, Salais alleges that TDADS [Mexia State School] and TDADS employees Korn, Thornton, and Thomas were negligent in the care and treatment of Ruben in each of the following ways:

1. Failure to recognize and/or appreciate the risk factors for the potential occurrence of death when performing a physical restraint;

2. Misuse of the restraints and restraint board when performing a physical restraint;

3. Failure to anticipate the risk of traumatic asphyxia when performing a physical restraint;

4. Failure to plan the physical restraint according to the increased risk for serious injury to Decedent;

5. Inappropriate management of the complication of performing a physical restraint;

6. Failure to have the requisite knowledge regarding appropriate responses to a combative physical restraint;

7. Failure to perform the appropriate interventions during the physical restraint of Decedent once health complications were encountered;

8. Failure to provide proper education and training to employees who were called upon to assist in the restraint of Decedent.

Section 74.351 of the Civil Practices and Remedies Code provides that within 120 days of filing suit, a claimant must serve a curriculum vitae (CV) and one or more expert reports regarding every defendant against whom a health care claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp. 2009). Salais provided two expert reports. One report was by James Wohlers, a paramedic, which addresses the standard of care and breach elements relating to the use of the restraint board and the AED. The other report, of Donald Winston, M.D., addresses the causation element.

TDADS objected to the reports and moved to dismiss Salais's health-care liability claim under section 74.351. *See id.* The motion asserted that Salais's experts were not qualified and that their reports were inadequate. The trial court granted TDADS's motion to dismiss without stating any grounds. In her first issue, Salais argues that the trial court erred in granting TDADS's motion to dismiss.

 **[1]** **[2]** **[3]** **[4]** We review the trial court's decision to dismiss a health-care liability claim by the abuse-of-discretion standard. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). Also, a trial court's decision on whether a person is qualified to offer an expert opinion in a health-care liability claim is reviewed under the abuse-of-discretion standard. *Moore v. Gatica,* 269 S.W.3d 134, 139 (Tex.App.-Fort Worth 2008, pet. denied). "However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*" *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279–80 (Tex.App.-Austin 2007, no pet.); *see also Methodist Hosp. v. Shepherd–Sherman,* 296 S.W.3d 193, 197 (Tex.App.-Houston [14th Dist.] 2009, no pet.) ("Though we may not substitute our judgment for that of the trial court, the trial court has no discretion in determining what the law is or applying the law to the facts.").

### Wohlers Report

*Qualifications*

TDADS's motion to dismiss and brief assert that Wohlers's report and CV do **\*532** not establish his qualifications to testify about the standards of care applicable to the Mexia State School healthcare staff or to the treatment for individuals with behavioral, mental, and developmental disabilities. Its brief also asserts that Wohlers's report does not show that the "management and care" of Ruben on the occasion in question is "something universally done."

Regarding his qualifications, Wohlers's report states:

> I received my paramedic education from Creighton University in 1992. Initially I was a paramedic in Omaha, Nebraska from 1992 to 1996, then a paramedic for the City and County of Denver from 1996 until 2000. Since 2000, I have been with the Grand Island Fire Department in Grand Island, Nebraska as a paramedic/firefighter. I have also been involved in restraint asphyxia education since 2006. I teach to EMS, Law Enforcement and persons involved in the restraining of combative persons. I have been qualified as an expert in the field of restraint asphyxia.

Wohlers's CV restates the above history and notes his certification as an EMS instructor and that he specializes in "restraint-related issues" and instructs on Advanced Life Support and Basic Life Support topics. His report further states:

> I am familiar with the standard of care for restraining a combative person and understand what steps should be taken to monitor for respiratory distress. Through my education, background and experience, I am knowledgeable in the standard of care that the staff of Mexia State School should have provided to Mr. Gonzales on the night he died.

On the issue of Wohlers's qualifications, we turn to the applicable statute, section 74.402, which provides in pertinent part:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b, c) (Vernon 2005).

 **[5]**   We disagree that Wohlers was required to be qualified in general as an expert about the standards of care applicable to the Mexia State School healthcare staff for the care and treatment for individuals **\*533** with behavioral, mental, and developmental disabilities. Rather, under the literal language of subsections 74.402(b)(1, 2), Wohlers is only required to be practicing health care in a field of practice that involves *the same type of care or treatment* as that delivered by the defendant health care provider and have knowledge of the accepted standards of care for health care providers for *the care or treatment of the condition involved in the claim. See id.* § 74.402(b)(1, 2); *see, e.g., Group v. Vicento,* 164 S.W.3d 724, 730–31 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Based on Salais's allegations and the information

in Wohlers's report, the type of care or treatment and the condition involved is the use of physical restraint and a restraint board on a combative person. Wohlers's report and CV show that he is a certified practitioner and instructor in health care services relevant to the health-care liability claim in this case; he has been a paramedic since 1992 and has been instructing on restraint asphyxia since 2006, including teaching persons involved in the restraining of combative persons. His report states that he is familiar with the standard of care for restraining a combative person and is knowledgeable of the standard of care that the staff of Mexia State School should have provided to Ruben on the night he died with respect to the use of physical restraint and a restraint board.

Under the applicable criteria in section 74.402(b), Wohlers's report and CV demonstrate that he is qualified to offer an expert opinion on the accepted standards of care for this type of care or treatment by TDADS healthcare staff of combative persons. To the extent the trial court concluded otherwise, the trial court abused its discretion.

*Adequacy*
TDADS's motion to dismiss asserted that Wohlers's report is inadequate because it does not articulate the relevant standard of care and/or the bases for the relevant standards of care applicable to TDADS and it does not specifically state the manner in which TDADS breached the applicable standard of care.

 **[6]**   When considering a motion to dismiss under subsection 74.351(b), the issue is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. *See Bowie Mem. Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *Palacios,* 46 S.W.3d at 878. An "expert report" is "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

 **[7]**    **[8]**   In determining whether the report represents a good-faith effort, the inquiry is limited to the four corners of the report. *Palacios,* 46 S.W.3d at 878. The report need only represent a good-faith effort to provide a fair summary of the expert's opinions. *Id.* The report does not have to marshal all of the plaintiff's proof and the plaintiff need not present

evidence in the report as if it were actually litigating the merits. *Id.* at 879. Rather, to constitute a good-faith effort, the report must address the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff calls into question and to provide a basis for the trial court to conclude that the claims have merit. *Id.* at 875.

 **[9]**     The Wohlers report notes that he has been qualified as an expert in restraint  **\*534**  asphyxia. It cites an investigative report that he reviewed and details the course of events and the conduct of three employees (Thomas, Korn, and Thornton) in placing Ruben on a restraint board and, according to Thomas, using a restraint strap across his diaphragm, after which Ruben "was breathing hard, in gasps, and making gurgling sounds." According to Korn, a restraint strap was across Ruben's chest, and Korn observed only a "slight rise" in his chest; Ruben had a weak pulse. Thornton observed Ruben on the restraint board and thought he was asleep, but he looked "funny" and was breathing shallow. Nurse Sanderson arrived, and after finding Ruben's color to be abnormally pale, no blood pressure, and no pulse, she initiated CPR and attempted to use an AED. Mexia Fire/EMS then arrived, took over CPR, and did an endotracheal intubation before transferring Ruben to Parkview Regional Hospital, where he was pronounced dead. Wohlers states:

> I am familiar with the standard of care for restraining a combative person and understand what steps should be taken to monitor for respiratory distress. Through my education, background and experience, I am knowledgeable in the standard of care that the staff of Mexia State School should have provided to Mr. Gonzalez on the night he died.

> The standard of care requires that if any one of the persons involved in the restraining of Mr. Gonzalez had recognized that he was in respiratory distress, he should not have been placed on a restraint board and had straps placed across his chest. Had anyone of the restrainers prevented the application of the restraint board, it is more likely than not that Mr. Gonzalez would not have suffered restraint asphyxia. No one intervened in the application of the restraint board.

Wohlers's report sets forth his familiarity with the standard of care and the basis therefor, what the standard of care is, and how the TDADS staff breached it on the occasion in question. The report addresses the standard of care and breach with sufficient specificity to inform TDADS of the

conduct that Salais calls into question and provides a basis for the trial court to conclude that the claims have merit. *See Palacios,* 46 S.W.3d at 875. It informs TDADS "what care was expected but not given." *Fagadau v. Wenkstern,* 311 S.W.3d 132, 138 (Tex.App.-Dallas 2010, no pet. h.) (citing *Palacios,* 46 S.W.3d at 880). To the extent the trial court concluded otherwise, the trial court abused its discretion.

### Dr. Winston Report

 **[10]**     **[11]**     Section 74.351(i) permits a claimant to satisfy any requirement of section 74.351 for serving an expert report by serving reports of separate experts. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i); *see Packard v. Guerra,* 252 S.W.3d 511, 527 (Tex.App.-Houston [14th Dist.] 2008, pet. denied). Expert reports can be considered together in determining whether the plaintiff in a health–care liability action has provided adequate expert opinion regarding the standard of care, breach, and causation. *See Walgreen Co. v. Hieger,* 243 S.W.3d 183, 186 n. 2 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *Martin v. Abilene Regional Med. Center,* No. 11–04–00303–CV, 2006 WL 241509, at \*4–5 (Tex.App.-Eastland Feb. 2, 2006, no pet.) (mem. op.). A physician's report on causation should not be read in isolation. *See Martin,* 2006 WL 241509, at \*4; *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(C) (providing that only a physician can be an expert giving opinion testimony on causal relationship).

 **\*535** *Qualifications*

TDADS's motion to dismiss and brief assert that Dr. Winston's report and CV do not establish his qualifications to testify about causation. Its brief first asserts that there is no showing that Dr. Winston is a licensed physician. "Expert" means, "with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5) (C) (Vernon Supp. 2009); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 74.403(a) (Vernon 2005).

Dr. Winston's report is in a letter format, and his letterhead and typed signature block identify him as "Donald Winston, MD." His letterhead also reveals his website

(www.urbansurgeon.com) and his email address at that website. Furthermore, his December 2008 CV reflects that he is a licensed Texas physician (No. F0832, licensed in February 1978 and expiring May 31, 2010). TDADS's assertion that there is no showing that Dr. Winston is a licensed physician is incorrect.

Dr. Winston's report is a letter to Salais's attorney and states in its entirety:

> At your request, I have reviewed an autopsy report and death certificate of Ruben Gonzales, a 15 year old Hispanic male who apparently was a student at the Mexia State School.
>
> I have no way of knowing exactly what took place on or about January 15, 2007, but I have reviewed a Third Amended Petition in Cause 28901A which states that three employees of Mexia State School physically restrained Mr. Gonzales. After a period of time, a nurse at the hospital found Mr. Gonzales dead. Resuscitation failed, and after endotrachial [sic] intubation by Mexia Fire Department EMS, he was taken to Parkview Regional Hospital where he was pronounced dead.
>
> My focus is on the Autopsy report in Case No. JP0187–07–0120ACG done January 16th 2007.
>
> I agree with the physical findings of:
>
> 1. Petechiae in the right and left conjunctivae
>
> 2. Contusions to the right arm and left leg
>
> 3. Subcutaneous hemorrhage on the upper back and lower back
>
> 4. Two subgaleal hemorrhages
>
> 5. Abrasions and contusions on face and arms
>
> 6. Mechanical asphyxia
>
> I disagree with the final opinion of the nine pathologists to the extent that there is evidence that Mr. Gonzales in any way contributed to his own death, but I agree that his death was a homicide caused by restraint and mechanical asphyxia imposed on him by the three Mexia State School employees.
>
> If you have any other questions, please feel free to contact me. [1]

[1] To the extent that Salais has asserted a health-care liability claim based on alleged misuse of the AED (it is in the Wohlers report, but it is not pleaded by Salais), there is "no report" at all as to causation, and the trial court properly dismissed that part of the health-care liability claim. *See Benson v. Vernon,* 303 S.W.3d 755, 760–61 (Tex.App.-Waco 2009, no pet.).

**[12]** **[13]** **[14]** TDADS is correct that Dr. Winston's *report* fails to show how he is qualified to render an expert opinion on causation in this case. Rule 702 of the Texas Rules of Evidence requires that an **\*536** expert be qualified by "knowledge, skill, experience, training, or education." TEX.R. EVID. 702. The qualifications of an expert must appear in the report itself and cannot be inferred. *See Benson v. Hall,* No. 10–09–00284–CV, 2010 WL 376957, at \*1 (Tex.App.-Waco Feb. 3, 2010, no pet. h.); *Estorque v. Schafer,* 302 S.W.3d 19, 26 (Tex.App.-Fort Worth 2009, no pet.); *Philipp v. McCreedy,* 298 S.W.3d 682, 686 (Tex.App.-San Antonio 2009, no pet.); *Baylor College of Medicine v. Pokluda,* 283 S.W.3d 110, 117 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *Hansen v. Starr,* 123 S.W.3d 13, 19 (Tex.App.-Dallas 2003, pet. denied). Dr. Winston's report does not set forth his qualifications at all. His CV reflects that he is currently practicing in the field of emergency medicine in Houston and has held several positions as an emergency medicine physician and a general and trauma surgeon. Aside from their not being in the report itself, these position descriptions alone are inadequate to show how Dr. Winston is qualified to opine on the causal relationship of Ruben's death. Merely being a physician is insufficient to qualify as a medical expert. *See Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996); *Hagedorn v. Tisdale,* 73 S.W.3d 341, 350 (Tex.App.-Amarillo 2002, no pet.).

Because there is no showing in Dr. Winston's report that he is qualified to give an expert opinion on causation, to the extent the trial court granted the motion to dismiss on this basis, it did not abuse its discretion. We overrule Salais's first issue.

*Adequacy*

**[15]** Because of our disposition of the second issue, we must address TDADS's challenge to the adequacy of Dr. Winston's report in its motion to dismiss. On the adequacy of Dr. Winston's report, we are precluded "from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart,* 228 S.W.3d at 279. But here, there is no gap, and there is no guessing, that Dr.

Winston's opinion on the cause of Ruben's death—"restraint and mechanical asphyxia imposed on him by the three Mexia State School employees"—*is the same conduct* referred to in the Wohlers report as being the three Mexia State School employees' breach of the standard of care in restraining a person in respiratory distress.

When the reports are read together, as they must be in this case, they satisfy the causal-relationship requirement because they constitute a good-faith effort to provide a fair summary of the causal relationship between the employees' conduct and Ruben's death by restraint asphyxia. *See Martin,* 2006 WL 241509, at *5. Read together, they provide "enough information linking the defendant's breach of the standard of care to the plaintiff's injury." *Baker v. Gomez,* 276 S.W.3d 1, 8 (Tex.App.-El Paso 2008, pet. denied). And because Dr. Winston's report does link the employees' conduct with Gonzalez's death, TDADS's reliance on *Bogar v. Esparza* and *Shaw v. BMW Healthcare, Inc.* is misplaced, as those cases are distinguishable on that basis. *Cf. Bogar v. Esparza,* 257 S.W.3d 354, 364 (Tex.App.-Austin 2008, no pet.) ("In essence, Dr. Adame's report is a second autopsy report, opining about the cause of Ms. Guerrero's death *without explaining who caused it or how.*") (emphasis added); *Shaw v. BMW Healthcare, Inc.,* 100 S.W.3d 8, 12–13 (Tex.App.-Tyler 2002, pet. denied) (op. on reh'g) ("An opinion solely addressing the cause of death does not satisfy the statutory requirements.").

### Extension

Subsection 74.351(c) provides: "If an expert report has not been served within the **\*537** period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c). In her second issue, Salais asserts that the trial court abused its discretion in not granting her alternative motion for a thirty-day extension to cure her expert report's deficiency.

 [16]     The docket sheet appears to reflect the trial court's denial of that motion, but docket-sheet entries are not "of-record" rulings. Any order or judgment, to be effective, must be entered of record. *Kocman v. Kocman,* 581 S.W.2d 516, 518 (Tex.Civ.App.-Waco 1979, no writ); *see also Willis v. Nucor Corp.,* 282 S.W.3d 536, 543 (Tex.App.-Waco 2008, no pet.).

 [17]     Dr. Winston's report is technically deficient—as opposed to being "no report"—because the report lacks his qualifications to give an expert opinion on causation. It is thus appropriate to remand this case to the trial court so it can exercise its discretion whether to grant a thirty-day extension so that Salais can attempt to cure this deficiency. *See Austin Heart,* 228 S.W.3d at 284–85; *see also In re Buster,* 275 S.W.3d 475, 477 (Tex.2008) ("A report by an unqualified expert will sometimes (though not always) reflect a good-faith effort sufficient to justify a 30–day extension.").

Accordingly, we sustain the second issue and remand this cause to the trial court with the instruction to consider and rule on Salais's motion for a thirty-day extension to attempt to cure the deficiency in Dr. Winston's report.

Chief Justice GRAY dissenting.

TOM GRAY, Chief Justice, dissenting.

Ana Maria Gonzalez Salais appeals the trial court's judgment dismissing her health care liability claim against the Texas Department of Aging and Disability Services. Because the trial court did not abuse its discretion in granting TDADS's motion to dismiss or in denying Salais's request for a 30–day extension, we should affirm the trial court's judgment. Because the Court does not, I respectfully dissent.

### BACKGROUND

Salais's son, Ruben Gonzalez, was a patient at a TDADS facility, the Mexia State School. After an altercation with the State School staff, Gonzalez was placed on a restraint board. He then died. Salais sued both TDADS and the Mexia State School. The trial court granted TDADS's motion to dismiss.

In two issues on appeal, Salais argues that the trial court erred in granting TDADS's motion to dismiss pursuant to section 74.351 of the Texas Civil Practice and Remedies Code and erred in denying Salais's request for a 30–day extension pursuant to section 74.351(c) of the Texas Civil Practice and Remedies Code.

### DISMISSAL

Section 74.351 of the Civil Practices and Remedies Code provides that within 120 days of filing, a claimant must serve a curriculum vitae and one or more expert reports regarding every defendant against whom a health care claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2009). "Section 74.351 has numerous subparts, including:

• subpart (b) requiring trial courts to dismiss a claim with prejudice and award fees if "an expert report has not been served" by the statutory deadline;

• subpart (c) allowing a 30–day extension of the deadline if a report is found inadequate; and

**\*538** • subpart ( *l* ) providing that a motion challenging a report's adequacy should be granted only if the report does not represent a good-faith effort to comply with the statute." *Lewis v. Funderburk,* 253 S.W.3d 204, 207 (Tex.2008) (footnotes omitted); TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b), (c), ( *l* ) (Vernon Supp. 2009).

When considering a motion to dismiss under section 74.351, the issue for the trial court is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). An "expert report" means:

> A written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp. 2009). To constitute a "good-faith effort," the report must discuss the standard of care, breach, and causation with sufficient specificity to fulfill two purposes: (1) to inform the defendant of the specific conduct the plaintiff has called into question; and (2) to provide a basis for the trial court to conclude that the claims have merit. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879.

The report must include the expert's opinion on each of the three elements that the statute identifies: standard of care, breach, and causal relationship. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about these elements. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999).

We review a trial court's order dismissing a claim for failure to comply with the expert report requirements under an abuse-of-discretion standard. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. Expert reports that omit at least one of the three specifically enumerated requirements of an expert report cannot constitute a good faith effort to meet the statutory requirements. *See Jernigan v. Langley,* 195 S.W.3d 91, 94 (Tex.2006); *Palacios,* 46 S.W.3d at 879.

Salais provided two reports to serve as her expert report. One report was prepared by James Wohlers, a paramedic from Nebraska, which Salais alleged addressed the expert report elements of the standard of care and the breach of that standard. The other report was prepared by Donald Winston, a physician from Houston. Salais alleged Dr. Winston's report addressed the causation element. TDADS complains, and I agree, that Dr. Winston's report wholly fails to address the causation element.

Assuming without deciding that Dr. Winston is otherwise qualified to render an opinion on causation, he does not. Dr. Winston states in his report that he reviewed the autopsy report of Ruben Gonzalez and the death certificate. Then, he simply states that, although he disagrees with the nine pathologists on whether Gonzalez was in part responsible for his own death, he agrees with them in their conclusion that it was homicide caused by restraint and mechanical asphyxiation "imposed on him by the three Mexia State School employees."

**\*539** What Dr. Winston fails to do is draw the connection or explain the causal link between the negligent actions of a specific health care provider (the elements of standard of care and breach as described by Wohlers, the other purported expert) and the damages/injury (Gonzalez's death). In other words, his report on causation must make the connection that the death by mechanical asphyxiation was caused by the conduct described by Wohlers, assuming that was adequately presented in the other expert report. *See Bowie,* 79 S.W.3d at 53. Because Dr. Winston did not indicate he had reviewed

the other purported expert's report, this required connection is simply missing. Further, it is impermissible to infer that the conduct referenced in one report is the basis for the conclusions in the other report. *See Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.).

Dr. Winston's report is similar to an expert report discussed in *Shaw v. B.M.W. Healthcare, Inc.,* 100 S.W.3d 8 (Tex.App.-Tyler 2002, pet. denied). In *Shaw,* the Shaws filed two expert reports to address the three elements, one from a physician and one from a registered nurse. The Shaws agreed that the physician's report did not set out the applicable standards of care or address how the defendants breached any standards. They argued, however, that those omissions were irrelevant because the physician only rendered an opinion on the cause of death. Citing to *Palacios,* the Tyler Court of Appeals held that because there was no discussion in the report as to the applicable standard of care and any breaches of that standard, an opinion solely addressing the cause of death did not satisfy the statutory requirements of an expert report. *Shaw,* 100 S.W.3d at 13 (citing *Palacios,* 46 S.W.3d at 879). Like the report in *Shaw,* Dr. Winston's report only addressed Gonzalez's cause of death without a link between the alleged breach and the injury. Accordingly, I would hold that Dr. Winston's report does not meet the requirement of an expert report because there is nothing in the report that addresses the causal connection between the breach by the Mexia State School employees of the standard of care as allegedly contained in Wohlers's report and the injury, the death of Gonzalez, claimed. The causation element has been omitted from the report.

Because Salais's expert reports omit at least one of the three specifically enumerated requirements of subsection (r)(6), they cannot constitute a good faith effort to meet those requirements. I need not decide TDADS's objections to Wohlers's report. Accordingly, because the trial court did not abuse its discretion in granting TDADS's motion to dismiss Salais's suit against TDADS, Salais's first issue should be overruled.

**CONTINUANCE**

Salais further argues that should we determine the reports were deficient, we should remand the matter back to the trial court for a 30–day extension. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (Vernon Supp. 2009). The parties agree and the trial court's docket sheet indicates that a request for a 30–day extension was denied. Section 74.351(c) provides in part that the trial court may grant one 30–day extension to the claimant to cure a deficiency in an expert report. *Id.* The term "may" as used in subsection (c) vests the trial court with discretion to grant a 30–day extension. *Bosch v. Wilbarger Gen. Hosp.,* 223 S.W.3d 460, 465 (Tex.App.-Amarillo 2006, pet. denied); *Hardy v. Marsh,* 170 S.W.3d 865, 870–71 (Tex.App.-Texarkana 2005, no pet.).

I assume without deciding that once the trial court determines that the report furnished **\*540** did not constitute a good faith effort to meet the requirements of an expert report, the trial court can, nevertheless, grant a 30–day extension to cure the deficiency. To grant such an extension, the trial court would have to consider the totality of the circumstances surrounding the preparation of the report, such as the difficulty, if any, encountered by the plaintiff in obtaining the necessary experts or in getting the medical records necessary for the expert to review, the diligence of the plaintiff in securing an expert on the specific type of healthcare liability claim, whether a 30–day extension would have allowed the plaintiff to cure the defect, and the extent of the deficiency in the proffered report. This list of considerations is by no means exhaustive.

But in this case, we have not been provided any record from which we could review the trial court's determination. Because we have no record to review, Salais is unable to support the complaint that the trial court abused its discretion in failing to grant a 30–day extension. *See In the Interest of D.W.,* 249 S.W.3d 625, 648 (Tex.App.-Fort Worth 2008, no pet.) (because no record of hearing on motion to extend dismissal deadline, court presumes evidence supported trial court's ruling and no abuse of discretion shown).

Salais's second issue should be overruled.

**CONCLUSION**

Having overruled each issue, I would affirm the interlocutory order of dismissal of the trial court. Because the Court does not, I respectfully dissent.

**All Citations**

323 S.W.3d 527

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

346 S.W.3d 546
Supreme Court of Texas.

Tyler SCORESBY, M.D., Petitioner,

v.

Catarino SANTILLAN, Individually and As Next
Friend of Samuel Santillan, A Minor, Respondent.

No. 09–0497.    |    Argued Nov. 9,
2010.    |    Decided July 1, 2011.    |
Rehearing Denied Sept. 30, 2011.

**Synopsis**

**Background:** Patient brought action against physicians under
Medical Liability Act. The 96th District Court, Tarrant
County, Jeff Walker, J., denied physicians' motions to dismiss
for failure to file compliant health care expert report, and
granted patient 30-day extension to cure deficiencies in
report. Both physicians appealed. On consolidated appeal, the
Fort Worth Court of Appeals, Bill Meier, J., 287 S.W.3d 319,
dismissed the appeals. Physicians appealed.

**Holdings:** The Supreme Court, Hecht, J., held that:

[1] trial court should err on side of granting plaintiff additional
30 days in which to cure deficiency in expert report, and
defendant cannot seek review of this ruling or appeal court's
concomitant refusal to dismiss claim before 30 day period has
expired;

[2] document qualifies as "expert report" under Medical
Liability Act if it contains statement of opinion by individual
with expertise indicating that claim asserted by plaintiff has
merit;

[3] 30 day extension to cure deficiencies in expert report
may be granted if report is served by statutory deadline and
contains opinion of individual with expertise that claim has
merit;

[4] doctor's expert report was deficient because it did not state
standard of care; and

[5] doctor's expert report, although deficient, was not the legal
equivalent of "no report" at all under Act.

Affirmed.

Willett, J., filed concurring opinion.

Johnson, J., dissented and filed opinion in which Wainwright,
J., joined.

West Headnotes (20)

**[1]    Health**
&#x1F511; Affidavits of merit or meritorious defense;
expert affidavits

Medical Liability Act entitles a defendant to
dismissal of a health care liability claim if, within
120 days of the date suit was filed, he is not
served with an expert report showing that the
claim against him has merit. V.T.C.A., Civil
Practice & Remedies Code §§ 74.001–74.507.

9 Cases that cite this headnote

**[2]    Appeal and Error**
&#x1F511; On motions relating to pleadings

Trial court's refusal to dismiss health care
liability claim when defendant is not served
with an expert report within 120 days of the
date suit was filed is immediately appealable.
V.T.C.A., Civil Practice & Remedies Code §§
74.001–74.507.

5 Cases that cite this headnote

**[3]    Appeal and Error**
&#x1F511; On motions relating to pleadings

**Health**
&#x1F511; Affidavits of merit or meritorious defense;
expert affidavits

Medical Liability Act sets specific requirements
for an adequate expert report and mandates that
objective good faith effort be made to comply
with them, but it also authorizes the trial court to
give a plaintiff who meets the 120–day deadline
for serving expert report an additional thirty days
in which to cure a "deficiency" in the elements of
the report, and trial court should err on the side
of granting the additional time and must grant

it if the deficiencies are curable, and defendant cannot seek review of this ruling or appeal the court's concomitant refusal to dismiss the claim before the thirty-day period has expired. V.T.C.A., Civil Practice & Remedies Code §§ 51.014(a)(9), 74.351(a–c, l), (r)(6).

18 Cases that cite this headnote

**[4]     Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

While Medical Liability Act contemplates that a document can be considered an expert report despite its deficiencies, the Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

4 Cases that cite this headnote

**[5]     Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

Document qualifies as an "expert report" under Medical Liability Act if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

15 Cases that cite this headnote

**[6]     Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

Under Medical Liability Act, expert's lack of relevant qualifications and his opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so, and this lenient standard avoids the expense and delay of multiple interlocutory appeals and assures plaintiff a fair opportunity to demonstrate that his claim is not frivolous. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

3 Cases that cite this headnote

**[7]     Health**

⚷ Purpose

Goal of the Medical Liability and Insurance Improvement Act (MLIIA) and the Medical Liability Act is to make health care more available and less expensive by reducing the cost of health care liability claims, and eliciting an expert's opinions early in the litigation is an obvious place to start in attempting to reduce frivolous lawsuits and thereby reduce the costs of claims. V.T.C.A., Civil Practice & Remedies Code §§ 74.001–74.507; Vernon's Ann.Texas Civ.St. art. 4590i (Repealed).

5 Cases that cite this headnote

**[8]     Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

Purpose of Medical Liability Act's expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

16 Cases that cite this headnote

**[9]     Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

Failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report under Medical Liability Act, means that the claim is either frivolous, or at best has been brought prematurely. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

24 Cases that cite this headnote

**[10]     Pretrial Procedure**

⚷ Dismissal or default judgment

There are constitutional limitations upon the power of courts to dismiss an action for discovery violations without affording a party

the opportunity for a hearing on the merits of his cause, and those limitations constrain the legislature no less in requiring dismissal.

1 Cases that cite this headnote

**[11]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

No particular words or formality are required in expert report under Medical Liability Act, but bare conclusions will not suffice, and the report must address all the elements set forth in Act, and omissions may not be supplied by inference. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

8 Cases that cite this headnote

**[12]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

Medical Liability Act allows a claimant a thirty-day period to cure deficiencies before the trial court finally determines that the report is inadequate and the claim must be dismissed. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

Cases that cite this headnote

**[13]    Health**
    Purpose

Medical Liability Act's principal purpose is to reduce the expense of health care liability claims. V.T.C.A., Civil Practice & Remedies Code §§ 74.001–74.507.

2 Cases that cite this headnote

**[14]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

Goal of the Medical Liability Act's expert report requirement is to deter frivolous claims, and inadequate expert report does not indicate a frivolous claim if the report's deficiencies are

readily curable. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

18 Cases that cite this headnote

**[15]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

Medical Liability Act's thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

45 Cases that cite this headnote

**[16]    Appeal and Error**
    On motions relating to pleadings

Under Medical Liability Act, all deficiencies in expert report, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

4 Cases that cite this headnote

**[17]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

Doctor's expert report was deficient, and thus did not satisfy standards for expert report under Medical Liability Act, because it did not state the standard of care, but, rather, only implied that it was inconsistent with the defendant physicians' conduct. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

9 Cases that cite this headnote

**[18]    Health**
    Affidavits of merit or meritorious defense; expert affidavits

Doctor's expert report, although deficient because it did not state the standard of care, was not the legal equivalent of "no report" at all under Medical Liability Act, given that there was no question that, in doctor's expert opinion, patient's health care liability claim against defendant physicians had merit, and since the report was served within the statutory 120 day deadline, trial court had authority under Act to grant patient an additional 30 days to cure deficiencies in the expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(a–c).

29 Cases that cite this headnote

**[19]    Appeal and Error**
👉 On motions relating to pleadings

**Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Although doctor's expert report was deficient, because it did not state the standard of care, it was possible to cure deficiencies in the expert report, and thus, trial court granted patient an additional 30 days to cure deficiencies in the expert report, and trial court's decision granting patient an additional 30 days to cure deficiencies, and denying the defendant physicians' motions to dismiss patient's health care liability claim, were not appealable before the 30 day period had expired. V.T.C.A., Civil Practice & Remedies Code § 74.351(a–c), (r)(6).

14 Cases that cite this headnote

**[20]    Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Medical Liability Act requires that expert's knowledge, training or experience, and practice be relevant to patient's claim. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*548** Eric Rene Reyes, Jason C.N. Smith, Art Brender, Fort Worth, for Catarino Santillan.

**\*549** Michael Alan Yanof, Philipa Remington, Dallas, for Tyler Scoresby, M.D.

Randy J. Hall, David Leon Pratt II, Fort Worth, for Yadranko Ducic, M.D.

**Opinion**

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice MEDINA, Justice GREEN, Justice WILLETT, Justice GUZMAN, and Justice LEHRMANN joined.

[1]    [2]    [3]    The Medical Liability Act [1] entitles a defendant to dismissal of a health care liability claim if, within 120 days of the date suit was filed, he is not served with an expert report showing that the claim against him has merit. [2] The trial court's refusal to dismiss is immediately appealable. [3] The Act sets specific requirements for an adequate report [4] and mandates that "an objective good faith effort [be made] to comply" with them, [5] but it also authorizes the trial court to give a plaintiff who meets the 120–day deadline an additional thirty days in which to cure a "deficiency" in the elements of the report. [6] The trial court should err on the side of granting the additional time [7] and must grant it if the deficiencies are curable. [8] The defendant cannot seek review of this ruling [9] or appeal the court's concomitant refusal to dismiss the claim before the thirty-day period has expired. [10]

[1]    TEX. CIV. PRAC. & REM.CODE §§ 74.001–.507. All references to the Act are to these provisions.

[2]    *Id.* § 74.351(b).

[3]    *Id.* § 51.014(a)(9); *Badiga v. Lopez,* 274 S.W.3d 681, 685 (Tex.2009).

[4]    TEX. CIV. PRAC. & REM.CODE § 74.351(r)(6).

[5]    *Id.* § 74.351(*l* ).

[6]    *Id.* § 74.351(c).

7    *Samlowski v. Wooten,* 332 S.W.3d 404, 411 (Tex.2011) (plurality op. of Medina, J., joined by Jefferson, C.J., and Hecht, J.) (" '[T]rial courts should err on the side of granting claimants' extensions to show the merits of their claims.' " (quoting *id.* at 416 (Guzman, J., joined by Lehrmann, J., concurring in the judgment))).

8    *Id.* at 411 (plurality op. of Medina, J., joined by Jefferson, C.J., and Hecht, J.); *id.* at 416 (Guzman, J., joined by Lehrmann, J., concurring in the judgment).

9    TEX. CIV. PRAC. & REM.CODE § 51.014(a)(9) (no interlocutory appeal); *In re Watkins,* 279 S.W.3d 633, 634 (Tex.2009) (orig.proceeding) (no review by mandamus).

10   *Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007).

[4]  [5]  [6]  While the Act thus contemplates that a document can be considered an expert report despite its deficiencies, the Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report. Based on the Act's text and stated purposes, we hold that a document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so. This lenient standard avoids the expense and delay of multiple interlocutory appeals and assures a claimant a fair opportunity to demonstrate that his claim is not frivolous. The expert report before us meets this test, and therefore the trial court's order allowing thirty days to cure deficiencies and denying the defendants' motions to dismiss were not appealable. Accordingly, we affirm the court of appeals' judgment dismissing the appeal for want of jurisdiction. [11]

11   287 S.W.3d 319 (Tex.App.-Fort Worth 2009).

**\*550 I**

On behalf of Samuel Santillan, a minor, Catarino Santillan sued Dr. Tyler Scoresby and Dr. Yadranko Ducic, two otolaryngology (ENT) surgeons (collectively, "the Physicians"), alleging that they negligently performed a medial maxillectomy to remove growths from Samuel's sinus cavity. Santillan asserts that an incision made too far into Samuel's brain lacerated a blood vessel and required surgery to stop the bleeding, resulting in brain damage and partial paralysis.

To satisfy the Act's expert report requirement, Santillan timely served the Physicians with a letter from Dr. Charles D. Marable to Santillan's attorney. The letter did not attach Marable's curriculum vitae or describe his credentials or experience other than to state that he is "a Board–Certified neurologist". From having examined Samuel and reviewed his medical records, Marable explained his condition as follows:

The patient was initially seen on 8/3/07. He is now a 17–year–old Latin–American male who was taken to John Peter Smith on 1/17/06 for a preoperative diagnosis of maxillary sinus neoplasm under the care of Dr. Yadro Ducic, M.D., an ENT physician, and another surgeon, Dr. Tyler Scorsby [sic], with procedures of left mediomaxillectomy [sic], excision of neoplasm of the maxilla, calvarial bone growth and reconstruction of maxilla and excision of tumor of pterygopalatin [sic] structures. During the procedure, an incision was made in the right parietal region in a coronal fashion and carried down the pericranium. As a result of this, there was cortical laceration with active bleeding from several medium size vessels in the area.

According to Dr. Scorsby's [sic] note, the patient awoke in the operating room without complications and was taken to the post anesthesia care unit. However, on awakening he did not have a normal neurologic exam, in fact, had a right-sided hemiparesis, and due to the progression of his neurological deficit, increasing intercerebral hemorrhage was noted by CT scanning.

He was taken back to the operating suite on 1/18/06 by Dr. Gregory Smith, D.O., a neurosurgeon. Dr. Smith's preoperative diagnosis was that of expanding inter-cerebral hematoma, status post split thickness skull harvesting, with postoperative diagnosis of expanding intercerebral hematoma and intercerebral hematoma skull perforation. Procedure performed was that of a left parietal craniotomy with evacuation of intercerebral hematoma, repair and hemostasis. Dr. Smith's operative report states there was cortical laceration with active bleeding from several medium-sized vessels in the left parietal area, which were then cauterized with bipolar cautery for hemostatis. An underlying intercerebral hematoma was entered and eventually evacuated successfully with suction.

* * *

It appears he was in the hospital until 2/11/06, and at that time was transferred to HealthSouth Rehabilitation Hospital, Cityview, admitted on 2/11/06, date of discharge 2/21/06. He was discharged with the diagnosis of left parietal hemorrhage, maxillary sinus tumor resection, right hemiparesis, persistent pain, apraxia, seizure prophylaxis, peptic ulcer prophylaxis and right hemisensory deficit. During his stay at HealthSouth Hospital he progressed in all areas of mobilization and self-care. He was ambulating greater than $400'$, but still had significant right upper extremity weakness and spasticity. It was then deemed necessary to transfer him to an outpatient brain injury program and work on his strength, cognition and overall mobilization....

**\*551** He was seen on 8/3/07. He still has weakness of his right arm and leg. Walking seems to still be a problem.... He is still having headaches in the occipital region.

Marable's letter concluded:

> As a Board–Certified neurologist, my opinion is that Dr. Ducic violated the standards of care, as well as Dr. Scorsby [sic], and as a result his damages are that of a right-sided hemiparesis with possibility of seizure foci in the future. Although he has not had any seizures, he certainly does meet the criteria for a seizure disorder. Had it not been for Dr. Ducic and Dr. Scorsby's [sic] negligent activity in causing cortical laceration of this patient's left parietal lobe, he would not have needed further hospitalization at John Peter Smith or the ICU therapy, or going to HealthSouth Rehab, and is now left with a right hemiparesis at a young age.

The Physicians each timely objected that the letter was inadequate as an expert report, asserting that: (i) a neurologist is not qualified to testify regarding the standard of care for an ENT surgeon in performing the procedures the Physicians performed on Samuel; (ii) Marable's opinions regarding the Physicians' standard of care, breach, and causal relationship to Samuel's injuries were conclusory and directed to Scoresby and Ducic collectively rather than individually; and (iii)

Marable's curriculum vitae was not included, as the Act requires. [12] The Physicians argued Marable's letter was so woefully deficient, it did not even qualify as an expert report under the Act to meet the 120–day deadline. They moved the court to dismiss the case with prejudice and award them their reasonable attorney fees and costs.

[12]   TEX. CIV. PRAC. & REM.CODE § 74.351(a).

After the 120–day deadline, Santillan served the Physicians with Marable's curriculum vitae and his amended report, in which he added that "the applicable standard of care would have been to perform the procedure of a calvaria bone transplant without nicking or lacerating the parietal cortex [and] to get the appropriate surgeon, such as a neurosurgeon, instead of an ENT physician to do a calvaria bone grafting procedure", and that "Dr. Ducic and Dr. Scorsby [sic] ... failed to perform a careful and well-planned surgery, causing a laceration of the cortical hemisphere, causing substantial bleeding". At the hearing on the Physicians' objections and motions, the trial court refused to consider Marable's post-deadline amended report. The Physicians complained that Marable's original letter did not show that he had sufficient qualifications and experience to render an opinion regarding the surgery, and did not define the standard of care, state how it was breached, or explain how a breach resulted in Samuel's injuries. The Physicians acknowledged that Samuel suffered a lacerated artery but argued that such things are inevitable in surgery, no matter how carefully it is performed, and do not necessarily indicate a breach of the standard of care. The trial court denied the motions to dismiss and granted Santillan a thirty-day extension to cure deficiencies in the report.

The Physicians appealed, persisting in their contention that Marable's letter was too inadequate to qualify as an expert report; therefore, Santillan had not met the 120–day deadline; and consequently, the Act did not permit an additional thirty days to cure the deficiencies but instead required that the case be dismissed. [13] The court of appeals construed our analysis in *Ogletree v. Matthews* [14] to mean that deficiencies **\*552** in a document tendered as an expert report will not preclude it from qualifying as such. [15] The court concluded that an interlocutory appeal in these circumstances was not permitted. [16]

[13]   287 S.W.3d at 320.

[14]   262 S.W.3d 316.

15    *287 S.W.3d at 324*.

16    *Id.* at 325.

We granted the Physicians' petitions for review. [17]

17    *53 Tex.Sup.Ct.J. 1061 (Aug. 27, 2010)*. We have jurisdiction to determine whether the court of appeals had jurisdiction. *Tex. Dep't of Criminal Justice v. Simons, 140 S.W.3d 338, 343 (Tex.2004)*.

While this appeal has been pending, the Physicians have lodged essentially the same objections to Santillan's amended report as they made to the original report. They have also moved again for dismissal, attorney fees, and costs. The trial court has not ruled on those objections and motions.

## II

The Legislature enacted the Medical Liability and Insurance Improvement Act ("MLIIA") in 1977 [18] in response to "a medical malpractice insurance crisis in the State of Texas" that was having "a material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future". [19] The Legislature found that the crisis had been created by an "inordinate[ ]" increase in the volume and expense of health care liability claims. [20] Concerned that "the direct cost of medical care to the patient and public of Texas ha[d] materially increased", [21] the Legislature's purpose in the MLIIA, expressly stated, was to

18    Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, formerly TEX.REV.CIV. STAT. ANN.. art. 4590i [hereinafter 1977 Act].

19    1977 Act, § 1.02(a)(5)–(6).

20    1977 Act, § 1.02(a)(1)–(5).

21    1977 Act, § 1.02(a)(8).

reduce excessive frequency and severity of health care liability claims [,] ... decrease the cost of those claims[,] ... do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis[, and thereby] ... make affordable medical and health care more accessible and available to the citizens of Texas.... [22]

22    1977 Act, § 1.02(b)(1)–(3), (5).

In 2003, the Legislature replaced the MLIIA with the Medical Liability Act, repeating its 1977 findings and statements of purpose. [23]

23    Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 10.11, 2003 Tex. Gen. Laws 847, 864–882, 884–885.

 [7]    Fundamentally, the goal of the MLIIA and the Medical Liability Act has been to make health care in Texas more available and less expensive by reducing the cost of health care liability claims. To that end, both statutes have sought to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit. "[E]liciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits" [24] and thereby reduce the costs of claims.

24    *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001).

The Legislature first added an expert report requirement to the MLIIA in 1993, then strengthened it over the next ten years, finally allowing interlocutory appeals to ensure uniform enforcement. We **\*553** look first at the requirement, then the appeal, and finally at their proper operation together.

## A

The 1993 amendment to the MLIIA required a plaintiff, within ninety days of filing suit, either to file an affidavit that he had obtained a suitable expert's opinion that his claim had merit or to post a $2,000 bond or cash deposit. [25] The trial court could extend the deadline for up to ninety days "for good cause shown". [26] A plaintiff who failed to comply risked dismissal without prejudice and liability for costs, again, except for "good cause ... shown". [27]

25    Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 3, 1993 Tex. Gen. Laws 2347, 2347, formerly TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(a)–(b) [hereinafter 1993 Act].

26    1993 Act, former art. 4590i, § 13.01(d).

27    1993 Act, former art. 4590i, § 13.01(c).

In 1995, the Legislature required that the expert report itself be filed and raised the amount of the bond or deposit posted in lieu of a report to $5,000. [28] The amendment retained the ninety-day initial deadline but added that even if a bond or deposit were posted, an expert report and curriculum vitae must be filed within 180 days of initiating suit. [29] The amendment specified the qualifications the expert was required to have [30] and defined the report as one "provid[ing] a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." [31] The failure to make "a good faith effort" to comply [32] could result in dismissal with prejudice and liability for attorney fees as well as costs. [33] But if the failure—even missing the deadline completely [34]—was "not intentional or the result of conscious indifference but was the result of an accident or mistake," the trial court was required to grant "a grace period of 30 days to permit the claimant to comply". [35]

[28]　Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, formerly TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(a) [hereinafter 1995 Act].

[29]　1995 Act, former art. 4590i, § 13.01(d).

[30]　1995 Act, former art. 4590i, §§ 13.01(r)(5) & 14.01.

[31]　1995 Act, former art. 4590i, § 13.01(r)(6).

[32]　1995 Act, former art. 4590i, § 13.01(l ).

[33]　1995 Act, former art. 4590i, § 13.01(e).

[34]　Stockton v. Offenbach, 336 S.W.3d 610, 616 (Tex.2011) ( "Under article 4590i, a plaintiff could obtain an extension, even when no report was provided by the deadline, if the plaintiff could show an 'accident or mistake' in failing to furnish a timely report.").

[35]　1995 Act, former art. 4590i, § 13.01(g).

The Medical Liability Act, adopted in 2003 and now in effect, eliminates the bond/deposit alternative, shortens the deadline for the expert report and curriculum vitae to 120 days (unless extended by agreement), and requires service rather than filing. [36] The Act retains the definition of an expert report [37] but is more specific about an expert's qualifications. [38]

[36]　TEX. CIV. PRAC. & REM.CODE § 74.351(a).

[37]　Id. § 74.351(r)(6).

[38]　Id. §§ 74.351(r)(5), 74.401–.403.

The Act now distinguishes between missing a deadline altogether and serving an inadequate report. Section 74.351(b) provides that

> [i]f, as to a defendant ..., an expert report has not been served [by the deadline], the court, on the motion of the *554 [defendant], shall, subject to Subsection (c), enter an order that:
>
> (1) awards [the defendant] reasonable attorney's fees and costs of court ...; and
>
> (2) dismisses the claim with respect to the [defendant] with prejudice to the refiling of the claim. [39]

[39]　Id. § 74.351(b).

Under section 74.351(l ), the same consequences attend serving an inadequate report that "does not represent an objective good faith effort" to comply with the Act's requirements. [40] But before those consequences are imposed, the Act provides an opportunity for deficiencies to be cured. Section 74.351(a) requires that any objection to the sufficiency of a report be lodged within twenty-one days of service, [41] and section 74.351(c) provides:

[40]　Id. § 74.351(l ).

[41]　Id. § 74.351(a).

> If an expert report has not been served [by the deadline] because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency." [42]

[42]　TEX. CIV. PRAC. & REM.CODE § 74.351(c).

[8] [9] [10]　The Act's thirty-day extension to cure deficiencies replaces the 1995 law's thirty-day "grace period" for "accident or mistake", shifting the focus from the claimant's conduct to the report's contents. But the importance of an appropriate delay in finally dismissing a claim for want of an adequate report is undiminished. The purpose of the expert report requirement is to deter frivolous claims, [43] not to dispose of claims regardless of their merits. "The Legislature has determined that failing to timely file an expert

report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely." [44] But the Legislature has likewise recognized that when an expert report can be cured in thirty days, the claim is not frivolous. It must be remembered that " '[t]here are constitutional limitations upon the power of courts ... to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause' ", [45] and those limitations constrain the Legislature no less in requiring dismissal.

[43] *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.2d 873, 878 (Tex.2001) ("And one purpose of the expert-report requirement is to deter frivolous claims.").

[44] *Id.*

[45] *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991) (quoting *Societe Internationale v. Rogers,* 357 U.S. 197, 209–210, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), citing *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 350–351, 29 S.Ct. 370, 53 L.Ed. 530 (1909), and *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); *accord Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 705–706, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)); *see also Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003).

For these reasons, we have held that trial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period. This "minimal delay before a report's sufficiency may again be challenged and the case dismissed, if warranted" [46] does not impair the purpose of the Act.

[46] *Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007).

**B**

Under the MLIIA, there was no interlocutory appeal from the denial of a motion **\*555** to dismiss a health care liability claim for failure to comply with the expert report requirement, and we did not make clear until 2008 that review by mandamus was available. [47] In adopting the Medical Liability Act in 2003, the Legislature permitted an interlocutory appeal from an order denying "all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351". [48] In a series of cases, we have explained the limits of this review mechanism.

[47] *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461–462 (Tex.2008).

[48] TEX. CIV. PRAC. & REM.CODE § 51.014(a)(9); Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 1.03, 2003 Tex. Gen. Laws 847, 849.

If an expert report is timely served, even without a curriculum vitae, we held in *Ogletree v. Matthews* that the trial court's denial of a motion to dismiss, asserting the report's inadequacy, cannot be appealed if the court also grants a thirty-day extension to cure deficiencies. [49] "This prohibition," we said, "is both logical and practical." [50] Otherwise,

[49] 262 S.W.3d at 321.

[50] *Id.*

the court of appeals would address the report's sufficiency while its deficiencies were presumably being cured at the trial court level, an illogical and wasteful result. Moreover, because the Legislature authorized a single, thirty day extension for deficient reports, health care providers face only a minimal delay before a report's sufficiency may again be challenged and the case dismissed, if warranted. [51]

[51] *Id.*

If after an extension has been granted, the defendant again moves to dismiss, we held in *Lewis v. Funderburk* that a denial of the motion is appealable. [52]

[52] 253 S.W.3d 204, 207–208 (Tex.2008).

If no expert report is timely served, we held in *Badiga v. Lopez* that the denial of a motion to dismiss is appealable, even if the court grants an extension. [53] The Medical Liability Act, unlike the MLIIA, does not authorize an extension if no report is timely served. Granting an extension not authorized by section 74.351 does not preclude appeal. But because an appeal is available, we held in *In re Watkins* that review by mandamus is not available. [54]

[53] 274 S.W.3d 681, 685 (Tex.2009).

54 *279 S.W.3d 633, 634 (Tex.2009).*

The present case requires us to determine whether a document served on a defendant can be so lacking in substance that it does not qualify as an expert report, and therefore an immediate appeal from the denial of a motion to dismiss is available under *Badiga.*

**C**

[11] The Act defines an expert report to be

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. [55]

55 TEX. CIV. PRAC. & REM.CODE § 74.351(r)(6).

The qualifications and experience necessary for an expert are prescribed in great detail. [56] The adequacy of a report is determined by whether it "represent[s] an objective good faith effort to comply" with *556 the statutory definition. [57] As we have explained:

56 *Id.* §§ 74.351(r)(5), 74.401–.403.

57 *Id.* § 74.351(*l*).

> In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. [58]

58 *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001).

No particular words [59] or formality [60] are required, but bare conclusions will not suffice. [61] The report must address all the elements, [62] and omissions may not be supplied by inference. [63]

59 *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002) (per curiam) ("[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.' ").

60 *Palacios,* 46 S.W.3d at 879 ("The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.").

61 *Id.* ("A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes.").

62 *Id.* ("Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements.").

63 See *Bowie Mem'l Hosp.,* 79 S.W.3d at 53 ("[T]he report must include the required information within its four corners.").

[12] But as we have seen, the Act allows a claimant a thirty-day period to cure deficiencies before the trial court finally determines that the report is inadequate and the claim must be dismissed. In *Ogletree,* we rejected the argument that a deficient report is no report. [64] There, the claimant provided the opinion of a radiologist, without a curriculum vitae, on a urologist's standard of care. [65] Dr. Ogletree argued that the report was really no report at all, but we held that despite its shortcomings, it "implicated Dr. Ogletree's conduct", so that the trial court was authorized to grant a thirty-day extension, and an appeal was prohibited. [66]

64 *Ogletree v. Matthews,* 262 S.W.3d 316, 320–321 (Tex.2007).

65 *Id.* at 318.

66 *Id.* at 321.

[13] [14] *Ogletree*'s holding, though sound, can be extended only so far. To stretch the meaning of deficient to include a sheet of paper with the two words, "expert report", written on it would mock the Act's requirements. The expert report in Lewis was substantively no more than that —one physician's thank-you letter to another for referring the patient. [67] In determining where to draw the line, we are guided by two considerations. One is that the Act's principal

purpose is to reduce the expense of health care liability claims. The Legislature could reasonably have determined that that purpose is served by an interlocutory appeal from the denial of a motion to dismiss for want of an adequate expert report, but as we observed in *Ogletree,* permitting two such appeals—one before the thirty-day cure period and one after—is simply wasteful. The other consideration is the goal of the Act's expert report requirement: to deter frivolous claims. An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable.

67    *Lewis v. Funderburk,* 191 S.W.3d 756, 762–763 (Tex.App.-Waco 2006) (Gray, C.J., dissenting), *rev'd,* 253 S.W.3d 204 (Tex.2008).

 **\*557** **[15]** **[16]** We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. We recognize that this is a minimal standard, but we think it is necessary if multiple interlocutory appeals are to be avoided, and appropriate to give a claimant the opportunity provided by the Act's thirty-day extension to show that a claim has merit. All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case.

### III

 **[17]** **[18]** **[19]** Dr. Marable's letter in this case easily meets this standard. Claiming expertise as a neurologist, he described the injury to Samuel's brain, ascribed it to the Physicians' breach of the standards of care, and stated that their breach caused Samuel's partial paralysis and other lingering debilities. As an expert report, Dr. Marable's letter was deficient. For example, it did not state the standard of care but only implied that it was inconsistent with the Physicians' conduct. But there is no question that in his opinion, Santillan's claim against the Physicians has merit.

 **[20]** The dissent argues that Dr. Marable was not qualified to give an opinion about the Physicians' conduct because he is only a neurologist, not a surgeon, and therefore his letter is so deficient it does not qualify as an expert report. The Act requires that Dr. Marable's knowledge, training or experience, and practice be "relevant" to Santillan's claim.[68] We express no view on the adequacy of Dr. Marable's qualifications; the

trial court did not specifically address the matter, and it is premature for us to consider it. But the dissent's arguments, we believe, show the wisdom of our approach in determining what qualifies as an expert report.

68    *See* TEX. CIV. PRAC. & REM.CODE § § 74.351(r)(5), 74.401(a), (c).

The dissent acknowledges that, as in *Ogletree,* a radiologist is qualified to opine on "whether the urologist should have involved radiology-related devices and techniques (the specialty in which the expert was qualified) in treating the patient and whether the failure to do so resulted in injury."[69] In that instance, the dissent contends, there is an "apparent closely-related connection" between radiology and neurology.[70] The dissent sees no such connection between neurology and ENT surgery that damages the brain.[71] But surely a neurologist's expertise is relevant in explaining the connection between the Physicians' injury to blood vessels during surgery and the hemiparesis and weakness Simon suffered. What further relevance that expertise has to Santillan's claim should first be addressed by the trial court. In no event, however, do we think a claimant's opportunity to cure and a defendant's immediate right to appeal should turn on such fine distinctions, either in an expert's qualifications or in his opinions.

69    *Post* at ——.

70    *Id.*

71    *Id.*

This case also demonstrates the difficulty with any more stringent standard. The trial court denied the Physicians' motions to dismiss and ordered that Santillan have a thirty-day extension to cure deficiencies in Dr. Marable's report nearly three years ago. Santillan had already served an amended report, in response to which the Physicians had filed renewed objections **\*558** and again moved to dismiss the case. Now that we have dismissed this appeal for want of jurisdiction, the trial court will rule on the objections to the amended report and the motions to dismiss. Whatever the ruling, another appeal will undoubtedly follow. Our holding today will all but eliminate the first, wasteful appeal. Just as importantly, it will help assure that a claimant, after being apprised of a defendant's objections to an expert report, and having had an opportunity to discuss those objections at a hearing before the trial court, will have a fair opportunity to

cure any deficiencies and demonstrate that his claim is not frivolous and should be determined on the merits.

* * *

Accordingly, the judgment of the court of appeals dismissing this appeal for want of jurisdiction is

*Affirmed.*

Justice WILLETT filed a concurring opinion.

Justice JOHNSON filed a dissenting opinion, in which Justice WAINWRIGHT joined.

Justice WILLETT, concurring.
Since 2006 we have circled an issue both recurring and elusive: whether any document, even one that never accuses anyone of committing malpractice, suffices to warrant an unreviewable thirty-day extension under Section 74.351(c).[1] Until today, the issue was procedurally (and frustratingly) unreachable and thus unresolvable. Finally it is squarely presented, and I am confident today's decision will brighten the line between deficient-report cases (where an extension is discretionary) and no-report cases (where dismissal is mandatory).

[1]    *See* TEX. CIV. PRAC. & REM.CODE § 74.351(c).
       * * *

In a trio of concurrences in 2007,[2] 2008,[3] and 2009,[4] I focused on this nagging question: Is there a legal difference between filing nothing and filing something that amounts to nothing? That is, can a filing be so utterly lacking in the required statutory elements as to be no report at all, thus requiring dismissal? I join today's decision, which I read to confirm my consistently stated view: If a document bears zero resemblance to what the statute envisions—more to the point, *if it never asserts that anyone did anything wrong*—it cannot receive an extension.

[2]    *Ogletree v. Matthews,* 262 S.W.3d 316, 323 (Tex.2007) (Willett, J., concurring).

[3]    *Lewis v. Funderburk,* 253 S.W.3d 204, 210 (Tex.2008) (Willett, J., concurring).

[4]    *In re Watkins,* 279 S.W.3d 633, 636 (Tex.2009) (Willett, J., concurring).

In *Ogletree v. Matthews,* I described what I naively hoped would be "a rare bird in Texas legal practice"[5]—a plaintiff passing off as a bona fide report a document so facially absurd that, "no matter how charitably viewed, it simply cannot be deemed an 'expert report' at all, even a deficient one."[6] The deficient-or-no-report issue was not present in *Ogletree,* but I noticed it in another then-pending case, *Lewis v. Funderburk,* filed one week before *Ogletree.*[7]

[5]    262 S.W.3d at 324 (Willett, J., concurring).

[6]    *Id.* at 323.

[7]    *Funderburk,* 253 S.W.3d at 209 (Willett, J., concurring).

In *Funderburk,* the Court confronted "an actual sighting of this rare bird, a species that in my view merits extinction, not conservation."[8] The "report" in *Funderburk* was a thank-you letter from one **\*559** doctor to another—a letter that never once in any manner, way, shape, or form accused anyone of malpractice.[9] This thanks-for-your-referral letter was no more a medical-expert report "than a doctor-signed prescription or Christmas card would be," I wrote, adding, "If a report is missed, not just amiss, courts are remiss if they do not dismiss."[10] Alas, the defendant did not raise the "no report" issue, thus foreclosing a merits-based challenge.[11]

[8]    *Id.*

[9]    The letter is reproduced in its entirety in Chief Justice Gray's dissent in the court of appeals. *See Lewis v. Funderburk,* 191 S.W.3d 756, 762–63 (Tex.App.-Waco 2006) (Gray, C.J., dissenting), *rev'd,* 253 S.W.3d 204 (Tex.2008).

[10]   *Funderburk,* 253 S.W.3d at 210–11 (Willett, J., concurring).

[11]   *Id.* at 208 (majority opinion) ("We do not reach the question addressed in the concurring opinions here because it is not raised. As stated in his reply brief, '[Dr.] Lewis has made it abundantly clear that he is not appealing the trial court's [initial] order (no matter how vehemently he disagrees with it),' but instead is only appealing the order denying his second motion to dismiss.").

Finally came *In re Watkins,* where a plaintiff merely filed a narrative of treatment, something that omitted every

statutorily required element and had no apparent relationship to a medical-malpractice case.[12] Like *Funderburk,* this case also had a procedural wrinkle that kept the marquee "no report" vs. "deficient report" issue out of reach.[13] But the rare-bird sightings, I noticed, were becoming more commonplace. And they would proliferate on our docket, I predicted, absent appellate enforcement of the statute's mandatory-dismissal provision[14]—or alternatively, this Court's express adoption of a grace-period test that is indeed gracious, allowing extensions for most everything.

[12] 279 S.W.3d at 637 (Willett, J., concurring).

[13] *Id.* at 634 (majority opinion) ("The separate writings join issue again today on the question whether the item served was a deficient report or no report at all. But here it does not matter. If no report was served, interlocutory appeal was available, so mandamus is unnecessary. If the report was merely deficient, then an interlocutory appeal was prohibited, and granting mandamus to review it would subvert the Legislature's limit on such review.") (citations omitted).

[14] My sense is that such sightings have indeed grown more prevalent, making Chapter 74 defendants perhaps "identify with the seaside residents of Bodega Bay, besieged by avian attacks," *In re Watkins,* 279 S.W.3d at 637 n. 13 (Willett, J., concurring) (citing THE BIRDS (Universal Pictures 1963)), or else those Arkansans who witnessed the so-called Aflockalypse last New Year's Eve, when thousands of blackbirds and starlings fell mysteriously from the skies.

Under the Court's admittedly "lenient standard,"[15] the document must merely "[contain] a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit."[16] The line is forgiving but bright: The "report" must actually allege someone committed malpractice. The genesis of this elemental requirement is found in *Ogletree,* where the Court first indicated that the purported report must implicate a provider's conduct.[17] It merits emphasis, however, that today's standard, benevolent as it is, is not satisfied by any medical-related piece of paper; the bar is low but not subterranean. For example, the "report" in *Funderburk* would surely fail even today's lax test. The thank-you letter in that case never mentioned malpractice by anyone, **\*560** even in the most implicit or glancing manner. Again, it is not merely that the letter omitted every required statutory element. Rather, it never even hinted at having any relationship to a

malpractice case at all—no mention of a claim or a defendant, much less a claim that "an individual with expertise" indicates "has merit."[18]

[15] 346 S.W.3d 546, 549.

[16] *Id.* at 549.

[17] 262 S.W.3d at 321 ("Because *a report that implicated Dr. Ogletree's conduct* was served and the trial court granted an extension, the court of appeals could not reach the merits of the motion to dismiss.") (emphasis added).

[18] 346 S.W.3d at 549. The narrative in *In re Watkins* might also fail today's test, as it lacked every required statutory element, though unlike the referral letter in *Funderburk,* it at least mentions (twice) the defendant physician's name.
* * *

Based on my understanding of the Court's "minimal standard"[19]—requiring that someone with expertise express an opinion that the plaintiff has a meritorious malpractice claim against the defendant—I join the Court's decision.

[19] *Id.* at 557.

Justice JOHNSON, joined by Justice WAINWRIGHT, dissenting.

The Court says that a plaintiff who timely files a defective expert report is eligible for an extension of time to cure the report if

> [the report] contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so.

346 S.W.3d 546, 549. In my view the Court's standard does not conform to requirements the Legislature imposed in authorizing an extension to cure a deficient report. I respectfully dissent.

A trial court is statutorily authorized to grant an extension to cure elements of an expert report that are found deficient,

not to cure a report that substantively is not a report, nor to cure a report from which elements are absent as opposed to deficient:

> (b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:
>
>> (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and
>>
>> (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.
>
> (c) If an expert report has not been served within the period specified by Subsection
>
> (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency.

TEX. CIV. PRAC. & REM.CODE § 74.351(b), (c); [1] *see In re Watkins,* 279 S.W.3d 633, 634–35 (Tex.2009) (Johnson, J., concurring) ("The definition [of expert report] requires that for a document to qualify as a statutory expert report, it must demonstrate three things: (1) someone with relevant expertise (' "[e]xpert report" means a written report by an expert'), (2) has an opinion ('that provides a fair summary of the *expert's opinions'),* and (3) that the defendant was at fault for failing to meet applicable standards of care and thereby harmed the plaintiff...."). Absent an expert with relevant expertise, I do not see **\*561** how there can be an expert report under the statute, because the foundation of an expert report is the requirement that the report be by a qualified expert. "Expert" for purposes of a report means:

[1] Further references to the Civil Practice and Remedies Code will be by referring to section numbers unless otherwise indicated.

> [W]ith respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401....

TEX. CIV. PRAC. & REM.CODE § 74.351(r)(5)(A). Section 74.401 provides specific requirements for an expert to be qualified to provide the section 74.351 report:

> (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:
>
>> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>>
>> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>>
>> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* § 74.401(a). The Court has said that "[a] report by an unqualified expert will sometimes (though not always) reflect a good-faith effort sufficient to justify a 30–day extension." *In re Buster,* 275 S.W.3d 475, 477 (Tex.2008) (per curiam) (citing *Leland v. Brandal,* 257 S.W.3d 204, 208 (Tex.2008)). The Court has recognized that not every doctor is qualified to render an opinion about every aspect of medicine or medical science. *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 463 (Tex.2008); *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996) ("[G]iven the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question.").

The Court's new test apparently allows a report to qualify as a deficient report even if the report demonstrates none of the three requirements of section 74.401(a). The test requires only that the person rendering the opinion have some type of undefined level of expertise. It abandons the requirements that the report show the expert (1) has knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (2) qualifies on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *See* TEX. CIV. PRAC. & REM.CODE § 74.401(a)(2), (3). Nor does the test require a showing that the expert is practicing medicine or was doing so when the claim arose. *See id.* § 74.401(a)(1).

Dr. Marable's report says nothing about his surgical qualifications. The report does not give any facts or information which would qualify him to opine on the standards of care for the type of surgery performed in this case, and he did not attach a CV to the report. [2] The report was written on a letterhead showing that he maintains board certification in neurology **\*562** and psychiatry. In his report he makes it clear that he is basing his opinion on his expertise in neurology, not surgery: "As a board certified neurologist, my opinion is that Dr. Ducic violated the standards of care, as well as Dr. Scoresby, and as a result [Santillan's] damages are that of a right-sided hemiparesis with possibility of seizure foci in the future." The neurological expertise on which Dr. Marable relies does not involve surgery. *See* WILSON STEGEMAN, MEDICAL TERMS SIMPLIFIED 106 (1976) (noting that neurologists do not perform surgery); American Academy of Neurology, *Working with Your Doctor,* https://patients.aan.com/go/workingwithyourdoctor (last visited Apr. 18, 2011) ("Neurologists do not perform surgery."). Dr. Marable's report does not claim that he now performs or has in the past performed surgery, much less this particular type of surgery. The report neither claims that he has knowledge of the standard of care for performing the surgery nor that he is qualified on the basis of training or experience to offer an expert opinion on those standards of care. *See* TEX. CIV. PRAC. & REM.CODE 74.401(a)(2), (3). The report does not say that he has participated in, observed, or even read about how to do "procedures of left mediomaxillectomy, excision of neoplasm of the maxilla, calvarial bone growth and reconstruction of maxilla and excision of tumor of pterygopalatin structures," which were the surgical procedures performed by Drs. Scoresby and Ducic. [3] In short, nothing in Dr. Marable's report raises an inference that he is a qualified expert as to this type of surgery, as prescribed by statute, and the report is all that was before the trial court in regard to his qualifications.

[2]    An amended report by Dr. Marable with a CV attached was filed on the day the defendants' motions to dismiss were heard. The CV was not considered by the trial court, but it did not show that Dr. Marable had any training or expertise in the type of surgery involved here.

[3]    Santillan's attorney represented during oral argument that he believed Dr. Marable's amended report contained statements by Dr. Marable that he had seen surgery of this type because he had treated patients after they had the surgery.

In *Ogletree v. Matthews,* we considered a defendant's contention that no statutory expert report had been filed because the report was by a radiologist who was not qualified to express an opinion on the standard of care for a urologist. 262 S.W.3d 316, 319 (Tex.2007). The urologist defendant had performed a urethral catheterization during which the patient suffered bruising and bladder perforation. *Id.* at 317. We held that the radiologist's report was deficient, not absent. *Id.* at 320. But in *Ogletree* the radiologist was opining about whether the urologist should have performed the catheterization under flouroscopic guidance in order to avoid or more timely diagnose the perforation. *Id.* at 318. In that instance, the radiologist was opining about whether the urologist should have involved radiology-related devices and techniques (the specialty in which the expert was qualified) in treating the patient and whether the failure to do so resulted in injury. The matter before us is different from *Ogletree* because there is no apparent closely related connection between the expertise involved in the specialty of neurology and the expertise involved in knowing how to perform, and performing, the surgery performed by Drs. Scoresby and Ducic.

In *McAllen Medical Center,* 275 S.W.3d 458, we considered the validity of a doctor's expert reports in negligent credentialing suits against the medical center. McAllen challenged the adequacy of the reports on the basis that the doctor was not qualified to express opinions as to the credentialing process. *Id.* at 462. We agreed with McAllen and held that the reports were inadequate:

On this record, the plaintiffs have not established Dr. Brown's qualifications. "The standard of care for a hospital is what an ordinarily prudent hospital **\*563** would do under the same or similar circumstances." Nothing in the record here shows how Dr. Brown is qualified to address this standard. Nor can we infer that she may have some knowledge or expertise that is not included in the record.

Moreover, "a negligent credentialing claim involves a specialized standard of care" and "the health care industry has developed various guidelines to govern a hospital's credentialing process." Dr. Brown's reports contain no reference to any of those guidelines, or any indication that she has special knowledge, training, or experience regarding this process. Nor was Dr. Brown qualified merely because she is a physician; "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed

medical doctor should be automatically qualified to testify as an expert on every medical question."

*Id.* at 463 (citations omitted).

The substance of the issue before us is similar to the issue we decided in *McAllen Medical Center.* Dr. Marable's report indicates that the defendants violated standards of care for the surgery and their negligent activity caused damages to Santillan. But Dr. Marable's report does not show he was qualified under the statute to give such an expert opinion, nor did his opinion about the surgeons' decisions and actions during surgery involve his specialty except to the extent a physician with his specialty would have been involved in post-surgical care and possibly a decision to reoperate.

If Dr. Marable's report had in some manner demonstrated that he was qualified to render an opinion about the standard of care for the surgery involved, then I might agree that his conclusory statements about the defendants having negligently violated applicable standards of care and those negligent activities having caused damages were sufficient to support an extension of time. But the report sets out his opinion as a neurologist, not a physician with surgical expertise. The Legislature did not intend that an expert report could be by a doctor with no demonstrated or inferable experience and training in a practice area who reads medical records and writes a report containing the simplistic indictments in the report here: the defendants negligently lacerated the brain and further surgery was required. *See* TEX. CIV. PRAC. & REM.CODE § 74.401(a).

The Court says that " 'there are constitutional limitations upon the power of courts ... to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.' " 346 S.W.3d at 554 (quoting *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991)). I agree. But the statement does not fit here. First of all, the constitutionality of the statute is not challenged. Second, even if it were, the statutory requirement of a timely report by a qualified expert did not spring upon Santillan without warning. The requirement was in place before the surgery took place in January 2006, while suit was not filed against the defendant doctors and Tarrant County Hospital until January 2008. Santillan had time to find a qualified expert to provide the report required to show his claim had merit, if he could find such an expert.

I would hold that failure to timely serve a report by an expert qualified under the statute is not merely a deficiency in an element of the report, it is a deficiency going to the question of whether the report is competent and is entitled to be given any weight. And I would hold that it is not an expert report and the filing of such a report supports inferences that a **\*564** proper report by a qualified expert was not available, the claim lacks merit, and the claim should be dismissed.

I would reverse the judgment of the court of appeals and dismiss the case. *See Badiga v. Lopez,* 274 S.W.3d 681, 684–85 (Tex.2009).

**All Citations**

346 S.W.3d 546, 54 Tex. Sup. Ct. J. 1413

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1694869
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (1st Dist.).

Cyril B. TAWA, M.D., Houston
Interventional Cardiology, P.A., and
Angela Rowan, R.N. F.N.P. -C, Appellants
v.
Glenn P. GENTRY and Patricia Gentry, Appellees.

No. 01–12–00407–CV.  |  April 18, 2013.

On Appeal from the 333rd District Court, Harris County,
Texas, Trial Court Case No.2011–05219.

**Attorneys and Law Firms**

Gordon M. Carver III, for Houston Interventional Cardiology,
PA, Cyril B. Tawa, M.D., Angela Rowan.

Matias J. Adrogue, for Patricia Gentry.

Panel consists of Chief Justice RADACK and Justices
HIGLEY and BROWN.

**MEMORANDUM OPINION**

SHERRY RADACK, Chief Justice.

**\*1** This is an interlocutory appeal from the denial of
appellants' motions to dismiss under Chapter 74 of the
Texas Civil Practice and Remedies Code. We reverse the
trial court's order denying appellants Angela Rowan's and
Houston Interventional Cardiology's motion to dismiss (as it
relates to care provided by Rowan) and remand to the trial
court for assessment of attorneys' fees and costs. We affirm
the trial court's order denying appellants Cyril Tawa's and
Houston Interventional Cardiology's motion to dismiss (as it
relates to care provided by Tawa).

**BACKGROUND**

The following summary of the plaintiff's hospital visit, during
which he suffered a stroke, is taken from Dr. Nicolaos
Madias's August 8, 2011 expert report [1] :

[1]  For purposes of our review of the adequacy of a medical
expert report under Chapter 74, we take the allegations
in the report as true. *Marino v. Wilkins,* —— S.W.3d ——,
—— n. 1, 2012 WL 749997, at \*17 n. 1 (Tex.App.-
Houston [1st Dist.] Mar, 8, 2012, pet. denied).

On November 14, 2008, 53 year-old plaintiff/appellee Glenn
Gentry (Gentry) visited his primary physician, Dr. Keller,
complaining of fatigue and shortness of breath. Keller
determined that he had atrial fibrillation with a rapid
ventricular rate. Keller sent Gentry to the Emergency Room at
North Cypress Medical Center. Upon admittance, he was seen
by defendant/appellant Dr. Cyril B. Tawa, M.D., the attending
physician, and defendant/appellant Angela Rowan, Tawa's
nurse practitioner. Gentry's primary complaint was heart
palpitations and he was "found to have atrial fibrillation with
a ventricular rate of 130 beats per minute."In the Emergency
Room, Gentry was given "Cardizem bolus followed by a
Cardizem drip to control the ventricular rate."

Upon admission, Gentry was taken off some of his regular
medication and others were prescribed. Specifically, he was
"prescribed to discontinue Lovenox and Lisinopril; to take
Toprol XL, Clonidine, started [on] a Heparin drip and
Coumadin (warfarin)." The following three days, November
15, 16, and 17, Tawa ordered Coumadin be administered.

Several medical tests were performed on Gentry's heart
and kidneys during his hospital stay. According to the
records, Mr. Gentry had "elevated creatinine." Tawa then
consulted with Dr. Lal, who determined that a kidney
biopsy was necessary. "Medications that promote reversal
of Coumadin effects as well as infusion of coagulation facts
were prescribed on November 18, 2008, including vitamin K
iv and FFP (fresh frozen plasma).""Lal wrote in a Progress
Note on November 18 that a plan was made for a kidney
biopsy (Dr. Tawa, Dr. Keller, Dr. Morello, patient); FFP, vit
K iv; hold Coumadin and heparin."

The kidney biopsy was performed on November 19, 2008,
and later that day Gentry's records indicate he had a "CVA
(*cerebrovascular accident* ) believed to be of ischemic origin
with left hemiparesis, aphasia, lethargy.""Impression and
plan included: atrial fibrillation, embolism, not a candidate
for TPA because of recent kidney biopsy, MRI, and
transfer to ICU," where he "received a 'heparin drip." His

stroke"resulted in aphasia and weakness of left extremities."A neurology consultation that same night indicated that "Gentry had developed hemiplegia, probably cardio embolic and this was discussed with Dr. Lal, Dr. Tawa, and his family, and heparin infusion was prescribed."

**\*2** The medical records also describe the results of CT scans of his heart and brain, and later ultrasound images of his carotid and vertebral arteries." At the time of his discharge from the hospital on December 1, 2008, "Gentry had left-sided weakness, speech impairment, sitting up in a chair and in normal sinus rhythm."

Gentry and his wife, Patricia Gentry, sued Dr. Tawa, Dr. Lal, Rowan, and Houston Intervention Cardiology, P.A. On June 14, 2011, pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code, the Gentrys served the defendants with an expert report and *curriculum vitae* (CV) of Dr. Nicolaos E. Madias, M.D. Defendants Tawa, Rowan, and Houston Intervention Cardiology filed objections and motions to dismiss. The trial court overruled the objections, but granted the Gentrys 30 days to cure any deficiencies in Madias's report. The Gentrys timely filed an Amended Expert Report and CV. Tawa, Rowan, and Houston Intervention Cardiology filed objections again, as well as a motion to dismiss and request for attorneys' fees. The trial court denied defendants' motion, and Tawa, Rowan, and Houston Intervention Cardiology timely brought this interlocutory, accelerated appeal.

## ISSUES ON APPEAL

Appellants argue that Madias's amended report does not represent a good faith effort to comply with section 74.351(r)(6) of the Texas Civil Practice and Remedies Code. Accordingly, appellants argue that the trial court abused its discretion by overruling their objections to Madias's amended report, and by denying their motions to dismiss and refusing to award attorneys' fees. Appellants seek reversal of the trial court's orders, dismissal with prejudice of the Gentrys' claims against appellants, and a remand to the trial court with instructions to award to appellants reasonable attorneys' fees and costs.

## APPLICABLE LAW

Section 74.351 of the Texas Civil Practice and Remedies Code requires the trial court perform a 'gate-keeper' function, to prevent medical negligence causes of actions from proceeding unless the claimant has made a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *TTHR, L.P. v. Guyden,* 326 S.W .3d 316, 319 (Tex.App.-Houston [1st Dist.] 2010, no pet.)(citing TEX. CIV. PRAC. & REM.CODE ANN. § 74.351; *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005))."A report need not marshal all of the plaintiff's proof but it must include the expert's opinions on the three statutory elements: standard of care, breach, and causation."*Id.; see Am. Transitional Care Centers v. Palacios,* 46 S.W.3d at 873, 880 (Tex.2001); *Spitzer v. Berry,* 247 S.W.3d 747, 750 (Tex.App.-Tyler 2008, pet. denied) (quoting *Palacios,* 46 S.W.3d at 880) (stating "fair summary" is "something less than a full statement" of applicable standard of care, how it was breached, and how that breach caused injury).

To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879. A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (citing *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). The trial court may not draw any inferences, but must rely exclusively on the information contained within the report's four corners. *See TTHR,* 326 S.W.3d at 319. In addition to setting forth the requisite criteria, a Chapter 74 report must also be authored by a qualified "expert." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

**\*3** We review a trial court's decision on a motion to dismiss a case for failure to comply with section 74.351 for an abuse of discretion.*Palacios,* 46 S.W.3d at 877; Tex. Civ. Prac. & Rem.Code Ann. § 74.351(Vernon Supp.2009). Although we defer to the trial court's factual determinations, we review questions of law de novo. *Rittmer v. Garza,* 65 S.W.3d 718, 722 (Tex.App.-Houston [14th Dist.] 2001, no pet.). To the extent that resolution of the issue before the trial court requires interpretation of the statute itself, we apply a de novo standard. *Buck v. Blum,* 130 S.W.3d 285, 290 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

## DR. TAWA

In appellants' first issue, they argue that the trial court abused its discretion in failing to find Madias's report deficient as it relates to Tawa (and to the vicarious liability of Houston Interventional Cardiology for Tawa's care). Specifically, Tawa argues that Madias's report is deficient because (1) he is "not qualified to render an opinion regarding the applicable standard of care for Dr. Tawa," (2) it "fails to specify the applicable standard of care," (3) it "fails to adequately set forth the manner in which Tawa allegedly breached the standard of care," and (4) it "fails to discuss the causal relationship between the breach and Mr. Gentry's" stroke.

### A. Qualification

Tawa contends that Madias's report "seek[s] to hold Dr. Tawa strictly liable for the conduct of all, solely by virtue of the fact that Dr. Tawa signed Mr. Gentry's admitting order." This, according to Tawa, "invents a dangerous new brand of vicarious liability, casting a net over the 'attending physician' and any and all health care providers that subsequently come into contact with a patient." He notes that not every licensed doctor is automatically qualified to testify on every medical question, *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996), and that, to offer his opinion on the standard of care applicable to attending physicians, Madias's expertise must be evident from the four corners of his report and his CV. *Palacious,* 46 S.W.3d at 878.

Tawa relies on *Christus Health Southeast Texas v. Broussard,* 267 S.W.3d 531, 536–37 (Tex.App.-Beaumont 2008, no pet.), a case in which a neurologist expert opined on the standard of care applicable to a hospital's administrative decisions. Specifically, the expert—who had experience treating patients that, like the complainant, had "a history of fluctuating mental capacities"—opined about the hospital's decisions related to the complainant's discharge from long-term care. *Id.* The complainant was intubated and being treated for "pneumonia and acute respiratory deficiency." *Id.* at 534.While the complainant was waiting to be discharged pursuant to her doctor's orders, plaintiff alleged that the defendant hospital removed the complainant's finger pulse oximeter, then left complainant unrestrained and unsupervised. *Id.* She dislodged her breathing tube and suffered a hypoxic brain injury.*Id.* The court noted that the expert's report and CV did not "explain how his experience

with treating patients with fluctuating mental status gives him expertise regarding a hospital's 'administrative decision' about the circumstances under which a hospital can disregard a doctor's discharge order."*Id.* at 536.It thus held that the expert's report did not demonstrate that he was qualified to opine on the hospital's standard of care in making administrative decisions:

> **\*4** [The expert's] report and curriculum vitae explain that he has active staff privileges at Reston Hospital, where he sits on the credentials committee, and that he is on the utilization review subcommittee for the neurology section of Fairfax Hospital. As [plaintiff] argued in his response to the motion to dismiss, "this case concerns the Defendant Hospital's decision to abandon [complainant], not whether the nursing staff followed protocol."The report does not state that [the expert] is familiar with hospital administration or the standards to be applied to implementing an attending physician's discharge order. The fact that [the expert] is on staff at a hospital and serves on that hospital's credentials committee does not establish that he possesses specialized knowledge of the protocols, policies, or procedures a hospital of ordinary prudence would have had in place in determining when a facility should disregard a discharge order. *See Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404, 409 (Tex.App.-Fort Worth 2003, no pet.).

> [The expert's] report and curriculum vitae do not explain how [his] committee assignments and experience on staff at Reston Hospital make him familiar with the standards applied by hospitals under these circumstances. Thus, the trial court abused its discretion in overruling [defendant's] objections to [the expert's] report.

267 S.W.3d at 536.

According to Tawa, "Dr. Madias' opinion regarding Dr. Tawa's liability is not based upon the medical care Mr. Gentry received from Dr. Tawa."Rather, he asserts, "Madias' conclusion regarding liability is based upon whether Dr. Tawa should have made the administrative decision to prevent implementation of another physician's order."Thus, Tawa contends that, like the report at issue in *Broussard,* Madias's report does not show he is qualified to opinion about "customs, policies and procedures."

The Gentrys respond that Tawa's argument "represents either a mischaracterization or a misunderstanding of the opinion offered by Dr. Madias."They argue that nowhere in Madias's

report does he opine that Tawa as the attending physician is strictly liable for other's care; nor does he suggest that Tawa should have "overruled" the orders of another physician. Instead, Madias notes that as the attending physician, Tawa is responsible for managing the overall care of the patient, which might include attempting to prevent performing procedures that "pose a great risk to the patient given the totality of that patient's medical circumstances."The Gentrys also point out that Lal's progress notes "indicate that Dr. Tawa was a party to the decision to stop Mr. Gentry's antithrombotic treatment and administer procoagulant treatment," such that he may have "endorsed or approved these decisions." Finally, the Gentrys contend that it is apparent from Madias's report and CV that he familiar with the standard of care regarding attending physicians similarly situated with Tawa.

### 1. Applicable Law

**\*5** Chapter 74 sets forth general criteria for qualifying an expert physician:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM.CODE § 74.401(a).

The relevant issue is not "the physician's area of practice but the stated familiarity with the issues involved in the claim before the court."*Pediatric Med. Group, Inc. v. Robinson,* 352 S.W.3d 879, 884 (Tex.App.-Dallas 2011, no pet.)."Where a particular subject of inquiry is common to and equally developed in all fields of practice, and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those with confronted the practitioner charged with malpractice, the witness is qualified

to testify."*Rittger v. Danos,* 332 S.W.3d 550, 559 (Tex.App.-Houston [1st Dist.] 2009, no pet.).

### 2. Analysis

Madias is board certified in Internal Medicine, licensed to practice in Massachusetts, and is a professor at Tuffs University School of Medicine. His report states that he has reviewed Gentry's medical records and is "qualified to evaluate and render an opinion ... based on the following":

(1) I have the training and experience in the management of patients with atrial fibrillation; in the use of anticoagulation therapy in these patients; in the risk of embolic stroke in the absence of anticoagulation therapy; in the indications and contraindications of a kidney biopsy; and in the diagnosis and management of kidney disease.

(2) I have been actively practicing medicine and caring for patients like Mr. Gentry at the time he was diagnosed with atrial fibrillation and thereafter including the time that the claim was filed. In addition, I have been actively involved in the diagnosis and management of kidney disease during the same period.

(3) I have knowledge of the standard of care associated with the diagnosis and treatment of the illness and injury that Mr. Gentry suffered, including his atrial fibrillation, the need for anticoagulation, the risks of embolic stroke, and management of kidney diseases.

(4) As a doctor of Internal Medicine who has treated many patients with atrial fibrillation and uncontrolled hypertension, I have knowledge of the risks involved when such patients' antithrombotic treatment is discontinued. The consequences of discontinuation of antithrombotic therapy and the causes of cardiac embolism are well known within the specialty of Internal Medicine. Because of this, I am qualified to offer opinions on the causation of Mr. Gentry's injuries.

**\*6** To determine if Madias is qualified to opine on the standard of care applicable to Tawa, we look to "the medical condition involved in the claim and ... the expert's familiarity and experience with it."*Grandbury Minor Emergency. Clinic v. Thiel,* 296 S.W.3d 261, 267 (Tex.App.-Fort Worth 2009, no pet.).

Tawa's argument that Madias is not qualified to render an opinion rests primarily on his assertion that "Dr. Madias'

opinion regarding Dr. Tawa's liability is not based upon the medical care Mr. Gentry received from Dr. Tawa," but instead whether "Tawa should have made the administrative decision to prevent implementation of another physician's order." From this, Tawa argues that Madias has not shown himself qualified to testify about such "administrative" decisions.

We disagree with Tawa's narrow characterization of Madias's opinion. Madias opines that Gentry's stroke was most likely caused by "the discontinuation of Coumadin and administration of FFP and vitamin K." He opined that Tawa's standard of care encompassed both his role as attending physician to be "responsible for the entire care delivered to the patient by all healthcare providers," and his "role of internist caring for the atrial fibrillation and the management of this condition." Madias opined that a "patient with atrial fibrillation of uncertain time as to the initiation of the arrhythmia and on Coumadin therapy should not discontinue all antithrombotic therapy unless clots in the atria are absent or active bleeding is present." He also states, with regard to Tawa, that "the standard of care requires an internist to know that administration of fresh frozen plasma and vitamin K to reverse the anticoagulation caused by Coumadin therapy is very risky in a patient like Mr. Gentry since discontinuation of antithrombotic therapy may help to trigger the development of more clots in the atria."

According to the medical record summary contained in Madias's report, after admitting Gentry to the hospital, Tawa prescribed, among other things, Coumadin and Heparin to address his atrial fibrillation. "Lal wrote in a Progress Note on November 18 that a plan was made for a kidney biopsy (Dr. Tawa, Dr. Keller, Dr. Morello, patient); FFP. Vit K iv.; hold Coumadin and heparin." Tawa argues that this Progress Note is not sufficient to suggest that he had any involvement in the medical decision to discontinue the medication that he had previously prescribed, and he argues that "the Amended Report does not state or even suggest that Dr. Tawa participated in the decision to discontinue Coumadin therapy and administer vitamin K and fresh frozen plasma." A fair reading of Lal's Progress Note is that Dr. Tawa was involved or, at a minimum, acquiesced in a treatment that called for an order discontinuing medication that Tawa had prescribed. And, contrary to Tawa's argument that Madias does not suggest elsewhere in his report that Tawa was involved in this decision, Madias's report further attributes these decisions to Tawa in a section entitled "Was the treatment that Mr. Gentry received after his admission on November 14, 2008 by his health care providers including Dr. Tawa, Dr. Lai, and Angela Rowan NP–C, the expected management to be implemented by competent and responsible professionals?"

> **\*7** Unfortunately, Mr. Gentry's health care providers decided soon after his admission, and despite the persistence of atrial fibrillation, to stop the antithrombotic therapy in order to address by means of a kidney biopsy the possible cause of the patient's reduced renal function; this problem was unrelated to the patient's symptoms.

Madias's report states that he has experience treating and managing patients similarly situated with Gentry, i.e., those diagnosed with atrial fibrillation, and that he has "knowledge of the standard of care associated with the diagnosis and treatment of the illness and injury that Mr. Gentry suffered, including his atrial fibrillation, the need for anticoagulation, the risks of embolic strike, and management of kidney disease." He further states that in his Internal Medicine practice, he has "treated many patients with atrial fibrillation and uncontrolled hypertension," and that he has "knowledge of the risks involved when such patient's antithrombotic treatment is discontinued."

Madias's report further explains that the "consequences of discontinuation of antithrombotic therapy and the causes of cardiac embolism are well known within the specialty of Internal Medicine," and that "[a]ll of the concepts and opinions that I present are completely in the domain and expected knowledge of an internist without additional training in cardiology or any other subspecialty." Finally, he notes that the "standard of care that apply to a subspecialist in Cardiology or Nephrology managing Mr. Gentry must satisfy or even exceed those that apply to a specialist in Internal Medicine. That is, the standard of care applicable to internist that do not have additional subspecialties such as Cardiology or Nephrology."

"Where a particular subject of inquiry is common to and equally developed in all fields of practice, and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those which confronted the practitioner charged with malpractice, the witness is qualified to testify." *Rittger,* 332 S.W.3d at 558 (holding that neurologist/ professor of medicine was qualified to opine

on the standard of care in case against emergency room physician who failed to diagnose stroke in pregnant patient, explaining that the fact that the patient "was pregnant when she experienced her stroke or that she presented herself in a emergency room setting does not require that [the expert] be a an obstetrician or emergency room physician," because he "is shown to be sufficiently competent and qualified to testify as to the care of patients with stoke as a complication of pregnancy-related toxemia"). When, according to the expert's report, the relevant standard of care is basic and not limited to any particular specialty, an expert is qualified if "actively participating in rendering medical care 'relevant to the claim,' which can be demonstrated by a report showing the "injury involved was of the type [the expert] treated in his practice."*Padilla v. Loweree,* 354 S.W.3d 856, 864 (Tex.App.-El Paso 2011, pet. denied) (holding that orthopedic surgeon was qualified to opine on standard of care against gynecological surgeon because subject-matter of claimi.e., positioning and padding of patients' extremities-is common to types of surgeries expert performs).

 **\*8** We disagree with Tawa that Madias's report and opinions are analogous to the expert's report and opinions "about the administrative decisions of the Defendant Hospital" that the court in *Brossard* held the expert was not qualified by experience or knowledge to opine about. 267 S.W.3d at 536. Rather, Madias's report and CV demonstrate that he has experience treating patients similarly situated with Gentry, and that the standards about which he opines are generally and well-known within his field of expertise. Tawa has not established that the trial court abused its discretion in finding Madias qualified to render an opinion regarding the applicable standard of care for Tawa.

## B. Adequacy of Report

### 1. Standard of Care

Tawa next argues that Madias's report "fails to specify an adequate standard of care for Dr. Tawa."Specifically, Tawa asserts that the "standard of care articulated in the report is ambiguous and conclusory because the report provides no specific information about what Dr. Tawa should have done differently to meet the expected standard."Tawa cites *Kingwood Pines Hospital v. Gomez,* 362 S.W.3d 740, 743 (Tex.App.-Houston [14th Dist.] 2011, no pet.) for the proposition that Madias's report fails to include specific enough information about what an ordinarily prudent healthcare provider would have done, and *Kettle v. Baylor Medical Center at Garland,* 232 S.W.3d 832, 838–39

(Tex.App.-Dallas 2007, pet. denied) for the proposition that Madias's failure to include specific information about the time frame in which Tawa was "required to intervene" renders his articulation of the standard of care fatally deficient. Finally, Tawa argues that the "report impermissibly infers that the standards of care applicable to Dr. Lal also apply to Dr. Tawa."

The Gentrys respond that a physician can be liable for negligence in Texas based on a number of different acts or omissions, including choosing an inappropriate procedure, abandoning a patient, not obtaining informed consent, and not monitoring a patient's condition. Thus, they argue, "a physician can be held liable for omissions-an affirmative action is not required in every case."Additionally, they note that even the authority Tawa cites acknowledges that a full statement of the standard of care is not required, *Kingwood Pines Hosp.,* 362 S.W.3d at 748; all that is required is a statement sufficient to put the defendants on notice of the nature of the claims against them, which Madias's report does.

The Gentrys also contend that the *Kingwood Pines* case primarily relied upon by Tawa is distinguishable on its facts because it involved a conclusory articulation of a nonmedical standard of care not present in this case. The Gentrys argue that *Kettle*—the case Tawa cites for the proposition that Madias's report lacks requisite specificity about the timeframe for intervention—is likewise distinguishable. In that case, the court found the word "promptly" to be too ambiguous to articulate the standard of care that turned on when a procedure should have been performed to prevent a patient's death. According to the Gentrys, this case does not involve the same ambiguity concerns, given that the only possible time to intervene in this case would have been before cessation of antithrombotic therapy and the subsequent administration of vitamin K and fresh frozen plasma. Finally, the Gentrys assert that Tawa's contention that Madias's report imputes Lal's standard of care to Tawa is simply not supported by the actual contents of the Amended Report.

 **\*9** Madias's report contains the following articulation of the standard of care as it relates to Tawa:

> The accepted standard of medical care applicable to Dr. Tawa relates to this dual role of attending physician and that of internist caring for the patient. As the attending physician in the admission to the hospital of Mr. Gentry, Dr. Tawa is responsible for the entire care delivered to the patient by all healthcare providers, including Dr. Lal and Angela Rowan. Thus, Dr. Tawa must oversee the

care delivered by the other providers and ensure that it is within the standard of care. Failure to fulfill this task leads to substandard care. Dr. Tawa also treated Mr. Gentry in the role of internist caring for the atrial fibrillation and the management of this condition. A patient with atrial fibrillation of uncertain time as to the intuition of the arrhythmia and on Coumadin therapy should not discontinue all antithrombotic therapy unless clots in the atria are absent or active bleeding is present. The standard of care requires an internist to know that administration of fresh frozen plasma and vitamin K to reverse the anticoagulation caused by Coumadin therapy is very risky in a patient like Mr. Gentry since discontinuation of antithrombotic therapy may help to trigger the development of more clots in the atria.

It is important to recognize that the accepted standards of care for the diagnosis and management of the illness of Mr. Gentry are entirely dependent on his condition as a patient and are largely independent of the subspecialty (e.g. Cardiology or Nephrology) of the providers. Mr. Gentry had a medical condition typically managed by internists (specialty in Internal Medicine), and both Dr. Lal and Dr. Tawa were board certified in Internal Medicine.

The standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Identifying the standard of care is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.*

Madias's report adequately set forth the standard of care. It states that, in managing atrial fibrillation such as Gentry's, antithrombotic therapy should not be discontinued unless certain conditions are present. This is sufficient to put Tawa on notice of the "specific conduct" that the Gentrys have called into question, and what he should have done differently. *Palacios,* 46 S.W.3d at 879; *e.g., Menefee v. Ohman,* 323 S.W.3d 509, 519 (Tex.App.-Fort Worth, 2010, no pet.)(expert's statement that defendant-physician "owed the patient in an acute care setting the duty to immediate and sufficient medical response to her condition in order to prevent brain damage" was sufficient articulation of standard of review, in case alleging that physician was negligent in failing to immediately prescribe anticonvulsants).

**\*10** The cases relied upon by Tawa are inapposite. In *Kingwood Pines,* a minor who was being evaluated for a psychiatric condition stemming from sexual abuse sued her doctor and hospital after she was sexually molested by another patient while in the hospital. 362 S.W.3d at 743–44. The court noted that her expert's report contained only conclusory statements "regarding the provision of a secure environment, the supervision of patients, and the prevention of harm to patients," without "indicat[ing] what an ordinarily prudent health care provider would do under the same or similar circumstances." *Id.* at 749. The court thus held that the articulation of the standard of care was insufficient as the expert merely stated "that appellants did not provide a safe and secure environment for [the plaintiff], but do not specify how this should have been accomplished." *Id.* Given that Medias's report does indicate what course of action was called for, it does not lack specificity as the report in *Kingwood Pines* did.

*Kettle,* the other case cited by Tawa, is likewise distinguishable. In that case, the court affirmed the trial court's dismissal of a plaintiff's claim for failure to serve an adequate expert report as to plaintiffs claims against certain physicians. 232 S.W.3d at 638–39. Among other things, the court concluded that the expert's articulation of the standard of care was vague in that it did not specify what action should have been taken when:

> Cohen's opinion that all the physician-defendants collectively shared the same duty to diagnose and treat Kettle's condition "promptly" or "earlier" is also too vague and general to satisfy *Palacios.* It could be stated that every physician has a general duty to diagnose or treat medical conditions timely but that truism does not inform the physician-defendants what the standard specifically required them to do. It is conclusory.

*Id.* This analysis is simply not relevant to the Gentrys' claims, as it is clear when each action was taken that Madias's views as a breach of the standard of care, i.e., discontinuation of antithrombotic therapy and administration of fresh frozen plasma and vitamin K.

We find the facts presented here to be more analogous to *Springer v. Johnson,* 280 S.W.3d 322, 334 (Tex.App.-Amarillo 2008, no pet.). In *Springer,* the plaintiff was admitted to the hospital for cardiac surgery and, prior to that surgery, her attending physicians discontinued her anticoagulant therapy. 280 S.W .3d at 325. Three days later, she was discharged without receiving a prescription or instructions to resume her anticoagulant therapy. *Id.* She then suffered a stroke. *Id.* Similar to Madias's report, the expert in *Springer* opined that she should have been prescribed anticoagulation medication, and further that each doctor had a duty to coordinate her care to ensure that she received the proper medication, given the risk indicators:

> [The] expert report indicates [plaintiff] suffered from paroxysmal atrial fibrillation, an abnormal heart rhythm alternating between a normal heart rhythm, and she underwent a combined coronary bypass graft and aortic valve replacement while at Lubbock Heart Hospital. He opines that these two facts are clinical indicators establishing a compelling and absolute need for anticoagulation therapy using warfarin because (1) an aortic valve replacement significantly increased her risk of thromboembolism, i.e., clot formation in a blood vessel that breaks loose and is carried by the blood stream until it eventually plugs another blood vessel, and (2) her paroxysmal atrial fibrillation added to that risk. [The expert] further opines that [plaintiff] should have been prescribed warfarin and aspirin. He states that Springer, [plaintiff]'s cardiac surgeon, and Rizzo and Solis, her attending cardiologists, were under a duty to coordinate an appropriate plan for their patient's care which would have included coordinating care between themselves as well as employees and agents of Lubbock Heart Hospital. He further opines they were also under a duty to supervise anticoagulation

management of Johnson utilizing a combination of warfarin and aspirin.

 *\*11* *Id.* at 331–32.The *Springer* court rejected the defendants' reliance on *Kettle* for the proposition that the standard of care was not sufficiently articulated. *Id.* at 333.The court pointed out that the report at issue "states the standard of care, the clinical indicators that should have prompted treatment (patient with newly implanted aortic mechanical prosthesis and history of atrial fibrillation), and the treatment that should have been administered (warfarin therapy with a prescribed low dose aspirin) to satisfy the duty of care."*Id.* Here, Madias likewise states the clinical indicators (atrial fibrillation of uncertain time) and the treatment that should have been administered (continued antithrombotic therapy).

Finally, we agree with the Gentrys that Tawa's assertion that Madias's report does not differentiate between the standards of care applicable to Tawa and Lal is not supported by the contents of the actual report. While Madias states that the standards applicable to both Tawa and Lal are known and applicable to internists generally without regard to their additional specialties, his report clearly articulates a separate standard for both Tawa and Lal individually, and then states that they had an obligation to coordinate their treatment of Gentry.

The trial court did not abuse its discretion in determining that Madias's report adequately articulated a standard of care related to Tawa.

**2. Causation**

Tawa next argues that Madias's report "fails entirely to discuss a causal relationship between Dr. Tawa's conduct and Mr. Gentry's embolic CVA."Specifically, he argues that "the report does not state *or even suggest* that Mr. Gentry would not have suffered a stroke if he had remained on antithrombotic therapy."Tawa cites several cases for the proposition that a report that only sets forth causation in a conclusory fashion is not sufficient. *Tenet Hosp. LLC v. Love,* 347 S.W.3d 743, 755 (Tex.App.-El Paso 2011, no pet.)(expert opinion that if defendant hospital "had a pulmonologist or critical care specialist on call and available to see and treat this patient or had transferred this patient before her condition worsened, [patient] would more likely than not be alive today" was impermissibly conclusory); *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 249 (Tex.App.-San Antonio 2004, no pet.)(expert's mere assertion

that patient would have survived was conclusory when report did not explain causal relationship between patient's death and alleged omissions by hospital, including whether treatment would have or could have been effective).

The Gentrys contend that Tawa's argument does not represent a fair reading of Madias's report. They assert that "when one views the report in total, it is clear that causation of Mr. Gentry's injuries is sufficiently addressed and connects the actions and omissions of Dr. Tawa to those injuries."

Madias's report states that the care Gentry received at North Cypress Medical Center by Tawa, Rowan, and Lal was "below the standard of ordinary care, and that it was a proximate cause of his cerebrovascular accident (embolic stroke) that resulted in hemiplegia with permanent and severe neurologic disability."His report then goes on to explain the underlying medical basis for his opinion:

> **\*12** The cause of the CVA was acute cerebral ischemia with brain infarction within the right side of the brain that resulted from embolism of blood clots that originated in the left cardiac chambers (i.e., left atrium). The consulting neurologist, the CT head, the Brain MRI, all support that cardiac embolism was the cause of the patient's CVA. The relative normalcy of the Duplex carotid evaluation is also consistent with embolism as the basis for the CVA. Because patients with atrial fibrillation are at a much higher risk for embolic stroke, it is important for them to receive antithrombotic therapy unless there is active bleeding or the absence of clots has been confirmed. In this case, the discontinuation of Coumadin and administration of FFP and vitamin K was the most likely cause of the formation of clots in Mr. Gentry's atria and his subsequent CVA.

Madias's report contains additional information about (1) the source of Gentry's blood clots leading to his CVA, (2) the substantial risk and usual course of treatment for patients with atrial fibrillation associated with substantial hypertension and left atrial enlargement, (3) why the actions of each defendant healthcare provider were negligent and

proximately caused of Gentry's stroke, and (4) why a kidney biopsy was not indicated, given Gentry's symptoms. Contrary to Tawa's assertions, Madias's report clearly states his opinion that the discontinuation of Coumadin and infusion of vitamin K and fresh frozen plasma was the most likely cause of Gentry's stroke. The cases Tawa cites are inapposite because unlike the conclusory reports in those cases, Madias's report does "explain the basis of the expert's statements regarding causation and link his conclusions to the facts."*Love,* 347 S.W.3d at 754.

The trial court did not abuse its discretion in determining that Madias's report adequately articulated a causal link between Tawa's care and Gentry's stroke. Because we have concluded that Madias possessed the required qualifications to prepare an expert report opining on Tawa's care, and because we have concluded Madias's report meets the statutory requirements, we overrule appellants' first issue complaining that the trial court abused its discretion in failing to grant Tawa's motion to dismiss.

## ROWAN

In appellants' second issue, they argue that the trial court abused its discretion in failing to find Madias's report deficient as it relates to Rowan (and to the vicarious liability of Houston Interventional Cardiology for Rowan's care). Specifically, Rowan argues that Madias's report is deficient because (1) he is "not qualified to render an opinion regarding the standard of care applicable to nurse practitioners," (2) it "fails to specify a standard of care applicable to Ms. Rowan," and (3) "fails entirely to dismiss the causal relationship between Ms. Rowan's alleged breach and Mr. Gentry's embolic CVA."

### A. Qualification
Rowan argues that Madias is not qualified to testify on the standard of care for a nurse practitioner. She relies on *HB Properties L.P. v. Cox,* No, 02–09–00111–CR, 2009 WL 3337190 (Tex.App.-Fort Worth Oct. 5, 2009, pet. denied) (mem.op.), which held that a doctor board certified in internal medicine was not qualified to render an opinion on the standard of care applicable to nurses. In that case, although the expert's CV reflected experience and expertise in internal medicine and as a medical administrator, nothing in his report or CV demonstrated familiarity with the acceptable standard of care for nurses. *HB Props. L.P.,* 2009 WL 3337190, at

*4 (holding trial court abused its discretion in failing to grant motion to dismiss because "[t]hough [expert] is not automatically disqualified from giving an expert opinion regarding the accepted standard of care for HN's nurses simply because he is an internal medicine physician instead of a nurse, we may not through inferences or otherwise fill in the gaps in his report where he fails to detail why or how he is qualified to opine about the applicable standard of care for HN's nurses."). Rowan contends that Madias's report similarly fails to demonstrate a familiarity with the standard of care applicable to a nurse practitioner working in cardiology.

**\*13** The Texas Civil Practice and Remedies Code sets forth the criteria for an expert witness against a health care provider such as Rowan:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM.CODE § 74.402(b).

Applying this standard, the courts of appeals have consistently required a physician-expert proffering an opinion on the applicable standard of care of a nonphysician to affirmatively demonstrate experience and familiarity with the standard of care for the nonphysician's field.

> When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the

claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. However, if the physician states he is familiar with the standard of care for both nurses and physicians, and for the prevention and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. Further, if a physician states he is familiar with the standard of care and responsibilities and requirements for physician's assistants, and he has worked with, interacted with, and supervised physician's assistants, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers.

*Baylor Med. Center at Waxahachie v. Wallace,* 278 S.W.3d 552, 558 (Tex.App.Dallas 2009, no pet.)(citations omitted).*Compare Simonson v. Keppard,* 225 S.W.3d 868, 873 (Tex.App.-Dallas 2007, no pet.)(physician not qualified to opine on standard of care for nurse practitioner because his report does not "state that he either has knowledge of the standard of care applicable to nurse practitioners or that he has ever worked with or supervised nurse practitioners) and *Jones v. Ark–La–Tex Visiting Nurses, Inc.,* 128 S.W.3d 393, 396 (Tex.App.Texarkana 2004, no pet.)(physician not qualified to opine on standard of care for nurse because his "report fails to state [his] qualifications to give the standard of care for nurses monitoring a patient in a home healthcare setting"), *with San Jacinto Methodist Hosp. v. Bennett,* 256 S.W .3d 806, 813 (Tex.App.-Houston [14th Dist.] 2008, no pet.)(physician qualified to opine on standard of care for nurse because his "report stated that he is familiar with the standard of care for both nurses and physicians for the prevention and treatment of decubitus ulcers").

**\*14** Madias's report does not profess any knowledge about the standard of care applicable to nurse practitioners. He

does not claim to have experience training or supervising nurse practitioners or provide any other basis for the trial court to conclude that he was familiar with such standard. In contending that Madias is qualified to opine about the standard of care applicable to Rowan, the Gentrys only point to evidence that Madias is "familiar with the management of patients with medical conditions similar to Mr. Gentry," and ask us to conclude that he "therefore would be familiar with the standard of care as it relates to nurses managing such patients."Neither the text of section 74.402 nor the cases interpreting it allow us to make such an assumption.

Because nothing in Madias's report demonstrates that he is familiar with the standard of care applicable to nurse practitioners, we hold that the trial court abused its discretion by denying Rowan's motion to dismiss (and Houston Intervention Cardiology's motion to dismiss as it relates to vicarious liability for Rowan's care of Gentry). We thus sustain appellants' second issue.

### B. Attorneys' Fees

Rowan and Houston Intervention Cardiology request that we reverse the trial court's order denying their motion to dismiss the Gentrys' claims related to Rowan's care and remand to the trial court with instructions to award to them reasonable attorneys' fees and costs under section 74.351 of the Texas Civil Practice and Remedies Code. The Gentrys argue that an award of attorneys' fees under section 74.351 is not appropriate, even if Madias's report is deficient, because it is not so deficient that it should be considered "no report at all."

Section 74.351 provides that, if a timely expert report is not filed, upon motion, the court "*shall*... enter an order that: ... awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider." TEX. CIV. PRAC. & REM.CODE § 74.351. This "automatic attorney's fees sanction comes into play when a timely but deficient expert report has been filed."*Hightower v. Baylor Univ. Med. Ctr.,* 348 S.W.3d 512, 522 (Tex.App.-Dallas 2011, pet. denied). Thus, appellants Rowan and Houston Interventional Cardiology are entitled to an award of reasonable attorneys' fees and costs incurred related to claims premised on care provided by Rowan.

### CONCLUSION

We affirm the trial court's order denying appellants Tawa and Houston Interventional Cardiology's motion to dismiss claims related to Tawa's care of Gentry. We dismiss the Gentrys' claims against appellants Rowan and Houston Interventional Cardiology (only as to vicarious liability claims related to Rowan's care of Gentry). We remand to the trial court for an award of reasonable attorneys' fees and costs to Rowan and Houston Interventional Cardiology related to the dismissed claims and for further proceedings.

### All Citations

Not Reported in S.W.3d, 2013 WL 1694869

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

185 S.W.3d 65
Court of Appeals of Texas,
San Antonio.

Marie TOVAR, Individually and as Representative
of The Estate of Guadalupe M. Rodriguez,
Guadalupe Palacios, and Gilda Sanchez, Appellants,
v.
METHODIST HEALTHCARE SYSTEM
OF SAN ANTONIO, LTD., L.L.P., d/b/a
Southwest Texas Methodist Hospital, Appellee.

No. 04–05–00054–CV.    |    Nov. 16, 2005.

**Synopsis**
**Background:** Patient's estate brought medical malpractice action against hospital, alleging that the negligence of hospital's nurses resulted in a delay in diagnosis that caused patient's condition to deteriorate and that the delay in diagnosis delayed the discovery of a cerebral hemorrhage. The 285th Judicial District Court, Bexar County, Lori Massey, J., dismissed action, and estate appealed.

**[Holding:]** The Court of Appeals, Sandee Bryan Marion, J., held that doctor's expert report satisfied Medical Liability and Insurance Improvement Act's requirements on standard of care, breach of that standard, and causation.

Reversed and remanded.

West Headnotes (12)

**[1]    Health**
        Affidavits of merit or meritorious defense; expert affidavits

Medical malpractice plaintiffs must provide each defendant physician and health care provider an expert report with the expert's curriculum vitae, or voluntarily nonsuit the action. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(d)(Repealed).

Cases that cite this headnote

**[2]    Health**
        Affidavits of merit or meritorious defense; expert affidavits

For an expert's report to constitute a "good-faith effort" under the Medical Liability and Insurance Improvement Act, the report must provide enough information to (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l),(r)(6)(Repealed).

6 Cases that cite this headnote

**[3]    Health**
        Affidavits of merit or meritorious defense; expert affidavits

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l), (r)(6)(Repealed).

Cases that cite this headnote

**[4]    Health**
        Affidavits of merit or meritorious defense; expert affidavits

Although expert report under Medical Liability and Insurance Improvement Act need not marshal all the plaintiff's proof, it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l), (r)(6)(Repealed).

6 Cases that cite this headnote

**[5]    Health**
        Affidavits of merit or meritorious defense; expert affidavits

Under Medical Liability and Insurance Improvement Act, expert report cannot merely

state the expert's conclusions about standard of care, breach, and causal relationship; instead, the expert report must explain the basis of expert's statements to link his conclusions to the facts. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(r)(6)(Repealed).

2 Cases that cite this headnote

**[6]** **Health**
👉 Standard of Care

**Health**
👉 Hospitals in General

The standard of care for a hospital or other medical provider is what an ordinarily prudent hospital or other medical provider would do under the same or similar circumstances.

Cases that cite this headnote

**[7]** **Health**
👉 Standard of Care

**Health**
👉 Breach of Duty

Identifying the standard of care is critical in medical malpractice action because whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.

Cases that cite this headnote

**[8]** **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Doctor's expert report satisfied Medical Liability and Insurance Improvement Act's requirements on standard of care, breach of that standard, and causation; doctor's expert report sufficiently set forth standard of care because doctor specifically stated what should have been done for patient with acute neurological process, doctor's expert report also sufficiently set forth how standard of care was breached because he specifically stated what nurses should have done, but did not do, and doctor's expert report linked his conclusion regarding nurses' alleged breach

of standard of care with his conclusion that patient's neurological condition would not have deteriorated, resulting in need for surgery. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(r)(6)(Repealed).

6 Cases that cite this headnote

**[9]** **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

It is not enough that expert report under Medical Liability and Insurance Improvement Act provides insight about the plaintiff's claims. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(r)(6)(Repealed).

Cases that cite this headnote

**[10]** **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Medical Liability and Insurance Improvement Act requires only a fair summary of the expert's opinions, and although a fair summary is something less than all the evidence necessary to establish causation at trial, a fair summary must contain sufficiently specific information to demonstrate causation beyond mere conjecture in order to meet the Act's requirements. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(r)(6)(Repealed).

3 Cases that cite this headnote

**[11]** **Health**
👉 Affidavits of merit or meritorious defense; expert affidavits

Under Medical Liability and Insurance Improvement Act, plaintiff need not present evidence in the expert report as if it were actually litigating the merits. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(r)(6)(Repealed).

Cases that cite this headnote

**[12]** **Health**

☞ Affidavits of merit or meritorious defense; expert affidavits

Under Medical Liability and Insurance Improvement Act, expert report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(r)(6)(Repealed).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*66** Jeff Small, Law Office of Jeff Small, M. Stephen Cichowski, Cichowski & Gonzalez, P.C., San Antonio, for appellants.

Lucretia R. Marmor, Ruth G. Malinas, Ball & Weed, P.C., San Antonio, for appellee.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from the trial court's dismissal of appellants' medical malpractice case against appellee on the grounds that appellants' expert report did not satisfy the requirements of the Medical Liability and Insurance Improvement Act ("the Act"). In the underlying lawsuit, appellants sued three doctors and Southwest **\*67** Methodist Hospital, alleging, in part, that the hospital nurses' negligence resulted in a delay in diagnosis that caused Guadalupe M. Rodriguez's condition to deteriorate. Appellants contend the delay in diagnosis delayed the discovery of a cerebral hemorrhage. According to appellants, if the hemorrhage had been discovered and treated sooner, Ms. Rodriguez's neurological deterioration and death could have been averted. We reverse and remand.

## BACKGROUND

On June 7, 2001 at approximately 1:26 p.m., seventy-five-year-old Guadalupe M. Rodriguez arrived at the hospital.

Although she was alert and oriented at the time, she complained of a headache and right-arm numbness. Ms. Rodriguez was evaluated and an order admitting her to the Neurological Care Unit was written at approximately 5:10 p.m. However, she was not admitted to the unit until approximately 8:00 p.m., allegedly because of a nursing shortage. Over the next several hours, Ms. Rodriguez was seen by doctors who evaluated her condition, and nurses who documented her condition. At 9:30 p.m., a call placed to Dr. Chandrahasan was returned by Dr. Osonma, who ordered medication to treat Ms. Rodriguez's blood pressure and nausea. At 12:30 a.m. the next morning, the nursing personnel called Dr. Garrison and reported neurological changes and elevated blood pressure. Dr. Garrison ordered an emergency CT scan, which revealed a massive occipital parietal temporal hemorrhage. At 3:45 a.m., Ms. Rodriguez underwent surgery, following which she was kept on life-support until she was transferred to a hospice where she died on June 13, 2001.

After filing suit against the hospital and doctors, appellants filed the expert report of Dr. Kenneth C. Fischer. The hospital moved to dismiss appellants' claims on the grounds that Dr. Fischer's report did not adequately address the elements of standard of care, breach, and causation. After a hearing, the trial court granted the motion, and severed appellants' claims against the hospital from their claims against the doctors. This appeal ensued.

## ADEQUACY OF EXPERT REPORT

 **[1]**   **[2]**   Medical-malpractice plaintiffs must provide each defendant physician and health-care provider an expert report with the expert's curriculum vitae, or voluntarily nonsuit the action. *See* TEX.REV.CIV. STAT. ART.. 4590i, § 13.01(d) (Vernon Supp.2003); [1] *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX.REV.CIV. STAT. ART.. 4590i, § 13.01(r)(6). If a defendant moves to dismiss the plaintiff's case based upon the report's inadequacy, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of this

section." *Id.* § 13.01(*l* ). To constitute a "good-faith effort," the report must provide enough information to (1) inform the defendant of the specific conduct the plaintiff **\*68** has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

1     Article 4590i was repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884, and has been re-codified at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2004) (effective Sept. 1, 2003). Because the underlying lawsuit was filed on August 11, 2003, all references in this opinion will be to former article 4590i.

[3] [4] [5] A trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Id.* at 878. Although the report need not marshal all the plaintiff's proof, it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. *Id.* A report cannot merely state the expert's conclusions about these elements. *Id.* at 879. Instead, "the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002).

## STANDARD OF CARE AND
## BREACH OF THE STANDARD

[6] [7] [8] The standard of care for a hospital or other medical provider is what an ordinarily prudent hospital or other medical provider would do under the same or similar circumstances. *See Palacios,* 46 S.W.3d at 880; *see also Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Identifying the standard of care is critical because whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880.

Dr. Fischer's report stated the following with regard to the standard of care and the nurses' alleged breach of the standard of care:

> ... [T]he nursing personnel provided poor documentation of the clinical status of Ms. Rodriguez between 5 p.m. and 9 p.m. Despite the patient's

obvious deterioration at that time, they meekly accepted inadequate responses of Dr. Garrison and Dr. Osonma with no further calls to physicians until 12:30 a.m. when the patient was in extremis. The appropriate standard of care for nursing personnel treating a patient with acute neurological process is to promptly and expeditiously transfer the patient to the appropriate setting and carefully inform the treating physicians of changes in the patient's clinical status so that appropriate care can be rendered. The nursing personnel ... failed to perform these critical functions in their management of Ms. Rodriguez, thereby breaching the standard of care.

We conclude Dr. Fischer's report sufficiently sets forth the standard of care because he specifically states what should have been done for a patient "with acute neurological process." We also conclude Dr. Fischer's report sufficiently sets forth how the standard of care was breached because he specifically states what the nurses should have, but did not, do.

## CAUSATION

[9] To constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios*'s two-part test. *See Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. It is not enough that the expert report "provided insight" about the plaintiff's claims. *Wright,* 79 S.W.3d at 52. Nor may liability in a medical malpractice suit be made to turn upon speculation or conjecture. *See Hutchinson v. Montemayor,* 144 S.W.3d 614, 618 (Tex.App.-San Antonio 2004, no pet.). Therefore, although a fair summary is something less than all the evidence necessary to establish causation at trial, a fair summary must contain sufficiently specific information to demonstrate causation beyond mere conjecture in order to **\*69** meet the Act's requirements and satisfy the *Palacios* test. *See Wright,* 79 S.W.3d at 52.

On causation, Dr. Fischer's report stated the following:

*The results of the standard of care departures exercised by Dr. Chandrahasan, Garrison, Osonma, and the nursing personnel in the ER and the receiving floor caused a substantial delay in the appropriate diagnosis and initiation of treatment for the cerebral hemorrhage sustained by Ms. Rodriguez. This type of lesion harbored by Ms. Rodriguez requires prompt cessation of the Coumadin, an immediate brain CT scan, immediate institution of fresh frozen plasma to reverse the Coumadin, and obtaining neurological and neurosurgical consultation on a stat basis.* The failure of Dr. Chandrahasan to promptly have the patient transferred to the ICU from the ER as well as his failure to convey the particulars of Ms. Rodriguez' [sic] clinical situation to his on-call physician, Dr. Osonma, delayed the addressing of the patient's clinical deterioration. Similarly, the failure of Dr. Osonma and Dr. Garrison to respond appropriately to the changes conveyed to them by the nursing personnel also delayed realization of the appropriate diagnosis. *Again, the failure of the nursing personnel to insist upon prompt evaluation of the patient's changing clinical status further delayed diagnosis. Had the appropriate diagnosis been made expeditiously in the afternoon hours, when it should have been, instead of 2 a.m. in the morning, when it was finally discovered, the hemorrhage would have been detected at a much earlier stage with the possibility of only medical treatment required as opposed to the desperate and unsuccessful surgery which transpired at 3:45 a.m. Within reasonable medical probability, the dramatic neurological deterioration and death of Ms. Rodriguez would have been averted. The failure of the doctors and nursing personnel to perform within appropriate medical and nursing standards unfortunately caused this untoward result.* (Emphasis added.)

The hospital asserts Dr. Fischer's report contains no factual statements or explanation supporting his conclusion that the nurses' conduct caused Ms. Rodriguez's death; does not identify what the nurses failed to communicate to the physicians between 9:30 p.m. and 12:30 a.m., and does not identify what information the doctors should have acted upon. The hospital argues Dr. Fischer's report is no more adequate than the reports considered by this court in *Lopez v. Montemayor,* 131 S.W.3d 54 (Tex.App.-San Antonio 2003, pet. denied) and *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245 (Tex.App.-San Antonio 2004, no pet.). We disagree.

In *Lopez,* the plaintiffs relied on the following single sentence in the report to establish causation: "Additionally, it is the aspiration of the bridge section which caused and precipitated the medical circumstances leading to the patient's demise." 131 S.W.3d at 60. A panel of this court concluded that this statement was conclusory, and did not constitute a good faith effort to comply with the statute's causation requirement because the statement did not provide information linking Montemayor's actions to Lopez's death. *Id.*

In *Costello,* the expert report contained the following single sentence on causation: "Dr. Schilling's report states, 'If this patient would have been appropriately triaged and evaluated, then in all reasonable medical probability she would have survived.' **\*70** " *Costello,* 141 S.W.3d at 249. A panel of this court held that the expert's assertion that the patient would have survived was conclusory and we listed a variety of deficiencies in the report. *Id.* For example, the report did not explain the causal connection between failure to appropriately triage and evaluate and the patient's death; offered no explanation of what medical information a more timely triage and evaluation would have revealed; did not state what would have been done had Christus not failed to act; did not state how Christus' failure to act was a substantial factor in bringing about the patient's death and without which her death would not have occurred; and did not explain the medical basis or reasoning for the conclusion that Lozano "in all reasonable medical probability" would have survived. *Id.*

[10] Although our opinion in *Costello* listed these various deficiencies, this list should not be construed as mandatory. As we stated in *Costello,* the Act requires only "a 'fair summary' " of the expert's opinions. *Id.* Here, the expert report meets that requirement. Dr. Fischer links his conclusion regarding the nurses' alleged breach of the standard of care with his conclusion that Ms. Rodriguez's neurological condition would not have deteriorated, resulting in the need for surgery. Dr. Fischer states that if the nurses had "carefully inform[ed] the treating physicians of changes in the patient's clinical status ... [the] type of lesion harbored by Ms. Rodriguez .... [should have resulted in] prompt cessation of the Coumadin, an immediate brain CT scan, immediate institution of fresh frozen plasma to reverse the Coumadin, and obtaining neurological and neurosurgical consultation on a stat basis ... [then] ... [w]ithin reasonable medical probability, the dramatic neurological deterioration and death of Ms. Rodriguez would have been averted." We conclude Dr. Fischer's report satisfies the Act's requirement on causation.

## CONCLUSION

**[11]** **[12]** "[A] plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios, 46 S.W.3d at 879.* We conclude that Dr. Fischer's report put the defendant on notice of the conduct complained of, and represents a good-faith effort to provide a fair summary of the statutory elements of standard of care, breach, and causation. For these reasons, we reverse the trial court's order of dismissal and remand the cause for further proceedings.

**All Citations**

185 S.W.3d 65

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

46 S.W.3d 873
Supreme Court of Texas.

AMERICAN TRANSITIONAL CARE
CENTERS OF TEXAS, INC. d/b/a
American Transitional Hospital, Petitioner,

v.

Teofilo PALACIOS and Maria Palacios,
individually and a/n/f of Gloria Janeth
Palacios and Rocio Daniela Palacios,
minors, Maria Angelica Palacios, and Sentry
Insurance, a mutual company, Respondents.

No. 99–1311.    |    Argued Dec. 6,
2000.    |    Decided May 10, 2001.    |
Rehearing Overruled June 28, 2001.

Medical malpractice action was brought against hospital to recover for injuries patient allegedly suffered in fall at hospital. The 280th District Court, Harris County, Tony Lindsay, J., dismissed case for failure to file expert report, as required by Medical Liability and Insurance Improvement Act. Patient appealed. The Houston Court of Appeals, First District, reversed and remanded, 4 S.W.3d 857. On petition for review, the Supreme Court, Hankinson, J., held that: (1) trial court's determination about adequacy of expert report under Act is reviewed under abuse-of-discretion standard, and (2) expert's report did not provide fair summary of standard of care and how it was breached.

Court of Appeals' judgment reversed.

West Headnotes (12)

[1]     **Health**
        👉 Necessity of Expert Testimony

Expert testimony is necessary in medical-malpractice cases. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(d).

11 Cases that cite this headnote

[2]     **Appeal and Error**
        👉 Rulings on Motions Relating to Pleadings

A trial court's determination about the adequacy of an expert report under the Medical Liability and Insurance Improvement Act is reviewed under an abuse-of-discretion standard. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

172 Cases that cite this headnote

[3]     **Appeal and Error**
        👉 Costs and Allowances

Sanctions are generally reviewed under an abuse-of-discretion standard.

68 Cases that cite this headnote

[4]     **Health**
        👉 Affidavits of merit or meritorious defense; expert affidavits

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, the trial court should look no further than the report. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

9 Cases that cite this headnote

[5]     **Health**
        👉 Affidavits of merit or meritorious defense; expert affidavits

For an expert's report to satisfy the requirements of the Medical Liability and Insurance Improvement Act, the report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

138 Cases that cite this headnote

[6]     **Health**
        👉 Affidavits of merit or meritorious defense; expert affidavits

For an expert's report to constitute a good-faith effort under the Medical Liability and Insurance Improvement Act, the report must provide enough information to fulfill two purposes: first, the report must inform the defendant of the specific conduct the plaintiff has called into

question; second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

485 Cases that cite this headnote

**[7]** **Health**
    Affidavits of merit or meritorious defense; expert affidavits

A report that merely states the expert's conclusions about the standard of care, breach, and causation does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

262 Cases that cite this headnote

**[8]** **Health**
    Affidavits of merit or meritorious defense; expert affidavits

An expert's report that omits any of the statutory requirements does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

46 Cases that cite this headnote

**[9]** **Health**
    Affidavits of merit or meritorious defense; expert affidavits

To avoid dismissal due to inadequacy of an expert's report under the Medical Liability and Insurance Improvement Act, a plaintiff need not present evidence in the report as if it were actually litigating the merits. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

36 Cases that cite this headnote

**[10]** **Health**
    Affidavits of merit or meritorious defense; expert affidavits

The expert's report in a medical malpractice action can be informal in that the information in the report does not have to meet the

same requirements as the evidence offered in a summary-judgment proceeding or at trial. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

85 Cases that cite this headnote

**[11]** **Health**
    Affidavits of merit or meritorious defense; expert affidavits

Conclusory statement in expert's report that defendant hospital did not use precautions to prevent patient's fall was not good-faith effort to provide fair summary of standard of care and how it was breached, and thus, dismissal of medical malpractice action was warranted under Medical Liability and Insurance Improvement Act; it could not be determined from that statement if expert believed that standard of care required hospital to have monitored patient more closely, restrained him more securely, or done something else entirely. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

141 Cases that cite this headnote

**[12]** **Health**
    Affidavits of merit or meritorious defense; expert affidavits

An expert's report does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act if it simply states that he or she knows the standard of care and that it was or was not met. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

111 Cases that cite this headnote

**Attorneys and Law Firms**

**\*875** Matthew T. McCracken, John C. Marshall, James C. Marrow, Dee L. Dawson, Marshall & McCraken, Houston, for Petitioner.

D. John Leger, Leger & Coplen, Levon G. Hovnatanian, Martin Disiere & Jefferson, Houston, Mickey C. Shyrock, Law Office of Mickey C. Shyrock, Athens, for Respondents.

**Opinion**

Justice HANKINSON delivered the opinion of the Court.

In this medical-malpractice case we determine the standards for reviewing an expert report under section 13.01 of the Medical Liability and Insurance Improvement Act. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01. The trial court dismissed the Palacioses' medical-malpractice claims against American Transitional Care Centers, Inc., d/b/a American Transitional Hospital, because it determined that the Palacioses' expert report did not show a good-faith effort to provide a fair summary of the expert's opinions about the standard of care, breach, and causation, as required by section 13.01. *See id.* § 13.01(d), (e), (*l*), (r)(6). The court of appeals, after evaluating the trial court's decision as it would a summary-judgment decision, reversed, holding that the report did meet the statutory requirements. 4 S.W.3d 857, 860.

We hold that a trial court's decision to dismiss a case under section 13.01(e) is reviewed for abuse of discretion. We further hold that to constitute a good-faith effort to provide a fair summary of an expert's opinions under section 13.01(*l* ), an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. In this case, the trial court did not abuse its discretion in concluding that the challenged report does not meet the statutory requirements and in dismissing with prejudice the claims against American Transitional. Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

Teofilo Palacios suffered brain damage and other severe injuries following a two-story fall at work. After almost a year in an intensive rehabilitation program, he was transferred to American Transitional Hospital for further rehabilitation. Although Palacios at that time was able to **\*876** communicate with others and respond to simple commands, he required assistance with most daily tasks. In addition, due to the severity of his brain damage, Palacios' physicians prescribed bed restraints for him. Nevertheless, while a patient at American Transitional, Palacios fell from his bed and required additional medical care for his injuries. His family claims that this fall caused him to sustain further brain injury, which impaired his ability to communicate with others and to assist them in his care.

Palacios and his family sued American Transitional and the treating doctors, respectively, for negligently failing to prevent the fall and negligently treating him after the fall. After ninety days passed from the date the Palacioses filed suit, American Transitional, along with the other defendants, moved to require the Palacioses to file a $7,500 cost bond, as required by section 13.01(b) of the Medical Liability and Insurance Improvement Act. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(b) (authorizing a trial court to order a plaintiff to file a $7,500 cost bond for each defendant physician or health-care provider if the plaintiff has not complied with the expert-report or $5,000 cost-bond requirement in section 13.01(a)); *id.* § 13.01(a) (requiring the plaintiff to file either an expert report or a $5,000 cost bond for each defendant physician or health-care provider within ninety days of filing suit). The trial court granted the motion, and the Palacioses filed a cost bond for each defendant.

After 180 days passed from the date the Palacioses filed suit, American Transitional moved to dismiss the case against it because the Palacioses did not file an expert report and curriculum vitae, or nonsuit the claims against American Transitional, as section 13.01(d) of the Act requires. *Id.* § 13.01(d), (e). The Palacioses moved for an extension of time to file the report, which the trial court granted. *See id.* § 13.01(f), (g). The Palacioses then filed a report prepared by Dr. Catherine F. Bontke, who treated Palacios at the first rehabilitation hospital. American Transitional again moved to dismiss under section 13.01(e), claiming that the report did not satisfy the statutory requirements. *See id.* § 13.01(*l*), (r)(6). The trial court granted the motion, dismissed with prejudice the claims against American Transitional, and severed those claims to make the judgment against American Transitional final. *See id.* § 13.01(e).

The Palacioses appealed, and with one justice dissenting, the court of appeals reversed and remanded after using summary-judgment review standards to evaluate the sufficiency of the expert report. 4 S.W.3d at 860. After indulging every reasonable inference in the Palacioses' favor and eliminating any deference to the trial court's decision, the court of appeals concluded that the trial court erred in dismissing the case because the Palacioses made a good-faith effort to provide a report that met the requirements of section 13.01(r)(6). *Id.* at 862–63. American Transitional petitioned for review challenging both the standard of review applied by the court of appeals and the sufficiency of the Palacioses' report.

[1] Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases. *E.g., Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). "There can be no other guide [than expert testimony], and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury." *Hart,* 399 S.W.2d at 792. Because expert testimony is crucial to a medical-malpractice case, **\*877** knowing what specific conduct the plaintiff's experts have called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims. This makes eliciting an expert's opinions early in the litigation an obvious place to start in attempting to reduce frivolous lawsuits. *See* HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995).

Accordingly, in section 13.01, the Legislature requires medical-malpractice plaintiffs, within 180 days of filing suit, either to provide each defendant physician and health-care provider with an expert report and the expert's curriculum vitae, or to nonsuit the claims. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d). If the plaintiff fails within the time allowed either to provide the expert reports and curriculum vitae, or to nonsuit the case, the trial court must sanction the plaintiff by dismissing the case with prejudice, awarding costs and attorney's fees to the defendant, and ordering the forfeiture of any applicable cost bond necessary to pay that award. *Id.* § 13.01(e). If the plaintiff does timely file a report, the defendant may move to challenge the adequacy of the report, and the trial court must grant the motion if "it appears to the court ... that the report does not represent a good faith effort to comply with the definition of an expert report." *Id.* § 13.01(*l*). The statute defines an expert report as "a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). If a trial court determines that an expert report does not meet these statutory requirements and the time for filing a report has passed, it must then dismiss with prejudice the claims against the defendant who has challenged the report. *Id.* § 13.01(e).

American Transitional contends that a trial court's determination about the adequacy of an expert report should be reviewed under an abuse-of-discretion standard. The Palacioses respond that whether a report meets the requirements of subsections 13.01(*l*) and (r)(6) is a question of law. They suggest that a trial court's decision on the adequacy of a report should be reviewed as a court would review a summary-judgment decision: that is, by indulging every reasonable inference and resolving any doubts in the nonmovant's favor, and eliminating any deference to the trial court's decision. We agree with American Transitional.

[2] [3] The plain language of section 13.01 leads to the conclusion that abuse of discretion is the proper standard. First, the statute directs the trial court to grant a motion challenging the adequacy of an expert report if it "appears to the court" that the plaintiffs did not make a good-faith effort to meet the statutory requirements. *Id.* § 13.01(*l*). This language plainly vests the trial court with discretion. *See* TEX. GOV'T CODE § 312.002. ("[W]ords shall be given their ordinary meaning."). Second, the statute states that dismissal under section 13.01(e) is a sanction: If the requirements of section 13.01(d) are not met, the court must "enter an order as sanctions" dismissing the case and granting the defendant its costs and attorneys' fees. TEX.REV.CIV. STAT. ANN .. art. 4590i, § 13.01(e). Sanctions are generally reviewed under an abuse-of-discretion standard. *Koslow's v. Mackie,* 796 S.W.2d 700, 704 (Tex.1990). And we presume the Legislature was aware of the standard of review ordinarily applied in sanctions cases when it explicitly identified a court's dismissal under section 13.01(e) as a sanction. **\*878** *See McBride v. Clayton,* 140 Tex. 71, 166 S.W.2d 125, 128 (1943) ( "All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it.").

Nevertheless, the court of appeals concluded that the usual standard of review for sanctions should not apply here. The court reasoned that the provisions of article 4590i at issue here were intended to discourage frivolous lawsuits, while sanctions, in contrast, are a response to litigation misconduct. We disagree with this distinction.

Filing a frivolous lawsuit can be litigation misconduct subject to sanction. *See* TEX.R. CIV. P. 13 (imposing sanctions for filing groundless motions, pleadings, or other papers in bad faith or for the purposes of harassment). And one purpose of the expert-report requirement is to deter frivolous claims. HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995). The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that

the claim is either frivolous, or at best has been brought prematurely. *See id.* This is exactly the type of conduct for which sanctions are appropriate. *See TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991) (holding that "death-penalty" sanctions are appropriate when a party's discovery abuse justifies a presumption that its claims lack merit). For these reasons, we hold that an abuse-of-discretion standard of review applies to a trial court's decision to dismiss a case under section 13.01(e).

 [4]    We next consider whether the trial court abused its discretion in dismissing the Palacioses' claims against American Transitional. The parties disagree about how to determine a report's adequacy under section 13.01(*l* ). American Transitional argues that the trial court must engage in a two-step process: (1) the trial court must determine whether the report constitutes a fair summary of the expert's opinions, TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6); and (2) if the trial court concludes that the report is not a fair summary, it must then look outside the report at the plaintiff's conduct to determine whether the plaintiff made a good-faith effort to meet the statutory requirements, *id.* § 13.01(*l* ). The Palacioses, on the other hand, argue that the statute requires only one inquiry—whether the report evidences a good-faith effort to provide a fair summary of the expert's opinions. According to the Palacioses, the trial court does not have to make any factual determinations because the only relevant information is in the report itself. We agree with the Palacioses that a trial court should look no further than the report in conducting a section 13.01(*l* ) inquiry.

The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. *Id.* § 13.01(*l* ). That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. *Id.* § 13.01(r)(6). Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

 [5]    [6]    Under subsections 13.01(*l* ) and (r)(6), the expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See* **\*879** *Hart v. Wright,* 16 S.W.3d 872, 877 (Tex.App.—Fort Worth 2000, pet. denied). In setting out the expert's opinions

on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *See* 4 S.W.3d at 865 (Taft, J. dissenting); *Wood v. Tice,* 988 S.W.2d 829, 830 (Tex.App.—San Antonio 1999, pet. denied) (noting that one of the purposes of article 4590i is to deter frivolous claims).

 [7]    [8]    [9]    [10]    A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. *See, e.g., Hart,* 16 S.W.3d at 877 (holding that a report was inadequate because it stated that the patient had a heart attack and the doctor breached the standard of care, without describing the standard of care); *Wood,* 988 S.W.2d at 831–32 (holding that an expert report did not meet the statutory requirements because it did not name the defendants, state how the defendants breached the standard of care, demonstrate causation and damages, or include a curriculum vitae). However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *See, e.g.,* TEX.R. CIV. P. 166(f) (setting out the requirements for the form and content of affidavits offered as summary-judgment proof); TEX.R. EVID. 802 (stating that most hearsay is inadmissible).

 [11]    American Transitional contends that Dr. Bontke's report does not meet the statutory requirements because it does not represent a good-faith effort to provide a fair summary of her opinion on the standard of care and how American Transitional breached that standard. The Palacioses respond that the following parts of Dr. Bontke's report establish these elements:

> Based on the available documentation I was able to conclude that: Mr. Palacios fell from his bed on 5/14/94 while trying to get out of it on his own. The nursing notes document that he was observed by nursing on the hour for two hours prior to the fall. In addition, ten minutes before the fall, the nursing notes documents [sic] the his wrist/vest restraints were on. Yet, at the time of his fall he was found on the floor with his vest/wrist restraints on but not tied to the bed. It is unclear how he could untie

all four of the restraints from the bedframe in under ten minutes. Obviously, Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized.

....

All in all, Mr. Palacios sustained a second brain injury with a left subdural hematoma while he was an inpatient at [the Hospital].... [I]n my opinion, the medical care rendered to Mr. Palacios at the time of his second brain injury was below the accepted and expected standard of care which he could expect to receive. Moreover, this [sic] below the accepted standard of care extends to both the cause of the second injury as well as the subsequent treatment....

The Palacioses rely mostly on one sentence in the report to establish the standard of care: "Mr. Palacios had a habit of **\*880** trying to undo his restraints and precautions to prevent his fall were not properly utilized." They argue that the inference can be made from that sentence, along with the statement that "[i]t is unclear how he could untie all four of the restraints from the bed frame in under ten minutes," that Dr. Bontke believes American Transitional's staff should have tied the restraints to the bed more securely.

 **[12]**    The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. *See Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 366 (Tex.1987). Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." 4 S.W.3d at 865 (Taft, J. dissenting). The statement the Palacioses rely upon—that precautions to prevent Palacios' fall were not properly used—is not a

statement of a standard of care. Neither the trial court nor American Transitional would be able to determine from this conclusory statement if Dr. Bontke believes that the standard of care required American Transitional to have monitored Palacios more closely, restrained him more securely, or done something else entirely. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *See Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.—El Paso 1995, writ denied). Knowing only that the expert believes that American Transitional did not take precautions to prevent the fall might be useful if American Transitional had an absolute duty to prevent falls from its hospital beds. But as a general rule, res ipsa loquitur does not apply in medical-malpractice cases. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 7.01 (limiting res ipsa loquitur in medical malpractice to the limited classes of cases to which it applied as of August 29, 1977); *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990).

When the expert report's conclusory statements do not put the defendant or the trial court on notice of the conduct complained of, section 13.01(*l* ) affords the trial court no discretion but to conclude, as the trial court did here, that the report does not represent a good-faith effort to provide a fair summary of the standard of care and how it was breached, as section 13.01(r)(6) requires. And because the statutory 180 day time period had passed when the trial court here made that determination, section 13.01(e) required the court to dismiss with prejudice the Palacioses' claims against American Transitional. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e). Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

**All Citations**

46 S.W.3d 873, 44 Tex. Sup. Ct. J. 720

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 22. Examining Boards
    Part 11. Texas Board of Nursing
      Chapter 217. Licensure, Peer Assistance and Practice

22 TAC § 217.11

Tex. Admin. Code tit. 22, § 217.11

§ 217.11. Standards of Nursing Practice

Currentness

The Texas Board of Nursing is responsible for regulating the practice of nursing within the State of Texas for Vocational Nurses, Registered Nurses, and Registered Nurses with advanced practice authorization. The standards of practice establish a minimum acceptable level of nursing practice in any setting for each level of nursing licensure or advanced practice authorization. Failure to meet these standards may result in action against the nurse's license even if no actual patient injury resulted.

(1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall:

(A) Know and conform to the Texas Nursing Practice Act and the board's rules and regulations as well as all federal, state, or local laws, rules or regulations affecting the nurse's current area of nursing practice;

(B) Implement measures to promote a safe environment for clients and others;

(C) Know the rationale for and the effects of medications and treatments and shall correctly administer the same;

(D) Accurately and completely report and document:

(i) the client's status including signs and symptoms;

(ii) nursing care rendered;

(iii) physician, dentist or podiatrist orders;

(iv) administration of medications and treatments;

(v) client response(s); and

(vi) contacts with other health care team members concerning significant events regarding client's status;

(E) Respect the client's right to privacy by protecting confidential information unless required or allowed by law to disclose the information;

(F) Promote and participate in education and counseling to a client(s) and, where applicable, the family/significant other(s) based on health needs;

(G) Obtain instruction and supervision as necessary when implementing nursing procedures or practices;

(H) Make a reasonable effort to obtain orientation/training for competency when encountering new equipment and technology or unfamiliar care situations;

(I) Notify the appropriate supervisor when leaving a nursing assignment;

(J) Know, recognize, and maintain professional boundaries of the nurse-client relationship;

(K) Comply with mandatory reporting requirements of Texas Occupations Code Chapter 301 (Nursing Practice Act), Subchapter I, which include reporting a nurse:

(i) who violates the Nursing Practice Act or a board rule and contributed to the death or serious injury of a patient;

(ii) whose conduct causes a person to suspect that the nurse's practice is impaired by chemical dependency or drug or alcohol abuse;

(iii) whose actions constitute abuse, exploitation, fraud, or a violation of professional boundaries; or

(iv) whose actions indicate that the nurse lacks knowledge, skill, judgment, or conscientiousness to such an extent that the nurse's continued practice of nursing could reasonably be expected to pose a risk of harm to a patient or another person, regardless of whether the conduct consists of a single incident or a pattern of behavior.

(v) except for minor incidents (Texas Occupations Code §§ 301.401(2), 301.419, 22 TAC § 217.16), peer review (Texas Occupations Code §§ 301.403, 303.007, 22 TAC § 217.19), or peer assistance if no practice violation (Texas Occupations Code § 301.410) as stated in the Nursing Practice Act and Board rules (22 TAC Chapter 217).

(L) Provide, without discrimination, nursing services regardless of the age, disability, economic status, gender, national origin, race, religion, health problems, or sexual orientation of the client served;

(M) Institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications;

(N) Clarify any order or treatment regimen that the nurse has reason to believe is inaccurate, non-efficacious or contraindicated by consulting with the appropriate licensed practitioner and notifying the ordering practitioner when the nurse makes the decision not to administer the medication or treatment;

(O) Implement measures to prevent exposure to infectious pathogens and communicable conditions;

(P) Collaborate with the client, members of the health care team and, when appropriate, the client's significant other(s) in the interest of the client's health care;

(Q) Consult with, utilize, and make referrals to appropriate community agencies and health care resources to provide continuity of care;

(R) Be responsible for one's own continuing competence in nursing practice and individual professional growth;

(S) Make assignments to others that take into consideration client safety and that are commensurate with the educational preparation, experience, knowledge, and physical and emotional ability of the person to whom the assignments are made;

(T) Accept only those nursing assignments that take into consideration client safety and that are commensurate with the nurse's educational preparation, experience, knowledge, and physical and emotional ability;

(U) Supervise nursing care provided by others for whom the nurse is professionally responsible; and

(V) Ensure the verification of current Texas licensure or other Compact State licensure privilege and credentials of personnel for whom the nurse is administratively responsible, when acting in the role of nurse administrator.

(2) Standards Specific to Vocational Nurses. The licensed vocational nurse practice is a directed scope of nursing practice under the supervision of a registered nurse, advanced practice registered nurse, physician's assistant, physician, podiatrist, or dentist. Supervision is the process of directing, guiding, and influencing the outcome of an individual's performance of an activity. The licensed vocational nurse shall assist in the determination of predictable healthcare needs of clients within healthcare settings and:

(A) Shall utilize a systematic approach to provide individualized, goal-directed nursing care by:

(i) collecting data and performing focused nursing assessments;

(ii) participating in the planning of nursing care needs for clients;

(iii) participating in the development and modification of the comprehensive nursing care plan for assigned clients;

(iv) implementing appropriate aspects of care within the LVN's scope of practice; and

(v) assisting in the evaluation of the client's responses to nursing interventions and the identification of client needs;

(B) Shall assign specific tasks, activities and functions to unlicensed personnel commensurate with the educational preparation, experience, knowledge, and physical and emotional ability of the person to whom the assignments are made and shall maintain appropriate supervision of unlicensed personnel.

(C) May perform other acts that require education and training as prescribed by board rules and policies, commensurate with the licensed vocational nurse's experience, continuing education, and demonstrated licensed vocational nurse competencies.

(3) Standards Specific to Registered Nurses. The registered nurse shall assist in the determination of healthcare needs of clients and shall:

(A) Utilize a systematic approach to provide individualized, goal-directed, nursing care by:

(i) performing comprehensive nursing assessments regarding the health status of the client;

(ii) making nursing diagnoses that serve as the basis for the strategy of care;

(iii) developing a plan of care based on the assessment and nursing diagnosis;

(iv) implementing nursing care; and

(v) evaluating the client's responses to nursing interventions;

(B) Delegate tasks to unlicensed personnel in compliance with Chapter 224 of this title, relating to clients with acute conditions or in acute are environments, and Chapter 225 of this title, relating to independent living environments for clients with stable and predictable conditions.

(4) Standards Specific to Registered Nurses with Advanced Practice Authorization. Standards for a specific role and specialty of advanced practice nurse supersede standards for registered nurses where conflict between the standards, if any, exist. In addition to paragraphs (1) and (3) of this subsection, a registered nurse who holds authorization to practice as an advanced practice nurse (APN) shall:

(A) Practice in an advanced nursing practice role and specialty in accordance with authorization granted under Board Rule Chapter 221 of this title (relating to practicing in an APN role; 22 TAC Chapter 221) and standards set out in that chapter.

(B) Prescribe medications in accordance with prescriptive authority granted under Board Rule Chapter 222 of this title (relating to APNs prescribing; 22 TAC Chapter 222) and standards set out in that chapter and in compliance with state and federal laws and regulations relating to prescription of dangerous drugs and controlled substances.

**Credits**

**Source:** The provisions of this § 217.11 adopted to be effective September 28, 2004, 29 TexReg 9192; amended to be effective November 15, 2007, 32 TexReg 8165.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 19, 2015

22 TAC § 217.11, 22 TX ADC § 217.11

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
        Title 4. Liability in Tort
            Chapter 74. Medical Liability (Refs & Annos)
                Subchapter H. Procedural Provisions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 74.351

§ 74.351. Expert Report

Effective: September 1, 2013
Currentness

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

(d) to (h) [Subsections (d)-(h) reserved]

(i) Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

(j) Nothing in this section shall be construed to require the serving of an expert report regarding any issue other than an issue relating to liability or causation.

(k) Subject to Subsection (t), an expert report served under this section:

(1) is not admissible in evidence by any party;

(2) shall not be used in a deposition, trial, or other proceeding; and

(3) shall not be referred to by any party during the course of the action for any purpose.

(*l*) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

(m) to (q) [Subsections (m)-(q) reserved]

(r) In this section:

(1) "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

(2) "Claim" means a health care liability claim.

(3) [reserved]

(4) "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

(5) "Expert" means:

(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

(B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

(C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

(D) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence; or

(E) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

(s) Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:

(1) written discovery as defined in Rule 192.7, Texas Rules of Civil Procedure;

(2) depositions on written questions under Rule 200, Texas Rules of Civil Procedure; and

(3) discovery from nonparties under Rule 205, Texas Rules of Civil Procedure.

(t) If an expert report is used by the claimant in the course of the action for any purpose other than to meet the service requirement of Subsection (a), the restrictions imposed by Subsection (k) on use of the expert report by any party are waived.

(u) Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a).

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003. Amended by Acts 2005, 79th Leg., ch. 635, § 1, eff. Sept. 1, 2005; Acts 2013, 83rd Leg., ch. 870 (H.B. 658), § 2, eff. Sept. 1, 2013.

Notes of Decisions (1880)

V. T. C. A., Civil Practice & Remedies Code § 74.351, TX CIV PRAC & REM § 74.351

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 4. Liability in Tort
      Chapter 74. Medical Liability (Refs & Annos)
        Subchapter I. Expert Witnesses (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 74.402

§ 74.402. Qualifications of Expert Witness in Suit Against Health Care Provider

Effective: September 1, 2003
Currentness

(a) For purposes of this section, "practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

(d) The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the defendant health care provider departed from accepted standards of health care but may depart from those criteria if, under the circumstances, the court determines that there is good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

(e) This section does not prevent a health care provider who is a defendant, or an employee of the defendant health care provider, from qualifying as an expert.

(f) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003.

Notes of Decisions (82)

V. T. C. A., Civil Practice & Remedies Code § 74.402, TX CIV PRAC & REM § 74.402
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.